UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-CV-80425-COHN/SELTZER

DONTRELL STEPHENS,

     Plaintiff,

v.

RIC BRADSHAW, in his capacity as Sheriff
of Palm Beach County, Florida,[1]
and DEPUTY SHERIFF ADAMS LIN,
individually,

     Defendants.

_____/

## SECOND AMENDED COMPLAINT AND JURY TRIAL DEMAND

    Plaintiff, DONTRELL STEPHENS ("STEPHENS"), sues RIC BRADSHAW,

individually, and in his official capacity as the Sheriff of Palm Beach County ("BRADSHAW"),

and DEPUTY SHERIFF ADAMS LIN, individually ("LIN"), and states as follows:

### Introduction

    1.    This case involves another in a long line of unjustified police shootings by

officers of the PALM BEACH COUNTY SHERIFF'S OFFICE ("PBSO").  Acting consistent

with PBSO policies, procedures, customs, and practices of condoning aggressive police tactics,

failing to identify, train, discipline, or otherwise properly supervise officers who have engaged in

excessive and unjustified use of force, and ratifying "officer involved shootings" with little or no

investigation, LIN repeatedly shot STEPHENS, an unarmed 20-year-old young man who had

neither disobeyed any lawful order nor posed any threat to the officer.  True to form,

---

[1] BRADSHAW is being named pursuant to, and in reliance upon, the parties' written stipulation that
"'Palm Beach County Sheriff's Office' is not sui juris and is not subject to suit.  For claims against such
office, the appropriate defendant is the Sheriff, Ric Bradshaw, in his official capacity."

BRADSHAW and PBSO approved LIN's conduct, which has left STEPHENS a paraplegic who will spend the rest of his life confined to a wheelchair.

## Jurisdiction and Venue

2.      STEPHENS seeks damages for both state law and federal law claims.

3.      Venue is proper in Palm Beach County, Florida, because (a) the conduct from which the claims arise occurred in Palm Beach County, and (b) Defendants have offices, work, and/or reside in Palm Beach County.  Moreover, Defendants have already admitted that venue is proper.

4.      On or about November 4, 2013, STEPHENS provided written notice of his claim, via certified mail, and pursuant to section 768.28 of the Florida Statutes, to Sheriff Ric Bradshaw, PBSO, the Palm Beach County Board of County Commissioners, and the Florida Department of Financial Service.  Copies of the letter and green cards are attached as Composite Exhibit A.  The Department of Financial Services or the appropriate agency failed to make final disposition of the claim within 6 months, which is deemed a final denial of the claim.

## Parties

5.      STEPHENS is an African-American male who, at all materials times, has resided in Palm Beach County, Florida.

6.      Since January 2005, BRADSHAW has been the Sheriff of Palm Beach County, Florida.  BRADSHAW is the final policymaking authority in matters of law enforcement in Palm Beach County.  He is responsible, among other things, for hiring, training, and supervising PBSO Deputy Sheriffs, and for establishing, enforcing, and, if necessary, revising the policies, procedures, customs, and practices of PBSO.

7.     Defendant LIN is employed as a Deputy Sheriff with PBSO.  He works under the supervision and control of BRADSHAW.

## Background Allegations

*Community Policing: A Change in Attitude*

8.     In his "Message from the Sheriff" on the PBSO website, BRADSHAW states that "one of my goals is to implement a strong Community Policing effort throughout the county." PBSO has, in fact, established 34 Community Policing units in Palm Beach County.

9.     The PBSO website describes the "Community Policing philosophy" as "a partnership between the citizens, other agencies, and the Sheriff's Office."  In its early days, "Community Policing" was symbolized by PBSO Deputy Sheriffs on bikes, in shorts, interacting with the public in a more friendly and less hostile environment.  In recent years, however, the reality of "community policing" has shifted from cooperation to confrontation.  Members of the community are seen, not as partners, but as subjects who must succumb to the officer's "command presence."   Officers take an unyielding, aggressive, "zero tolerance" approach to patrolling Community Policing districts.

10.     This change in attitude is perhaps best illustrated by how LIN dresses, and is equipped, as a PBSO Community Policing officer: olive green military-style pants, a heavy ballistic vest covering his upper body, criss-crossing bandoliers, shotgun shells, a Taser, a full gun belt, and a Glock semi-automatic weapon with 15 rounds in the magazine and one in the chamber, four more 15-round magazines on his belt (for a total of 76 rounds on his body).

11.     LIN's combat-ready, aggressive appearance conformed with departmental policy which condoned the intimidation of private citizens without regard to the absence of probable

cause or reasonable suspicion that individuals being confronted were engaged in criminal activity.

*The Use of Force: A Pattern of Abuse*

12.    PBSO Deputy Sheriffs have increasingly, and alarmingly, used deadly and excessive force in situations where the use of such force was entirely unjustified and where the conduct of the officers created dangers that would otherwise have not existed and contributed to the claimed need to use force.  This conduct includes initiating "stop and frisk" encounters without reasonable suspicion (particularly in areas targeted as "high crime" and populated by minorities), using a level of force not called for under the circumstances, and escalating force without a reasonable basis.

13.    There has specifically been an increasing and alarming number of "officer involved shootings" in which PBSO Deputy Sheriffs have shot members of the public.  Between January 2005, when BRADSHAW became Sheriff, and October 2010, PBSO officers shot 31 people, killing 16.  Among the shootings that occurred during this time period:

    *  In 2005, a group of deputies opened fire on John Garczynski, 37, a suicidal energy trader with a gun to his head, after a deputy's stumble startled other officers;

    * In 2006, Chester Washington was shot and killed by a Deputy Sheriff near Jupiter after being stunned by a Taser and appearing to reach into his pants. Deputies later learned that he was carrying a pocket knife but no gun.

    * In 2007, an unarmed 21-year-old, Andy Jackson II, was shot in the head by a Deputy Sheriff who claimed that Mr. Jackson lowered his hands toward his waistband as if reaching for a weapon.  Mr. Jackson fell into a coma and was placed on life support, but he was able to survive the shooting, suffering permanent partial memory loss and loss of full use of his dominant hand.

    * In 2008, deputies followed a car into a parking lot at night.  After the car appeared to accidentally bump into the police vehicle, causing no damage, a Deputy Sheriff shot and killed the unarmed driver, Ruben DeBrosse, 16.  He later claimed to be in fear that DeBrosse was trying to run him over.

4

* In 2008, Adam Phillips, a drug addict with no history of violence, who was scheduled to enter a rehabilitation facility in three weeks, stole his mother's car. The car's engine failed on Federal Highway in Boynton Beach. A team of Deputy Sheriffs came to the scene and surrounded the car, ordering Mr. Phillips to get out. He did not get out, but he also had taken no threatening action, and was not armed, when a Deputy Sheriff shot him dead. PBSO conducted no formal investigation, then found that the officer involved committed no wrongdoing.

* In 2010, a Deputy Sheriff shot and wounded a mentally impaired teenager who allegedly lunged his vehicle toward the deputy.

14.     Of these 31 shootings, 30 were found by PBSO to be justified, often following little or no investigation.

15.     In October 2010, the Palm Beach Post published a lengthy article about the rash of police shootings and the lack of thorough investigations. Through this public reporting, BRADSHAW was placed on notice of numerous deficiencies in PBSO's approach to the use of force, particularly officer involved shootings. A number of unjustified shootings also led to lawsuits, resulting in the payment of awards or settlements, which further served to put BRADSHAW on notice of the need for better policies, procedures, customs, and practices.

16.     Nonetheless, the pattern of abuse continued. In 2012, PBSO officers were involved in eight shootings, six of them fatal. Among those who were killed:

* Michael Camberdella, an 18-year-old bipolar boy who was involved in a domestic incident with his mother. When police arrived, the boy was standing in front of his home, holding a hammer and hedge shears. The Deputy Sheriff claimed that Mr. Camberdella, who had no criminal history, ignored commands to get on the ground and started walking toward him. The boy's family was left to wonder why the officer did not use his taser before firing the fatal shots.

* Victor Arango was shot and killed by a PBSO Deputy Sheriff outside a suburban Boynton Beach bar. Mr. Arango reportedly was trying to break up a fight involving his girlfriend. The deputy claimed that Mr. Arango began fighting with another deputy and reached for a gun in his waistband. But claims of the threat posed by Mr. Arango were belied by the fact that he had broken his left hand just days before the shooting and was still wearing a cast. Moreover,

witnesses – including a rookie deputy – said the Deputy Sheriff disarmed Mr. Arango and then opened fire.

* Seth Adams, who found a PBSO Deputy Sheriff in his driveway, ordered the officer off his property, and became involved in a confrontation. Claiming that he feared that Adams was reaching for a weapon, the Deputy Sheriff shot Adams four times: twice in the head, once in the abdomen, and once in the forearm. Adams, who was unarmed, died at age 24.

17.     In 2013, PBSO officers were again involved in eight shootings, four of them fatal and one (the shooting of STEPHENS) resulting in paralysis.

18.     In the first four months of 2014, PBSO officers have been involved in four shootings, three of them fatal, all of them deemed justified.   Among them:

* In February 2014, Anesson Joseph was naked in the street when he ran toward PBSO officers and was shot three times, killing him.

* In March 2014, Anthony Ribeiro was arguing with a Deputy Sheriff while holding a wine glass.  When he raised the glass, the Deputy Sheriff, claiming to be in fear for his safety, shot Mr. Ribeiro at least three times.  As of this filing, Mr. Ribeiro remains in the hospital nearly two month later, having suffered injuries to his lungs, hands, abdomen and leg.  Mr. Ribeiro is listed in critical condition and is said by family to be hanging on to life "by a thread."  He was recently charged with aggravated assault with a deadly weapon for raising the wine glass.

* In April 2014, Matt Pollow suffering from mental health issues and having run out of his medication, called 911 "looking for help."  A short time later, Pollow allegedly lunged at a Deputy Sheriff with a screwdriver.  The officer thought it was a knife and shot Pollow dead.

19.     The trend of increased use of force shows no sign of letting up.  BRADSHAW is on notice of this trend but has not acted to stop it.  PBSO has created a Post-Critical Incident Assessment Team to meet, discuss, and evaluate shootings.  But the team is directed to produce no formal reports and draw no official conclusions.  It is thus, by design, incapable of determining whether an officer involved in a shooting is in need of training, discipline, or other

6

remedial action.  Moreover, PBSO's training division does not conduct formal reviews of officer involved shootings.

20.     BRADSHAW routinely makes public statements, shortly after an officer involved shooting, justifying and/or defending the shooter's actions.  For example, BRADSHAW made public statements of support for the Deputy Sheriffs involved in the DeBrosse, Camberdella, Arango, Adams, and Joseph shootings described above, and a PBSO spokesman acting on BRADSHAW's behalf made public statements of support for the Deputy Sheriff involved in the Phillips shooting.  These statements send the message to PBSO officers that the use of deadly force is condoned without any serious review of or regard for justification and will not result in any adverse consequences.  This message is strongly reinforced when PBSO declares a shooting "justified" with little or no investigation, a formal ratification of the officer conduct.

21.     Indeed, PBSO routinely performs cursory investigations of incidents involving the questionable use of deadly and excessive force on the part of Deputy Sheriffs, with an eye toward exonerating the officers rather than finding the truth.  Investigating officers and supervisors uncritically endorse officers' versions of events, even when those versions are incomplete, inconsistent, and contradicted by objective evidence.  As a result, incidents involving the questionable use of force are not properly and impartially investigated, documented, or addressed with corrective measures where warranted.

22.     The use of practical and available technology to document facts surrounding the questionable use of force (such as lapel video cameras) has been ignored in an apparent effort to perpetuate the ability to endorse officers' versions of events without the need to confront conflicting documentary evidence.

23.     Due to this intentionally inadequate investigative process, in virtually all officer involved shootings, PBSO has declared the conduct of the officer who pulled the trigger to be "justified."  As the Palm Beach Post noted in an article published on January 11, 2013: "It's been years since either the sheriff's office or prosecutors have deemed any police shooting in Palm Beach County unjustified."

24.     The consistent lack of accountability within PBSO for the questionable and often unjustifiable use of deadly and excessive force evinces a reckless disregard for the constitutionally required constraints on the use of such force by PBSO officers.  It has, in turn, promoted an acceptance of disproportionate, aggressive, and unconstitutional behavior towards ordinary citizens.  The resulting culture of aggression both promotes and condones intimidating and harsh approaches toward the citizenry, with the excessive use of force as a frequent and foreseeable outcome.

25.     Problems created by the failure to properly investigate officer involved shootings and other uses of force, or to take appropriate disciplinary action, are only exacerbated by the failure to train, or re-train, officers involved in use of force incidents.

26.     Less than five months before the STEPHENS shooting, BRADSHAW wrote, in an article entitled "Well-Trained Officers Are Crucial to PBSO's Mission," that "every time we have a serious incident, our training staff reviews the outcome and determines whether we need to change policies or response. The same goes for all use-of-force incidents, no matter how small. We learn from every incident."

27.     Yet, as noted above, PBSO's training division does not conduct formal reviews of officer involved shootings.  When officer conduct is approved through a formal finding of justification, no additional training is required.

8

28.     The failure of BRADSHAW to competently investigate use of force incidents, and to institute appropriate disciplinary and retraining action in the wake of them, serves to tacitly condone the egregious misconduct of the deputies involved.  The agency's inaction in this regard effectively annuls its official general orders regarding the use of force and substitutes in their place a permissive de facto custom and practice of tolerating excessive force, which will invariably have the effect of promoting similar misconduct by other deputies in the future.  In sum, the pattern and practice of the excessive use of force on the part of PBSO officers stems from systemic deficiencies in training and supervision and from the inadequate investigation and routine ratification of the use of deadly and excessive force.

*Deputy Lin: An Escalation in Violence*

29.     LIN was hired by PBSO in 2004.  He worked as a PBSO Deputy Sheriff until late 2007, when he was called up for active military duty.

30.     LIN served in Afghanistan for 10 months.  He was a sergeant with the military police assigned to Kandahar and Bagram.  He watched the flag-draped coffins of fallen U.S. soldiers marched into the air base on their way home, then had to guard the enemy detainees accused of killing them.

31.     Prisoners held in Afghanistan, who included Taliban, spit at LIN.  He has reported that the desperation of the civilians was shocking.  They sent their children into minefields so they could be admitted to U.S. military hospitals and treated for other ailments.

32.     In describing his time spent serving in an area of physical beauty, LIN commented that, "If it weren't for the mines and the people trying to kill you, that is a damn nice country."

33.     Between January 2007 and January 2009, eight PBSO Deputy Sheriffs were called to active military service.

34.     The impact of military service is profoundly stressful, and the transition back to civilian life can often be difficult.

35.     PBSO has a responsibility to the community to identify and assist deputies who display symptoms of stress.

36.     Notwithstanding its experience with returning soldiers, and the length and nature of LIN's service in Afghanistan, PBSO conducted no psychological evaluation of LIN as part of his return to law enforcement work in late 2008.  Indeed, PBSO did nothing at all to determine whether LIN was suffering from any type of post-traumatic stress disorder.

37.     Since his return from Afghanistan, LIN has been involved in an increasing and disturbing number of incidents involving the use of force and the harassment of citizens, all reflecting a more aggressive, forceful approach to policing.

38.     LIN's Internal Affairs file contains numerous use of force reports, citizen complaints, and "incident reviews."  Among the incidents described in LIN's file are (i) an allegation that he conducted an illegal "stop and frisk" on a woman walking along the sidewalk by claiming that she was obstructing traffic, (ii) an allegation that he used excessive force, and used the N-word, while effecting the arrest of an African-American man, and (iii) an incident in which LIN fired his Taser at a man because of a perceived threat, LIN created a written report stating that he gave the man multiple commands to drop a rock in his right hand before deploying the Taser, the Taser-mounted video showed that LIN said "drop the rock" just one time, less than one second before firing the Taser, and LIN admitted to the discrepancies between his written report and the video but claimed that he was still justified in deploying the

Taser.  On those occasions, as on all occasions when LIN's interaction with the public has been evaluated by a PBSO supervisor, LIN's conduct was determined to be reasonable, justified, and/or consistent with PBSO policy.  LIN was therefore not subject to any discipline or mandated training.

39.     In ostensible fulfillment of its responsibility to the community to identify and assist deputies who display symptoms of job stress or performance-related issues, and with a goal of timely detecting problematic behaviors, PBSO has established an "Early Intervention System" or EIS.  The Early Intervention System, among other things, flags officers involved in five use of force incidents within a 12-month period, or five "incident reviews" within the last twenty-four months.  The system is supposed to identify officers who may be in need of further training, increased supervision, or other remedial action.

40.     On six separate occasions since May 2011, the PBSO Early Intervention System flagged LIN for having five or more use of force incidents in the preceding twelve months.  On two occasions since March 2013, the Early Intervention System flagged LIN for having five or more incident reviews in the preceding twenty-four months.

41.     None of the Early Intervention System alerts, however, led to any additional training for LIN or any other disciplinary action.  To the contrary, on the two occasions when PBSO supervisors wrote formal memoranda about LIN's use of force alerts, they reiterated that LIN's use of force was and justified "and conforms to existing General Orders."  Moreover, on both occasions, the "analysis" of LIN's need for assistance consisted of nothing more than asking LIN himself whether he had any problems that would affect his performance and whether he needed any assistance from the Employee Assistance Program -- which, not surprisingly, LIN answered in the negative.

42.   BRADSHAW was on notice of problems with LIN's behavior, yet, by the actions of PBSO supervisors working pursuant to his direction and control, repeatedly ratified (and even re-ratified) LIN's increasingly aggressive and confrontational conduct.

43.   Not only has PBSO failed to discipline LIN, or even recommend further training as a result of Early Intervention System alerts, but it named LIN "PBSO Community Policing Deputy of the Year for 2010/2011," thus holding him up as an example of how its Community Policing officers should behave.  It has also allowed him to teach at the police academy.

*The Shooting of Dontrell Stephens: An Unprovoked and Unnecessary Tragedy*

44.   On the morning of September 13, 2013, LIN put on his military-style, combat-ready dress and equipment, as described in paragraph 10 above, and headed to work in District 3 as a Community Policing officer.

45.   LIN parked his police vehicle on the single westbound lane of Vilma Lane, facing toward Haverhill Road, supposedly for the purpose of "observing traffic patterns and activity in a school zone."  His vehicle was positioned in a way that it would obstruct any traffic heading west on Vilma Lane.  LIN states that he was watching a bus stop located at the intersection of Norma Elaine Road and Haverhill Road.

46.   At approximately 8:20 a.m., STEPHENS was riding a bicycle west-to-east across Haverhill Road and onto Norma Elaine Road.

47.   LIN decided to stop and detain STEPHENS for an unspecified traffic infraction (which he did not call in to dispatch), later claiming that STEPHENS had impeded southbound traffic on Haverhill Road.  LIN has also acknowledged, however, that STEPHENS' unfamiliarity to him was a factor in this decision.

48.     The stop was pretextual, lacked probable cause, and even lacked reasonable suspicion to believe that STEPHENS had engaged in or was engaging in any violation of the law.

49.     LIN stopped STEPHENS, not because of any activity in which he was engaged, but because he was an unfamiliar black face passing through the Community Policing area over which LIN, consistent with new attitudes in Community Policing, showed zero tolerance and exercised command presence.  He stopped STEPHENS in order to engage in an unwarranted and illegal "stop and frisk."

50.     LIN approached STEPHENS from behind, as STEPHENS rode his bike west on Norma Elaine Road.

51.     When LIN hit his blue lights, the dashcam was automatically activated (and captured footage extending back 30 seconds).

52.     The dashcam video clearly shows STEPHENS holding a cell phone in his right hand as he stepped off the bike.

53.     As STEPHENS got off his bike, he crossed in front of a parked Mazda sedan. LIN stopped his car and walked around the other side of the Mazda, approaching STEPHENS.

54.     Upon stopping STEPHENS, LIN claims to have instructed him, loudly and repeatedly, to show his hands.  But the dashcam video contradicts this claim.

55.     Roughly four seconds after he got out of his police vehicle, and less than one minute after he first decided to stop STEPHENS, LIN fired four shots into STEPHENS, who fell to the ground.

56.     STEPHENS was shot suddenly, without warning, and without any reasonable justification.  He did not evade arrest, flee the scene, or refuse to comply with any orders given

to him by LIN.  At no time did STEPHENS strike, attempt to strike, or pose a threat of any injury of any kind to LIN.  Prior to and during the stop, STEPHENS had a clearly visible cell phone in his hand.  He was unarmed and possessed nothing resembling a weapon of any kind.

57.     LIN claimed that, during the four seconds before he was shot, STEPHENS refused to comply with orders, gave what LIN described as a "thousand mile stare," turned sideways in a manner suggesting preparation to fire a weapon, and reached his left hand toward his waistband.  These claims are false and, again, contradicted by the dashcam video.

58.     The first Deputy Sheriff to arrive at the scene, after speaking to LIN very briefly, and without any real investigation of the incident, said "I got your back, you know that," and "you had to shoot," reflecting a policy and procedure of reflexively defending and justifying officer involved shootings.

59.     During the PBSO "investigation" that followed, the lead investigator asked LIN leading questions in a manner clearly intended to prompt LIN to say things that would support a finding that the shooting was justified.

60.     PBSO documented the scene, took witness statements, and reviewed the dashcam video from LIN's police vehicle, then concluded that the shooting of STEPHENS was justified. In short, PBSO ratified LIN's decision to use deadly force and the basis for it.

61.     PBSO initially reported the incident as a violation of Florida Statute 784.07 (assault on a law enforcement officer) in which the *victim* was LIN.  PBSO ultimately charged STEPHENS with a drug offense and the crime of refusal to obey a lawful order.

62.     Following the shooting, STEPHENS was transported to St. Mary's Hospital in West Palm Beach, where he was admitted for approximately 140 days and received acute care for paraplegia caused by a gunshot wound to his chest.  His injuries are permanent and severe.

63.     All conditions precedent to suit have been performed, have occurred, or are excused.

### COUNT I: 42 U.S.C. §1983 VIOLATION OF PLAINTIFF'S CIVIL RIGHTS (LIN)

64.     Plaintiff realleges paragraphs 1 through 63.

65.     LIN's actions on the morning of September 13, 2013, occurred within the scope of his employment with PBSO and under color of state law.

66.     LIN knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that there was no reason to stop or arrest STEPHENS, as there was no probable cause or reasonable suspicion to believe he was committing a crime at any time while he was observed by LIN.

67.     LIN had a legal duty to use only that amount or degree of force against STEPHENS as was reasonable and necessary under the circumstances.  Pursuant to the written policies of PBSO, national police standards, and federal and state constitutional law, a police officer cannot use "excessive force," often defined as a level of force inappropriate to the circumstances, against members of the public.

68.     On September 13, 2013, LIN used an excessive and unnecessary amount of force against STEPHENS, which was objectively unreasonable in light of the facts and circumstances confronting LIN and did not involve a rapidly evolving situation other than that created by LIN, particularly considering that (a) he lacked reasonable suspicion or probable cause, (b) the alleged violation was a traffic infraction not even involving an accident, (c) STEPHENS posed no immediate threat to the safety of LIN or any other person; and (d) STEPHENS was not actively resisting arrest or attempting to evade arrest by flight.

69.     LIN knew or should have known, and every reasonable officer in that position would have concluded, that the force he used against STEPHENS was unlawful.

70.     LIN violated STEPHENS' constitutional rights to be secure in his person, free from unreasonable seizure and from the use of excessive force.

71.     These violations were of a type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established.

72.     LIN acted knowingly, intentionally, and maliciously, and/or with a reckless or callous indifference to the federally protected rights of STEPHENS.

73.     As a direct and proximate result of LIN's violation of STEPHENS' civil rights, STEPHENS has suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future.

74.     Plaintiff has retained the undersigned attorneys to prosecute this action on his behalf and has agreed to pay them a reasonable fee and to reimburse the costs of this action.

WHEREFORE, Plaintiff demands judgment against LIN for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

**COUNT II: 42 U.S.C. § 1983 DEPRIVATION OF PLAINTIFF'S CIVIL RIGHTS (BRADSHAW)**

75.     Plaintiff realleges paragraphs 1 through 74.

16

76.     At all material times, BRADSHAW was responsible for PBSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

77.     At all times material hereto, BRADSHAW was charged with the responsibility of adopting and implementing rules, policies, practices, customs, and procedures for the proper and efficient maintenance, supervision, and control of PBSO Deputy Sheriffs.  These duties include, but are not limited to:

(a)     To create, adopt, and implement rules, regulations, practices, and procedures, toward hiring, supervising, and retaining law enforcement officers who do not have a propensity towards violence and the excessive use of force;

(b)     To create, adopt, and implement rules and regulations, practices and procedures, for proper and efficient training of law enforcement officers in a way and to an extent necessary to ensure the utilization of a force continuum which prevents any propensity towards violence and excessive force, and which ensures that the least amount of force would be utilized to maintain order and control;

(c)     To create, adopt, and implement rules and regulations, practices and procedures for proper community policing, ensuring elimination of improper "stop and frisk" tactics without reasonable suspicion and probable cause, particularly when such tactics are disproportionately directed at African-American males;

(d)     To create, adopt, and implement rules and regulations, practices, and procedures for the proper and efficient supervision, control, discipline, and assignment of law enforcement officers in a way and to an extent necessary to ensure that citizens will not be subjected to excessive force or unnecessary force by the agents and employees of the PBSO; and

(e)     To implement rules, regulations, policies, practices, and procedures for the proper and efficient supervision, discipline, control, and investigation of law enforcement officers to reduce or eliminate instances of untruthfulness, including excessive force and instances of corroboration or ratification of untruthful accounts of excessive force events committed by fellow law enforcement officers.

78.     BRADSHAW owed a legal duty to STEPHENS to exercise reasonable care in hiring, training, and retaining safe and competent employees.  STEPHENS was in the zone of

risk that was reasonably foreseeable to BRADSHAW.  BRADSHAW breached that duty and the breach caused STEPHENS' damages.

79.     In addition, BRADSHAW, with deliberate indifference to the possibility of STEPHENS' injuries, has encouraged the well-settled policy, practice, and custom of using "stop and frisk" tactics, absent any reasonable suspicion or probable cause to believe that these individuals have committed a criminal act, in any area deemed to be "high crime."  This invariably involves, in particular and in disproportionate number, African-American males such as STEPHENS, thereby resulting in Deputy Sheriffs, such as LIN, engaging in the unwarranted use of "stop and frisk" tactics.  Despite knowing of the unconstitutional behavior and the need to take corrective action, BRADSHAW has failed to do so.

80.     BRADSHAW has also, with deliberate indifference as to the possibility of STEPHENS' injuries, failed to adequately train or otherwise supervise and direct PBSO and its Deputy Sheriffs concerning the rights of the citizens they encounter in their duties, such that it is a well-settled policy, practice, and custom for Deputy Sheriffs, including LIN, to take extreme and reckless actions against the citizens of Palm Beach County they encounter, including STEPHENS, all in the name of self-defense, resulting in "trigger happy" Deputy Sheriffs killing and/or seriously injuring innocent citizens.

81.     BRADSHAW was on notice, by this history of widespread abuse, of the need to correct the well-settled policy, practice, and custom of his Deputy Sheriffs' extreme and reckless actions against the citizens of Palm Beach County.  This need for more or different training has been so obvious and the inadequacy of same, combined with BRADSHAW's conscious choice not to act, has resulted in the violation of constitutional rights, including, but not limited to the deprivation of STEPHENS' civil rights.

82.     In further disregard of the citizens of Palm Beach County, BRADSHAW has, with deliberate indifference, either failed to direct, failed to otherwise fully require, or has sought to limit, PBSO and others in the proper investigation of the extreme and wanton acts of his Deputy Sheriffs, such that it is the well-settled policy, practice, and custom of PBSO to limit internal investigations, with few or no serious questions ever raised as to a Deputy Sheriff's decision to use excessive force and/or deadly force.  Despite knowing of this behavior and the need to take corrective action, BRADSHAW has declined to do so.

83.     By limiting and/or failing to properly investigate, resulting in findings of no excessive force and the justification for Deputy Sheriffs' extreme actions, by encouraging the well-settled policy, practice, and custom of using "stop and frisk" tactics, absent any reasonable suspicion or probable cause to believe that these individuals have committed a criminal act, and through allowing the well-settled policy, practice, and custom of Deputy Sheriffs' extreme and reckless actions against the citizens of Palm Beach County, BRADSHAW has ratified, condoned, and consented to Deputy Sheriffs' unlawful conduct, specifically including the unlawful conduct of LIN as to STEPHENS.  The ratification, condoning of, and consenting to, prior unlawful conduct of other Deputy Sheriffs served as an inducement to LIN to violate STEPHENS' civil rights, and the ratification, condoning of, and consenting to the violation of STEPHENS' civil rights confirmed that LIN's conduct conformed with BRADSHAW's policy, practice, and procedure.

84.     BRADSHAW was on notice of the history of failing to properly investigate (and thus address and correct) the extreme and wanton acts of his Deputy Sheriffs and failed to do so, leading to STEPHENS' deprivation of civil rights.  The deprivation of civil rights, of which the circumstances described herein were a material part, together constituted a widespread pattern

19

sufficient to notify BRADSHAW and were obvious, flagrant, rampant, and of continued duration rather than isolated occurrences.

85.     As described more fully above, LIN has a history of reports of excessive use of force incidents causing injuries and violations of citizens' rights, of which BRADSHAW was aware.  LIN was not counseled on correction of such excessive use of force causing injuries by his supervisors, including BRADSHAW.  BRADSHAW knew or should have known LIN had a propensity for misconduct, including excessive use of force against members of the public. Instead, BRADSHAW ratified and condoned LIN's unlawful behavior, which was a moving force and/or proximate cause of injuries to STEPHENS.

86.     The actions committed by LIN against STEPHENS were proximately caused by the well-settled policies, customs, practices, and procedures of BRADSHAW in failing to fulfill his duties as alleged herein, which was also the moving force behind STEPHENS having his civil rights violated.

87.     In addition to the well-settled policies, customs, practices, and procedures referenced above, BRADSHAW was grossly negligent, reckless, or deliberately indifferent to the health, safety, and welfare of STEPHENS, in that BRADSHAW expressly acknowledged and assented to the failure to properly train, supervise, control, conduct proper investigation into prior excessive behavior, screen and review for continued employment, the person and conduct of LIN.  As a result, BRADSHAW knew or had reason to know that LIN would act unlawfully and he failed to stop LIN's actions, resulting in the violation of STEPHENS' civil rights.

88.     The above-described well-settled customs and policies demonstrate a deliberate indifference on the part of BRADSHAW, as the policymaker of PBSO, to the constitutional rights of persons within Palm Beach County, and were a moving force or proximate cause of

violations of STEPHENS' rights alleged herein.  Despite knowing of the unconstitutional behavior and the need to take corrective action, BRADSHAW has declined to do so.

89.     As a direct and proximate result of BRADSHAW's actions and inactions, under color of state law, and in violation of 42 U.S.C. § 1983, STEPHENS was deprived of his constitutional rights to be secure in his person, free from unreasonable seizure and from the use of excessive force.

90.     As a direct and proximate result of the violation of STEPHENS' civil rights, STEPHENS has suffered damages, including mental anguish, bodily injury, pain and suffering, disability, disfigurement, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems appropriate.

## COUNT III: BATTERY
## (BRADSHAW)

91.     Plaintiff realleges paragraphs 1 through 63.

92.     STEPHENS suffered a harmful and offensive contact when he was shot by LIN.

93.     LIN was acting in the scope of his employment.

94.     LIN acted intentionally but not in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

95.     Pursuant to Florida Statute 768.28(9), BRADSHAW is vicariously liable, but LIN is not personally liable, for LIN's battery.

96.     As a direct and proximate result of LIN's battery, STEPHENS has suffered damages, including bodily injury, pain and suffering, disability, disfigurement, mental anguish, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future.

WHEREFORE, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

## COUNT IV: BATTERY
### (LIN)

97.     Plaintiff realleges paragraphs 1 through 63.

98.     STEPHENS suffered a harmful and offensive contact when he was shot by LIN.

99.     LIN was acting in the scope of his employment.

100.    LIN acted intentionally, in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

101.    As a direct and proximate result of LIN's battery, STEPHENS has suffered damages, including bodily injury, pain and suffering, disability, disfigurement, mental anguish, emotional distress, humiliation, embarrassment, loss of capacity of the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future.

22

WHEREFORE, Plaintiff demands judgment against LIN for compensatory damages, punitive damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT V: NEGLIGENT USE OF FIREARM**
**(BRADSHAW)**

102.    Plaintiff realleges paragraphs 1 through 63.

103.    LIN's conduct of stopping and approaching STEPHENS created a foreseeable zone of risk.  LIN owed a duty to all within the zone, including STEPHENS, to act with reasonable care to lessen the risk or see that sufficient precautions were taken to protect others from the harm that the risk imposes.

104.    LIN breached his duty of care to STEPHENS by virtue of LIN's negligent handling of a firearm and his negligent decision to use a firearm as to STEPHENS.

105.    Pursuant to Florida Statute 768.28(9), BRADSHAW is vicariously liable, but LIN is not personally liable, for LIN's negligence.

106.     As a direct and proximate result of LIN's negligence, STEPHENS has suffered grievously, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, expensive hospitalization, and medical care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future

WHEREFORE, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

**COUNT VI: NEGLIGENT SUPERVISION, RETENTION, AND TRAINING**
**(BRADSHAW)**

107.    Plaintiff realleges paragraphs 1 through 63.

108.    BRADSHAW owes a legal duty to supervise PBSO Deputy Sheriffs, retain only those fit for duty, and provide necessary and appropriate discipline, training, and retraining.

109.    During the course of LIN's employment, BRADSHAW became aware or should have become aware of problems with LIN that indicated his unfitness, specifically his propensity for violating citizens' civil rights and using excessive force, which increased after his return from military duty.

110.    BRADSHAW failed to take further action, such as a psychological evaluation or other screening following his military duty, thorough investigations of the incidents reflected in his personnel file and Internal Affairs file, discipline, additional training, retraining, reassignment, or discharge.

111.    Instead, BRADSHAW continued to employ LIN as a Community Policing deputy in District 3, which put LIN in a position of authority over citizens in Palm Beach County.

112.    STEPHENS fell within the zone of foreseeable risk created by LIN's employment.

113.    As a direct and proximate result of BRADSHAW's negligent supervision, retention, and training of LIN, STEPHENS was subjected to injury, including deprivations of his civil rights and a battery.   STEPHENS has suffered grievously, suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, expensive hospitalization, and medical care and treatment, loss of earnings, loss of ability to earn money, and aggravation of a previously existing condition.  The losses are permanent and/or continuing and STEPHENS will continue to suffer losses in the future

WHEREFORE, Plaintiff demands judgment against BRADSHAW for compensatory damages, costs, and such other and further relief as the Court deems appropriate.

24

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury for all issues appropriately tried by a jury.

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed and sent via electronic filing using the CM/ECF system with the Clerk of the Court, which sends e-mail notification of such filing to all CM/ECF participants in this case, on this 6th day of June, 2014.

/S/ JACK SCAROLA
JACK SCAROLA
Florida Bar No.: 169440
Attorney E-Mail(s):  peq@searcylaw.com
Primary E-Mail: eservice@searcylaw.com
Secondary E-Mail(s): Quinlanteam@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax: (561) 383-9465
Attorney for Plaintiff