

# The Peregrine Corporation

Specialists in Defense Dynamics

August 25, 2014

Summer M. Barranco, Esq.
Law Offices of Purdy, Jolly, Giuffreda & Barranco, P.A.
2455 E. Sunrise Blvd., Suite 1216
Fort Lauderdale, FL 33304

    **Re.:   Stephens v. Palm Beach County Sheriff's Office, et al.**

Dear Attorney Barranco:

    I am writing to provide my report in the above-referenced case.  In preparation, I have reviewed a volume of documentary evidence, provided both in hard copy form and in digital format on a thumb drive,  including Deputy Sheriff ("DS") Lin's dashcam video of the incident and DS Borut's dashcam video, gun exchange video, and DS Lin walk-through video, Zone 3 calls for service, D/S Lin's Internal Affairs file and Human Resources file, Palm Beach County Fire Rescue records, Incident report, discovery demands (interrogatories and requests for production of documents) and responses thereto, 2nd Amended Complaint and Answer thereto, Defendant's Disclosures, Offense Report, copies of photographs, Internal Affairs Critical Incident Review, PBSO General Order 500.00 Use of Force, DS Lin Training Records, Office of the State Attorney's Jan. 31, 2014 letter/report containing Investigative Review and Summary, PBSO Policy re. Discharge of Firearms, Shooting Incidents and Use of Deadly Force, disc containing 175 color photographs of the scene and evidence, depositions of DS Adams Lin (May 15 and June 30, 2014), Captain Ronald Mattino, and Sgt. John Nolan, expert report and curriculum vitae of Geoffrey P. Alpert, and expert report of Melvin Tucker with curriculum vitae and list of testimony.

    I have today received via Federal Express some additional items from your office, including a transcript of Dontrell Stephens' deposition, additional copies of photographs, Sgt. Nolan's notes as referenced in his deposition, various Internal Affairs summaries as requested in item 3 of plaintiff's request, written response to DOJ report regarding Albuquerque, Detective Smith's Powerpoint presentation regarding investigation of the incident, and PBSO Post Critical Incident Assessment Team material.  I have not yet had time to review these materials, except for a quick look at the plaintiff's deposition.  If necessary, I will supplement this report after I have had a chance properly to review these new materials.

    In addition, on August 19, 2014, I inspected items of physical evidence at the Palm Beach County Sheriff's Department, including plaintiff's Shimano bicycle, plaintiff's broken Samsung

1

Kapelsohn 000001

EXHIBIT B

cell phone, Deputy Lin's Glock Model 22 pistol with magazines and live ammunition, fired cartridge cases, black Bic lighter, cognac cigarillo, and plaintiff's denim shorts. I also visited the scene of the incident, spoke with DS Lin, and did a "drive through" and "walk through" of the incident with him.

I am, of course, also relying on my education, training and experience. This includes fifty-seven (57) years of experience with firearms, the last thirty-five (35) years of which are as a professional law enforcement firearms instructor. I have held multiple certifications as a firearms instructor (FBI, NRA, Glock, H&K, State of New Jersey, Commonwealth of Pennsylvania, and others), and have been certified in other use of force modalities representing the full use of force spectrum, including defensive tactics, weapon retention, pepper spray, chemical munitions, ASP baton, side-handle baton, Taser, less lethal impact munitions, executive protection, pursuit and defensive driving, FATS, etc. I have provided firearms and tactics training for numerous law enforcement agencies, including the New York State Police, Oregon State Police, Louisiana State Police, Missouri Highway Patrol, Police Departments of Philadelphia, Atlantic City, Jersey City, Trenton, Baltimore, Dallas, Seattle, Spokane, Tacoma, Salt Lake County Sheriff's Office, San Francisco Sheriff's Office, Snohomish County Sheriff's Department, Yellowstone County Sheriff's Department, Nevada State Fire Marshal's Office, Tennessee Bureau of Investigations, North Carolina Justice Academy, New Jersey Department of Corrections, New Jersey Division of Fish & Wildlife Bureau of Law Enforcement, Massachusetts Metropolitan Police, Massachusetts Criminal Justice Training Council, Washington, D.C. Metropolitan Police, Metropolitan Toronto Police, Calgary Police Service Tactical Unit, and have taught at the FBI Academy at Quantico, Virginia, at Fort Dix, New Jersey (countersniper rifle course hosted by the NJ State Police), and at many other locations. In Florida I have trained and certified firearms instructors and armorers for the Police Departments of Miami, Jacksonville, St. Petersburg, Clearwater, and the Martin County Sheriff's Office, have conducted instructor-level training in Tampa and at the Florida Law Enforcement Training Center at Lively, have taught in several national senior firearms and tactics instructor programs for the U.S. Bureau of Alcohol, Tobacco & Firearms in Orlando, and have taught at Annual Training Conferences of the International Association of Law Enforcement Firearms Instructors (IALEFI) held in St. Augustine (1988), Tampa (2000), and Palm Beach County (1998, 2006 and 2009). I have served on the IALEFI Board of Directors for the past 29 years, and have been a vice president of the association for what is now approaching 20 years. I was a Charter Member and presenter at the Annual Conferences of the American Society of Law Enforcement Trainers (ASLET), and am a member and presenter at Conferences of the International Law Enforcement Educators & Trainers Association (ILEETA). I have authored over 100 published articles and other works, am the principal author of "Firearms Training Standards for Law Enforcement Personnel" (IALEFI, 1993) and the Associate Editor of "Standards & Practices Reference Guide for Law Enforcement Firearms Instructors" (IALEFI 1994). I have served as a reserve deputy sheriff in two sheriff's departments over the past seventeen years. I taught "Police Use of Force" for two years in the Criminal Justice Department at Indiana University, and "Use of Force in Law Enforcement" for seven years at the Allentown Police Academy. When I previously lived in New Jersey, I was an instructor at the Burlington County Police Academy. I have been a consultant to the Pennsylvania Municipal Police Officers Education & Training Commission, and a member of the curriculum development committee that wrote the use of force curriculum taught at all police academies throughout the Commonwealth of Pennsylvania for the past ten

Kapelsohn 000002

years, am on its Patrol Rifle Standards Committee, and have written and consulted on use of force policies for law enforcement agencies and tactical teams. I am certified in force science and in shooting scene reconstruction, and regularly testify in those areas in state and federal courts throughout the country. I have testified as an expert in state and federal courts (including several state courts in Florida) about fifty (50) times, and have never failed to be qualified (accepted) as an expert by any court to which I have been proffered.

Additional details of my education, training, experience and qualifications are contained in my curriculum vitae, provided along with this report.

<u>The Incident.</u>

Without attempting to recount every detail at this time, the incident resulting in this lawsuit can be generally described as follows, with additional details to be added later:

The incident took place on the morning of September 13, 2013, around 8:22 a.m. Palm Beach County Sheriff's Office ("PBSO") Deputy Sheriff Adams Lin was assigned to community policing in the Stacy Street area. He was sitting in his marked police car on Vilma Lane where it intersects Haverhill Road, watching traffic and school buses on Haverhill picking up children for school. DS Lin saw a black male riding a bicycle who had apparently come out of the parking lot of the Majik Food Store to DS Lin's immediate right, cross from the east (northbound) side of Haverhill into the center of the road, and then cut across the southbound (west) side of Haverhill and into Norma Elaine Road. According to DS Lin, he did not recognize the bicycle rider, now known to be Dontrell Stephens, as someone who lived in that neighborhood. DS Lin says that Stephens cut across the southbound lane of Haverhill in front of a truck and perhaps other traffic, causing the truck to brake to avoid hitting him, and impeding the flow of traffic. DS Lin says that based on what he saw, he decided to pull Stephens over for the traffic violation. After allowing an oncoming truck to pass his location, DS Lin pulled out of Vilma Lane, headed north on Haverhill, waited for a schoolgirl to cross the crosswalk, and then turned left into Norma Elaine Road to follow Stephens.

By the time he turned into Norma Elaine Road, DS Lin's dashcam video shows that Stephens was already riding down the street, a distance of about three houses ahead of him. DS Lin accelerated to catch up, turned on his flashing emergency lights, and says he gave a quick "chirp" or two of his siren to let Stephens know he should pull over. Stephens turned and looked back at the marked police car with flashing emergency lights behind him, but did not pull over immediately. Instead, Stephens continued to ride his bicycle over a grass swale to the right of a mailbox, steering to place himself in front of two cars parked in the paved parking area along a small apartment building at 5061-5067 Norma Elaine Rd. DS Lin followed close behind Stephens, driving his police car over the same grass swale and bringing it to a stop nosed in at an angle toward the front of a parked silver car. DS Lin's dashcam video shows Stephens do a rolling dismount from his bicycle in front of the silver car, letting his bicycle fall on the ground, and beginning to move quickly to the left on the dashcam's view, away from his bicycle and DS Lin's police car and into the space between two parked cars. According to DS Lin, he himself exited his police car immediately upon bringing it to a stop, moving to the left around the rear of the parked silver car, out of the view of the dashcam. DS Lin has testified that he gave Stephens

Kapelsohn 000003

verbal commands to stop, and to raise his hands.  At this point, DS Lin says he had his own hand hovering over the Taser he carried in a holster on the front of his tactical vest. DS Lin has testified that Stephens then at first took a few steps toward him and raised his hands, but then stepped back and bladed his body to Lin, with his left side to the rear away from Lin, lowered his hands and reached behind his body with his left hand, and then brought his left hand out quickly from behind him with a black or dark flat-topped object in it which appeared to be a handgun. Fearing that Stephens was about to shoot him, DS Lin drew his service pistol and fired four rounds, all of which hit Stephens.

Stephens fell in front of the parked cars out of view of the dashcam, where he lay on his back, still conscious and, according to DS Lin, still moving. DS Lin moved forward and covered Stephens at gunpoint, called in the shooting on his radio, and gave several orders to Stephens, including ordering him to turn over on his stomach, and ordering him to stop moving his hand(s) to his stomach.  The first backup officer to arrive was DS Borut.  Still covering Stephens at gunpoint, DS Lin told Borut to check Stephens' left side and behind the left side of his back as "… he [Stephens] was reaching in there somewhere." No weapon was found there, but a black cell phone was found on or near Stephens' crotch as he lay on his back on the ground.  Stephens maintains that the cell phone was in his right hand throughout the incident, never in his left hand where DS Lin says he saw the black flat-topped object that appeared to him to be a gun.  When another backup officer arrived, DS Lin told him to get Lin's first aid pack from the trunk of his car, and Lin and another deputy then proceeded to provide first aid to Stephens until PBC Fire Rescue arrived and took over Stephens' medical care.

### The Dashcam Video from Deputy Sheriff Lin's Car.

The dashcam video from DS Lin's car first shows the view of the Haverhill Road intersection from Lin's car as it is stopped on Vilma Lane, looking across at Mobilaire Drive. Several vehicles pass by heading southbound on Haverhill  The first such southbound vehicle is a van, after which a southbound white pickup truck stops at the intersection with its left turn signal on to turn left into Vilma Lane.  Additional vehicles southbound on Haverhill then include a car and an SUV together, then a white car, a black car, another black car, and a white panel van.  At that point, apparently having waited for a northbound white work van with what appear to be ladders or scaffolding on a rack on top to pass, DS Lin pulls out northbound onto Haverhill. Additional southbound vehicles seen in the dashcam view after DS Lin turns northbound on Haverhill are a black SUV, and then what appears to be a white passenger van or small bus. What appears to be a school bus can be seen turning southbound onto Haverhill from a side street a few blocks to the north. The bicyclist cannot be seen on Haverhill at any point.

After waiting for a girl to cross the crosswalk at Norma Elaine Road, DS Lin turns left into Norma Elaine.  At this point, Stephens can be seen for the first time on the video, riding his bicycle west on Norma Elaine at about the third building in.  DS Lin accelerates to catch up with Stephens, who rides his bike across a grass swale to the right of a mailbox at 5061-5067 Normal Elaine.  As Stephens crosses the grass swale, the dashcam's view appears to show that his right hand is not holding the handlebar of his bike, but that his right arm is instead bent upward at the elbow, with his hand holding what appears to be a cell phone to his ear. The audio of DS Lin's dashcam video activates for the first time as the deputy drives his car across the grass swale after

Kapelsohn 000004

Stephens, and reflection on the wall of the building shows that DS Lin has his flashing emergency lights activated. Just after he begins to cross the grass, Stephens looks back over his left shoulder and appears to see the police car, perhaps because of its flashing lights, or because of the one or two "chirps" of the siren DS Lin says he gave as he followed Stephens.

DS Lin's car comes to a stop, nosed in toward the front end of a parked silver car, at 8:22:34 or 35. Stephens does the rolling dismount from his bike and drops the bike at about 8:22:36, and moves around the front end of the silver car away from DS Lin's patrol car. (According to DS Lin, Lin is at about that time exiting his patrol car and moving around the rear end of the parked silver car, in anticipation that Stephens may be about to run from him.) While difficult to distinguish due to a commercial radio station that was playing in DS Lin's car at the time, at or shortly after DS Lin is getting out of his car, he can be heard to say, "Stop - […unintelligible…] your hands." From 8:22:38 through 8:22:40, Stephens cannot be seen on the dashcam video's view. At about 8:22:40, Stephens' left arm comes back into view on the left edge of the video screen. Stephens' arm at that point is not raised up (as he had been ordered by DS Lin to do), but is down near Stephens' waist, with his elbow bent somewhat rather than straight. Then, at about 8:22:41, Stephens can be seen to make a sudden rearward movement, followed by the sound of four rapid gunshots. By 8:22:42 the gunshots are over, having been fired in less than one second (1.0 second) total elapsed time from first shot to last.

When the shots are fired, Stephens falls to the ground, out of the camera's view in front of the parked vehicles. Moments later, DS Lin appears on the screen, moving in from the left to cover Stephens at gunpoint. DS Lin can be seen using his left hand, apparently to turn on his portable radio, and can faintly be heard transmitting, "Shots fired 5067 Norma Elaine. [unintelligible]" At about 8:24:00 sirens can be heard approaching. While waiting for backup to arrive, DS Lin can be heard issuing several commands to Stephens. These include: "…[unintelligible] back pocket!", "Roll over on your stomach!", and "Stop moving your hands toward your stomach!" At about 8:25:24 another uniformed officer appears in the dashcam video view. After confirming in reply to this officer's question that he has Stephens covered, DS Lin tells him to "check underneath his back – his left side – he was reaching in there somewhere." Soon afterwards a second backup officer appears in the dashcam view, after which DS Lin can be heard asking one of the responding officers to get his kit from his car trunk, apparently so they can provide first aid to Stephens.

As mentioned earlier, a problem with the dashcam video's audio track is that DS Lin was listening to a commercial radio station while watching the school buses, and the radio station audio (announcements and music) makes it difficult to hear what DS Lin says to Stephens and what he transmits on his radio until some time after the shooting. It also sounds as if the Bluetooth-type body microphone worn by DS Lin did not begin to transmit, or did not transmit well, immediately upon his exiting his police car. In any event, it is not until about 8:24:23, when DS Lin begins to give orders about Stephens' "pocket" and telling him to roll over on his stomach, that clear audio of DS Lin's voice, other than the commercial radio station broadcast, can be heard on the dashcam video sound track.

Kapelsohn 000005

<u>Physical Evidence.</u>

I examined several items of physical evidence at the Palm Beach County Sheriff's Office Evidence Section on August 19, 2014. Evidence Item Tracking #004, DS Lin's Glock Model 22 .40 caliber pistol, serial number MPX208, was in safe and serviceable condition, passing the standard Glock armorer's tests (inspections). Using Brownell's competition weights, the trigger pull weighed between 7-1/4 and 7-1/2 pounds each, which is toward the heavy end of the range for a Glock pistol of this configuration. The pistol has fiber optic sights, a Blackhawk weapon flashlight mounted on the rail on the front of the frame, non-slip grip tape on its grip and the sides of the slide, and an enlarged magazine well, all of which I am advised were department-approved features.

Along with the pistol were one Glock 22 magazine of 15-round capacity containing 12 live rounds of ammunition. Together with the one round that would have been in the chamber of DS Lin's pistol, this accounts for the four (4) rounds he fired.

There were also four (4) additional Glock 22 magazines. Two of them were fully loaded with 15 rounds each. The other two contained 14 rounds each, in addition to which there was a small manila envelope containing two (2) live rounds, apparently removed from these two magazines. All of the ammunition I inspected was Speer (ATK) "Gold Dot" .40 S&W ammunition.

Evidence Item 025-01 contained four (4) Speer (ATK) brand, .40 S&W fired cartridge cases, visually consistent with the live ammunition in the magazines and displaying firing pin indentations consistent with having been fired in a Glock Model 22 pistol. The cartridge case labeled as having been recovered at Stanchion 2 has what appear to be gravel or pavement indentations in the side of the case, suggesting it may have been stepped on lightly or pressed against the parking lot surface in the aftermath of the shooting.

Evidence Item 022 was a black Samsung "flip phone" type cell phone. When closed, it measured slightly less than 4" long by 2" wide by ¾" thick. When opened, it would measure over 7" long. The hinge holding the flip top to the body of the phone was broken on one side, but the two parts can be put together and/or held in place with one's hand(s).

Evidence Item #027 was a black Bic lighter and a "cognac cigarillo."

Evidence Item #020 was a pair of Sean John blue denim shorts, size 34, "Touch of Gold," with a total of seven (7) pockets, including large right and left rear pockets, each measuring 8-1/2" deep by 6-7/8" wide. The right rear of the shorts also had a "ruler" type pocket (about 8" deep by 3-3/4" wide), with a smaller pocket (3" deep by 3-3/4" wide) below it.

<u>Analysis and Discussion.</u>

As taught to law enforcement officers nationwide, including in Palm Beach County, the standard for justifiable use of force is that set out in the U.S. Supreme Court's decision in <u>Graham v. Connor</u>, 490 U.S. 386 (1989). Based on the holdings in that case, officers are taught

6

that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. Assuming DS Lin, having ordered Stephens to stop and put up his hands, then saw Stephens, who was only a short distance from him, blade his body, lower his hands, reach behind himself, and then suddenly thrust his hand forward with a black object in it that looked like a handgun, in a motion consistent with drawing and firing a handgun, that would, indeed, force DS Lin to "make [a] split-second judgment – in circumstances that are tense, uncertain, and rapidly evolving," about his need to defend himself against what reasonably appeared to be a deadly threat.

PBSO General Order 500.00 on "Use of Force" sets forth a standard used throughout the United States, which is in accordance with state statutes nationwide and with federal law on use of force by law enforcement personnel. Thus, Section I.E.1 provides:

> Employees are authorized to use deadly force when there is reasonable belief that such force is necessary to:
>
> 1. Prevent imminent death or serious bodily harm to the employee or another individual; ...

Note that the deputy's "reasonable belief" is the applicable standard, and is the only standard that is workable from a practical viewpoint. The standard must be one based on the deputy's reasonable belief, rather than on absolute truth, because in many – perhaps most -- situations the deputy cannot know the absolute truth of whether or not an actual deadly threat does or does not exist. Thus, a robber threatening to shoot a convenience store clerk with what appears to be a handgun held in the pocket of the robber's jacket and pointed at the clerk may actually have a gun in his pocket, or may only have his hand, pointed forward to make it appear as if he has a gun. Neither the clerk nor a police officer can know for sure whether or not the robber actually has a gun in his pocket or not, so both the PBSO Use of Force policy and the law – as taught to police officers nationwide -- allow the officer to respond on the reasonable belief that it is a gun, as the robber has represented it to be.

If, instead of concealing it in a jacket pocket, the robber openly displays what appears to be a handgun, the deputy can still rarely know whether or not an actual deadly threat is presented. The "gun" can be a realistic-looking toy gun, a non-firing replica gun, or a real gun that is unloaded or mechanically inoperable. I have worked in several such cases myself. Even if what the deputy sees is a real gun that is loaded and operable, the robber may have no intention of ever firing the gun, but may only be using it as a threat to get what he wants. Because the deputy cannot possibly know the actual condition of the "gun" or the robber's state of mind, he must act on his reasonable belief that what appears to be a gun is, in fact, a real, loaded, functional weapon, and that the robber holding it poses a deadly threat to himself and others.

The circumstances of this incident, as reportedly perceived by DS Lin, are such as to have made it reasonable for Lin to believe that Stephens was drawing a handgun to attack him.

7

Kapelsohn 000007

When DS Lin activated his flashing lights and "chirped" his siren, Stephens, despite having looked back and seen the marked police car behind him, did not pull over immediately, but steered around the front of the parked cars, did a rolling dismount, and moved quickly to place a parked car between himself and the deputy. Having been told to raise his hands, Stephens at first did so, but then bladed his body – which police themselves are taught is an aggressive move that can facilitate drawing a weapon without it being immediately perceived or countered by one's opponent – and then reached behind himself and suddenly thrust his hand forward with a black object in it that reasonably appeared to DS Lin to be a handgun.

Officers are trained that various factors should be taken into consideration in determining the reasonableness of any given use of force. These are often called "Officer Factors," "Subject (or Suspect) Factors," and "Situational Factors." Some of these factors are listed in the PBSO Use of Force Policy, under the heading "Factors Used to Determine Reasonableness," including:

- The level of threat or resistance presented by the subject.
- Whether the subject was posing an imminent threat to employees …
- The potential for injury to citizens, employees or subjects.
- The conduct of the subject being confronted (as reasonably perceived by the employee at the time).
- The time available to an employee to make a decision.
- The availability of other resources.
- The training and experience of the employee.
- The proximity or access of weapons by the subject.
- ….
- The environmental factors and/or other exigent circumstances.

In the framework of the above factors, the "level of threat or resistance" presented by Stephens was at first evasion of the officer's control (failure to stop immediately, and then positioning himself with a car between himself and the deputy), then non-compliance with the officer's command to raise his hands when he lowered his hands and reached behind his back, then apparently a deadly force attack ("aggravated active resistance") when he brought his hand out quickly with a black object in it that appeared to be a gun. Continuing down the above bullet-points, the threat posed appeared to be imminent, and the "potential for injury" appeared to be death or serious bodily injury. The "conduct of the subject" was initially evasion, then blading his body, dropped his hands, moving his hand behind his back, and then bringing his hand forward with the black object in it. The "time available to an employee to make a decision" was a fraction of a second, as discussed more fully below, and the deputy's decision and reaction would, even then, lag behind the suspect's action, to the deputy's tactical disadvantage. At the moment when Stephens made his movements there were no "other resources" available to DS Lin. His "training and experience" made him aware of the vulnerable situation he was in at that moment, and of the need to take action immediately to defend himself. The "proximity or access of weapons by the subject" was, in DS Lin's perception, that Stephens already had a gun in his hand and was bringing it to bear on Lin. And the "environmental factors" included the facts that DS Lin was only a few feet from Stephens – certainly well within the deadly danger zone of a handgun in Stephens' hand – and without any intervening cover that would shield DS Lin from rounds fired by Stephens. It can also be considered an "environmental factor" that the location

Kapelsohn 000008

where this occurred is a relatively high crime area. While certainly not determinative, this is one of many factors an experienced and reasonable officer would include in his evaluation of an unfolding situation such as this.

Officers are also trained to recognize clues of impending resistance or attack by a suspect. These include factors such as changes in a suspect's facial coloration, tightening of the jaw muscles, "target glance," and "conspicuous ignoring." They also include several of the factors noted by DS Lin in this case, including Stephens' "thousand yard stare" when Lin attempted to make eye contact with him, and Stephens blading his body – a defensive or aggressive position in which officers themselves are trained, and which is an obvious indicator of impending resistance or attack when assumed by a suspect. Stephens' behaviors as described by DS Lin were such as would elevate any well-trained deputy's level of apprehension that either attack or resistance by flight was about to occur momentarily.

Nationwide, law enforcement officers are trained in the tactical principle of "action vs. reaction." DS Lin was trained in this principle, which holds that once an attacker begins an action (i.e., a threatening movement), the defender cannot react fast enough to prevent it from happening. Sometimes phrased as "action is faster than reaction," this tactical truth is the basis for weapon takeaways, and for many other defensive tactics moves. As applied to this situation, the principle means that once DS Lin saw Stephens making the movement consistent with drawing a handgun from behind his back, Lin knew that he was already at a tactical disadvantage, and would have to act immediately in order to have any chance of surviving the perceived deadly attack by Stephens. DS Lin's tactical disadvantage was further exacerbated by the fact that his service pistol was still secured in its holster, and his dominant hand was "hovering" over his Taser, so he could use it if Stephens attempted to flee or resist in a non-deadly manner. DS Lin's service pistol was in a Blackhawk thigh holster that required two (2) separate retaining locks to be released, one with the deputy's forefinger and the other with the deputy's thumb, in order to draw the pistol. Under the circumstances of this incident, it would likely have taken DS Lin at least a second and a half (1.5 seconds), and more likely closer to two (2.0) seconds, to draw his pistol and fire the first shot from it. In contrast, once a suspect begins to bring his hand out from behind his back with a potential weapon in it, the suspect can bring the gun to bear and fire a shot in half a second (0.5 seconds) or less. This is the embodiment of the "action is faster than reaction" principle, in that the time required for the officer to (1) perceive the suspect's movement, (2) make a determination that the suspect's movement is threatening, rather than innocent, (3) decide what action to take, (4) move the hand to the holster, (5) grip the pistol and release the holster's two security locks, (6) draw the pistol and bring it to bear on the threat, and (7) place the trigger finger inside the trigger guard, and pull the trigger rearward far enough to fire the pistol, will result in the suspect having the ability to fire several shots at the officer before the officer can draw and fire his first shot in return. As stated above, these perceptions, decisions and actions by the deputy would take at least 1.5 seconds, and more likely close to 2.0 seconds. During this time, the suspect could point a handgun he was drawing from behind his back and shoot the deputy multiple times. See, for example, "Subject Motion" videos in the "Demos" section of the Force Science Institute website, at www.forcescience.org.

From reading the deposition transcripts, it appears that plaintiff's counsel is skeptical that Stephens' cell phone could be mistaken for a pistol, or that any pistols are as small as Stephens'

Kapelsohn 000009

cell phone. First, I note that there have been many instances in which police officers have mistaken cell phones for handguns. These include instances in which the suspects appear to be trying to convince the police or others that their cell phone is actually a handgun (e.g., the Marquise Hudspeth incident involving the Shreveport, LA police), and numerous other instances throughout the country (e.g., Las Vegas Metropolitan Police shooting in daylight in July 2013; Houston Police Department shooting in August 2014 in which three officers shot a suspect reaching for a black object in his waistband that turned out to be a cell phone, Chicago Police Department shooting of Ortiz Glaze on or about April 30, 2013, Seattle Police Department shooting on or about October 2007, and many others). In other incidents, black or dark objects other than cell phones have been mistaken for handguns, including wallets, small flashlights, etc. I have worked in at least two such cases myself.

Although Stephens' black cell phone is relatively small when closed, it is twice that size when opened. Even when closed, the phone is close in size to many semi-automatic pistols. For example, one model of pistol mentioned by DS Lin, the Raven Arms .25 auto (MP25), was produced and sold in the millions, and has been a commonly used crime gun. The dozens of makes and models of guns that approximate the size of Stephens' closed cell phone include the Jennings J22, the FN "Baby Browning .25 (4.1" long and 2.8" high), the earlier Colt .25 Auto (4.5" long), the KelTec P3AT .380 and Ruger LCP .380 (both just over 5" long), the Bryco "38" (actually a .380), the new Glock G42 .380, the Kahr PM9 and similar models, the Lorcin, the Colt Mustang, the High-Standard derringer, other brands of derringers in calibers ranging from .22 through .44 Magnum, and dozens of other guns. In evaluating whether a black cell phone, which may or may not have been open, in Stephens' hand could reasonably have been mistaken for a handgun, one must understand that when a person grips a small handgun, much of the handgun is covered by the person's hand, with only the upper portion of the gun, at most, exposed. Thus, a cell phone, a wallet, a small black or dark-colored flashlight, or any number of other objects can present the appearance of a handgun in someone's hand, depending on the angle at which it is viewed. I note that by carefully reviewing the dashcam video in this case, it appears as if the cell phone is Stephens' hand is not closed, but is open, when he is falling immediately after having been shot. Thus, DS Lin's view of the dark object could well have been of a black object over 7" long, not of the closed phone that was slightly less than 4" long.

It is also important to note that when DS Lin saw Stephens' hand coming out from behind him with a black, flat-topped object in it, the deputy could not afford to wait until Stephens stopped his movement so that Lin could carefully examine a stationary object. Had the object been a gun, waiting that long could well have proved fatal. Instead, DS Lin had to make a literally split-second attempt to identify the black, flat-topped object in motion, before it was fully leveled at him and, if it proved to be a gun, fired. This extremely difficult task of discriminating a deadly weapon from a harmless look-alike is not a task DS Lin chose to challenge himself with, but rather one which Stephens forced upon him by his own actions.

Stephens' denim shorts had four back pockets, any one of which could have held a handgun of almost any common size, from the smallest guns to full-sized service pistols. A pistol could also have been kept in the waistband of Stephens' shorts. A gun carried in either way could have been readily accessed and drawn to attack DS Lin. As an experienced officer trained with firearms himself, DS Lin was aware of this, and accordingly had no choice but to

10

view Stephens' reaching behind himself and bringing his hand back out with a dark, flat-topped object visible in it as a deadly attack.

## Drawing and Firing His Service Pistol Would Block DS Lin's View of Stephens' Hands.

What an untrained individual might not realize is that, when DS Lin drew his service pistol to fire at Stephens, raising the pistol into firing position would, of necessity, block out Lin's view of Stephens' hands, arms, and body from about mid-torso down. Thus, once DS Lin perceived Stephens' threatening movement and drew his gun to eye level, anything else Stephens did with his hands and arms thereafter, except for raising them upwards into a "surrender" position, would not likely have been seen by DS Lin at all. This factor combines with the speed of the shooting and the reaction time needed to stop shooting discussed below to show this incident in a completely different light than what the untrained individual might expect.

## Time Span of DS Lin's Shots, and Reaction Time Needed to Stop Shooting.

Throughout the country, law enforcement officers are trained that their purpose of shooting at someone who poses a deadly threat is to "stop the threat," and that in order to do so they should normally aim at the center of mass of the available target (center of the chest of a standing attacker), and fire repeatedly until they observe the threat to be stopped. That observation could be by virtue of seeing the attacker fall, or drop his weapon and raise his hands, or run away without a weapon in hand, or any number of other possibilities. Officers are not trained to fire a shot and then stop to re-evaluate the condition of the attacker before firing each subsequent shot, as the time needed to perform this evaluation from one shot to the next may be all the time the attacker needs to pull the trigger of his own weapon with deadly effect.

A well-trained officer such as DS Lin can achieve reasonable hits on a man-sized target at distances such as this while operating the trigger from shot to shot as quickly as the officer's trigger finger can move. For most officers using a pistol such as DS Lin's Glock 22, this is roughly a quarter of a second (0.25 second) from shot to shot. This would allow DS Lin's four shots to be fired in roughly three-quarters of a second (0.75 second) elapsed time from the discharge of the first shot until the discharge of the last shot. A review of the dashcam video shows this to be a reasonably close, if perhaps not exact, approximation of the timing of DS Lin's four shots.

Just as there is a human reaction time needed to perceive a firing signal or stimulus (such as a threatening movement by a suspect) and begin firing (the separate elements of which activity are discussed above), similarly there is a reaction time needed for an officer to observe that a threat has been stopped (or to perceive any other "cease firing" signal) and to stop pulling the trigger. Even in the low-stress environment of laboratory experiments, where the signal to stop firing is as simple as a light turning on or off, individuals routinely fire one or two shots after the "cease firing" signal is given. In simplified explanation, this is because it takes longer to perceive the "cease firing" signal and get the finger to stop pulling the trigger than the rate (e.g., about 0.25 seconds from shot to shot) at which the finger is pulling the trigger and firing shots. Whether one, or two, additional shots will be fired depends in large part on where in the trigger-pulling sequence the shooter's trigger finger is when the "cease firing" signal is first

11

Kapelsohn 000011

given. Even when this phenomenon was initially studied, the researchers noted that, in an actual deadly force confrontation in which stress levels would much higher, the impetus to survive would be strong, and the "threat is stopped" stimulus would likely be more ambiguous and thus harder to perceive and distinguish than the simple light turning off in a laboratory experiment, the number of shots fired after an uninvolved, unstressed observer might conclude the threat had theoretically been "stopped" might be more than an additional one or two shots. See, "Time to Start Shooting? Time to Stop Shooting? The Tempe Study," by Bill Lewinski, Ph.D. and Dr. Bill Hudson, *Police Marksman*, Sept./Oct. 2003, and "New Developments in Understanding the Behavioral Science Factors in the "Stop Shooting" Response," by W. Lewinski, Ph.D. and Christa Redman, *Law Enforcement Executive Forum* (2009). In this incident, it would be unreasonable to expect DS Lin to have stopped  shooting in less than three-quarters of a second (0.75 second) after his first shot discharged. The circumstances of the incident are such, including the speed with which it all occurred and the fact that DS Lin's raised gun at this distance blocked out his view of Stephens' hands while firing, that even if he had seen Stephens' hands were empty – which they were not – it is unlikely DS Lin could have stopped firing in less time than he did.

Additionally, I note that nationwide, police in officer-involved shootings ("OIS") annually average a "hit ratio" of about 25% or less. In other words, roughly 75% of the shots fired by police miss the attacker at which they are fired, despite the fact that the average OIS distance is about seven (7) feet, and nearly 90% of all shootings take place within 21 feet. I would attribute DS Lin's 100% hit ratio (four hits for four shots fired) to the fact that he is well trained, and to the fact that he utilized his skills as trained, rather than firing in a panic.

<u>A Closer Analysis of the Dashcam Video.</u>

Is it essential for anyone attempting to analyze this incident to understand that the dashcam video does not show the same view as DS Lin saw from his position at any given time. The dashcam is mounted and aimed to show a view from slightly to the right of the center of the patrol car. When seated behind the steering wheel, DS Lin's eyes are centered nearly two feet to the left of the camera's lens. When Stephens is riding across the grass swale, there is a very brief (about one second), very narrow view of his right hand with the cell phone in it, barely visible <u>to the dashcam lens</u>, just past the right side of Stephens' body. DS Lin, two feet further to the left of the dashcam, would have had little view of Stephens' right hand and cell phone, if in fact he could see it at all.

It is also important to understand how our eye works when we look at things. It is not the case that we "see" the equivalent of a still photograph of what is in front of us, in which we can then turn our attention to any corner of the photo and minutely examine the details the camera lens has captured. For example, a still photograph or "freeze frame" taken by the dashcam shortly before DS Lin was about to drive onto the grass swale behind Stephens would show the license plate of the car parked on the opposite (south) side of Norma Elaine Road, the smallest of the pine trees in the vacant lot across the street from the incident location, and the mailbox five houses down the street. In actuality, while those things were available to be seen, and DS Lin may have had them within his peripheral vision, it is doubtful that DS Lin "saw" any of those things, at least not in sufficient detail to recall or describe them. At any given time, our eyes

12

Kapelsohn 000012

focus on a relatively small area of interest (called a "saccade") to which our mind has directed our attention. Our visual focus is then redirected (in a "saccadic movement") to another small area of interest. Our eyes will typically shift in several saccadic movements per second. As DS Lin was driving behind Stephens, and was preparing to drive across the grass swale, hopefully missing the mailbox and not striking Stephens on his bike should he have stopped more promptly, DS Lin would only have "seen" the cell phone in Stephens' hand if his eyes were directed to that area during the one second when the hand and phone came into the camera's view – and even then, he would have seen it only if his own view, from two feet further left, had revealed any portion of the hand or phone at all. See, generally, "Perception and cognition in decision training; The quiet eye in action," by Dr. J. N. Vickers, Human Kinetics Publishers, Champaign, IL (2007).

The problem caused by the divergent views of the dashcam relative to DS Lin's own eyes becomes more extreme as the incident continues. Thus, when Stephens does his rolling dismount from the bike, the cell phone, which appears to be open in his right hand, only becomes visible to the dashcam after Stephens has moved around the front of the parked silver car. By that time, DS Lin has already exited his patrol car, and has begun moving around the back of the silver car to intersect Stephens' path of movement. Whether DS Lin could see the cell phone in Stephens' right hand, or whether Stephens, once out of view of the dashcam, had switched the phone to his left hand, or whether he had slipped the phone into one of the four (4) back pockets of his shorts, cannot be known from any evidence on the dashcam video. DS Lin's statement that he could, at some point in time, see Stephens' hands and that they were empty could very well be accurate, as there is a period of roughly two and a quarter (2.25) seconds when Stephens is not visible on the dashcam video. That is more than enough time for Stephens to have pocketed the phone, switched the phone from one hand to the other, palmed the phone (i.e, held it in such a way that it was not visible), or some other possibility. The fact that the dashcam view shows the phone in Stephens' right hand several seconds before the shooting, and then shows it in his right hand after the shots are fired, does not prove that there was no time at which Stephens' hands were empty, and that there was no time at which Stephens brought the phone out from behind him with his left hand.

The errors in analysis that can be caused by the divergence of a dashcam view from what the officer could actually see have been well recognized in the law enforcement field, and have been clearly illustrated in actual incidents. In my own training of police and others, I often show two different dashcam videos of the shooting of Marquise Hudspeth by the Shreveport (LA) police on March 15, 2003. The video from one dashcam shows Hudspeth walking across the parking lot of a convenience store when he is gunned down by police for no apparent reason whatsoever. Anyone watching this dashcam video would come to the conclusion that the shooting was unjustified. Luckily, a second police car, parked at an angle to the first, recorded a dashcam video that shows Hudspeth holding what appears to be a silver-colored handgun, swinging it to point first at one officer and then at another. It is clear that the police believe the object to be a gun, as the video shows an officer ducking down when it is pointed at him. At that point the police fire several shots, and Hudspeth drops to the ground. This second dashcam, luckily substantiating what the officers themselves saw, shows the shooting to be fully justified, despite the fact that the object in Hudspeth's hand was later found to have been a silver-colored cell phone.

13

Kapelsohn 000013

Unfortunately, the dashcam video in the Stephens incident neither shows the view that DS Lin himself saw, <u>nor does it show Stephens at all during the time period when DS Lin says Stephens made the threatening movement with the black object in his hand</u>.  Contrary to the assertions of plaintiff's experts, the video does not contradict or discredit DS Lin's account of what he observed.

At about 8:22:38 on the dashcam video, Stephens disappears off the left-hand edge of the screen.  At about 8:22:40, about two and a quarter seconds later, Stephens' left arm and a small sliver of his left side become visible again on the left-hand edge of the screen.  About a second later, the first shot is heard.

Keeping in mind that, prior to the sound of the first shot, it would have taken DS Lin between a second and a half and two seconds (1.5 to 2.0 seconds) to draw his handgun and fire that first shot, it becomes apparent that the actions of Stephens that looked like Stephens was drawing a gun from behind his back, causing DS Lin to fear for his life, had to have happened while Stephens was out of view of the dashboard camera – not after he reappeared in view.  In other words, at the point where Stephens reappeared in view at about 8:22:40, DS Lin was already in the process of drawing his service pistol to fire it, having been prompted to do so by whatever he had observed of Stephens' actions.

It is also obvious that shortly before the shots are fired, Stephens' hands are not raised, as Stephens has testified they were.  To the contrary, Stephen's left arm can be seen lowered from when he first reappears on the video at about 8:22:40.  The video evidence thus flatly contradicts Stephens' testimony, and is consistent with DS Lin's account that, while Stephens had at first raised his hands, he then lowered them.  Stephens' body, when he reappears in the video at 8:22:40, is also bladed with his left side to the rear, again consistent with DS Lin's account of Stephens' actions.

DS Lin has stated that Stephens' motion behind his back was made with Stephens' left hand, which then came out from behind him holding the black, flat-topped object.  This may well be an accurate observation by DS Lin, as there was more than enough time, while Stephens was out of view of the dashcam, for him to have switched his phone from one hand to the other, or put his phone in a back pocket or in his waistband with his right hand, and thereafter brought the phone back out in his left hand.

It is also possible that DS Lin's recollection of which hand Stephens had the black object in is incorrect.  Officers often misremember, or fail to remember at all, details of what occurred during shootings in which they have been involved.  This is widely studied, and widely reported in the professional literature in the law enforcement and behavioral science fields.  I myself have worked in a number of cases where the involved officers have stated that the suspect pointed a gun at them (substantiated by the physical evidence), but cannot recall in which hand the suspect held the gun.  This is a relatively minor detail in comparison to the fact that the officer has had a gun pointed, and perhaps fired, at him, causing him to shoot the suspect to survive.  It is also a relatively minor detail compared to others about which officers have been mistaken.  I have, for example, worked in a case for the U. S. Department of Justice involving the fatal shooting of a

Kapelsohn 000014

man in front of the White House where an officer who, seconds after the shooting, told his supervisor that he had fired the two shots that downed the attacker turned out not to have fired his gun at all.  In another case, I interviewed an officer who stated that he and the kidnapper, exchanging shots in broad daylight about 32 feet from each other in a schoolyard, were the only ones present there.  In fact, during the exchange of shots, a teacher had driven her car between the officer and the kidnapper in an attempt to escape the gunfire.  Thousands of officers, including many I have worked with in the aftermath of their shootings, have not heard the sound of their own guns being fired, while others have believed their own gunshots, perhaps discharged accidentally, to be shots fired by the suspect.  Officers involved in shootings often misperceive or misremember the distances involved, fail to notice the presence of others at the scene, cannot recall how many shots they fired, did not feel the recoil of their weapons as they discharged, or can recall in minute detail the gun that was pointed at them, but cannot describe the facial features, the hair color or style, the clothing, or the race of the person who pointed the gun at them.  Ultimately, even if DS Lin is mistaken (and I am not saying he is) about which hand Stephens had the black object in that looked like a gun, it does not undercut his justification for firing.  Stephens, both by his own testimony and by that of DS Lin, had been told to raise his hands.  Both Stephens and DS Lin have testified that Stephens did so.  The video then corroborates DS Lin's testimony that Stephens lowered his hands.  And we know that Stephens had the black cell phone, which could easily be mistaken for a gun, in one or the other of his hands.  Even if Stephens made the threatening movement with his right hand, rather than his left, DS Lin would still be justified in firing if he reasonably perceived Stephens' motion to be a life-threatening attack.

If DS Lin has accurately described his perceptions that caused him to fear for his life and to fire his service pistol, Stephens could have avoided the deputy's use of force by simply: (1) following the deputy's commands to keep his hands up, (2) not reaching behind himself where his hand would be out of the deputy's view, and (3) not suddenly bringing his hand out with a black object in it that could reasonably be mistaken for a gun.

### Reports of Plaintiff's Experts.

Geoffrey Alpert makes several statements in his August 5, 2014 report that require comment.  On page 6 of his report, Mr. Alpert writes, "Deputy Lin claims to have ordered Mr. Stephens to show his hands but the dash cam video does not record any verbal exchange before the sound of gunshots."  As discussed above, while it is difficult to hear DS Lin on the audio track of the dashcam until some time after he calls in that shots have been fired, not only can he be heard telling Stephens to stop and to do something with his hands as he exits the patrol car at about 8:22:36, but Stephens himself has testified that DS Lin told him to put up his hands. (Stephens deposition at p.78.)  Mr. Alpert, at page 8 of his report, attempts to make an even bigger issue of the supposed failure of DS Lin to give any verbal commands, and his supposedly conflicting testimony that he did give verbal commands.  Mr. Alpert is simply wrong.

Stephens has also testified that he heard DS Lin give a short sound of the patrol car's siren (Stephens depo. at p. 77), as DS Lin has stated he did, despite the fact that the siren cannot be heard on the dashcam video.

Kapelsohn 000015

Mr. Alpert states, at page 7 of his report, that:

- "[t]he video begins as Dontrell Stephens crosses Haverhill Road and shows no evidence that Mr. Stephens impeded the flow of traffic as he did so.
- The distance between Deputy Lin and Mr. Stephens together with the fact that Mr. Stephens was traveling away from Deputy Lin make it highly unlikely that Deputy Lin was in a position to determine whether Mr. Stephens was someone "unfamiliar" to Deputy Lin.

Especially considering that Mr. Alpert claims that the statements in his report "reflect objective truth," the above two bullet points are remarkable. Despite Mr. Alpert's statement above, the video does not show Dontrell Stephens crossing Haverhill Road at all, as Stephens does so out of the view of the dashcam. The video therefore cannot possibly show whether or not Stephens impeded the flow of traffic on Haverhill Road as Mr. Alpert maintains, but the video does show a stream of traffic southbound on Haverhill passing DS Lin's parked position, including several trucks and vans which may include the truck DS Lin said had to brake when Stephens cut across Haverhill. Thus, nothing in the video is inconsistent with DS Lin's statement that Stephens' crossing of Haverhill Road impeded the flow of traffic.

Mr. Alpert's second bullet point above similarly misstates the facts, and misrepresents what the video shows. The video does not show the distance between DS Lin and Stephens as Stephens is crossing Haverhill, as the video does not show Stephens at all at that point in time. While crossing Haverhill, DS Lin first saw Stephens as Stephens was quartering sideways to him, which allowed DS Lin to see a side view of Stephens' face. Thus, it is misleading to say Stephens was "travelling away from Deputy Lin" as Mr. Alpert has stated. The video does not show Stephens' distance from Deputy Lin, as Mr. Alpert would have one believe. Mr. Alpert does not state that he has ever been to the scene, but I have. From my visit to the scene, I can state that one can easily distinguish facial features of someone crossing Haverhill where Stephens did, from DS Lin' position on Vilma Lane.

Mr. Alpert's statement on page 8 of his report that "when an officer uses deadly force ... it makes the officer the judge, jury and executioner" is sensationalist, unprofessional, and inaccurate. Officers use deadly force to defend themselves and others from death or serious bodily harm, not to judge or execute the suspect.

Mr. Alpert states on p. 9 of his report that DS Lin was not wearing "a regular uniform," although, to the contrary, he was wearing a uniform approved by his agency. Mr. Alpert then states that "dressing and equipping for combat in a community policing setting escalates the chances of aggressive actions and reactions," for which Mr. Alpert, despite his years of performing and reviewing statistical studies of policing, gives no supporting citation or reference. It is apparently just his unsupported opinion. To the contrary, Captain Mattino, with actual police experience, stated in his deposition that wearing a uniform and being equipped as DS Lin was could have exactly the opposite effect, namely the effect of deterring violence and resistance by suspects with whom the officer must deal.

16

Kapelsohn 000016

Mr. Alpert suggests, on page 9 of his report, that when DS Lin saw Stephens lower his hands that he had been ordered to raise, and reach behind his back in a motion consistent with drawing a gun, DS Lin's "required response rather than the use of a firearm" would have been to draw and use his Taser. This remarkable proposition by Mr. Alpert is (1) contrary to the mainstream of law enforcement training, not only today but for many decades, (2) contrary to the use that Taser International, the manufacturer of the majority of Tasers used by U.S. police agencies, recommends be made of its products, (3) tactically unsound, (4) foolish, and (5) indicative of a complete lack of tactical acumen by Mr. Alpert. The time constraints of a situation such as this simply do not permit an officer to respond in an effective or reasonable manner to the apparent drawing of a weapon, or an aggressive furtive movement, by drawing a Taser or other less-lethal weapon. There is no indication that DS Lin fired merely upon Stephens reaching behind him; instead, he says he drew and fired when he saw Stephens' hand come out from behind him with a black, flat-topped object in it that appeared to be a gun.

Mr. Alpert states, at page 9 of his report, that because the video supposedly shows it to be "unlikely to be truthful" for DS Lin to state that Stephens obstructed traffic and that Lin didn't recognize Stephens -- both of which, as discussed above, the video does not in any way disprove or discredit -- that "[t]he stop of Mr. Stephens appears most likely to have been a product of profiling." First, I didn't realize Mr. Alpert's expertise including determining the truthfulness of witnesses. Second, as discussed above, the video does not show what Mr. Alpert represents it to show. And third, this is a lower-income neighborhood with a minority population approaching 90% of the total population, divided roughly evenly between Hispanics and blacks. Accordingly, Mr. Alpert's suggestion that DS Lin's stopping of a black young man riding a bicycle down the street in this neighborhood was "profiling" make no sense, unless DS Lin was also stopping most of the other people he saw in that neighborhood as well.

Finally, I note that Mr. Alpert, in giving his opinions that the supposedly-flawed investigation of this incident by PBSO will lead other deputies to use excessive force, fails to mention that not only the PBSO, but the Florida State's Attorney, found DS Lin's use of force to be justified.

Turning to Melvin Tucker's report, Mr. Tucker states, on page 4 of his report, that even assuming DS Lin's account to be true, "his use of deadly force against Dontrell Stephens on September 13, 2013 violated well established law enforcement use of force training and standards and was a greater level of force than other officers would have used, under the same or similar circumstances, in 2013." After this assertion, Mr. Tucker presents no basis whatsoever for his statement, and completely fails to show that drawing and firing at a suspect whom the officer reasonably perceives to be drawing a handgun from behind his back somehow "violates well established law enforcement use of force training." We are left with Mr. Tucker's *ipse dixit* to this effect.

Mr. Tucker, at page 5, admits that an officer can justifiably use deadly force for "the protection of himself or another from a threat of serious bodily harm or death," and that "[o]fficers are instructed that they need not wait until they see the "muzzle flash" before they take action" -- as to which see my discussion of action vs. reaction above.

Kapelsohn 000017

Mr. Tucker's attempted analogy, on p. 6 of his report, to an officer stopping a drunk driver on New Year's Eve, in which the officer fires when the driver puts his hands in his pockets, is not analogous. Stephens, having been told to raise his hands and having done so, didn't just lower his hand and put it behind his back, he then brought it forward with a black object in it that appeared to be a gun.

As to Mr. Tucker's assertion, on p. 6, that the "video clearly shows Stephens holding a cell phone in his right hand during the incident," see the discussion above regarding the fact that the video does not show Stephens at all, and thus does not show what was or was not in Stephens' hands, during the critical few seconds before the shots were fired.

Mr. Tucker's assertion, at p. 7, that "in the context of the encounter, he [Lin] had no reasonable basis to believe that Stephens was armed with any weapon," presumes that officers are only permitted to defend themselves against what appears to be the drawing of a weapon against them if they have some reason, in advance of the attack, to believe the suspect is armed. To the contrary, officers are trained to assume that any suspect they stop may be armed until they are able to confirm that the contrary is the case.

Mr. Tucker asserts, at p. 7, that when stopping Stephens, DS Lin should have taken cover and communicated with Stephens from behind cover, and that DS Lin violated officer safety principles by not speaking to Stephens from behind the parked silver car. First, DS Lin moved toward Stephens because he believed Stephens was about to run from him – a judgment that appears reasonable for an experienced officer to make, after one views Stephens' behavior on the dashcam video. Secondly, it is simply impractical to require that officers should never approach traffic violator riding a bicycle on the street except from behind cover. To do so would hamper the police, and would stifle ordinary communication between police and the public in many cases. This is not a situation in which DS Lin is stopping a suspected armed robber or other armed criminal. To the contrary, it came as a surprise to DS Lin when Stephens lowered the hands he had been told to raise, reached behind his back, and came out with what appeared to be a handgun.

Mr. Tucker baldly asserts again, on p. 7 of his report, that DS Lin's "decision to shoot violated well established law enforcement use of force training and standards" – without stating what those supposedly well-established training and standards are. Certainly there is no training and no standard to the effect that an officer in Deputy Lin's position cannot fire at a suspect who lowers his hands that he has been commanded to raise, reaches behind his back, and comes out with what appears to be a gun in his hand. If such a standard and such training are "well established," Mr. Tucker should cite to some authority and substantiate that such a standard exists.

Toward the bottom of page 7, Mr. Tucker states that "Stephens had a cell phone in his right hand during the entire incident," despite the fact that there is no video evidence showing Stephens at all during the critical seconds immediately prior to the shots being fired.

On page 8 of his report, it appears that Mr. Tucker, like Mr. Alpert, did not hear DS Lin telling Stephens to "stop" and "…. your hands" about the time he would have been exiting his

Kapelsohn 000018

patrol car, although those words are audible, albeit with difficulty, on the dashcam sound track, and although Stephens himself has testified that DS Lin told him to put his hands up.

Mr. Tucker's description of DS Lin carrying "offensive police equipment" at page 8 of his report is surprising. The weapons carried by DS Lin are defensive, not offensive, and are such as were approved by the PBSO. Mr. Tucker then goes on to state that it was indicative that DS Lin "had an unreasonable fear of being harmed in a police encounter" because he was "wearing his bullet proof vest and was equipped, on September 13, 2013, with seventy-six (76) rounds of ammunition, three (3) shotgun shells, and expandable baton, pepper spray (OC), a pocket knife, five (5) sets of handcuffs, a TASER electronic control weapon, a rifle, a shotgun, and his sidearm." The rifle, the shotgun, and two of the sets of handcuffs were in DS Lin's patrol car. If Mr. Tucker is correct that DS Lin was "equipped" with these items at the time of his encounter with Stephens, we might also say that Lin was "equipped" with a fire extinguisher, a spare tire, tire iron, jack, first aid kit, dashcamera, seat belts, and all the other items in his patrol car.

Hopefully Mr. Tucker doesn't mean to criticize DS Lin for wearing a ballistic (not "bullet proof," as Mr. Tucker calls it) vest. Most uniformed officers wear ballistic vests, and many departments mandate that they do so. Wearing a vest is not indicative of paranoia, but rather of common sense.

The baton, pepper spray, and Taser were less-lethal use of force options issued to DS Lin by the PBSO. They are certainly not "offensive" in modern law enforcement use, but rather are intended to give the officer the option of using lower levels of force if circumstances permit.

I know few law enforcement officers who do not carry a pocket knife, and I know thousands who do. Many manufacturers of police equipment make pocketknives especially for police. Among a myriad of uses, a pocket knife can allow an officer to cut a seat belt to rescue someone from a car wreck, and can allow an officer to cut away clothing, such as a pants leg, from a wound to which life-saving direct pressure, a pressure dressing, or a tourniquet must be applied.

The shotgun issued to DS Lin, a Remington Model 870, held only four (4) rounds of ammunition, and these rounds were buckshot. Unlike the shotguns used by some agencies, the PBSO shotgun in this case had no extended magazine, SideSaddle, Speed-Feed stock, butt-cuff, or other device for carrying additional ammunition. Buckshot will not effectively penetrate barriers such as a car door or sometimes even car windshields, and is not only generally ineffective (due to its pattern spread) but presents a risk to innocent persons (unintended targets) beyond about 25 yards. Accordingly, at greater distances, or where penetration is required, officers are trained to switch from buckshot to a rifled slug, which is a more accurate, single lead projectile. PBSO taught its deputies the procedure for doing this, called a "substitute slug" drill. However, if the deputy has no rifled slugs available on his person, he will not be able to use them when needed. Accordingly, DS Lin carried three rifled slugs on his vest. I know other officers who do the same. The world's largest manufacturer of police holsters, Safariland, even makes a molded plastic 2-shell carrier that many officers use for this very purpose. DS Lin's decision to

19

Kapelsohn 000019

carry three rifled slugs with him so he would have them available if needed showed professionalism, foresight and preparation, not paranoia.

DS Lin carried three pairs of handcuffs on his person, two pairs in the commonly-used double handcuff case on his belt, and other pair on his vest. He had two extra pair of handcuffs in his patrol car. When asked at his deposition if he had ever had to use three sets of handcuffs, he replied (Lin depo., Vol. 1, p. 110), "I have had many incidents where I've used five sets." Many officers I have trained and worked with carry at least two pair of handcuffs on their person, often supplemented by several nylon "flexcuffs" carried in slots intended for flexcuffs in their duty belts, on their tactical vests, or even rolled up inside their hats. Sometimes two pair of handcuffs are needed to cuff a single large individual, if his torso width, muscular development or physical injury prevent his hands from being brought close enough together behind his back to be spanned by a single set of cuffs. Certainly there are many instances where police need to handcuff several suspects in one incident. DS Lin's carrying of three pair of handcuffs should not be a basis for criticizing him, accusing him of paranoia, or suggesting that because he carried three pair of handcuffs, he reacted improperly to Stephens' threatening actions.

Finally, we get to DS Lin's carrying of 76 rounds of handgun ammunition. This complement of ammunition took the form of his loaded Glock pistol, and four spare magazines. The PBSO required that DS Lin and other deputies carry at least two spare magazines. In the case of the Glock 22, which has magazines holding 15 rounds each, this totaled to 76 rounds of ammunition. If DS Lin had, instead of a Glock 22, been issued any of many other makes and models of popular service pistols holding fewer rounds of ammunition in each magazine, the same number of magazines would have carried a complement of fewer rounds. And if DS Lin had been issued a 9mm Glock 17, an extremely popular service pistol, and had carried only two (2) spare magazines, he would have been carrying 52 rounds of ammunition, or 58 rounds if the "plus two" magazines were used. Many officers carry a back-up (second) handgun on duty in addition to their service sidearm, but DS Lin did not. An officer carrying, for example, a 9mm Glock 17 and two spare magazines, plus a back-up gun, could easily be carrying about 70 rounds of ammunition. The suggestion that DS Lin was paranoid, or that he "had an unreasonable fear of being harmed" because he carried 76 rounds of ammunition instead of 58 or 52 or 49 or some other number, is in my view not substantiated. While DS Lin was assigned to a "community policing" role, he could easily have had to respond to an active shooter in a school, or an armed robbery in progress, or a barricaded gunman situation, in any of which he might have needed every round of ammunition he could carry. And any situation he responded to could have resulted in his being wounded or pinned down behind cover, without the ability to get back to his car for his rifle or shotgun, in which case he might again have needed all the handgun ammunition he was carrying.

Finally, I must object to Mr. Tucker's suggestion, at page 9 of his report, that the equipment carried by DS Lin was excessive because PBSO "had not lost a deputy to hostile gunfire in the twenty (20) years preceding the incident with Stephens." As a law enforcement training professional, I find it not only hard to believe, but unconscionable, that Mr. Tucker would set previous law enforcement deaths in any given agency as the threshold for the agency's officers to wear a ballistic vest, carry three sets of handcuffs, carry a Taser and pepper spray and a baton, and carry four spare magazines for their duty weapon. On that basis, agencies in which

Kapelsohn 000020

no officer has ever been killed should, I imagine, not bother wearing ballistic vests or carrying guns at all.  But the nature of the law enforcement task is to be prepared not only for the violent crimes that have occurred in the past, but for those that are yet to occur, the details or requirements of which cannot be known in advance.

## Conclusion.

Based on the foregoing, it is my professional opinion, to a reasonable degree of professional certainty, that if Deputy Sheriff Lin's account of what occurred accurately describes what he perceived, his use of deadly force in this incident was a reasonable use of force in self-defense; that his use of force was in keeping with his training and his department's use of force policies; and that it was in keeping with police use of force practices, training and procedures that are widely accepted and widely taught throughout the United States.  Given the same circumstances, many other reasonable officers on the scene would have used deadly force in the same manner and degree as that used by Deputy Sheriff Lin.  Deputy Sheriff Lin's use of force was necessitated by the actions of the plaintiff in initially attempting to evade the deputy's control, then failing to follow the deputy's verbal commands, and finally in making threatening physical movements that were consistent with the drawing of a handgun.  Under these circumstances, it was reasonable, and in keeping with the deputy's training and experience, to believe his life was in danger, and to respond with deadly force in self-defense.

I reserve the right to supplement or amend this report if additional relevant information becomes available to me.

Very truly yours,

Emanuel Kapelsohn, President

21

Kapelsohn 000021

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

DONTRELL STEPHENS,                    CASE NO. 9:14-cv-80425-COHN/SELTZER

       Plaintiff,

vs.

RIC BRADSHAW, in his capacity
as Sheriff of Palm Beach County, Florida,
PALM BEACH COUNTY SHERIFF'S
OFFICE and DEPUTY SHERIFF ADAMS
LIN, individually.

       Defendants.

_____/

### DEFENDANTS' EXPERT WITNESS LIST

Defendants, RIC BRADSHAW, in his official capacity as Sheriff of Palm Beach County,

Florida, PALM BEACH COUNTY SHERIFF'S OFFICE and DEPUTY ADAMS LIN, individually,

by and through their undersigned counsel, in accordance with Rule 26(a)(2) of the Federal Rules of

Civil Procedure, files this their expert witness list and would state as follows:

1.     Emanuel Kapelsohn
    The Peregrine Corporation
    1771 Creekview Dr.
    Fogelsville, PA 18051

    See attached report.

2.     Bruce Koenig and Doug Lacey
    Bek Tek, LLC
    Audio/Video Forensic Consultants
    12115 Sangsters Court
    Clifton, VA 20124-1947

    They will provide testimony regarding the following:

    • Making a half and quarter speed copy of portions of Deputy Lin's dash cam video,
including superimposed running time stamp, down to milliseconds;

    • Capturing, for purposes of manual printing, 9,000 frames from the dash cam video

1

of Deputy Lin so as to generate still photo images of a portion of the video between the time stamp 8:22:13 and 8:27:10;

• Making a copy of a portion of Deputy Lin's dash cam video which will run in real time, and contain a superimposed running time stamp to including minutes, seconds and milliseconds format.

3.       Deputy Charles (Chuck) Robinson
         Palm Beach County Sheriff's Office
         3228 Gun Club Road
         West Palm Beach, Florida 33406

Deputy Robinson is not a hired, retained expert subject to Rule 26 of the Federal Rules of Civil Procedure, and corresponding local rules, however, it is anticipated that he will provide testimony regarding the operation of Deputy Lin's dash cam video system, including the operation of the system's microphones, including the body microphone worn by Deputy Lin.

**I HEREBY CERTIFY** that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a copy of same via email to: **JACK SCAROLA, ESQUIRE**, Searcy, Denney, Scarola, Barnhart & Shipley, P.A., 2139 Palm Beach Lakes Blvd., West Palm Beach, Florida 33409, mep@searcylaw.com this __25th__ day of August, 2014.

PURDY, JOLLY, GIUFFREDA & BARRANCO, P.A.
Attorneys for Defendants
2455 East Sunrise Boulevard, Suite 1216
Fort Lauderdale, Florida 33304
Telephone (954) 462-3200
Telecopier (954) 462-3861

BY _____
         RICHARD A. GIUFFREDA
         Florida Bar No. 705233

2

Kapelsohn 000023