UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

FORT LAUDERDALE DIVISION

CASE NO. 14-80425-CIV-BSS

```
DONTRELL STEPHENS,                 .
                                   .
              Plaintiff,           . Fort Lauderdale, Florida
                                   . January 7, 2016
              v.                   . 10:05 a.m.
                                   .
RIC BRADSHAW, ET AL.,              .
                                   .
              Defendants.          .
. . . . . . . . . . . . . . . .    .
```

- - - - -

Transcript of Evidentiary Hearing had

before the Honorable Barry S. Seltzer,

United States Magistrate Judge.

- - - - -

Proceedings recorded by mechanical stenography, transcript produced by computer.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

```
APPEARANCES:

For the Plaintiff:      John Scarola, Esq.
                        Patrick E. Quinlan, Esq.
                        Searcy Denney Scarola
                          Barnhart & Shipley, P.A.
                        2139 Palm Beach Lakes Boulevard
                        P.O. Drawer 3626
                        West Palm Beach, Florida  33477


For the Defendants:     Summer M. Barranco, Esq.
                        Richard A. Giuffreda, Esq.
                        Purdy Jolly Giuffreda & Barranco, P.A.
                        2455 E. Sunrise Boulevard
                        Suite 1216
                        Fort Lauderdale, Florida  33304


Court Reporter:         Francine C. Salopek, RMR, CRR
                        Official Court Reporter
                        United States District Court
                        299 E. Broward Blvd., Room 205F
                        Fort Lauderdale, Florida 33301
                        (954)769-5657/mjsfcs@aol.com


                        -  -  -  -  -
```

```
 1              THURSDAY, JANUARY 7, 2016, 10:05 A.M.

 2          (The Judge entered the courtroom)

 3      THE COURT:  Okay.  Good morning.  Please be seated.

 4  Good morning, Francine.

 5      THE COURT REPORTER:  Good morning.

 6      THE COURT:  All right.  Let me welcome you here to the

 7  courthouse, today being January 7, 2016.  Let's go ahead and

 8  call our case.

 9          Dontrell Stephens vs. Sheriff of Palm Beach County and

10  Adams Lin.  And I guess technically I misstated.  It should be

11  Evett Simmons, but just for purposes of simplicity here, I'll

12  refer to it as "Stephens."

13          Okay.  Let me ask the counsel to state their

14  appearances.

15      MR. SCAROLA:  Good morning, your Honor.  Patrick

16  Quinlan and his assistant, Jack Scarola, on behalf of the

17  plaintiffs.

18      THE COURT:  Got a promotion there.  Nice.

19      MR. SCAROLA:  Or a demotion, as the case may be.

20      THE COURT:  And from the defense.

21      MS. BARRANCO:  Good morning, your Honor.  Summer

22  Barranco and Richard Giuffreda here on behalf of the

23  defendants.

24      THE COURT:  All right.  I had set aside the entire

25  day, if need be, because there's a lot of terrain to cover, and
```

4

```
1   I don't know -- it's very hard to predict how long it will all
2   take.
3           Let me try to give an overview of what I'd like to do.
4   In terms of the motions -- and I think I've got them all here,
5   been through this a couple of times, once preparing for it last
6   month and then doing it again for today.  There are a number of
7   motions, but I think there's a certain logical sequence in
8   which we should approach it.
9           I think before we get to the evidentiary motions and
10  in terms of excluding certain topics and expert witness
11  testimony, I think it probably make sense to first address the
12  plaintiff's motions with regard to the Monell count and the
13  negligent -- Count 5, negligence count.  And then once I've
14  ruled on them, and we know essentially what the scope of the
15  existing claims for trial will be, then I think we could
16  probably at that point better address what topics and what
17  testimony from which experts should be permitted.
18          When we're done with that, please remind me, I'd like
19  to discuss -- we had at the last hearing talked about some -- I
20  don't want to say unorthodox, but some, you know, variations of
21  trial procedure and -- such as questionnaires for the venire.
22  We had talked about whether we're gonna permit the jurors to
23  ask questions, and I said I would entertain that.  And so
24  before we leave today, I'd like to do that.  So if I should
25  forget, please remind me.  Of course, I'll take up any other
```

1   questions that you have at that time.

2        I am gonna be out of the office the week before the

3   trial, so I'd like to be essentially trial ready by, I guess, a

4   week from tomorrow and have all the T's crossed and I's dotted.

5   But I think the first place for us to start really is, really

6   with the scope of the claims, and that goes to the plaintiff's

7   two motions.

8        I'm not going to ask that you approach the lectern.

9   It's going to be somewhat informal.  We don't have a jury.

10  It's going to be a long day.  If you want to take your jackets

11  off and be comfortable, that's fine.

12       And I'd like to have sort of a conversational format

13  with us working collaboratively to come up with the best

14  reasoned conclusions.  So I'll just go back and forth between

15  the parties.  But before I'm done, I'll make sure everybody has

16  had an opportunity to be heard.  So there's no need to, you

17  know, be tempted to jump in when opposing counsel are speaking.

18  Everybody will have an opportunity.

19       All right.  Before we get to that, any other topics

20  that we need to address today before we go ahead and start?

21       **MR. SCAROLA:**  Your Honor --

22       **MR. QUINLAN:**  Oh.

23       **MR. SCAROLA:**  -- there are two matters that we would

24  like to address.

25       **THE COURT:**  Okay.

1          **MR. SCAROLA:**  Obviously, the order that your Honor has

2      described in which we'll deal with these issues makes logical

3      sense.

4          **THE COURT:**  Okay.

5          **MR. SCAROLA:**  We do, however, have a practical

6      problem.

7          **THE COURT:**  All right.

8          **MR. SCAROLA:**  And that is that Dr. Alpert, who is here

9      to testify live --

10         **THE COURT:**  Oh, I thought they were going to be by

11     phone.

12         **MR. SCAROLA:**  No, sir.

13         **THE COURT:**  Okay.

14         **MR. SCAROLA:**  He was able to be here, but he has a

15     surgical procedure scheduled tomorrow and a flight that he

16     needs to catch.

17         **THE COURT:**  Okay.  All right.

18         **MR. SCAROLA:**  So we would ask that your Honor make an

19     exception to allow us to take his testimony out of order.

20         **THE COURT:**  What time does he need to leave by?  I

21     guess he's out of town, right, so he has to catch a flight?

22         **MR. SCAROLA:**  Yes.

23         **THE COURT:**  What time is his flight?

24         **MR. QUINLAN:**  I believe the flight is around

25     two o'clock.  He probably wants to get out by noon.

```
1              THE COURT:  Okay.  I think we'll be able to cover

2   essentially the scope of the claims in sufficient time to take

3   his testimony.  But if I am -- I'm not sure which is

4   Dr. Alpert, but --

5              MR. QUINLAN:  He's out in the hallway.

6              THE COURT:  Oh, okay.  Okay.

7              If we start to get a little too close to 12 o'clock,

8   then -- or even 11 o'clock, let me know, and we'll just then,

9   at that point, skip ahead to his presentation.

10             MR. QUINLAN:  And there is one other matter, Judge, if

11  I could?

12             THE COURT:  Yes.

13             MR. QUINLAN:  This is a little bit of good news.

14             THE COURT:  Okay.

15             MR. QUINLAN:  Stipulation.

16             THE COURT:  Stipulation with regard to --

17             MR. QUINLAN:  We reached a stipulation -- if I could

18  approach, I'll hand you a copy of it.

19             THE COURT:  Okay.

20             MR. QUINLAN:  Or I'll hand a copy --

21             THE COURT:  That would be, Aaron, Docket Entry 211,

22  motion for clarification on the issue of vicarious liability.

23             MR. QUINLAN:  Yes, your Honor.

24             THE COURT:  Okay.

25             MR. QUINLAN:  And I apologize.  We just worked out the
```

```
1   final wording of it late yesterday afternoon, so we haven't
2   even filed it yet.
3          THE COURT:  Okay.
4          MR. QUINLAN:  But I just wanted to let your Honor
5   know --
6          THE COURT:  Okay.  I know that was one of the issues.
7   Let me take a look at it.
8          MR. QUINLAN:  As long as you are all right with
9   signing off on it.
10         THE COURT:  Okay.  Withdraw....
11         MR. QUINLAN:  Do you have a copy, Counsel?
12         MR. GIUFFREDA:  I don't.
13         MR. QUINLAN:  Here you go.
14         THE COURT:  Okay.  All right.  Yes.  Order
15   approving....
16         I guess you had not assigned -- oh, okay, I'm just
17   gonna go ahead and insert the date for the attorneys'
18   stipulation for today.  7th.  Let me go ahead and... Court
19   having... Count 4.
20         Let me go ahead... today's the 7th.  All right.  Just
21   for the record, I am no longer the chief, so we're gonna --
22   that privilege has been -- that torch has been passed to
23   another deserving magistrate, Frank Lynch.  We do three-year
24   rotations.  And so Judge Lynch now is the chief.  I just needed
25   that.
```

```
1            All right.  So for the record -- and let me ask the
2   attorneys to keep track, because at the end, I may ask you to
3   submit an order just summarizing my rulings on the various
4   motions.  Not in any great detail, I'll put the detail on the
5   record orally, but just the ultimate ruling.
6            As to Docket Entry 211, plaintiff's motion for
7   clarification, we'll go ahead and deny that as moot, in light
8   of the stipulation, which I've just signed.
9            And, Aaron, here is the stipulation.
10           Okay.
11           All right.  Any other housekeeping matters before we
12  get into the first motion?
13           MR. QUINLAN:  No, your Honor, other than just to
14  inform your Honor that Dr. Alpert and Mel Tucker are in the
15  courtroom now, and I've explained --
16           THE COURT:  Okay.
17           MR. QUINLAN:  -- the procedure that we're gonna
18  follow.  And if we get close to the flight time, we can do
19  that.
20           THE COURT:  We'll do that.
21           All right.  Let's --
22           MR. GIUFFREDA:  I think there was one thing, your
23  Honor, if I may.
24           THE COURT:  Yes.
25           MR. GIUFFREDA:  The issue with the trial being limited
```

1   to five days, which I was honestly not aware of that.

2            **THE COURT:**  Straight-up order.

3            **MR. GIUFFREDA:**  Yeah.

4            **THE COURT:**  I mentioned that, I think, at the outset

5   at the scheduling conference.

6            **MR. GIUFFREDA:**  Yeah, and I don't think I was there

7   for that.

8            **THE COURT:**  We can get you the order.  But anyway,

9   yes.

10           **MR. GIUFFREDA:**  I think the concern we have is whether

11  this case can be tried in five days, even without a *Monell*

12  claim.  I think honestly --

13           **THE COURT:**  You know, the way I've applied the order

14  is, you know, a good-faith estimate.

15           **MR. GIUFFREDA:**  All right.

16           **THE COURT:**  You know, I think there was once a patent

17  case that I had, where we were running over five days.  We

18  wound up bifurcating liability and damages.  The jury came back

19  plaintiffs' verdict for liability, and they settled damages.

20           You know, but usually the way that I approach it is a

21  good-faith estimate.  And a lot of that may ultimately wind

22  up -- depending upon, you know, what the rulings are today.

23           **MR. GIUFFREDA:**  Sure.  Okay.

24           **THE COURT:**  But thank you for raising that.

25           **MR. GIUFFREDA:**  No, we want to stay here.  We just

```
 1   wanted to make sure that wasn't some absolute, you know --
 2          THE COURT:  Yeah, like the Eleventh Circuit's green
 3   light, red light.
 4          MR. GIUFFREDA:  Yeah, right.  That was it, yeah.
 5          THE COURT:  All right.
 6          MR. GIUFFREDA:  Don't have to worry about that.
 7          THE COURT:  There are two -- there's the Count 5 claim
 8   and the Monell claim, which is -- docket entry is earlier.
 9   Okay.  Let's start Docket Entry 188, the Count 5 claim,
10   negligence.
11          Let me go ahead and give plaintiff's counsel -- and,
12   by the way, for the record, I have read through, at least
13   twice, every filing that pertains to today.  So if I cut you
14   off, it's not to be rude.  It's just that I'm pretty familiar
15   with it.
16          But let me go ahead and turn, first, on the Docket
17   Entry 188, the Count 5 motion.
18          MR. SCAROLA:  Thank you, your Honor.
19          Your Honor, we are seeking leave to amend based upon
20   the manner in which the evidence in this case has developed.
21   And we've laid out the basis for our seeking that amendment.
22   To summarize this in a very succinct manner, we contend that
23   what should have been initiated as a conversation by Deputy
24   Sheriff Lin with a young man, who, at most, had been involved
25   in a noncriminal traffic infraction, was from the outset
```

```
1    negligently turned into a confrontation and negligently

2    permitted to escalate into a conflagration.

3         There was substantial negligence that preceded the

4    excessive use of force.  And the focus of the amendment will be

5    on that negligent conduct leading up to the excessive use of

6    force.

7         THE COURT:  Let me ask you a question.

8         MR. SCAROLA:  Yes, sir.

9         THE COURT:  One of the objections that defendants

10   raise is that, you know, this greatly broadens the scope of a

11   trial, that it's gonna go back to what uniform the officer put

12   on in the morning, and it goes far beyond now what we had

13   planned for trial.

14        And then in your reply, you say, on page 2, in

15   response to defendants' claim of prejudice and having to

16   address what is, in essence, a whole array of different

17   theories -- you say that the specific examples of negligence

18   identified in paragraph 105 of amended Count 5 are all among

19   the totality of circumstances that plaintiff will offer and a

20   jury will consider in assessing whether Deputy Lin acted

21   reasonably in deciding to shoot.

22        If that's the case, then how can you also argue that

23   the negligence is distinct from the intentional tort?  If

24   you're saying it's essentially the same thing?

25        MR. SCAROLA:  Well, your Honor, we're not saying that
```

1    it's the same thing.  We are, indeed, saying that the
2    surrounding circumstances, the facts leading up to the
3    intentional excessive use of force are part of the totality of
4    what we anticipate proving.  But there are -- there's clearly a
5    distinction between the negligence that precedes the choice to
6    reach for a firearm and to fire at Dontrell Stephens.  There is
7    a distinction between that decision and the negligence that
8    precedes that decision.
9         Even though the jury is entitled to view the totality
10   of these circumstances in assessing Deputy Sheriff Lin's
11   credibility, in assessing the attitude with which he approached
12   this circumstance, in escalating it to the point where the
13   intentional decision to use excessive force was made, the
14   negligence leading up to that, I suggest, is distinct from the
15   decision to pull and shoot his firearm.
16        **THE COURT:**  Putting aside the question of whether
17   there exists such a legal duty not to wear certain types of
18   uniforms or carry certain types of equipment and not to pursue
19   somebody who is -- has committed a traffic violation, which
20   duties, I'm assuming, you're alleging he breached, would not --
21   it seems to me there are two possible -- you've got the
22   plaintiff saying the officer just walked up to him and shot
23   him, essentially.  He put his hands up, and the officer just
24   shot him with his hands up.  You've got the defendant saying he
25   thought he reached behind his back and came out with a black

1    object, which he thought was a gun.

2           Let's assume, for the sake of argument, that it was a

3    gun.  Would that not, in fact, be a superseding, intervening

4    cause that would break the chain of causation such that

5    whatever breach occurred, assuming putting on the camouflage

6    uniform is some type of breach of a legal duty, that that --

7    assuming, for the sake of argument, that that somehow could be

8    considered negligence, or pursuing the plaintiff in a police

9    car, assuming that that's somehow negligent, even if it were,

10   if the defendant did have -- if the plaintiff did have a gun,

11   would that not have been a superseding, intervening,

12   independent, efficient cause, unforeseeable, intentional tort,

13   criminal act that would have broken the chain of causation so

14   that there would be no damages on a negligence count?

15           **MR. SCAROLA:**  If we were to assume that Dontrell

16   Stephens was the aggressor, that Dontrell Stephens pulled a

17   gun --

18           **THE COURT:**  Right.

19           **MR. SCAROLA:**  -- on a police officer, who at that

20   point in time had done nothing beyond having negligently caused

21   these circumstances to escalate to the point where that

22   occurred, I think I would have to agree with your Honor, that

23   that was an intervening super -- the criminal act on the part

24   of Dontrell Stephens was an intervening, superseding cause.

25           **THE COURT:**  Okay.

1          **MR. SCAROLA:**  But those aren't the facts --

2          **THE COURT:**  Okay.  Next step in the hypothetical.

3          **MR. SCAROLA:**  Yes, sir.

4          **THE COURT:**  Let's assume -- because we have two

5    versions here.  Obviously, if the jury believes the plaintiff,

6    it's gonna be a relatively simple case.  They're gonna come

7    back with a finding of excessive force.  And a negligence claim

8    for that then really is of no matter in terms of damages.

9          But if they believe the deputy and find that his

10   perception was reasonable, then whether he was mistaken, if it

11   was nonetheless reasonable, then did that not break the chain

12   of causation when he reached back to his pocket, bladed his

13   body, you know, whatever the deputy is saying, came up with his

14   hand with a black, flat, shiny object -- would that not then

15   break the chain of causation?

16         **MR. SCAROLA:**  No, sir, I don't think so.  Because I

17   think at that point, I think at that point that what we are

18   talking about is a reasonably foreseeable response on Dontrell

19   Stephens' part to aggravated circumstances that never should

20   have existed to begin with.  This should have been a

21   conversation.

22         **THE COURT:**  But that goes to the officer's perception.

23   I'm saying, if the jury believes that the officer genuinely

24   thought and reasonably thought that the plaintiff had a gun --

25         **MR. SCAROLA:**  Yes, sir.

1      **THE COURT:**  -- if the jury says, Yeah, it was

2  reasonable for him to believe that he had a gun, would that not

3  also break the chain of causation?

4      **MR. SCAROLA:**  No, sir, I don't think it would.

5  Because he would have himself created the circumstances that

6  made it reasonable for him to mistakenly believe that Dontrell

7  Stephens was going for a gun.

8      **THE COURT:**  But isn't that causation in fact?  That's

9  the but-for argument.  But for the fact that he put on the

10  military uniform, but for the fact that he put on his siren and

11  sped after Stephens, but for -- that's true.  And you can go

12  back ad infinitum, but for the fact that his parents gave birth

13  to him.

14      **MR. SCAROLA:**  Which may or may not have been

15  negligent.

16      **THE COURT:**  But legal causation proximate cause is

17  different, as you would acknowledge, where you have an

18  independent, unforeseeable event.  Somebody pulls out what

19  appears to be a gun, albeit mistaken perception, but what a

20  jury, let's say, says he reasonably believed to be a gun,

21  doesn't that become the proximate cause, as opposed to the

22  officer putting on his uniform, of the shooting?

23      **MR. SCAROLA:**  No, sir.  Respectfully, I don't believe

24  that's the case if the police officer, himself, has created a

25  situation in which he is the cause of circumstances that

1   require him to make a split-second decision in assessing

2   whether what Dontrell Stephens is doing or not doing can be

3   reasonably perceived as a threat.  It never should have reached

4   that point.  But for the police officer's negligence --

5         **THE COURT:**  You're making a chain of events argument,

6   that he kicked off the chain of events that -- correct?

7         **MR. SCAROLA:**  Yes, sir.

8         **THE COURT:**  Okay.

9         All right.  The chain of events argument, though,

10  doesn't that fall when you have a superseding, unforeseeable,

11  intervening event?

12        **MR. SCAROLA:**  By definition, it does.  The law says

13  that a superseding -- an unforeseeable, superseding,

14  intervening event breaks the chain of causation.

15        **THE COURT:**  Right.

16        **MR. SCAROLA:**  My response to your Honor is --

17        **THE COURT:**  Right.

18        **MR. SCAROLA:**  -- that the determination as to whether

19  it was foreseeable or not, that's a jury question.  The jury

20  gets to determine whether the police --

21        **THE COURT:**  Proximate cause is a legal issue.

22        **MR. SCAROLA:**  Well, it can be both a legal and factual

23  issue.

24        **THE COURT:**  Let me ask you about -- and I was curious

25  to get there, because that was the first thing that kind of

1    jumped -- before I got the -- received the response and

2    considered the defendants' arguments -- and I'll get to that in

3    a moment -- that was the first thing that jumped out at me.

4         You know, assuming there's some type of breach of duty

5    to dress the way that he did, that that somehow could be the

6    cause -- you know, the proximate cause of the injury here.  So

7    that was my first concern.

8         **MR. SCAROLA:**  And I would like to address that, if I

9    could --

10        **THE COURT:**  Yeah.

11        **MR. SCAROLA:**  -- because I don't think it is accurate

12   to say that this police officer breached a duty to Dontrell

13   Stephens by dressing in the way in which he dressed.  I think

14   that's an oversimplification of what we are seeking to allege.

15        **THE COURT:**  Okay.

16        **MR. SCAROLA:**  What we are saying is that the totality

17   of the circumstances, including confronting this young

18   bicyclist, dressed in the manner in which he was dressed, as

19   aggressively as he confronted him, with blue lights and sirens,

20   allegedly shouting commands at him, that whole set of

21   circumstances was a negligent handling of what should have been

22   a peaceful conversation about a noncriminal traffic infraction.

23        All of those things combined --

24        **THE COURT:**  Right.

25        **MR. SCAROLA:**  -- placed both those parties in a

```
 1   circumstance where the police officer, if he had a reasonable

 2   perception of a threat of violence, created the circumstances

 3   that caused him to have that perception of the threat of

 4   violence.  It never should have reached that point.  That's the

 5   general negligence theory that we are attempting to present,

 6   which is separate and apart from the choice to use deadly

 7   force.

 8        THE COURT:  I've got the -- and I don't want to

 9   belabor this, because I want to get to the defense arguments,

10   but paragraph 105 of the proposed revision enumerates the

11   various breaches of duty, and it starts with negligently chose

12   to present himself in an overmilitarized fashion, which goes to

13   his dress.

14        MR. SCAROLA:  At least in part, yes, sir.

15        THE COURT:  Okay.  That would suggest that putting on

16   a lawfully issued uniform, Class C uniform for the Palm Beach

17   Sheriff's Office, is a breach of a legal duty.

18        The next two talk about his risk assessment in

19   determining whether or not Stephens was armed actually goes to

20   the shooting itself.  That's not separate and distinct from a

21   shooting.

22        MR. SCAROLA:  Well, sir, respectfully, I disagree with

23   you --

24        THE COURT:  Okay.

25        MR. SCAROLA:  -- for this reason.  The assessment as
```

1  to whether Stephens was armed begins the moment that Stephens

2  is in view of Deputy Sheriff Lin riding a bicycle with a black

3  object in his right hand held to his ear.  It continues when

4  Stephens dismounts his bicycle holding that same black object

5  in his right hand.

6         Deputy Sheriff Lin's testimony is, I am trained to

7  focus my attention on the hands of a suspect, because that's

8  the potential source of danger.

9         **THE COURT:**  Right.  But if you're arguing that that's

10  part of the negligence, then how is that different from the

11  excessive force claim in determining the reasonableness of the

12  officer's perceptions?

13         **MR. SCAROLA:**  Because that is what leads to his

14  ultimate decision to use deadly force.  But it is not the

15  decision to use deadly force.  It's separate and apart from

16  that.

17         **THE COURT:**  Let me give Mr. Giuffreda or Ms. Barranco

18  an opportunity to respond.

19         Your arguments went to -- appear to go more to the

20  administrative side of considering the claim at this point, but

21  let me give you an opportunity to be heard.

22         **MS. BARRANCO:**  Thank you, your Honor.

23         And as your Honor said, you've read the motions and

24  the responses, so I don't want to belabor the point.  But

25  certainly, you know, it's the defendants' position that this is

1   basically an eleventh-hour attempt to amend a claim that

2   originally was flawed from the get-go to the extent that it was

3   part and parcel of the use of force, and now they're trying to,

4   you know, bring in all these other potential theories, you

5   know, within weeks of a trial starting.

6         And certainly that would be unduly prejudicial to the

7   defendants to have to defend this -- these claims.  And as your

8   Honor has picked up on the fact that it's the defendants'

9   position that these other theories are futile in terms of the

10  legality, you know, whether or not there was a duty on the part

11  of Deputy Lin to dress in a certain way, particularly when the

12  evidence shows that he was dressed in an authorized uniform of

13  the agency, and how that could possibly be seen as a breach of

14  some kind of a legal duty, that, of course, your Honor, would

15  go to our argument that the proposed alternative theories are

16  futile, and, therefore, the amendment should be denied.

17        In terms of what your Honor mentioned a moment ago, it

18  would be the defendant's position that certainly when

19  Mr. Stephens decided, for whatever reason, to move the object

20  in his hand in a way that created that immediate concern on the

21  part of Sergeant Lin that he was an imminent threat to his

22  safety and security and his life -- I believe the deputy's

23  testimony was originally he was hovering his hand over his

24  taser, and then when he saw this conduct on behalf of

25  Mr. Stephens, that it was at that point he shifted his hand

1   over to his firearm -- it would be our position that,

2   number one, Mr. Stephens' conduct in terms of what he did with

3   this object in his hands, whether it was a cell phone or not,

4   it -- was what broke the -- was a superseding event that broke

5   the chain, the causation, in terms of anything that the deputy

6   did or didn't do up until that point.  And it really does boil

7   down to whether or not, you know, the use of force was

8   reasonable or excessive.  And this attempt to try to come up

9   with some other theories under the guise of it being negligence

10  is really nothing more than an attempt to, you know, try to get

11  another bite at the apple, to try to argue other issues before

12  this jury that really have no legal significance.

13          And we certainly, of course, have other motions before

14  the Court today regarding why some of those other arguments

15  about, you know, how Deputy Lin was dressed, how many bullets

16  he had on his belt, why those things shouldn't be permitted to

17  come through to this jury by way of expert testimony either.

18  It gets confusing to the jury and distracts them from what they

19  really need to decide in this case.

20          Uhm --

21          **THE COURT:**  I -- I'm sorry.

22          **MS. BARRANCO:**  So I mean that's basically how I would

23  address the issue that your Honor was concerned about with

24  plaintiff's counsel at this moment.

25          **THE COURT:**  One of the arguments that plaintiff's made

1    is, look, you were the ones that took the interlocutory appeal.

2    And although you had the right to do so, that that resulted in

3    a stay for the better part of a year, so that they couldn't

4    file anything.  They point out that at the November 2014

5    hearing, they said they may come back -- may want to come back

6    and try to amend it, and the reason they couldn't was by virtue

7    of your taking an appeal on a qualified immunity issue.  So,

8    therefore, it would be inequitable to put that on them,

9    essentially.  Let me get your response on that.

10            **MS. BARRANCO:**  Well, your Honor, if that was the only

11    delay we were referring to, that would be one thing.  However,

12    they've raised this -- and these allegations in terms of these

13    other theories are all things that they could have argued and

14    raised either initially in their initial complaint or, you

15    know, prior to a summary judgment being filed.  Heck, even when

16    the summary judgment was filed, I suppose they could have asked

17    for amendment.  Rather, they waited until -- essentially, the

18    Court in the hearing on the summary judgment motions was making

19    it clear that, you know, plaintiffs, you really -- your count

20    there for negligence doesn't survive, because your allegations

21    only have to do with the excessive force -- the use of force.

22    And it's then that the appeal was taken.

23            So I would submit, your Honor, that there's nothing

24    new here in terms of the facts, in terms of the video evidence,

25    in terms of the testimony as to why they couldn't have raised

24

1    any of these theories before.  And that's, of course, assuming

2    they have legal weight.

3         **THE COURT:**  Let me get, Mr. Scarola, your response to

4    that.  Because the issue here isn't -- it's not a -- unlike

5    with the *Monell* motion, where you say, Well, we've got new

6    evidence.  This isn't a new evidence; this is a new theory.

7         Seventeen months -- I think it was June 2014, was the

8    deadline -- I believe it was June 2014 -- was the deadline for

9    amending the complaint.  And let's assume that they had not

10   taken the interlocutory appeal.  So let's put ourselves now in

11   the position of where we were, I guess, about a year ago at

12   this time, when we were thinking about we're gonna go to trial

13   in late January.  So here we sit now in January 2015 *(sic)*,

14   seven months ago was your deadline for amending the complaint

15   to replead that count.  What is the good cause for allowing you

16   now to do it on the eve of trial when you could have done it

17   seven months ago, these theories?

18        **MR. SCAROLA:**  Your Honor, I -- obviously, this is

19   coming significantly after the deadline for amendment that was

20   established by the Court.

21        **THE COURT:**  Right.

22        **MR. SCAROLA:**  And the only thing I can tell your Honor

23   is that there is no prejudice to the defense.  We are not

24   talking about any new facts.  We are talking about

25   circumstances that had been fully and completely discovered.

```
1   It is a change in legal theory or an addition in legal theory,
2   but there is no prejudice whatsoever to the other side that has
3   been or could be argued as a consequence of permitting this
4   amendment.  This is a matter that rests in the sound discretion
5   of the Court.
6            THE COURT:  Yeah.
7            MR. SCAROLA:  Considering the extraordinary
8   seriousness of the matters that we are dealing with, we would
9   hope that the Court would exercise the discretion, in the
10  interest of justice, in allowing the fullest possible
11  presentation to be made to this jury.
12           THE COURT:  All right.  I always try to rule in the
13  interests of justice, but sometimes we all see that a little
14  different.
15           I'm gonna deny the motion to amend Count 5.  There
16  really was no reason that this could not have been pled before
17  the June 2014 deadline.  And, you know, I should also mention
18  that, in many ways, I wish it had been, because I think it
19  would have been a fascinating issue to brief on this causation
20  angle and to see how that played out at trial.  I'm not sure
21  what the right answer is, but I pulled out an opinion I had
22  done, I think, in 2003 on this whole issue of causation in a
23  different context going back, you know, looking at the
24  restatement and the earliest Florida Supreme Court cases as to
25  what constitutes a superseding, intervening cause.
```

```
 1          So that kind of jumped out at me, and I -- in some
 2   ways, I would have loved to have had that briefed and argued,
 3   you know, just for my own edification, to see whether that
 4   would hold water in this context or not.  But I think --
 5   certainly on the administrative grounds, I think the defendants
 6   make a good point.  And so I'm going to go ahead.  I think it
 7   would be unfair at this point.  And, again, there is no reason
 8   why it could not have been raised in these arguments in
 9   June 2014.
10          All right.  So that's Docket Entry 188.  And, again,
11   the reasons, we'll have them on the record.  I'll just ask the
12   parties when we're done just to submit a summary of my rulings.
13          Just as an aside, in case you want to look at it, the
14   opinion that I had done back -- it was a consent case, was a
15   35-page decision -- was Case Number 03-60487, Duarate vs. Aetna
16   Life.  Obviously, the facts were different, but involved a
17   woman who was terminated and whether there was a superseding
18   event that breached the cause -- the chain of causation.  And
19   there's a memorandum, opinion, and order granting summary
20   judgment.  And I went through a number of the early, more
21   recent Florida Supreme Court and Court of Appeals cases and
22   restatement.
23          All right.  Let me proceed to the Monell claim, which
24   is Docket Entry 192.  And I went back, and I reread my order on
25   the summary judgment, just the night before last, just to bring
```

```
1   myself back up to speed on what had been argued in

2   November 2015 -- '14.

3        Let me go ahead and turn to plaintiff to hear their

4   argument for reconsideration of the Monell claim.

5        MR. SCAROLA:  Thank you, your Honor.

6        Your Honor, in this --

7        THE COURT:  But before we do that, I'm looking at the

8   clock, and I'm kind of conscious of Mr. Alpert's situation.

9   How many minutes do you believe Mr. Alpert's presentation will

10  take?

11       MR. QUINLAN:  Twenty?

12       THE COURT:  And cross?  Is there gonna be

13  cross-examination argument?

14       MS. BARRANCO:  Five or ten minutes, your Honor, if

15  that.

16       THE COURT:  I think the argument on the Monell claim

17  is gonna take a little while, so maybe we should go ahead and

18  take Mr. Alpert now.

19       MR. SCAROLA:  Thank you, your Honor.

20       THE COURT:  Okay.

21       All right.  Or Dr. Alpert -- I'm sorry.

22       Let's then change gears, and that is docket entry --

23  the defense motion, Docket Entry 194.  Docket Entry 194 is the

24  defendant's motion in limine regarding plaintiff's law

25  enforcement experts.  And we'll bifurcate it.  We'll take --
```

1   the other expert, I believe, does not have a time constraint,

2   correct?

3         **MR. SCAROLA:**  That is correct, your Honor.

4         **THE COURT:**  Okay.  He's being paid by the hour.

5         **MR. SCAROLA:**  I don't know what my hourly fee will be.

6         *(Laughter)*

7         **THE COURT:**  Well, he's enjoying himself, so he doesn't

8   get to charge.

9         All right.  Let me go ahead then on 194.  Let me turn

10  to, first, the movant.

11        **MS. BARRANCO:**  Yes, your Honor.

12        **THE COURT:**  Ms. Barranco.

13        As to Dr. Alpert, why should his testimony be excluded

14  in whole or in part?

15        And maybe what we should do, thinking aloud, maybe we

16  should get his testimony on the record and save the argument

17  until after Mr. Tucker testifies also, and we get

18  Mr. Kapelsohn's testimony, and then we could get into argument

19  about 702 and whether any of this testimony is helpful to a

20  jury, the qualifications.  But maybe first we should go ahead

21  and just get the testimony on the record.  Maybe we should do

22  that.  All right?

23        Why don't we go ahead -- and, Dr. Alpert, do you want

24  to come forward?

25        And for the record, I've read through the expert

29

1    reports twice.  And so -- please raise your right hand.

2         *(GEOFFREY P. ALPERT, PLAINTIFF'S WITNESS, WAS SWORN)*

3         **THE COURT:**  Okay.  If you go ahead and be seated.

4         Let me just pull out your report.

5         This is Mr. Tucker's report.

6         **THE WITNESS:**  Thank you.

7         **THE COURT:**  Let me just... okay.  I think it's

8    Exhibit B.

9         **MR. SCAROLA:**  Your Honor, for purposes --

10        **THE COURT:**  194-2.  Okay.

11        **MR. SCAROLA:**  For purposes of expediting this

12   proceeding --

13        **THE COURT:**  Yes.

14        **MR. SCAROLA:**  -- may we assume that Dr. Alpert would

15   testify in accordance with his report, simply admit the report

16   as evidence of what his opinions would be and --

17        **THE COURT:**  Sure.  Yeah, that's an efficient way to do

18   it.  In fact, I allow my criminal hearings -- I have the case

19   agent adopt the affidavit as the testimony in direct

20   examination.

21        Let me ask this, Mr. Scarola, are there any material

22   changes to the report that we wish to note before we go in?

23        **MR. QUINLAN:**  I'll address that.

24        First of all, your Honor, consistent with the earlier

25   discussion, it's okay if I remain seated for all of this?

1          **THE COURT:**  Yeah, yeah, yeah, yeah.  Sure.

2          **MR. QUINLAN:**  Thank you, your Honor.

3          No, not material changes in the opinions reflected in

4     the report.  There is one portion of one of the bullet-pointed

5     opinions -- and I think we can probably save this for the

6     argument part -- where I think we would concede the wording of

7     it.  It's worded in a way that may infringe on the area that

8     should be decided by the jury, but we can address that later.

9          **THE COURT:**  All right.

10         **MR. QUINLAN:**  With regard to the report, and just to

11    follow up on your exchange with Mr. Scarola, the report itself

12    is 194-2.  We would ask that it be admitted and considered as

13    part of the hearing for purposes of expediting.

14         **THE COURT:**  All right.

15         **MR. QUINLAN:**  Dr. Alpert also signed an affidavit

16    that's been filed as DE 201-2.  We would ask the same thing

17    with regard to the affidavit.

18         In the affidavit, I believe it is -- let me confirm

19    that -- in an attachment to the affidavit, which is actually

20    20 -- yeah -- I'm sorry -- Exhibit 4 to 201-2, Dr. Alpert did

21    note that he had -- since completing his original report, he

22    had reviewed additional materials, because the case had

23    continued on with new materials being generated.  Doesn't

24    affect his opinions, but it is additional source material that

25    he looked at as part of formulating his opinions.  But, again,

ALPERT - DIRECT/QUINLAN

1    that's all laid out in the record.

2              **THE COURT:**  Okay.

3              All right.  Please state your name for the record and

4    spell your last name.

5              **THE WITNESS:**  Geoffrey Alpert, A-L-P-E-R-T.

6              **THE COURT:**  Okay.  Tap the mike.  Is the mike on?

7    Okay.

8              And, Dr. Alpert, we have your report dated August 5,

9    2014, at Docket Entry 194-2.  Are you adopting that report as

10   your testimony on direct examination with the additional

11   caveats that Mr. Quinlan mentioned?

12             **THE WITNESS:**  Yes, sir.

13             **THE COURT:**  All right.

14             Do we need to take any direct or could we go right to

15   cross then?

16             *(Discussion had off the record between counsel)*

17             **MR. QUINLAN:**  Right.  We were gonna do a little direct

18   on his background and a bit of his methodology.  I know some of

19   that is described in the written report itself, but I think it

20   will flesh out a little bit some of what's in the 194-2.

21             **THE COURT:**  All right.  Just briefly, because I think

22   it's pretty clear, his qualifications.

23                        **DIRECT EXAMINATION**

24   BY MR. QUINLAN:

25   Q.  Dr. Alpert, just -- and, again, briefly, as his Honor has

ALPERT - DIRECT/QUINLAN

1    said -- give us your background as it relates to police

2    practices.

3    A.   I was at the University of Miami in 1980 and was asked by

4    the Dade Association of Chiefs of Police to evaluate the

5    after-action reports of the McDuffie riot.  That led to a

6    series of work with the Dade Association of Chiefs of Police,

7    and at the time, Metro-Dade, now Miami-Dade Police, and some of

8    the City of Miami, where I was asked to come in and evaluate

9    their uses of force, the uses of deadly force, and kind of help

10   them formulate policies, training, look at their practices, and

11   work with them to develop a much more comprehensive view.

12        I also worked with -- when Janet Reno was state

13   attorney, with the grand jury, where we did a report on the use

14   of deadly force.  She asked me to be their research director

15   and work with the grand jury to formulate a report that was

16   published in the early '80s on the use of deadly force, where

17   they took testimony from a variety of people, wrote this civil

18   report that you do here in Florida, that's really quite

19   interesting.

20        Moving from that experience, the City of Dallas asked

21   me to review their use-of-deadly-force customs and practices in

22   the early '80s.  And I guess for the last -- hate to say it --

23   30 years that's what I've been doing.

24        Currently, I do the same.  I'm one of the federal

25   monitors in New Orleans.  That's what we're looking at under

ALPERT - DIRECT/QUINLAN

1   the consent decree in New Orleans.  We're looking to doing the

2   same in Portland, Oregon.

3   Q.  Let me interrupt you, Doctor.  And I know we're trying to

4   expedite, but if you could, give a little more background on

5   your role as a monitor in New Orleans.  What does that mean?

6   A.  Well, the justice -- it's a federal consent decree.

7   Basically, the Justice Department, the City of New Orleans, and

8   the New Orleans Police Department agreed on, gosh, 170-odd

9   paragraphs of reform.  They hired the monitoring team to come

10  in, under the direction of Judge Morgan, to assure that the

11  city was doing what they said they were going to do.

12       So, as a monitor -- I think there's six of us, or

13  seven of us, we all have different roles, where we go in, and

14  we basically work with the compliance bureau and the chief and

15  all the police officers in the city to make sure what they do

16  is within the consent decree and within constitutional

17  policing.  So we look at the consent decree, we look at the

18  laws, the regulations, the policies.  We -- I think we've

19  written -- rewritten almost every policy for the City of

20  New Orleans.  And I deal with the use of force, the

21  use-of-force investigations, the use-of-force training as a

22  monitor.

23       And in Portland, Oregon, theirs is much more limited.

24  It's basically the use of force in mentally ill.  And I do the

25  same thing in Portland.

ALPERT - DIRECT/QUINLAN

1  Q.  And have you done it in other jurisdictions in other

2  federal proceedings?

3  A.  Oh.  Oh, yes, sir, but this was just as a monitor,

4  appointed by the Court.

5  Q.  Okay.  Well, keeping in sort of the federal vein, have you

6  received any grants from the Justice Department to conduct any

7  of your research?

8  A.  Yes, sir.  Since about 1990, I've had -- I'm still under

9  grants from the Department of Justice, mostly the National

10  Institute of Justice, Bureau of Justice Assistance, and now

11  we're working on a CDC grant on police officer safety issues.

12  So, yeah, for the last 20-some years, I've worked with

13  federal -- federally funded grants that have been through

14  requests for proposals and through review processes.

15  Q.  You mentioned Miami-Dade and the McDuffie riots in -- what

16  was it, 1980?

17  A.  Yes, sir.

18  Q.  Have you had an ongoing relationship with that department

19  for the last 36 years?

20  A.  Yes, sir.  I did a very large racial profiling study for

21  them a few years ago, and I'm negotiating with them now on a

22  use-of-deadly-force study.  So I've been working with them

23  since, yeah, 1980, 1981.

24  Q.  Can you tell the judge a little bit more about the racial

25  profiling study that you did?

ALPERT - DIRECT/QUINLAN

1    A.   This was a few years ago, when there was a big push, as

2    there is today, dealing with the issue of racial profiling at

3    traffic stops.  And rather than wait until the feds came in and

4    dealt with them, they proactively wanted to do a study to see

5    what they were doing, whether it was right, wrong, or how it

6    could be improved.  And, gosh, three years, three-and-a-half

7    years, we did probably the most comprehensive study on racial

8    profiling in traffic stops.  And it was funded by the county.

9         We came up with some issues that they had to resolve.

10   They resolved them all.  And by the time it was over, they had

11   incorporated all of our recommendations into their policies and

12   practices.

13   Q.   And have you done studies of racial profiling in

14   jurisdictions other than Miami?

15   A.   We did the -- I was part of the team that did the study in

16   Los Angeles under their consent decree in the early 2000s.

17   Q.   Did you work on a project that related to deescalating

18   interactions between police and citizens?

19   A.   Yes, sir.  That was one of the outcomes of the Miami

20   studies after the riots, where not only did, at the time

21   Metro-Dade -- I'm little awkward saying that because

22   Miami-Dade -- develop the field force training, where they

23   really took that all over the country and the world, just to

24   explain how to deal with the crowds and riots, but they also

25   developed, through both research and practice, a process of

ALPERT - DIRECT/QUINLAN

1    deescalating interactions, and ended up with a really fine

2    program that has still some remnants of it.  But the

3    evaluations we did were in the '80s and '90s, and it -- yes --

4    so the answer is yes.  And it was a very successful project.

5    Q.  Okay.  I believe your report uses the term "community

6    policing."  Have you had involvement in the type of police work

7    known as "community policing"?

8    A.  Yes, sir.  In fact, I testified to the president's 21st

9    century task force on policing on two issues.  One was on the

10   officer-created jeopardy discussion that was had a little

11   earlier, and one was on procedural justice issues and use of

12   force.

13            And what was going on in the '80s, '90s, and early

14   2000s by a lot of police officers was really what they're now

15   calling "procedural justice," which is a form of community

16   policing.  It's treating people as they should be treated,

17   treating people with respect, with dignity, allowing people to

18   give voice and to provide information when they're stopped by

19   police officers as opposed to being yelled at, screamed at.

20   Now it's called procedural justice.  It's had other names, such

21   as a problem solving and community policing.  And early in its

22   day, it was called police in the community.  So many of these

23   obviously have been refined, but it's just a growth, a trend of

24   citizen interactions with police officers.

25   Q.  We have spoken a little bit about work you've done at the

ALPERT - DIRECT/QUINLAN

1   state federal, work you've done at the federal level.  Let me

2   just briefly ask you about any work you've done at the

3   international level.

4   A.   Yes, sir.  Recently, I've had the fortune to work in

5   Australia, and I've had two particular -- I was brought over to

6   work with Queensland police, a little bit with New South Wales

7   police, specifically on their use-of-force issues.

8          But I was just asked recently to evaluate the lin --

9   the chocolate cafe terrorist attack was a 16-hour siege, where

10  the New South Wales police held -- held -- well, as a person

11  was holding the innocent people at the cafe hostage for

12  16 hours, the police response.  They eventually went in after

13  the hostage, who had an ISIS flag and was basically a

14  terrorist, shot the manager of the cafe, and they asked me to

15  evaluate the shooting decision of the officers.

16         Similarly, in Queensland, they had five fatal

17  shootings, which for a force of 15,000 for us doesn't seem like

18  much, but for them was a catastrophe.  They've asked me to

19  evaluate -- I'm in the middle of evaluating those shootings to

20  determine -- they do -- since it's a different culture, they

21  don't have guns very often -- we're seeing that now with what's

22  going on in today's world -- but the investigations are

23  incredibly different, stretching all the way back to the

24  information on the -- everyone involved -- the officers, the

25  citizens, the relatives, but focusing on the event, the whole

ALPERT - DIRECT/QUINLAN

1    event, the totality of the event.

2            And I'm in the middle of evaluating those for the

3    Queens -- actually, for the coroner, and they have coronial

4    hearings in Australia, so the coroner holds them as opposed to

5    a court.

6    Q.  Can you summarize briefly your publications and

7    particularly emphasizing those that relate to use of force and

8    police tactics, things of that nature?

9    A.  Well, as a college professor, peer-review publications,

10   that's our currency.  So we do -- we have to do a lot of it.

11   That's what we do.  Fortunately, at my rank and status in the

12   profession, I'm able now not only to write -- and I've probably

13   written 150 or so peer-reviewed manuscripts, articles, for the

14   social sciences, basically, and now I'm able to spread out and

15   translate those efforts for the police community.

16           So a lot of my publications in the last few years on

17   use of force, on other aspects of police management and risk

18   assessment have been specifically for policing, published in

19   *Police Chief*, or the FBI law enforcement bulletin, or other

20   police magazines that get incredible coverage with the police

21   agencies, but for some reason aren't really accepted in

22   academia.

23   Q.  Now, have you ever been a sworn law enforcement officer?

24   A.  No, sir.

25   Q.  Okay.  What is your Ph.D. in?

ALPERT - DIRECT/QUINLAN

1   A.   Sociology.

2   Q.   Okay.   How -- have you acquired an understanding -- and

3   I -- you know, you've addressed this earlier -- but an

4   understanding of the standards that apply to police conduct?

5   A.   Yes, sir.

6   Q.   How did you gain that understanding if you weren't a sworn

7   officer?

8   A.   Well, I went through -- in fact, here in south Florida, I

9   went through both the community college, Miami-Dade Community

10  College -- I didn't go from A to Z to be a police officer,

11  obviously, but I did take courses, and at Broward police

12  academy, many years ago, sat through courses.

13          Most of the use-of-force courses I sat -- at both

14  academies, I sat through as an observer, some I taught at

15  both -- at both academies.   And all over the country I've

16  been -- and a few other countries -- have been fortunate to go

17  sit in on courses and teach courses on decision-making, not on

18  the how to do force, not on the defensive tactics side, but on

19  the decision-making side.

20  Q.   Uhm, do you know a social scientist who has as broad an

21  experience and as deep an experience in the policing world as

22  you?

23  A.   Well, there may be some in policing, but I think in this

24  area of use-of-force and high-risk police activities, I'm --

25  I've had the fortune -- and part of it's just because I'm

ALPERT - DIRECT/QUINLAN

1   old -- but I've had the fortune of a lot of experience,

2   probably more than most social scientists.

3   Q.   Okay.

4           All right.  So based on your experience, are you

5   familiar with the fact that there are objective criteria for

6   evaluating, as you have done --

7   A.   Yes, sir.

8   Q.   -- the conduct of police officers?

9   A.   Yes, sir.

10  Q.   Specific to use of force.

11  A.   Yes, sir.

12  Q.   All right.  Are you familiar with the -- both the

13  constitutional limitations on the use of force and the

14  practices and procedures adopted to promote adherence to those

15  constitutional standards?

16  A.   Yes, sir.  I'm not a lawyer.  I did go to law school as

17  part of my Ph.D., but I don't profess to be a legal expert by

18  any stretch.  But I'm familiar, and I know how to read cases,

19  so I understand, yes, and how those are applied in policies,

20  how those are applied in training, how those are applied in

21  disciplinary issues.

22  Q.   Do you have familiarity with practices and procedures

23  necessary to deter and detect violations of those

24  constitutional limitations?

25  A.   Yes, sir.

ALPERT - DIRECT/QUINLAN

1   Q.  Familiar -- do you have familiarity with the practices and

2   procedures necessary to sanction violations of those

3   limitations?

4   A.  Yes, sir.  And I can go into whatever detail you'd like me

5   to in terms of explaining.

6   Q.  I think for now, again trying to keep the initial

7   presentation brief, I just want to make sure that that's an

8   area that you have worked in.

9           And, again, apologize if we're going over something

10  you've mentioned.  You have not only studied, but you have, in

11  fact, written policies and procedures?

12  A.  Oh, yes, sir.

13  Q.  You mentioned peer review, that you, yourself, have

14  published peer review materials.

15  A.  Yes, sir.

16  Q.  Do you keep current on all the peer review publications

17  within your area of expertise?

18  A.  Well, yeah, that's what I was answering earlier.  Within

19  the totality of policing, probably not, but certainly within

20  the uses of force and my other areas of high-risk activities, I

21  do.

22  Q.  In terms of your work in this case and the report that you

23  produced, is it fair to say that you applied the same standards

24  to your work in this case that you do to the work that you've

25  conducted when retained by law enforcement agencies?

ALPERT - DIRECT/QUINLAN

1   A.   Oh, yes, sir.  And really the same standards I would use

2   when doing an analysis of any project.  Whether it was the

3   racial profiling study we did in Miami, or whether it's a

4   use-of-deadly-force incident or action that I've looked at

5   anywhere else, it's the same methods of looking at, you know,

6   the evidence, looking at the standards, and concluding whether

7   or not the -- what action was appropriate, what action was

8   unappropriate.

9   Q.   So what you did here is what you would do for a department.

10  It would -- it's what you would do for a publication.

11  A.   Yes, sir.  It's what I do for all those.

12  Q.   Okay.  We talked about national standards on use of force.

13  In connection with your work in this case, did you review

14  specifically the PBSO standards?

15  A.   Yes, sir.

16  Q.   And did you apply your knowledge of national standards --

17  let me take one step back.

18       Are the PBSO standards on use of force consistent with

19  what you know to be the national standards on what the

20  constitutional limitations are on the use of deadly force?

21  A.   Yes, sir.  I mean it's a policy I could certainly work with

22  and tinker with, but it certainly -- it is not, you know,

23  inappropriate policy.

24  Q.   Does your report reflect the application of the standards

25  with which you have gained familiarity over 36 years to the

ALPERT - CROSS/BARRANCO

1  facts that you reviewed as reflected in your reliance materials

2  and your supplemental reliance materials?

3  A.  Yes, sir.

4        **MR. QUINLAN:**  Okay.  Could I have just one moment?

5        *(Discussion had off the record between counsel)*

6        **MR. QUINLAN:**  Okay.  No further questions at this

7  time.  Thank you.

8        **THE COURT:**  Cross-examination.

9        **MS. BARRANCO:**  Yes, your Honor.  Thank you.

10                    **CROSS-EXAMINATION**

11  BY MS. BARRANCO:

12  Q.  Good morning.

13  A.  Good morning.

14  Q.  I know that your report states that you -- in coming to

15  the, I think it's 11 opinions that are in your report, that you

16  generally state that you rely on, you know, the -- your

17  peer-reviewed research and obviously your experience based on

18  what you have just told us this morning.

19        But I would like to ask you, say specifically in

20  regard to your opinion number 5 in your report that states:

21        "Assuming that Deputy Lin observed Mr. Stephens'

22        empty left hand go behind his back, and assuming

23        further that Deputy Lin felt threatened by

24        Mr. Stephens at that point, the use of a less lethal

25        weapon, his taser, would have been the required

ALPERT - CROSS/BARRANCO

1          response rather than the use of a firearm"?

2   A.  Yes, ma'am.

3   Q.  If I could ask you, specifically where did you come up with

4   that opinion?

5   A.  Well, there's a use-of-force continuum that is implied in

6   police work and is specific to every agency.  And certainly the

7   use of a firearm is a higher level of force than the use of a

8   less lethal weapon, such as a taser.  In -- before you take a

9   life, which is the most serious act anyone can do, particularly

10  a police officer in this case, you would want to use a less

11  lethal option, if possible.

12          And in this situation, as my number 5, as you read,

13  assuming certain things that occurred, if an officer were --

14  were -- if an officer felt threatened and needed to respond, a

15  less lethal approach would be far more appropriate than a

16  lethal one, because there was no indication that Mr. Stephens

17  was going to use deadly force.  There had been nothing to this

18  point that -- that indicated a lethal threat.

19  Q.  Well, Doctor, would you agree with me, though, that if, in

20  fact, Mr. Stephens did have a gun, that Deputy Lin, if he had

21  decided to use his taser first, would have been dead?

22  A.  No, ma'am.

23  Q.  He wouldn't have been shot first before -- as he's trying

24  to use his taser on this gentleman?

25  A.  Well, as I understand it, he has -- his taser was -- was --

ALPERT - CROSS/BARRANCO

1    I think is hovering, is the language you used earlier, and as I

2    recall the testimony.  If he had pulled and shot his taser, he

3    would have incapac -- if the taser worked, I mean, yeah,

4    there's always a possibility that it wouldn't work, but if it

5    worked as normal, it would have incapacitated Mr. Stephens.

6    Q.  And if, in fact, it didn't work exactly as it was supposed

7    to, Deputy Lin would have then been shot before he even would

8    have had a chance to use his taser on Mr. Stephens, isn't that

9    correct?

10   A.  Well, he would have -- he could have been shot.  If --

11   if -- and we're assuming a lot of facts that certainly aren't

12   on the record, but if Mr. Stephens had a weapon and was pulling

13   it out, and the taser didn't work, then, yeah, then

14   Mr. Stephens could have fired the gun at the officer, who

15   probably wouldn't have had a chance to transition if the taser

16   didn't work.

17   Q.  But, of course, we know in hindsight that it turned out to

18   be a cell phone, not a firearm, correct?

19   A.  Well, we know as it was occurring it was a cell phone.  It

20   wasn't just hindsight.

21   Q.  Well, is it your opinion, Doctor, that if, in fact,

22   Deputy Lin knew it was a cell phone that Mr. Stephens had, that

23   he would have been authorized to use his taser on him?

24   A.  Well, there was no threat.  You -- you have do a threat

25   analysis.  And this is where we're having our -- this

ALPERT - CROSS/BARRANCO

1    discussion.  The threat analysis up to this point was zero.

2    There was no threat on Deputy Lin by Mr. Stephens at this

3    point.  Even a perception of a threat was un -- would be

4    unreasonable up to this point.

5         Now, when there's these actions that the deputy talks

6    about, moving his hand, moving his left foot, the judge

7    mentioned earlier as he was reading through the -- or his

8    memory of the events is the same as my memory, yeah, then

9    there's -- starts to be a perception.  But it's -- to take a

10   life based on that sort of perception of possible, maybe, there

11   could be, that's not the way -- that's not the way you operate

12   in law enforcement.  That's inappropriate and unreasonable.

13   Q.  Well, you're aware, Doctor, that the constitutional

14   standard states that deputies are not required to wait to

15   actually see the gun and the muzzle flash before they make that

16   determination to use deadly force.

17   A.  Yes, ma'am.

18   Q.  So the law does not require a deputy to actually be in an

19   absolute knowing that he's in a deadly force situation before

20   he makes a determination to use the deadly force.

21   A.  I'm well aware of that, yes, ma'am.

22        **MS. BARRANCO:**  I have no further questions, your

23   Honor.

24        **THE COURT:**  Any redirect?

25

**REDIRECT EXAMINATION**

BY MR. SCAROLA:

Q.  You were asked about a taser -- if Mr. Stephens had a gun,

the officer pulled out a taser, and it didn't work, he could

have been shot.  If he had pulled out a gun instead of a taser,

if now Sergeant Lin had pulled out a gun instead of a taser,

and the gun jammed, same thing, right?

A.  Yes, sir.

          **MR. SCAROLA:**  Thank you.  No further questions.

          **THE COURT:**  Any recross?

          **MS. BARRANCO:**  No, your Honor.

          **THE COURT:**  Doctor, I just want to make sure I

understood your testimony correct.  Is it your testimony that

even if Mr. Stephens had a firearm, that the required response

from Deputy Lin would have been to use a taser?

          **THE WITNESS:**  Oh, no, sir.

          **THE COURT:**  Okay.  Maybe explain that, because I

thought that was what you said in response to Ms. Barranco's --

          **THE WITNESS:**  Oh, no.

          **THE COURT:**  Maybe if you can then maybe clarify that.

I thought that's what I understood you to say.

          **THE WITNESS:**  No, I apologize.

          It's a threat assessment.  And when -- and I'm

perfectly aware of what she was saying, that you don't wait to

see the muzzle flash of a gun before you respond, but you do a

1   threat assessment.  And you analyze, what is this threat?  And

2   it's an objective assessment; it's not a subjective one, as you

3   well know.

4       So if you -- as you analyze the threat, and the threat

5   increases, your response can increase.  And then, obviously, if

6   Mr. Stephens had a firearm, you don't bring a knife to a

7   gunfight, so to speak, so you would protect yourself --

8       **THE COURT:**  Right.

9       **THE WITNESS:**  -- and even take affirmative action if

10   the threat exists.

11       **THE COURT:**  All right.  So -- and I don't want to

12   misstate your testimony.  Assuming then, for the sake of

13   argument, that the officer reasonably believed -- I understand

14   that's where the dispute lies -- assuming he reasonably

15   believed that Mr. Stephens was pulling a gun, is it your

16   testimony that he was required to use a taser or that he could

17   have used a firearm?

18       **THE WITNESS:**  Oh, no -- excuse me -- no and yes.  No,

19   he is not required to use a taser --

20       **THE COURT:**  All right.

21       **THE WITNESS:**  -- if he objectively reasonably believes

22   that the firearm is coming.

23       **THE COURT:**  Okay.

24       **THE WITNESS:**  No, that's when you --

25       **THE COURT:**  All right.  Then I misunderstood your

1    response to Ms. Barranco's question.

2         I did have a question, though, about your

3    understanding of the legal standard.  On page 8 of your report,

4    you say that "police officers are authorized to use deadly

5    force when it is objectively necessary to take a life."

6         My reading of *Graham vs. Connor* is when it's

7    objectively reasonable.  And the standard is not objective

8    necessity, because 20/20 hindsight, you can never know if it

9    was a gun or not.  But would you agree that that's an incorrect

10   statement of the legal standard?

11        **THE WITNESS:**  Yes, sir.

12        **THE COURT:**  Okay.  Are your opinions then predicated

13   on that incorrect legal standard?

14        **THE WITNESS:**  No, sir.  The necessity -- I -- that got

15   through several rereads that shouldn't have.

16        **THE COURT:**  Okay.  All right.

17        Any -- do the attorneys have any follow-up based upon

18   my inquiry?

19        **MR. QUINLAN:**  I do have one just to clarify on,

20   paragraph 5.

21              **REDIRECT EXAMINATION (CONTINUED)**

22   BY MR. QUINLAN:

23   Q.  Your opinion number 5 reads:  "Assuming that Deputy Lin

24   observed Mr. Stephens' empty left hand go behind his back, and

25   assuming further that Deputy Lin felt threatened by

```
 1    Mr. Stephens at that point" -- at that point, when the hand

 2    went back, is that what you were explaining to the judge, that

 3    you're going through the threat assessment as time progresses,

 4    and you're looking at a point where, if at that point, he felt

 5    threatened, that would be a time where the use of the taser,

 6    the less lethal, would be appropriate?

 7    A.   When he had the time, yes, sir.

 8    Q.   When he had the time.

 9    A.   Yes, sir.

10    Q.   Thank you.

11         THE COURT:  Any follow-up from the --

12         MS. BARRANCO:  No, your Honor.

13         THE COURT:  Okay.

14         I think -- as an aside, there was an op-ed piece in

15    The New York Times on January 1st which addressed this issue.

16    It's written by two Yale law students and I believe a Yale law

17    professor.  They were advocating for a change from -- away from

18    the reasonableness standard.  And I believe they were arguing

19    for more of a standard of necessity.  And that's why I wrote --

20    when I saw this, it jumped out -- you know, reserve for a later

21    date a debate upon whether that would be workable or consistent

22    with the Constitution.  But you may want to take a look at it.

23    It was January 1st op-ed in the Times.

24         Thank you.  Good luck with your surgery.

25         THE WITNESS:  Thank you, sir.
```

1          *(Witness excused)*

2              **MR. QUINLAN:**  Judge, thank you for accommodating

3     Dr. Alpert.

4              **THE COURT:**  Sure.

5              Why don't we maybe -- he's on the meter, and depending

6     upon how the case turns out, somebody is gonna be paying, so

7     why don't we go ahead and call Mr. Tucker?

8              Okay.  Please raise your right hand.

9              *(MELVIN TUCKER, PLAINTIFF'S WITNESS, WAS SWORN)*

10             **THE COURT:**  Okay.  If you'll go ahead and please be

11    seated, get comfortable, and just pull up to the mike, and just

12    state your name and spell your last name.

13             **THE WITNESS:**  Yes.  My name is Melvin, M-E-L-V-I-N,

14    middle initial L, last name Tucker, T-U-C-K-E-R.

15             **THE COURT:**  All right.  Mr. Quinlan or Mr. Scarola, do

16    you wish for your witness's expert report to be adopted as his

17    testimony on direct examination?

18             **MR. QUINLAN:**  Yes, your Honor.

19             **THE COURT:**  Okay.

20             **MR. QUINLAN:**  And I'll go ahead and read in

21    corresponding numbers in the same fashion that we did with

22    Dr. Alpert, with your permission.

23             **THE COURT:**  All right.

24             And, Mr. Tucker, do you, therefore, at this point,

25    adopt your report -- I'm not sure what the date is -- Docket

```
 1    Entry 194-1, as your testimony on direct examination?
 2              THE WITNESS:  I do, sir.
 3              THE COURT:  All right.  Any errors, material
 4    omissions, any changes?
 5              THE WITNESS:  No, sir.
 6              THE COURT:  Okay.
 7              All right.  Mr. Quinlan, any additional questions?
 8              MR. QUINLAN:  Well, yes.  In addition, your Honor,
 9    there was an affidavit of Mel Tucker that was I think
10    previously filed and then refiled in connection with renewed
11    motion practice as Docket Entry 201-1 --
12              THE COURT:  Right.
13              MR. QUINLAN:  -- as Exhibit 2 to that filing.
14              Again, similar to Dr. Alpert, there were additional
15    reliance materials that were noted.  So we would ask that 201-1
16    be accepted --
17              THE COURT:  Okay.
18              MR. QUINLAN:  -- in the same fashion.
19              And Mr. Tucker did a supplemental affidavit that was
20    Docket Entry 111-28.  And, again, would ask that that be
21    accepted and considered as part of this hearing.
22              THE COURT:  All right.
23              MR. QUINLAN:  All right.  And with that, just a brief
24    direct examination, if I may.
25              THE COURT:  Okay.
```

1                    **DIRECT EXAMINATION**

2    BY MR. QUINLAN:

3    Q.  Mr. Tucker, the -- I know some of your background is laid

4    out in the papers, but start with your graduation from college

5    and the first thing you did after that, and how you then got

6    into law enforcement.

7    A.  I was getting ready to be drafted into the Army and didn't

8    want to be in the Army, so I went down and joined the Navy.

9    Q.  What year?

10   A.  1965 or '66.  Sent to officer candidate school in Newport,

11   Rhode Island, got commissioned and was assigned to a ship and

12   sent to the South Pole for a year.

13   Q.  And you -- just -- not to get into your background too

14   much, you grew up in --

15          **THE COURT:**  Obviously got on somebody's bad side.

16          *(Laughter)*

17          **MR. QUINLAN:**  I was gonna say --

18          **THE WITNESS:**  Actually, the only reason I mention

19   that, your Honor, is the ship that I was assigned to was out of

20   Key West, Florida --

21          **THE COURT:**  Oh, okay.

22          **THE WITNESS:**  -- and I was so proud -- so happy to be

23   coming back to my home state, and then they sent me to the

24   South Pole.

25

TUCKER - DIRECT/QUINLAN

1   BY MR. QUINLAN:

2   Q.  Right.  Well, I was gonna say, you're from Tampa, correct?

3   A.  Yes, sir.

4   Q.  So this was quite a shock to the system to be sent to the

5   South Pole.

6   A.  Yes, sir, it was.

7   Q.  All right.  So, go ahead.

8   A.  I served in the Navy for three years and a few months and

9   rose to the rank of lieutenant.  And I was on board my ship in

10  Norfolk, Virginia, and they paged me to the quarterdeck, and I

11  came out there, and an FBI agent flashed his credentials out at

12  me, said he wanted to talk to me, scared the daylights out of

13  me.

14          I said, What do you want to talk to me about?

15          He said, I want to talk to you about being an

16  applicant for an FBI agent.  Your brother says you'd be

17  interested.

18          My brother at the time was a Florida Department of Law

19  Enforcement agent and told -- gave him my name.  J. Edgar

20  Hoover was expanding the bureau by 800 agents back then.  They

21  told me the salary was $13,800 a year starting.  I said that's

22  got to be great.  So I applied and was accepted and went to THE

23  FBI academy.

24          From there, they sent me to Knoxville, Tennessee.

25          From Knoxville, Tennessee, they sent me to Morristown,

TUCKER - DIRECT/QUINLAN

1   Tennessee, a two-man resident agency, which, as a new agent, I

2   considered that with pride, because then I was out there

3   without supervision.

4          And then they were getting ready to send me to

5   Baltimore, Maryland.  All of which, after the Navy moves and

6   the FBI moves, I was not happy.  So I was in the police

7   department -- Morristown, Tennessee Police Department, a

8   45-officer department, complaining to the police chief about

9   having to move, and he said, Well, don't leave, take my job,

10  I'm retiring in 30 days, and I betcha the mayor would love to

11  have you.  And he went and told the mayor, the mayor contacted

12  me, and at the age of 27, I was hired as the chief of police in

13  Morristown, Tennessee.

14  Q.  And how long did you hold that job?

15  A.  Three-and-a-half years.  During that time period, I was

16  selected as Tennessee's law enforcement officer of the year and

17  was promoted to public safety director, had both the fire and

18  police department.

19          At the end of three-and-a-half years, 1974, I was

20  contacted by an officer on the Hickory, North Carolina, police

21  department, telling me that department was open.  It was twice

22  the size of Morristown.  And I was interested in professional

23  advancement, so I applied and was hired there.

24          Served there for three years.  Went back to school

25  during that time and got my master's degree from Appalachian

TUCKER - DIRECT/QUINLAN

1  State University in public administration.  Was on the

2  governor's law and order commission and was selected as

3  chairman of the North Carolina Criminal Justice Academy, which

4  I served in that capacity for three years.

5       Then I was contacted by Ashville, North Carolina.  The

6  manager there actually walked right into my office and said, I

7  want to hire you as a reform chief in Ashville.  We have a

8  corruption problem -- photographs in the newspaper of trucks

9  delivering liquor to the officers, liquor being provided by the

10  biggest gangster in town.  He told me he would pay me a salary

11  second only to his salary.  And he couldn't do any better than

12  that, because he wasn't gonna pay me more than he made.

13       And so he hired me, and I went up there.  That was,

14  again, a doubling of the size of the department.  Hickory --

15  Morristown was 45 officers, Hickory was 92, Ashville was 162.

16  I served there two years, arrested officers, hired officers,

17  made the changes.

18       Then I was contacted by my brother, who continuously

19  interfered in my professional life, told that the ash -- that

20  the Tallahassee, Florida Police Department was open.  I could

21  finally return to my home state if I applied.  I applied at the

22  age of 36, went to Tallahassee as chief of police, and that was

23  362 officers at that time, I think, where I served for almost

24  15 years.  And during that time, I was chairman -- vice

25  chairman of the Florida Criminal Justice Standards and Training

TUCKER - DIRECT/QUINLAN

1    Commission.  And that's pretty much it.

2         I retired in 1994, moved to Maine, where I went to

3    work for the Maine Community Policing Institute, the COPS

4    program that you heard Dr. Alpert talking about.  I was on the

5    adjunct faculty of the University of Maine, and in my -- I

6    taught police administration there.  And through the COPS

7    office, I trained law enforcement officers on virtually

8    everything, from ethics to high-risk police operations, use of

9    force, you name it, for the time I was up there.

10        Then I -- my wife is a doctor, and she had wanted to

11   do a pathology residency, so we moved from Maine to Tennessee

12   so she could go to the University of Tennessee in Knoxville and

13   get her pathology certification.  She -- when we did that, I

14   said, Well, let's move back to Morristown, since I knew

15   everybody there.  I got there and got elected to the city

16   council as a council member, had oversight of the police

17   department where I had formerly been the chief of police.

18        And during the time there, of course, I was contacted

19   by the Department of Homeland Security to do training of law

20   enforcement officers, actually retained -- trained 16 sheriffs'

21   departments in east Tennessee on police use of force.  Was

22   certified by the state as a use-of-force instructor, and so

23   they could get paid incentive pay for the course.  And did that

24   until 2008, when my wife took a job in Raleigh, North Carolina.

25   And at that point, having been retired, I was what I call a

TUCKER - DIRECT/QUINLAN

1    trailing spouse, and I went to Raleigh with her.  And that's

2    where I've been since.

3    Q.  Uhm, in terms of your testimony as a use-of-force expert,

4    have you actually testified in this courthouse before?

5    A.  Yes, sir.

6    Q.  What case?

7    A.  Judge was the magistrate on the case.  And it was before

8    Judge Cohn.  I think that's how his name -- it was the care --

9    Anthony Caravella case the last time I testified in this

10   courtroom, qualified and testified.  I've qualified and

11   testified at least 26, 27 times in Florida, 87 times around the

12   country.

13   Q.  How many of those 87 are in federal -- were in federal

14   court?

15   A.  Virtually all of them.  Use-of-force cases, you know, they

16   end up -- or almost all the civil rights cases end up in

17   federal court.

18   Q.  Okay.  And that -- the roughly 87, that's trial testimony?

19   A.  That's trial testimony, yes, sir.

20   Q.  Okay.  So there are other cases you've been retained to

21   bring your expertise, but have not testified at trial?

22   A.  I've been deposed 350 times, but -- that didn't go to

23   trial.  Or the cases that I was deposed in, some went to trial.

24   Q.  Okay.  Now, we already -- we talked about your report.  And

25   I think this is made fairly clear in your report, so we'll just

TUCKER - DIRECT/QUINLAN

1    touch on it briefly.

2          Are you familiar with the *Graham vs. Connor* and

3    *Tennessee vs. Garner* cases?

4    A.  Yes, sir, I am.  I've been training officers on it since

5    1985, 1989.

6    Q.  And you're familiar with -- you heard Dr. Alpert talk about

7    national standards for use of force.  You're familiar with

8    those standards as well?

9    A.  Yes, sir, I am.

10   Q.  Okay.  And your report references specifically *Daubert* and

11   *Kuhmo Tire*, correct?

12   A.  Right.

13   Q.  You're familiar with that case law and the methodology or

14   the approach described in those cases?

15   A.  I'm -- as I tell other people thinking about doing expert

16   witness work or litigation consulting, you got to know what the

17   rules are.  You can be the best basketball player in the world,

18   like you can be Michael Jordan, but you're gonna foul out in

19   the first inning if you don't know what the rules are.  I

20   learned that when I rendered an opinion in Albuquerque,

21   New Mexico, that a use of force was objectively unreasonable,

22   and the Court said that's a conclusion of law.

23          And so I learned -- I reread *Daubert*, reread *Kuhmo* and

24   started to do my reports answering the questions the best I

25   could to meet those requirements, based upon my knowledge,

TUCKER - DIRECT/QUINLAN

1   training, experience, et cetera, not assigning credibility to

2   any witnesses, reviewing sufficient materials to be able to

3   reach an opinion to a reasonable degree of professional

4   certainty, knowing that I have to be able to assist the trier

5   of fact, the jury, in understanding the questions at issue, to

6   not make any legal conclusions.  So I've been doing that for --

7   following that methodology for a few years now, and it's

8   consistent with what other experts do.

9   Q.   I want to ask you specifically about one of the things you

10  just mentioned, assisting the trier of fact.

11          Yeah, without going through all of your opinions --

12  they're all written down, they're in the report -- but you talk

13  about, in your report, the accepted standards of conduct, and

14  you use an acronym, I believe "BLET"?

15  A.   BLET is Basic Law Enforcement Training.  It's an acronym

16  for that, Florida BLET.  Every state has essentially BLET,

17  basic law enforcement training program.

18  Q.   Okay.  And you're familiar with what BLET has been for a

19  period of years?

20  A.   Well, I served on the commission that oversaw the --

21  established the training for officers in Florida.  I was vice

22  chairman of it, as I said, for three-and-a-half years.  And, of

23  course, training officers myself and using the BLET manuals

24  over the years.  And I have copies of the BLET manuals for most

25  states.  Yeah, I'm familiar with it all.

TUCKER - DIRECT/QUINLAN

1   Q.  You also referred to something called the "training key" in

2   your report?

3   A.  A training key, yes.  The International Association of

4   Chiefs of Police has two programs that they assist law

5   enforcement agencies in.  One is the training key program.  And

6   I provided one of those training keys as -- to support one of

7   my opinions in this case, training key number 398.  And those

8   are provided by the International Association of Chiefs of

9   Police, basically free of charge.  I think you can -- $30 a

10  year for membership for the agencies.

11          So that when you're training an officer on use of

12  force, one of the things you would do is you'd say to the

13  officer, Look, if you feel the need in this case to be wearing

14  a tactical vest and handcuffs to arrest five people, and 76

15  rounds of extra ammunition, taser, an asp baton -- an asp,

16  expandable baton -- an oleoresin capsicum, a shotgun, a knife,

17  and an AR-15, you might be -- you might rethink a little bit --

18  are you so afraid of physical harm or something that you feel

19  the need to carry all that?

20          So that's essentially what that was attached for,

21  because -- basically in a response to whether or not the

22  actions of the deputy were reasonable or not, or whether he

23  acted out of fear unreasonably.

24  Q.  You talk in your report about a threat assessment, the

25  process of threat assessment, correct?

TUCKER - DIRECT/QUINLAN

1   A.   Yes, sir.

2   Q.   Okay.  And you talk specifically about communicate, cover,

3   and conceal, is that right?

4   A.   Well, I can't help but reflect on the conversation, what's

5   happening earlier this morning on the issue of negligence.

6   And, frankly, the issue of how one responds to a situation --

7   to a call --

8        MR. SCAROLA:  Maybe, Mr. Tucker, you can do better

9   than I do.

10        (Laughter)

11        THE WITNESS:  I don't know, Mr. Scarola.  I just know

12   this, that when I came into law enforcement, now over 40 years

13   ago, the first thing I was taught was what we call the three

14   Cs.  In every call, until you find out what's going on, you try

15   to put yourself in a position where you have a little bit of

16   concealment, you know, stay behind the car door or whatever,

17   and some cover, the protection from the car, and you

18   communicate with the individual -- say, Sir, my name is

19   Deputy -- in this case, Lin, from the sheriff's department, put

20   your hands up so I can see them.  I want to talk to you for a

21   minute.

22        You do that.  You take a position of concealment and

23   cover and communicate with the individual, to start off with,

24   as opposed to sometimes, as was argued this morning, an officer

25   would step in front of a car and stand in front of the car and

TUCKER - DIRECT/QUINLAN

1    say, "Get out."  And then the guy tries to run him down, and he

2    has to use deadly force to protect himself from being run down,

3    that's what we're talking about, placing yourself in a position

4    of jeopardy, and then justifying the use of deadly force on the

5    fact that you have placed yourself in jeopardy in the first

6    place.  That's part of it.

7         The second part -- I don't mean to rattle on here, but

8    the threat assessment is extremely, extremely, extremely

9    important.  When law enforcement officers are trained -- and

10   this is what I think is the most important thing that I would

11   bring to assisting the jury in understanding this kind of a

12   case -- they're taught to make threat assessments -- risk

13   assessments, threat assessments.

14        And what are they told?  I've heard the instructors

15   give this example, and I use it as an example.  Here's a police

16   officer in the field.  It's a Saturday morning, nine o'clock,

17   bright and sunny in Florida.  And he sees a car proceed through

18   a stop sign slowly, a rolling stop, and he decides he's gonna

19   stop that car and give a ticket or a warning to that individual

20   driving the car.  And the car is being driven by a 65-year-old

21   white woman.  And he pulls her over.  And before he can get out

22   of her car -- his car, she's already out of her car, and she

23   has her hand in her purse and starts to come out with something

24   in her hand.  Would an officer reasonably respond to that by

25   saying, "Drop it, drop it," and draw his weapon and shoot that

TUCKER - DIRECT/QUINLAN

1    woman?

2         The answer, when I give that scenario over and over

3    and over and over again -- and I just did that before the

4    American Bar Association in a presentation I made to them here

5    in Florida on May the 17th, the Henry Lee Institute in

6    New Haven, Connecticut, a couple months back, where law

7    enforcement officers were present, and at Duke Law School, when

8    I made a presentation there on the same thing before lawyers

9    and police officers -- nobody said that an officer would be --

10   it would be reasonable for the officer to shoot under that set

11   of circumstances.

12        If that be the case, and you apply *Graham v. Connor*,

13   the *Graham v. Connor* test, the court says in that case -- and

14   we tell officers that in training -- that the Court said you

15   have to look at the totality of the circumstances.  That, in

16   essence, is the Court saying context.

17        Then they say to at least the minimum of whether or

18   not the severity of the crime at issue, whether there's -- the

19   person is posing an immediate threat to physical safety and

20   whether the individual is attempting to avoid arrest by flight.

21        Well, in the case with the woman, she was -- the

22   severity of the crime was rolling through a stop sign.  She

23   wasn't attempting to avoid arrest by flight.  So then you say,

24   Well, the question becomes whether or not she, by taking her

25   wallet out, which could be perceived as a gun, if you wanted

TUCKER - DIRECT/QUINLAN

1   to, under some scenario -- some people couldn't possibly say

2   that -- nobody has yet -- that that's the immediate threat.

3         Well, what is the difference between that scenario and

4   this one, except a black young man as opposed to a white older

5   female?  And that's the training that officers get on threat

6   assessment and making that kind of a judgment.  And that's the

7   kind of thing that officers need -- the jury needs to know

8   about how officers are taught to make that threat assessment.

9   BY MR. QUINLAN:

10  Q.  Let me ask you this.  With now almost 50 years of

11  experience in law enforcement, both working it and as an

12  expert, the accepted standards of conduct -- things like BLET

13  and training keys, the concept of a threat assessment and the

14  steps that an officer is trained to go through, the three Cs --

15  communicate, cover, and conceal -- are those things that, based

16  on your experience, the average layperson already knows?

17  A.  No.  The average layperson in terms of policing, from my

18  experience, is basically based upon what they see on TV.

19        And a perfect example is what -- if you were to talk

20  to somebody right now, today, about the shooting that just

21  happened in Chicago, where the officer was indicted, because

22  the guy was walking down the street with a knife, most people

23  will say, Well, he had a knife, and so I could see why maybe

24  the officer would have shot him.

25        Well, a threat assessment would be this.  When was the

TUCKER - DIRECT/QUINLAN

1    last time that a Chicago police officer died as a result of
2    being stabbed to death?  Well, I looked it up.  And it was in
3    1844, over 150 years ago.  So how does that become a reasonable
4    threat to the officer when there hasn't been an officer died
5    from being stabbed in Chicago for the previous 150 years?
6         So that's why -- and juries don't know those kind of
7    things, how -- what's the threat.  Actually, over the last
8    110 years in law enforcement, half of one percent of all the
9    officers killed in the line of duty been killed with a knife,
10   you know.
11   Q.  But, again, in terms of assisting the trier of fact, these
12   are things, from your experience, that folks don't know about
13   as a matter of common knowledge, correct?
14   A.  They don't know about that, and they don't know about in
15   this case, there's the -- Lin took what's called preemptive
16   action.  Jurors don't know what preemptive action is.  They
17   don't know what officers are taught about why there is a
18   so-called need for preemptive action.
19        Preemptive action -- by the way -- I can't help my
20   myself -- I don't think that preemptive action -- I heard
21   counsel say it was a constitutional -- under constitutional
22   authority.  I don't think that's anywhere in the Constitution.
23   I think it's under *Peoples vs. Morales*, some case law which
24   says you don't have to wait until you see the glint of steel.
25        And the reason for that is very simple.  It's a

TUCKER - DIRECT/QUINLAN

1   concept called PEDA -- that's an acronym -- P stands for

2   "perception," E stands for "evaluation," D stands for

3   "decision," A stands for "action" -- PEDA -- to perceive a

4   threat and to evaluate that threat and decide to act on that

5   threat, and then to act takes about 1.5 to 1.7 seconds.  It's

6   been tested scientifically with reliability and validity for

7   the last 30 years.  And a person coming out of their pocket

8   with a gun can come up and shoot you in .26 seconds.

9           So that's the reason why officers are taught to make

10  accurate threat assessments.  It's extremely important, or

11  you'll have a shooting which is based upon what we experts call

12  mistaken belief.  You believe the person's coming out with a

13  knife or gun, and they don't have it.  It's a cell phone or

14  whatever.  So the point is, the officers are also trained on

15  what you should look for to justify taking preemptive action.

16  They're call preattack indicators.

17          Unfortunately -- and I know this, because the

18  unintentional consequences of my own training of law

19  enforcement officers over the last 30 years, when I talk about

20  *Graham v. Connor*, your Honor, I always tell them that if you

21  use deadly force, you better be in a position where you can

22  articulate to your bosses and the jury that might hear this

23  later what your reasonable belief was based upon, that you were

24  having -- placed in an immediate threat kind of a situation,

25  and the law says -- *Graham v. Connor* is very strong for law

TUCKER - DIRECT/QUINLAN

1    enforcement.  It says can't judge it from 20/20 hindsight, and

2    you have to take into consideration that the officer has to

3    make split-second decisions as to what level of force to use in

4    rapidly evolving circumstances.

5         So when I trained my officers in Tallahassee, and the

6    first one was involved in a shooting, guess what his

7    use-of-force report said?  It said, I used deadly force in this

8    set of circumstances because I was in reasonable fear of my

9    life, and I had to make a split-second decision as to what

10   level of force to use in rapidly intense circumstances.  What

11   was he doing?  He was feeding back to me my training as his

12   grounds for justification.

13        And the same thing is true on the rest of it as to

14   preattack indicators.  You see, your Honor, I just gave you the

15   1,000-mile stare, and I'm gonna give you -- that's not a

16   1,000-mile stare.  But can you tell the difference between

17   them?  My shoulder just dropped somewhat.  Is that a threat?

18        The sweating, is that an indication that the person's

19   gonna attack you?  Well, it -- in Florida, in summertime, you

20   can have perspiration all over yourself.  That doesn't mean

21   that's a preattack indicator.

22        So the juries don't know what preattack indicators

23   are, they don't know what you're told about them, how to assess

24   them, what officers are taught.

25   Q.  Okay.  And in your report -- and I know some of it speaks

TUCKER - CROSS/GIUFFREDA

1   for itself, but did you apply all the standards, and your

2   familiarity with them, in analyzing the facts and circumstances

3   in this case?

4   A.   I did to the best of my ability.

5   Q.   All right.   Thanks.

6           **MR. QUINLAN:**  No further questions.

7           **MR. GIUFFREDA:**  I have a few, your Honor.

8           **THE COURT:**  Mr. Giuffreda, cross-examination.

9           By the way, if anybody needs a break at any point,

10  just let me know.

11                       **CROSS-EXAMINATION**

12  BY MR. GIUFFREDA:

13  Q.   Good -- I guess we're still morning, Mr. Tucker.

14          I don't know if you remember me.  We actually met in a

15  Lee County shooting case in like September of '05, the Fitch

16  case.  I don't know if you remember that case.  Anyway, it was

17  a long time ago.

18  A.   The van case, where --

19  Q.   The van case, yes.

20  A.   The guy took -- yeah, I remember it.

21  Q.   Pine Island Road, right.

22          All right.  I have a few questions for you.

23          You talk -- you just mentioned that a person can shoot

24  someone in .2 seconds.

25  A.   No, I said .26.

1  Q.  .26 seconds.

2  A.  According to the Force Science Center, that is, if you have

3  your -- if you have your gun out, and you're on a trigger, you

4  can pull the trigger and shoot somebody in .26 seconds, that's

5  right.

6  Q.  That's Bill Lewinski you're talking about?

7  A.  Well, it's not only Bill Lewinski.  Very frankly, I just

8  did my own testing here three months ago and consistently was

9  able to time it at .26 seconds to pull the trigger on somebody

10  who is drawing a gun.  Which it took that person to bring the

11  gun up from what's called a bootleg position about .48 seconds.

12  So you can pull the trigger twice as fast as the person can

13  draw.

14  Q.  So if someone has a gun concealed, ready to go, they can

15  fire much faster than a police officer can draw and fire.

16  A.  Now, let me -- let's talk about the qualifications of that.

17  Q.  Well, could you just answer that question?  Just --

18  A.  I'm going to answer the question.  The answer to the

19  question is, if it's a spontaneous attack, that is, the police

20  officer has his gun in his holster --

21  Q.  Right.

22  A.  -- and I already testified earlier today that we know that

23  to perceive a threat and evaluate and decide to act and act

24  takes 1.5 seconds to 1.7 seconds to get that gun out and shoot.

25  Q.  Right.

TUCKER - CROSS/GIUFFREDA

1   A.   The answer to your question is, if it's a hypothetical --
2   if it's a spontaneous attack, yes, the action beats reaction.
3   Q.   Okay.   And the truth is, police officers typically have to
4   react to action, correct, in deadly force situations where
5   someone pulls a gun on them?
6   A.   I can't think of -- since they're making a response, I
7   mean, I can't think of one where they wouldn't be reacting.
8   Q.   Okay.
9        All right.   And, obviously, it does take time to
10  react -- to perceive and react, that takes time, correct?
11  A.   That's correct.
12  Q.   All right.
13  A.   The PEDA concept.
14  Q.   Yes.   Okay.
15       And you would agree that police officers -- it does
16  come up in training that sometimes police officers get killed
17  in situations where they otherwise had no reason to think there
18  was a danger or that the person was armed.   In one of those
19  spontaneous, unforeseeable attacks that we've all seen on TV,
20  that does happen.
21  A.   It is true that that does happen.   And it is a real dilemma
22  for law enforcement officers.   There's no question about it.
23       If you look at -- and I can show you the pictures of
24  the two men that walked into Chipotle restaurant, both carrying
25  assault rifles, because it's an open carry state where they

TUCKER - CROSS/GIUFFREDA

1    were, and -- so they're holding their guns there.  The police

2    officer is in a real dilemma, because he knows those guys can

3    pick that assault rifle up to shoot and kill them like

4    that (indicating).  But they've got to put this in context.  Is

5    this an open carry state?  Are they legally possessing that

6    firearm?  Are they a threat or are they not a threat?  That's

7    an everyday dilemma for law enforcement officers today.

8    Q.  All right.  So, ultimately, you understand that the law is

9    there's an objectively reasonable standard, depending on the

10   facts of the case, right?

11   A.  As I understand the law -- and we're -- I assume you're

12   talking about *Graham v. Connor*.

13   Q.  Yeah.  And I'm not asking you to recite the details.  Just

14   that general statement, it's an objective standard,

15   reasonableness.

16   A.  The objective reasonableness standard is a two-part

17   standard.

18   Q.  I understand that.  I understand.  But just as a general

19   premise, it's -- rather than subjective, it's objective.

20        **MR. QUINLAN:**  Judge, if I may.

21   A.  No, that's not what I just got through saying.

22        **MR. QUINLAN:**  If I could interrupt?

23        I think we've kind of bled from a *Daubert* challenge

24   into discovery.  The defense chose not to depose Mr. Tucker in

25   this case.  And I just want to raise a concern that we seem to

TUCKER - CROSS/GIUFFREDA

1  be heading down a path of just taking his generalized

2  deposition, which, as we pointed out, they could have done to

3  explore his opinions.  But I'm not sure that the issues that

4  were just raised by that question are *Daubert* related.

5       **MR. GIUFFREDA:**  That is not my intention at all, your

6  Honor.  I'm actually trying to make this quick.  I just wish

7  the witness would answer simple questions simply.  I'm not

8  trying to -- I mean it's just a simple concept that we're

9  talking about -- objective reasonableness.  I know there's more

10  to it, but --

11       **THE WITNESS:**  It's not a simple concept.

12       **THE COURT:**  Okay.  I'll give you some latitude.  I

13  mean, I agree that --

14  BY MR. GIUFFREDA:

15  Q.  All right.  So, ultimately, it depends on the facts of the

16  case, and you don't make any credibility decisions, right?

17  A.  That's correct.

18  Q.  All right.  Now, in this case, you watched the video

19  evidence, correct?

20  A.  Yes.

21  Q.  Did you observe that Dontrell Stephens did not stop on the

22  side of the road?  He rode through someone's yard, up into

23  their driveway --

24  A.  That's correct.

25  Q.  -- and it was a rolling dismount.

TUCKER - CROSS/GIUFFREDA

1   A.   That's correct.

2   Q.   And then he threw the bicycle down and got off, correct?

3   A.   He stepped off of -- stepped through the bicycle's --

4   girl's bicycle, and he laid it down in the grass, yes.

5   Q.   He let it go, and it fell, right?

6   A.   Okay.

7   Q.   All right.  And are you aware that Dontrell Stephens

8   testified that he heard Deputy Lin say, "Raise your hands,"

9   correct?

10  A.   Yes.

11  Q.   All right.  And he claims he raised his hands and was

12  immediately shot next to the bicycle, correct?

13  A.   Correct.

14  Q.   All right.  And, of course, that's not on video, correct?

15  A.   *(No response)*

16  Q.   You never see Dontrell with his hands up on video.

17  A.   No.  He's off the screen at that point.  And when I first

18  see him being shot, is when he's moving away from the scene

19  from left to right.

20  Q.   All right.  Now, you testified that you're a trainer.

21  You've trained law enforcement officers, correct?

22  A.   Yes, sir.

23  Q.   All right.  And if you're familiar with Force Science and

24  Bill Lewinski and others, would you agree that some aspects of

25  law enforcement training include concepts like auditory

TUCKER - CROSS/GIUFFREDA

1   suppression, tunnel vision, some of the psychological impact of

2   being in stressful situations?  In fact, that's in key 398, the

3   International Association of Chiefs of Police --

4   A.  Yes, sir.

5   Q.  -- that you cited.  They talk about psychological stress

6   and things like that.

7        And so there is some training that includes these

8   concepts -- reaction times, psychological stress, tunnel

9   vision, the ability to perceive and see things under stress.

10  Those are concepts you try to teach in a classroom setting,

11  isn't that true?

12  A.  I think that it is more used in terms of justifying actions

13  as opposed to being taught in the classroom.  You know, I have

14  had classroom instruction where I've had somebody come running

15  into the classroom and take some kind of an action, and then

16  ask the student afterwards what they observed, and some

17  wouldn't notice the blue jeans the guy was wearing, some

18  wouldn't -- some would notice the hair, some would notice --

19  you know, different attention factors.  No question about that.

20  Q.  All right.  So you understand, as a law enforcement

21  trainer, that since law enforcement officers are human beings,

22  they may not see and perceive everything that say, for example,

23  a camera might, isn't that true?

24  A.  That is true.  Which is exactly why I was trying to give

25  you the answer I was giving you on objective reasonableness

TUCKER - CROSS/GIUFFREDA

1   that you didn't let me give.  I said it was a two-part test.

2   The officer subjectively believed something, based on what he

3   sees, and the question for -- under *Graham v. Connor*, the

4   objective reasonableness test, is would other officers have

5   perceived a threat the same way and acted the same way?  That's

6   important.

7   Q.  Or could they have?  Sure.

8   A.  No, it's not could have, it's would have.  It's not a

9   possibility.

10  Q.  Well, I think we'll let the judge decide what the law is

11  and what the language in the case law is.

12  A.  I agree.

13         **MR. SCAROLA:**  Yeah.

14         **THE COURT:**  *Graham v. Connor* is here if you want to

15  take a look at it.

16         **MR. GIUFFREDA:**  Yeah, and there's other cases, so....

17  BY MR. GIUFFREDA:

18  Q.  In this case, you understand it is -- the jury -- if the

19  jury believes Deputy Lin that Dontrell reached back and came

20  out with an object that he -- meaning Lin -- reasonably --

21  objectively reasonably believed was a firearm -- it turned out

22  to be a phone -- that the jury could make that conclusion in

23  this case.  You're not gonna try to tell the jury what result

24  to reach, correct?

25  A.  I can't tell the jury what conclusions to reach.  I can

TUCKER - CROSS/GIUFFREDA

1  only tell them what I've already talked about here today.

2  Q.  And you recognize they could reach that conclusion in this

3  case.

4  A.  Certainly.

5  Q.  All right.  So in that sense, you're not gonna be able to

6  assist them in answering that exact question, is that fair?

7  A.  That's correct.

8  Q.  All right.

9         All right.  Now, in terms of some of your opinions in

10  your report, uhm, you have an indication -- and I'm reading

11  from the motion DE 194, page 5, you have an opinion that even

12  assuming the version of facts of Deputy Adams Lin to be true

13  for the purpose of your analysis --

14         THE COURT:  I'm sorry, what page?

15         MR. GIUFFREDA:  It's page 5 of the motion, DE --

16         THE COURT:  Page 5 of the motion or the report?

17         MR. GIUFFREDA:  The motion, which is DE 194.  It's a

18  quote from the report.

19         THE COURT:  Okay.  Let me pull it out here.

20         THE WITNESS:  Page 4 of my report, your Honor.

21         THE COURT:  Right.  "Even assuming" --

22         MR. GIUFFREDA:  Right.

23         THE COURT:  All right.  So page 4 through 7.

24  BY MR. GIUFFREDA:

25  Q.      "Even assuming the version of the facts of

TUCKER - CROSS/GIUFFREDA

1          Deputy Lin to be true for the purpose of the

2          analysis, his use of deadly force against Dontrell

3          Stephens on September 13, 2013, violated

4          well-established law enforcement use-of-force

5          training and standards and was a greater level of

6          force than other officers would have used -- or would

7          have use *(sic)* under the same or similar

8          circumstances in 2013 *(sic)*."

9               Now, that opinion is based upon your analysis of the

10    evidence in the case and your understanding of the law,

11    correct?

12    A.   Yes, sir.

13    Q.   All right.  And that would be your opinion even if a jury

14    concluded that Deputy Lin reasonably, objectively believed that

15    the phone was actually a gun.  That would still be your

16    opinion.

17    A.   It is my opinion, notwithstanding what the jury may find.

18    It's my opinion.

19    Q.   All right.  So it's your opinion that when you watched this

20    evidence, it wasn't a reasonable, objective conclusion to

21    believe that the phone might have been a gun, as you understand

22    it.

23    A.   No.  What -- I'm not -- that's not what I testified to at

24    all.  What I said is, if you make -- put this situation in

25    context, going back to the white woman driving the car and

TUCKER - CROSS/GIUFFREDA

1   reaching in her purse and coming out with something, would you

2   shoot?  Or in this situation, a cell phone, which he clearly

3   had in his hand, was talking -- I could see it myself, and he

4   had it in his hand when he got off the bicycle -- I'm saying

5   that given the context of the call, there was no reason to

6   believe that Dontrell Stephens had a firearm, because there was

7   no knowledge on the part of the officer that Dontrell Stephens,

8   or a black male riding a bicycle, just done an armed robbery

9   down the street.  He could have been reaching for his own

10  wallet, if he did reach back there, to get ID out to show who

11  he is.

12          So the violation of the standards are, that didn't

13  make a proper threat assessment, took action when there

14  wasn't -- he took preemptive action when it wasn't justified

15  under how officers are trained, et cetera, et cetera.  The fact

16  that he -- other officers would not have is the objective

17  reasonableness test.

18  Q.  All right.  And that's based upon your view of the

19  evidence.  But -- and without getting too far off field

20  factually, because I'm not trying to turn this into a

21  deposition -- obviously, Deputy Lin's position is he never saw

22  the phone in his hand.  You can see it on the camera, but Lin

23  didn't see it.  You understand that.

24  A.  Yeah, I sure do.

25  Q.  All right.  And you understand that the camera is two feet

TUCKER - CROSS/GIUFFREDA

1  to Lin's right and has a different perspective of the plaintiff

2  than Lin had.  You understand that.

3  A.  *(No response)*

4  Q.  Or if you don't agree with that, that's fine.

5  A.  Don't believe my eyes, believe -- don't believe your lying

6  eyes.  I'm only telling you that what I see from the camera,

7  whether the camera is a foot and a half or a foot or nine

8  inches to the right -- they're usually mounted in the center of

9  the dashboard of a police car -- I don't know, maybe Deputy Lin

10  couldn't see to the right.  I don't know.

11  Q.  All right.

12  A.  I'm just saying what I saw.

13  Q.  What you see in the video, but you're not -- you don't have

14  an opinion of whether Deputy Lin saw the phone or whether he's

15  lying about not seeing the phone.

16  A.  Well, I'm not gonna say he was lying.  You're right, I

17  don't know what he saw.  I know what he was trained to look

18  for -- hands.

19  Q.  All right.  And then the next opinion you have here, that

20  we've cited in our motion:

21       "In addition, Lin's failure to follow

22     well-established law enforcement officer safety

23     standards existing in 2013 contributed to his poor

24     threat assessment, since Florida law enforcement

25     officers have been taught for 40 years that when

TUCKER - CROSS/GIUFFREDA

1        engaging in subject -- when engaging a subject, they

2        should seek a position of concealment and cover and

3        communicate" -- that's the three Cs" --

4   A.   Yes, sir.

5   Q.        -- "with the subject until they can clarify" --

6        excuse me -- "the circumstances confronting them."

7             Now, that is a, you say, well-established law

8   enforcement officer safety training standard, correct?

9   A.   Yes.

10  Q.   All right.  But you're not suggesting that's the law,

11  correct?

12  A.   No, it's not the law.

13  Q.   All right.

14  A.   It's what's been taught to law enforcement officers for

15  40-some years.

16  Q.   And, certainly, there are circumstances where law

17  enforcement officers have to put themselves in position of

18  danger just by the very nature of their job, correct?  That

19  does happen.

20  A.   Certainly, there are occasions when they place themself in

21  danger out of necessity, but there wasn't any necessity to

22  place himself in danger here.  He could have just communicated

23  with Dontrell Stephens, as I already testified.

24  Q.   Right.

25             As you already testified, this was just a minor

TUCKER - CROSS/GIUFFREDA

1   traffic infraction incident.  There was no reason to think he

2   was armed or anything like that, correct?

3   A.  Correct.

4   Q.  So there would be no reason to conceal himself or take

5   cover either, correct?  He should have just talked to him.

6   A.  Well, yes.

7        But an officer safety procedure is, if there's -- if

8   you want to be ultimately safe, just follow the simple

9   procedure -- stand behind some kind of concealment and cover

10  and communicate with the individual, tell them what to do,

11  until there's some establishment of security there, and then

12  you can go on from -- move from out of cover and issue him a

13  ticket, if you're going to.

14  Q.  All right.  But, ultimately, there really is no

15  step-by-step checklist that officers are required to follow

16  when encountering people.  It's just general officer safety

17  concept.

18  A.  Step-by-step procedure... officers are taught to interact

19  with an individual as I just described, if you can.

20  Q.  All right.

21       MR. GIUFFREDA:  The next opinion, frankly, your Honor,

22  is gonna touch on the motion to renew the *Monell* claim.

23  BY MR. GIUFFREDA:

24  Q.  But there's an opinion that the sheriff's "failure to put

25  in place, prior to 2013, an objective accountability system,

TUCKER - CROSS/GIUFFREDA

1    staffed with properly trained internal affairs investigators,

2    to review allegations of excessive force, and his routine

3    ratification of his deputies' actions sent a message to his

4    deputies and to the internal affairs investigators that

5    excessive force would be tolerated."

6         And then you go on to conclude that that failure, in

7    your opinion, somehow caused Deputy Lin to use unjustified

8    deadly force against Dontrell Stephens on September 13, 2013.

9         Is that opinion, which is contained in your report,

10   which is in the record, based upon your review of the materials

11   that are listed in the back of your report?

12   A.  It's based upon not only a review of the materials --

13   that's not an updated list, that was the materials that I

14   reviewed at the time of my report -- and my knowledge,

15   training -- my knowledge and experience, having managed

16   officers and conducted internal affairs investigations into

17   shooting situations, my work -- the book that I wrote and was

18   published in 2011 called *Officer-Involved Shootings:*

19   *Prevention and Investigation*, and talking with law enforcement

20   officers.

21        And in particular, it's even evidenced on this

22   videotape, when the officer comes up after -- after the

23   shooting and says to Lin, "That's okay, I got your back" --

24   that's on the tape -- as additional indications of that.

25   Q.  So Officer Borut's comment that you can hear on the video,

TUCKER - CROSS/GIUFFREDA

1  recognizing he wasn't even there and didn't witness anything --
2  A.  Right.
3  Q.  -- you considered that as evidence that the sheriff
4  tolerates the use of excessive deadly force.
5  A.  I think that's a manifestation of what we have in terms of
6  accountability for law enforcement officers.  Here, we have an
7  internal affairs investigation, which is what I'm getting at
8  here, that they reached a conclusion that the shooting was
9  justified and never even spoke to Dontrell Stephens before they
10 reached that conclusion.
11       Now, what does that say?  What it says to me is, they
12 just took the officer's version and said, Okay, this is what
13 happened, so it was a justified shooting.  I think when you do
14 that, what you are doing is telling your officers, It's okay, I
15 got your back, I'll take care of you, I'll indemnify you, you
16 won't be in any kind of a problem.  And that's -- that's my
17 experience over 40 years of looking at this stuff.  I have
18 looked at internal affairs investigations and -- numerous ones
19 and seen this happen.
20 Q.  All right.  But the bottom line is, the basis for that
21 opinion is -- comes out of the material you reviewed in this
22 case.  And then I have one other question.
23 A.  Yes, sir.
24 Q.  You're not aware that Dontrell Stephens was in the
25 hospital, and his criminal defense attorney invoked his right

TUCKER - CROSS/GIUFFREDA

1   to remain silent?  You're not aware of that fact?

2   A.  *(No response)*

3          **MR. QUINLAN:**  That's a --

4          **MR. GIUFFREDA:**  Okay.  Well, he just said that they

5   didn't take his statement.  There was a reason they didn't take

6   his statement, so... okay.  I'll move on, your Honor.

7          **MR. QUINLAN:**  There's evidence directly contrary to

8   that about the timing in which his statements were or were not

9   sought.  I'll leave it at that.

10         *(Discussion had off the record between counsel)*

11  BY MR. GIUFFREDA:

12  Q.  The next opinion, your Honor, which is on page 6 of 8,

13  you're critical of how Deputy Lin was dressed and the quantity

14  of weapons and ammunition that he had with him at the time.

15         And isn't it true that Deputy Lin was wearing what

16  some people refer to as a tactical uniform?  Isn't that true?

17  A.  Yes.

18  Q.  All right.

19  A.  Tactical vest and uniform.

20  Q.  All right.  And isn't it true that many agencies around the

21  country have officers that wear tactical uniforms with tactical

22  vests?

23  A.  I think that's, unfortunately, a -- the answer to that is,

24  unfortunately, yes, right now.

25  Q.  And I know that you're a former FBI agent, so I'm assuming

TUCKER - CROSS/GIUFFREDA

1   you're aware of the FBI incident where John Hanlon *(phonetic)*

2   and others were shot at, and some of them were killed, because

3   they were outgunned.  They didn't have enough weapons, enough

4   ammunition to deal with the people who attacked them.  You're

5   aware of that incident, aren't you?

6   A.  I certainly am.

7   Q.  And you're aware of September 11, 2001, correct?

8   A.  Yes, sir, I am.

9   Q.  All right.  So you recognize that the way he was dressed is

10   a common way officers have dressed, particularly since those

11   two events.

12   A.  You're asking me a question about what's common?  I can

13   tell you that that is not common dress throughout the nation.

14   Tactical vests, five sets of handcuffs, tasers, OC, shotgun,

15   shotgun shells, 76 rounds -- that's not common dress for police

16   officers throughout the nation.

17   Q.  In your opinion.

18   A.  It's -- yes, that's my opinion.  Everything saying here is

19   my opinion.

20   Q.  And in this case, Deputy Lin fired a handgun, correct?

21   A.  Yes, that's correct.

22   Q.  And he fired it four times, correct?

23   A.  Yes, sir.

24   Q.  And it's common for police officers to carry handguns,

25   correct?

TUCKER - CROSS/GIUFFREDA

1   A.   Yes, sir.

2   Q.   He didn't use a shotgun or pepper spray or a taser or

3   anything like that.

4   A.   No, he did not.  He used a handgun.

5   Q.   Okay.  And then you have some opinions about how Deputy Lin

6   had to feel, that Deputy Lin's own experience on the PBSO had

7   likely convinced him that nothing would happen to him if he

8   overreacted and used excessive force.

9        Now, there's really no basis for that opinion, is

10  there?  Deputy Lin has never admitted that he felt like he

11  could get away with using excessive force, true?

12  A.   I think I said "had to feel," and the reason I said that

13  is, based upon my experience in talking to officers, when

14  there's been a situation, and they're being investigated by --

15  for example -- and I don't know that to be the case here --

16  maybe a police officer who was at his house the previous Friday

17  night sharing beer and hamburgers at a social event, and now is

18  going to investigate him on Monday morning.  Most officers feel

19  like, feel like, that they're gonna be protected by their

20  agency, for good reason.

21       No one wants to find fault with the officer for

22  purposes of civil liability, bad publicity, including police

23  chiefs.  I have felt that pressure to not find an officer at

24  fault, because I thought, well, maybe I'll be named in a

25  lawsuit for negligent -- what I call TRASH -- training,

TUCKER - REDIRECT/QUINLAN

1    retention, assignment, supervision, and hiring.  So I have felt

2    that pressure to protect officers too.

3    Q.  All right.  But, ultimately, that opinion isn't based upon

4    any evidence.  Lin's never admitted that that was how he's

5    feeled -- felt or felt about it, and the sheriff hasn't

6    admitted that that's how he feels about it.  This is just an

7    opinion you have about how people feel --

8    A.  Based upon my experience in talking to officers and how

9    they feel about these kind of situations, that's correct, and

10   the lack of accountability for mistakes.

11   Q.  Okay.

12        **MR. GIUFFREDA:**  I don't have any other questions, your

13   Honor.

14        **THE COURT:**  Any redirect?

15                    **REDIRECT EXAMINATION**

16   BY MR. QUINLAN:

17   Q.  Just a couple things quickly, Chief Tucker.

18        Are officers trained specifically to focus on the

19   hands in their encounter with citizenry?

20   A.  Yes, sir, they are.

21   Q.  And did you train officers to do exactly that?

22   A.  "Show me your hands," that's -- you're looking at the hands

23   first thing.

24   Q.  All right.  And in terms of the threat assessment, and

25   what's embodied in your report and your opinions, using the,

TUCKER - REDIRECT/QUINLAN

1    quote, even assuming the accuracy of some -- Lin's description

2    of the encounter with Dontrell Stephens, you are attempting to

3    apply the reasonable standards that are reflected nationally

4    and adopted locally to those assumed facts.

5    A.  That's correct.

6    Q.  Reasonable -- objective, reasonable standards.

7    A.  That's correct.

8    Q.  Uhm, you are aware that Deputy Lin, now Sergeant Lin, in

9    his deposition acknowledged that he expected Sheriff Bradshaw

10   to show up at the scene and make a statement about --

11   A.  Yes, I recall that.

12   Q.  And you were asked about somebody being outgunned.  You

13   recall that Deputy Lin -- Sergeant Lin was asked at his

14   deposition about 76 rounds and his knowledge as to whether

15   anyone in the history of Palm Beach County ever had to use

16   76 rounds at one time.

17   A.  I remember.

18   Q.  Okay.  And would you consider that part of a reasonable

19   threat assessment?

20   A.  I -- would I consider what, him carrying 76 rounds or --

21   Q.  No, the consideration of whether 76 rounds is ever, in the

22   history of Palm Beach County law enforcement, proven necessary.

23   Is that part of the analysis and the assessment --

24   A.  Certainly.

25   Q.  -- that you would consider a reasonable threat --

1   A.   Certainly.

2   Q.   Thank you.

3           **THE COURT:**   Any recross?

4           **MR. GIUFFREDA:**   No, your Honor.

5           **THE COURT:**   Chief Tucker, do I understand that you're

6   assessing the reasonableness of Deputy Lin's action in light of

7   local law enforcement practices and standards?

8           **THE WITNESS:**   I am assessing the deputy's actions

9   under the national standard, which is replicated, basically,

10  through the use-of-force policy of the Palm Beach County

11  Sheriff's Office.   It's -- almost comports with the national

12  standards on use of force.

13          **THE COURT:**   All right.

14          **THE WITNESS:**   Consistent, as Dr. Alpert, I think,

15  testified to.

16          **THE COURT:**   But if you're going to be looking to a set

17  of police standards, wouldn't that then vary from jurisdiction

18  to jurisdiction?

19          **THE WITNESS:**   No, sir.   Not when you're talking about

20  the use of deadly force.   Clearly, a person does not in a small

21  community in Kansas get -- doesn't get a watered-down version

22  of the Constitution in terms of their protection against deadly

23  force compared to somebody in Chicago.   I mean I think that's a

24  standard -- I mean that's what the U.S. Supreme Court set for

25  us.

1    **THE COURT:**  But police departments, are they not, are

2    free to adopt stricter standards, higher standards governing

3    the use of deadly force than perhaps what the Constitution --

4    **THE WITNESS:**  They can adopt a stricter standard, but

5    not a lower standard.

6    **THE COURT:**  Right.

7    **THE WITNESS:**  They could say that you -- I mean like

8    pursuits, they could say, You will not engage in a pursuit,

9    and -- even though the national standards do permit it.

10   **THE COURT:**  So, for instance, Dr. Alpert wrote in his

11   report that the standard was what was objectively necessary.

12   If a police force adopted that as the standard, which they

13   would be free to do, that would not be the constitutional

14   standard.

15   **THE WITNESS:**  That's right.

16   **THE COURT:**  And if another jurisdiction adopted a

17   standard of objective reasonableness, then if we were to look

18   to police standards to tell us what was correct, it would vary

19   from jurisdiction -- from one jurisdiction to another, correct?

20   **THE WITNESS:**  I can only testify to what my experience

21   is, your Honor, and my experience is that when I go to

22   agencies, and I've had 520 cases that I reviewed, the policies

23   today on use of force are con -- very consistent, because

24   they're available, and they meet the requirements of

25   *Graham v. Connor* and state law, which reflects

1   *Graham v. Connor.*

2           **THE COURT:**  I saw somewhere in here one of the Palm

3   Beach Sheriff's Office witnesses who was deposed, high

4   ranking -- I think one of the training officers -- describe the

5   agency's standard as "reasonable and necessary."

6           **THE WITNESS:**  Yes, sir, I agree.

7           **THE COURT:**  All right.  But then if that were the

8   case, that is a higher standard than what the Constitution sets

9   forth, correct?

10          **THE WITNESS:**  Yes.  I think I know where that comes

11  from.  And I would suggest that's probably -- just my guess,

12  that would be an older officer, and when I -- Geoffrey Alpert's

13  close to my age, so I know how that slipped up.

14          When *Tennessee v. Garner* came in, in 1985, officers

15  were being taught then that when somebody was fleeing from you,

16  and you had probable cause to believe that they'd be an

17  imminent threat to somebody by their escape, the other part of

18  that, that they were taught, was, and there was no way that you

19  could apprehend them other than through the use of deadly

20  force, therefore, it was necessary, a lot of older officers --

21  and we used to teach it before *Tennessee v. Garner*, that before

22  you could use deadly force, you had to have a necessity, he had

23  to have an opportunity to harm you and the ability to harm you.

24  It was necessity, opportunity, and ability that was taught.

25  And it's just a carryover from the old days.

1           **THE COURT:**  All right.  Assuming that to be the case,

2    that the standard at the Palm Beach Sheriff's Office is

3    reasonable and necessary, that is not the constitutional

4    standard.

5           **THE WITNESS:**  No.  That's a higher standard.

6           **THE COURT:**  All right.  So then would it not be

7    misleading, then, to speak to a jury in terms of Officer Lin's

8    adherence to Palm Beach Sheriff's Office standards when those

9    are not the constitutional standards?

10          **THE WITNESS:**  No, sir, and here's why.

11          **THE COURT:**  All right.

12          **THE WITNESS:**  Very simply, if an officer violates

13   the -- an agency standard, what are they subjected to by the

14   agency?  Administrative culpability, not criminal culpability

15   and not civil culpability.

16          **THE COURT:**  Right.

17          **THE WITNESS:**  If an officer violates the national

18   standard, then he becomes culpable for all three.  And so

19   that's the reason why.  You know, frankly, agency -- violation

20   of an agency policy in terms of use of force is just that.  It

21   means the officer can be disciplined, maybe even fired, but it

22   doesn't go to anything else.

23          **THE COURT:**  I guess it then gets to the bottom-line

24   question.  Is agency policy -- here, Palm Beach Sheriff's

25   Office policy -- even relevant?  Is not the only relevant

```
 1    standard the constitutional one?
 2              THE WITNESS:  It is relevant --
 3              THE COURT:  I know it's probably a decision I need to
 4    make, but I'd like to get your opinion on that.
 5              THE WITNESS:  It's -- it is only relevant in the sense
 6    that it is a form of -- it is evidence of what the officer's
 7    guidance is from the agency regarding the use of force.  And
 8    training is based upon that policy too.
 9              THE COURT:  You know, in Whren vs. the United States,
10    which is -- the D.C. police department had certain policies
11    governing when, I believe, officers who are not in uniform
12    could pull over cars, and --
13              THE WITNESS:  Right.
14              THE COURT:  -- I don't know what the formulation was,
15    but emergency, extraordinary circumstance.  And, of course,
16    Whren did not involve that.  And so the Court spoke about the
17    distinction between the restrictive D.C -- Washington, D.C.,
18    policy and the constitutional standard.
19              THE WITNESS:  Correct.
20              THE COURT:  And they emphasized that they need to
21    judge solely by the constitutional standard, not the D.C.
22    standard.  And they said, because otherwise, in every
23    jurisdiction, the Fourth Amendment would mean something
24    different.
25              THE WITNESS:  That's correct.
```

1      **THE COURT:**  So, again, my question is here then, if

2   the only standard that governs the jury is the constitutional

3   standard, then invoking other -- why does not the invocation of

4   law enforcement agency standards create confusion?  And how is

5   it relevant?

6      **THE WITNESS:**  It's only relevant, as I said, that --

7   if there was an investigation done in this case, which there

8   was, and if you're looking at the agency policy, part of the

9   internal affairs investigation conducted -- there's three

10  reasons for doing an internal affairs investigation --

11  determine whether there was any violation of law or policy,

12  whether there was any training deficiencies or supervisory

13  deficiencies.

14      In this case, if they would have interviewed Dontrell

15  Stephens, and they would have looked at this case the way I

16  looked at it, frankly, they would have seen violation of their

17  own policy and would have taken action against Deputy Lin.

18      **THE COURT:**  But let's assume --

19      **THE WITNESS:**  Instead, he's been promoted.

20      **THE COURT:**  Let's assume that they found

21  administratively that he violated agency policy, because let's

22  say they determined it wasn't necessary.

23      **THE WITNESS:**  Correct.

24      **THE COURT:**  That does not mean, though, that he

25  violated constitutional standards.

```
 1              THE WITNESS:  That's correct.

 2              THE COURT:  All right.

 3          Any follow-up questions based on upon my inquiry?

 4              MR. QUINLAN:  Yeah, a couple, if I could, your Honor.

 5                   REDIRECT EXAMINATION (CONTINUED)

 6   BY MR. QUINLAN:

 7   Q.  Just for clarification, Mr. Tucker, it looks like item 51

 8   on your reliance list is PBCSO General Order 500.00, titled

 9   "Use of Force, Effective 6-6-12."  So you did look at the

10   specific PBSO policy.

11   A.  Oh, yes.  I had that when I wrote my report.

12   Q.  All right.  I don't have a copy of it in front of me, but I

13   have a quote of it in one of the pleadings, 186-2.

14          "Employees are authorized to use deadly force

15       when there is reasonable belief that such force is

16       necessary to prevent imminent death or serious bodily

17       harm to the employee or another individual.

18       Section I.E.1 of Palm Beach County Sheriff's Office

19       General Order 500.00."

20          From your perspective, does that comport with the

21   legal standard established in Graham vs. Connor?

22   A.  Yes, sir.

23          (Discussion had off the record between counsel)

24              MR. QUINLAN:  Nothing further.

25              THE COURT:  Anything further?
```

97

1          **MR. GIUFFREDA:**  Nothing, your Honor.

2          **THE COURT:**  Thank you.  Appreciate it.

3          **THE WITNESS:**  Thank you, your Honor.

4          *(Witness excused)*

5          **THE COURT:**  Do we want to -- it's about 20 after 12.

6    Do we want to defer to a majority vote -- if it's two to two,

7    I'll break the tie -- do we want to take Mr. Kapelsohn's

8    testimony by telephone and then break for a short --

9          **MR. GIUFFREDA:**  He's here.  Mr. Kapelsohn's here.

10         **THE COURT:**  Okay.

11         **MR. GIUFFREDA:**  And he has a 3:30 flight.  But I think

12   we could take a short break and then put Mr. Kapelsohn on.  And

13   I know I need to feed the meter anyway.  I'm parked across the

14   street in a three-hour limit lot, so....

15         **THE COURT:**  Okay.  All right.  I have 12:18.  12:30?

16   Would that be enough?  12:35?

17         **MR. GIUFFREDA:**  12:35 with security, probably.

18         **THE COURT:**  All right.

19         And then after Mr. Kapelsohn, we can take a short

20   lunch break, if you want.  Do you want to do that?

21         **MR. QUINLAN:**  Okay.  Sure.

22         **THE COURT:**  All right.  So let's break to about 12:35.

23         *(The Judge exited the courtroom)*

24         *(Recess taken at 12:19 p.m. until 12:37 p.m.)*

25         *(The Judge entered the courtroom)*

98

```
 1              THE COURT:  Please be seated.

 2              All right.  Welcome back.

 3              Recalling our case, Stephens vs. Bradshaw and Lin.

 4   And I see everybody is present.

 5              Why don't we go ahead then and proceed with

 6   Mr. Kapelsohn's testimony.

 7              Mr. Kapelsohn, if you'll come forward.  Let me just

 8   look -- find your report here.

 9              Okay.  Bear with me one moment as I try to organize

10   this mess.

11              Bear with me one moment.

12              Okay.  This was the -- defendants' motion was the last

13   one.  And let me just locate the plaintiff's motion.  This is

14   Docket Entry 186, I believe.

15              All right.  Please raise your right hand.

16        (EMANUEL KAPELSOHN, DEFENDANTS' WITNESS, WAS SWORN)

17              THE COURT:  Okay.  If you could please be seated.  Get

18   comfortable, pull close to the microphone, and state your name

19   and spell your last name.

20              THE WITNESS:  Emanuel Kapelsohn, K-A-P-E-L-S-O-H-N.

21              THE COURT:  All right.  And, Mr. Kapelsohn, I have

22   your opinion here dated August 25 -- I guess in the form of a

23   letter to Ms. Barranco, August 25, 2014, Docket Entry 186-2 --

24   dash 2.  And do you adopt the content of that report as your

25   testimony on direct examination?
```

1          **THE WITNESS:**  Yes, I do.

2          **THE COURT:**  All right.

3          Mr. Giuffreda, Ms. Barranco, do you have any questions

4    on direct examination before we go to cross-examination?

5          **MR. GIUFFREDA:**  Just a few things, your Honor.

6          And I know there's been no changes to the report, but

7    there are some additional articles Mr. Kapelsohn provided me

8    this morning regarding the eye movement issue.

9          **THE COURT:**  Saccadic movement, uhm-hum.

10         **MR. GIUFFREDA:**  Yes.  And I haven't filed them with

11   the Court, because I just printed this morning.

12         **THE COURT:**  All right.

13         **MR. GIUFFREDA:**  I have a copy for plaintiff's counsel.

14         **THE COURT:**  All right.

15         **MR. GIUFFREDA:**  But if the Court will allow, I'd like

16   to at least make them part of the record.

17         **THE COURT:**  All right.  Very well.

18         **MR. GIUFFREDA:**  And one of the articles is titled

19   "Vision in Shooting."

20         **THE COURT:**  Okay.

21         **MR. GIUFFREDA:**  And, honestly, I haven't read them

22   either, for whatever that's worth.

23         **MR. SCAROLA:**  That's dangerous.

24         **MR. GIUFFREDA:**  Isn't it?  It is.

25         But, ultimately, my expert is considering them and

KAPELSOHN - DIRECT/GIUFFREDA

1    would consider them and rely on them, so....

2              **THE COURT:**  Okay.  All right.

3              **MR. GIUFFREDA:**  All right.  So, briefly, if I could,

4    your Honor.

5              **THE COURT:**  Yes, go ahead.

6                        **DIRECT EXAMINATION**

7    BY MR. GIUFFREDA:

8    Q.  Could you please tell us your education, training, and

9    experience and certifications as it would relate to law

10   enforcement, and particularly use of force and use of deadly

11   force.

12   A.  Yes.  I have a bachelor's degree with honors from Yale

13   University and a law degree from Harvard Law School.

14             **THE COURT:**  You could have done better.

15             *(Laughter)*

16   A.  I started practicing law in New York City in 1977 or -- '78

17   was when I was actually admitted to the bar.  It takes them a

18   long time there.

19             And I've been a shooter and a user of firearms since

20   my father taught me to shoot when I was about six years old,

21   and I'm close to being 64 years old.  So I've been using

22   firearms for about 58 years.

23             For the last 36 years or so, I've been a professional

24   law enforcement firearms instructor.  I've trained and

25   certified police officers and police instructors all over the

KAPELSOHN - DIRECT/GIUFFREDA

1   United States, including for major city departments, major

2   states of police agencies, programs under contract for federal

3   agencies, programs for my own Commonwealth of Pennsylvania's

4   police training commission, helping rewrite their curriculum on

5   use of force and on firearms training.

6          I've been an academy instructor.  I would estimate

7   that since I started doing this work professionally, I've

8   trained in excess of 15,000 people.

9          Here in Florida, I've done firearms instructor and

10  use-of-force training programs for the police departments of

11  the City of Miami, Jacksonville, St. Petersburg.  I've trained

12  at a good number of international law enforcement instructor

13  training conferences held here in Orlando and in St. Augustine

14  and in West Palm Beach.  And I've taught at the state academy

15  at Lively, Florida.  And I've taught several other programs in

16  and around the state of Florida.

17         My work involves writing articles.  I have, oh,

18  something over 120 or 130 published articles and some longer

19  works.  I'm the principal author of a book called *Firearms*

20  *Training Standards for Law Enforcement Personnel*.  It's

21  actually short.  It's a set of standards about 60 pages long.

22  I'm the associate editor of a standards and practices guide for

23  law enforcement firearms instructors.  That's about 350 pages

24  long, published by the International Association of Law

25  Enforcement Firearms Instructors.  I've been on that

KAPELSOHN - DIRECT/GIUFFREDA

1    organization's board of directors for 29 years now.  I've been

2    its -- one of its three vice presidents for something going on

3    about 20 years now.

4           Agencies I've taught firearms instructors for include,

5    besides here in Florida, the New York State Police, the

6    Washington, D.C., Metropolitan Police, the police departments

7    of Baltimore; Dallas, Texas; Phoenix, Arizona; Philadelphia;

8    Atlantic City; Seattle; Spokane; Salt Lake City.

9           I, myself, have been a reserve, or specialist it's

10   called in Pennsylvania, deputy sheriff for 19 years for the

11   Berks County Sheriff's Department.  That's a sworn armed

12   position.  I do a lot of training, I do a lot of consulting for

13   them on policy issues, but I also go out and do sheriffs' work.

14          I lived in the state of Indiana for five years with my

15   family, from 2008 to 2012.  I was a reserve deputy sheriff

16   there.  That involved regular assigned duty shifts.

17          So I've done not as much law enforcement work as

18   someone who's been a full-time officer, but over the last

19   19 years, I've done a fair amount and seen a good bit.

20          My work involves consulting to manufacturers of police

21   products -- guns, holsters, ammunition, things of that sort.

22   And it involves expert witnessing.  I've done expert witness

23   work for about 32 years now in state and federal courts all

24   over the country.  I've testified in court, oh, probably around

25   55 times.  Also testified in administrative hearings, including

KAPELSOHN - DIRECT/GIUFFREDA

1    before federal agencies.  I've testified on firearms subjects

2    by invitation before both houses of Congress.  I've testified

3    many, many times in depositions.  And all told worked as an

4    expert or consultant in, oh, somewhere around 300 cases.

5            So I'll stop there and let you ask, if you would.

6    BY MR. GIUFFREDA:

7    Q.  All right.  And, Mr. Kapelsohn, are you familiar with the

8    legal standard, particularly as an attorney, that applies to

9    the use of deadly force under the Fourth Amendment?

10   A.  Yes, sir.

11   Q.  All right.  And did you apply that standard in your

12   analysis in this case?

13   A.  Yes, I did.

14   Q.  All right.  And, in particular, all the materials you

15   reviewed I believe are listed in your report, is that correct?

16   A.  Yes, except for -- I brought these articles about saccadic

17   movements and other eye movements, just to show that it's

18   accepted and known.  And, in fact, one of these articles is

19   written for the law enforcement field.  It's something that's

20   taught in law enforcement.  You don't need to be an

21   ophthalmologist or a medical doctor to know about it.  It's

22   taught at police academies.  It's taught in instructor training

23   programs.  I've been taught it in programs.  I've taught it to

24   others in programs.

25           So these are new, and they're not listed in my expert

KAPELSOHN - DIRECT/GIUFFREDA

1   report.  They're just here as examples.

2   Q.  All right.

3       **MR. GIUFFREDA:**  And for the record, your Honor, I

4   suppose the best thing would be for us to file those documents

5   and link it to his report, which is DE 186-2?

6       **THE COURT:**  I think to complete the record, yeah.

7       **MR. GIUFFREDA:**  Okay.

8       **MR. QUINLAN:**  Judge, I do want to note an objection to

9   the submission today of these additional materials,

10  particularly in the context of the case in which we're gonna be

11  arguing in a few minutes their motion to strike something that

12  we filed a couple weeks ago and the comment, accepted by your

13  Honor, that we could have anticipated the need to amend Count 5

14  a long time ago.  And for that reason alone, we were denied

15  motion for leave to amend.  I don't normally try to play

16  hardball with these kinds of things, but I think there's got to

17  be a little bit of a tit for tat here, and --

18      **THE COURT:**  Well, just kind of anticipating where

19  we're going, because I know that the basis of your objection in

20  terms of the saccadic movements, I think Mr. Tucker basically

21  said the same thing.  So I don't, you know --

22      **MR. GIUFFREDA:**  And I can address it differently, your

23  Honor.

24      **THE COURT:**  So I don't want to spend too much time,

25  but I appreciate -- I understand.

KAPELSOHN - DIRECT/GIUFFREDA

1          Okay.  Go ahead.

2          **MR. GIUFFREDA:**  And I appreciate that objection too,

3    your Honor.  I really -- I do.

4    BY MR. GIUFFREDA:

5    Q.  All right.  Mr. Kapelsohn, regardless of the articles that

6    you've provided to me this morning, can you please describe for

7    us what the nature of your training and experience and

8    certifications are as it would relate to being a firearms

9    instructor and considering things such as eye movement and

10   perception, auditory suppression, tunnel vision, psychological

11   stress and fear that officers experience during deadly force

12   encounters?

13   A.  Yes.  I'm certified as a police firearms instructor by the

14   FBI, by the NRA.  I've been certified by the New Jersey Police

15   Training Commission, when I lived and worked in New Jersey.

16   I've been certified as a firearms instructor by the

17   Pennsylvania Municipal Police Officers' Education and Training

18   Commission and by some others.

19          I've taken many, many courses over the past 35 years,

20   courses for those certifications that were typically a

21   week-long per course, but many, many hundreds, if not

22   thousands, of hours of training.  I attend training constantly.

23   I attend training programs and conferences every year.

24          The things that you've mentioned are also things that

25   I've studied for my certification in a field called force

KAPELSOHN - DIRECT/GIUFFREDA

1   science.  Mr. Tucker mentioned the Force Science Institute.

2   And I'm certified by that institute, which is run by Bill

3   Lewinski, who's a professor at the University of Minnesota at

4   Mankato in the criminal justice department.  He's a behavioral

5   psychologist.

6         I'm also certified in shooting scene reconstruction.

7   And my testimony regularly around the country involves aspects

8   of not only law enforcement training and use of force, but

9   things like shooting scene reconstruction, ballistics, and

10  force science, which is a field -- it's a fairly newly coined

11  term, maybe ten years ago.  By "newly termed," I mean about ten

12  years ago.

13        But it applies to many things that we've known and

14  taught and used in law enforcement training for decades,

15  including things having to do with human reaction time,

16  perception, vision, how the body reacts to stress, the

17  so-called body alarm reaction, or a fight-or-flight syndrome,

18  as it's called.

19        And this involves, among other things, changes in

20  perception, perceptual abilities, such as tunnel vision,

21  auditory exclusion.  It involves physiological changes.

22        Like the fact that someone starts to tremble when

23  they're terrified, and that they lose typically a good -- a

24  good deal of their fine motor coordination ability.

25        That affects what we do as firearms instructors in the

KAPELSOHN - DIRECT/GIUFFREDA

1    design of programs, in the design of techniques for officers to

2    use in those situations, because if -- if there are two

3    techniques, for instance -- let's just imagine my finger gun

4    here is an actual handgun.  If one way to close the slide of

5    this handgun, after it locks open, and we reload the handgun --

6    one way to close the slide is to push down on a little lever on

7    the side of the pistol.  And the other way to close the slide

8    is to grab it with our left hand and yank it and let it close.

9    One of those things is a finely coordinated muscular movement,

10   which may fail the officer's ability under stress, or with

11   gloves on, or while he's trembling, or while his hands are cold

12   or wet or bleeding.  Whereas the other, the yanking of the

13   slide, is a gross movement, which is in some -- it may take a

14   tenth of a second longer or two-tenths of a second longer, but

15   it's much more positive under stress.

16          So that's just one small example of how a knowledge of

17   the physiology of these events is important in order to design

18   firearms training programs.

19          Now, with regard to vision, we have to know and teach,

20   and officers and instructors have to learn, how our vision

21   changes, our visual abilities change in poor light, for

22   instance.  Two-thirds to three-quarters of law enforcement

23   shootings are under poor lighting conditions.  So we have to

24   know how the eye adapts to poor light, and how a flashlight's

25   use affects the officer's vision, or flashing lights on top of

KAPELSOHN - DIRECT/GIUFFREDA

1    a police car affect his vision in poor light, or going, not

2    necessarily at night, but in the daytime, from bright sunlight

3    here in Florida into a building where suddenly it's much

4    darker, and the pupils shut down, and there's gonna be a period

5    of time when the officer can't identify as much detail until

6    his eyes adapt to that poor lighting.

7         So all these things are parts of what are taught in

8    law enforcement, what -- parts of what we have to understand in

9    designing training programs and designing techniques.

10        Now, the things that were mentioned here, like tunnel

11   vision, where an officer tunnels on to a weapon that's pointed

12   at him, or auditory exclusion, where people under very high

13   stress actually either don't hear things, including loud

14   noises, things that are said, things that are yelled, gunshots,

15   these are things that are not fables created by the law

16   enforcement profession.  They've been studied for years in

17   laboratories.  There have been numerous scholarly articles

18   written about them.  They've been published in the FBI law

19   enforcement bulletin.  They've been published in textbooks on

20   law enforcement, on behavioral psychology, on physiology.

21   These are things that are known and are accepted.

22        The things I mentioned in my report have to do with

23   the differences between what an officer's dashboard camera may

24   see and what -- and record -- and what the officer himself or

25   herself may see.  And this is a growing field.  And it's a

KAPELSOHN - DIRECT/GIUFFREDA

1  widely addressed field today in articles and in courses that

2  are taught just on this very subject.  Because, in fact, I did

3  measure -- contrary to what was said in some of these court

4  papers, I did measure the distance between Officer -- excuse

5  me -- Deputy Lin's eyes, where he sat behind the steering

6  wheel, and the lens of his dashboard camera.  And I put that in

7  my expert report.  And my report says it's about two feet, it's

8  about 24 inches distance between them.

9          And when Mr. Stephens had the phone to his ear, you

10  can look on that dashboard camera video and see that you can

11  just barely see it.  Because he's riding the bike, and he's got

12  this thing to his ear, and you can just barely see it.  And

13  now, if we take an officer and put him, with his advantage

14  point, two feet further to the left, he may not see it.

15          Ultimately, it's gonna be for Deputy Lin to testify

16  whether he saw it or not.  And I'm not here, any more than the

17  chief is, to judge credibility of witnesses.  Juries are going

18  to do that.  But that has to be pointed out to them so that

19  they understand that.

20          And then, a moment later, after Mr. Stephens does the

21  moving dismount from his bike, and Deputy Lin, fearing that

22  Stephens is gonna bolt and run perhaps, jumps out of his police

23  car and moves further to the left.  Now his visual vantage

24  point is even further to the left.  It's no longer two feet off

25  from the camera lens; it's many feet off from the camera lens.

KAPELSOHN - DIRECT/GIUFFREDA

1          And so what the camera sees -- the one thing we can

2    say for sure, for certain, is that whatever that camera saw,

3    that is not exactly what the deputy saw, because his eyes are

4    not where the camera lens is.

5          And I mention in my report that in teaching this

6    subject, which I have for many years, I use police dashcam

7    videos and security camera videos.  And today many, many of the

8    cases that I work in involve not only police dashcam videos,

9    but they're starting to involve body cameras, and they're

10   starting to involve cameras in intersections that are police

11   cameras, and security cameras on buildings.

12         I'm working on one case right now for the City of

13   Chicago, where I think we've got five different videotapes of

14   the same event.  They all show different things, because

15   they're taken from different vantage points.  And the one

16   examples I give in my report, in particular, is of the Marquise

17   Hudspeth shooting in Shreveport, where we have one police

18   dashboard camera, and if that were the only one there, it would

19   show the police shooting down a man with no justification

20   whatsoever.  And I usually show that to the class first when

21   I'm teaching a criminal justice class or a class of recruits,

22   or whatever it may be, and I'll say, What do you think?

23         They say, Oh, my goodness, why did those officers

24   shoot that man?  Because it looks like he's just walking across

25   the parking lot of a convenience store.  Okay?  And in the --

KAPELSOHN - DIRECT/GIUFFREDA

```
 1   luckily, there's another police car, parked at an angle, taking

 2   another dashcam video that shows that Hudspeth has -- I'm gonna

 3   pull out my cell phone -- a dark-colored cell phone, metallic,

 4   held like you'd hold a gun, in fact, held in a two-hand grip,

 5   just like what police instructors would call a Weaver stance,

 6   and that he's swinging it back and forth and pointing it at

 7   officers.  And that, in fact, it's clear that they believe it's

 8   a gun, because when he points it at one of the officers, the

 9   officer ducks to not have that pointed at him.  And that's the

10   point at which they shoot.

11          So that's just one example of something that we use in

12   the law enforcement field to show that video evidence, which is

13   very powerful and very convincing evidence to juries and to

14   others, may, in fact, not give the whole story.  It may not

15   show what the officer himself or herself showed and -- saw, and

16   it may not show what some other camera at some other angle

17   would have shown.

18          So I'll stop there and let you ask me more, if you

19   wish.

20   Q.  Could you explain, in terms of your training and experience

21   as a firearms instructor and a use-of-force expert, how the

22   saccadic eye movement training that you've attended ties into

23   your opinions in this case, and how it will assist the jury in

24   analyzing both Deputy Lin's testimony and this video evidence?

25   A.  Saccadic movement, or saccadic movement, is a quick shift
```

KAPELSOHN - DIRECT/GIUFFREDA

1    of the eyes' focus, fixation of the eyes.  So if at one moment

2    I'm looking at the seal of the U.S. District Court there, and

3    now I look at counsel's table, if my eyes make that quick

4    shift, which is typically made in 30 to 80 milliseconds, in

5    other words, less than a tenth of a second, because we don't

6    have to move the head like I just did, we could just move the

7    eyes, like I did just then, without moving the head at all.

8            So it's a very fast shift.  And if I hadn't been

9    sitting here in this courtroom all morning, but had just come

10   on this scene, and now I look there at the man who's pointing

11   the sawed-off shotgun at me, and then I hear a movement here,

12   and my eyes make a quick shift to hear, and I see that there's

13   another armed robber with a handgun in his hand, those two

14   things I've fixed on visually, and I'll probably remember

15   afterwards.

16           But if you then ask that person, whether that be a

17   police officer or a civilian who was involved in that

18   situation, what was in between, well, my eyes traversed the

19   area in between the one and the other, and I may have a general

20   impression that there was some kind of desk here and some kind

21   of woman doing something over here and somebody in the

22   background there, but as to detail, I'll be at a loss, and the

23   fact is, I may not even have seen those things in a vague way.

24   Because the eye makes a shift.  And that is -- is what's

25   taught, and it's part of what's in these articles.

KAPELSOHN - DIRECT/GIUFFREDA

1              But the fact is that the officer in a situation may

2      look at the hands, and then may see a hand go behind the back

3      and come out with a dark object that looks to him to be a gun,

4      and it wasn't a preemptive movement.  He didn't fire when

5      someone reached behind them.  He fired when Mr. Stephens came

6      out with the dark object or black object that looks like a gun.

7      That's not preemptive; that's a response.  He may have been

8      mistaken in thinking that the object was a gun when it was a

9      cell phone, but it wasn't a preemptive action.

10             That officer, even looking at that scene, may have

11     been able to see Mr. Stephens' hands at one point, the phone at

12     one point, the movement at one point.  It doesn't necessarily

13     mean that the officer saw everything there.  And the example I

14     give in my report is that if we took a picture of this

15     situation that I've just been talking about, where we've got

16     either the seal there and counsel there at the table, we can go

17     back to that picture now, and we can say, Okay, Mr. Kapelsohn,

18     tell us exactly what's on his Honor's bench.

19             And I'll say, Well, there's four styrofoam cups with

20     clips in them, and then there's the microphone, and there's a

21     little miniature apothecary jar there, and each of these

22     things, and his glasses; and the woman here has a headphone on,

23     and she's typing away.  I can describe all that stuff from that

24     photograph.

25             Oh, oh, well, Mr. Kapelsohn, how about on the wall

KAPELSOHN - DIRECT/GIUFFREDA

1   back there behind the other table?

2          I say, Well, that kind of looks like a thermostat or

3   something back there.  Maybe it's an alarm.  I don't know what

4   it is, but there's some kind of electronic box on the wall.

5          Juries may think that someone's vision works that way,

6   like a photograph, where we can hold that officer responsible

7   for every little item on the bench and every little thing on

8   the reporter's table here.  But that's not the way it worked.

9   The officer's eyes went from there, in a saccade, to there, and

10  what was in between may not have been seen.

11         Now, whether Deputy Lin saw it or not is a matter for

12  Deputy Lin to testify to, but jurors might say to themselves,

13  Well, how could he not see it if it was there?  Well, he could

14  not see it based on some of the ways in which the human eye

15  works.

16  Q.  And is that a subject that you regularly train on for the

17  last several years?

18  A.  Yes.

19  Q.  And that was a subject you were certified in as part of

20  your Force Science certification.

21  A.  Yes.

22  Q.  Along with some of the other issues with the auditory

23  exclusion and tunnel vision and stress and flight -- fight or

24  flight.

25  A.  Yes.

KAPELSOHN - DIRECT/GIUFFREDA

1  Q.  And I think Mr. Tucker even acknowledged that officers have

2  been taught those types of concepts -- maybe the word

3  "saccadic" isn't used, but the concept that the eye doesn't see

4  everything a video sees are things that are taught.

5  A.  Instead of a saccade and saccadic movement, or saccadic

6  movement, we can simply say, Focus the eyes here and focus the

7  eyes there.  And what we don't focus on as we're transitioning

8  from one to the other, we may not see in any detail.  And what

9  we don't see in detail, we don't remember.

10 Q.  And in your analysis of the video evidence in this case and

11 the testimonial evidence in this case, do you think that that

12 testimony, based upon your expertise, would assist the jury in

13 understanding and analyzing both the testimony and the video

14 evidence?

15 A.  I believe so.

16 Q.  All right.  And one last question.  Have you testified

17 against law enforcement agencies?

18 A.  Many times, and against individual police officers.  And I

19 have some such cases right now.

20 Q.  Have you testified against gun manufacturers?

21 A.  Yes, I have.  And I have at least one such case right now

22 against a large manufacturer.

23 Q.  Okay.

24      **MR. GIUFFREDA:**  I don't have any other questions, your

25 Honor.

KAPELSOHN - CROSS/QUINLAN

1          **THE COURT:**  Okay.

2               Cross-examination, Mr. Quinlan?

3          **MR. QUINLAN:**  Yes.

4                          **CROSS-EXAMINATION**

5     BY MR. QUINLAN:

6     Q.  Good afternoon, Mr. Kapelsohn.

7               So you have testified in cases as an expert in

8     use-of-force cases, correct?

9     A.  Many times, yes.

10    Q.  Okay.  And that is involved in assessment of an assumed set

11    of facts and whether under that assumed set of facts, the

12    officer's conduct comported with *Graham vs. Connor*?

13    A.  *(No response)*

14    Q.  Whether --

15    A.  In some --

16    Q.  Let me ask a different way.

17               Whether the -- under an assumed set of facts, the

18    officer's conduct was objectively reasonable?

19    A.   In some instances, I am using assumed facts, like a

20    hypothetical, and in some instances, there are things that I do

21    when I do a shooting scene reconstruction or when I read a

22    ballistics report from the state ballistics lab, and it's not

23    assumed, it's something that is there as a fact.  If we measure

24    this knife and how long it is, or if we calculate this

25    trajectory through the car, it winds up over here, and it has

KAPELSOHN - CROSS/QUINLAN

1    to be.  So I wouldn't call that an assumed fact.

2    Q.  All right.  Well, let's start with this then.  You agree

3    that you, as an expert in use-of-force cases, attempt to render

4    opinions on whether conduct was objectively reasonable.

5    A.  In many courts and many cases, that wouldn't be

6    permissible, because that would be preempting the province of

7    the jury as to whether the officer's conduct or was not

8    objectively reasonable.  So, in those cases, I may be

9    testifying whether the officer's conduct comports with his or

10   her training, whether it comports with national standards for

11   police use of force, and things other than the statement that

12   it was objectively reasonable.  It depends, as I go around the

13   country, on what court you're in -- how it -- what I'm allowed

14   to say and how it needs to be expressed to be acceptable.

15   Q.  Okay.  In your report in this case, you opine that his use

16   of force -- I'm sorry -- use of deadly force in this incident

17   was a reasonable use of force in self-defense, correct?

18           **THE COURT:**  What page are you on?

19           **MR. QUINLAN:**  It's page 21 of 186-2.

20           **THE COURT:**  Okay.  Let me just get there.

21   A.  And I don't have a copy of my report in front of me, but

22   I'll assume that you're reading it correctly.

23   Q.  I'd be happy to give you one, if you want to look at it.

24   A.  Sure.

25           **MR. QUINLAN:**  May I approach the witness?

KAPELSOHN - CROSS/QUINLAN

1        **THE COURT:**  Yeah.

2            I think it's in the conclusion paragraph, right?

3        **MR. QUINLAN:**  Yes, that's correct.

4    BY MR. QUINLAN:

5    Q.  I was just reading that point *(indicating)*.

6    A.  Yes, I see it there.  And whether I would be able to

7    testify to that in this court depends on his Honor and what the

8    standard is here.

9    Q.  Okay.  And when we talked about assumed facts versus

10   determinative facts, you did assume, for purposes of your

11   opinion, the accuracy of deputy, now Sergeant Lin's perceptions

12   of what happened at the scene, correct?

13   A.  To some extent, and to some extent, it's also based on my

14   own viewing of the video, it's my own going to the scene, my

15   own measurements, and so forth.  So the things -- the things

16   that I -- there are things where I say -- have to say, if -- if

17   he is accurately recounting that this is what he perceived,

18   then thus and such.  Because I'm not attempting to say he's

19   telling the truth or he's not telling the truth.

20   Q.  I understand.

21           And as we discussed in your deposition, if Dontrell's

22   description of events is accepted as accurate, then, clearly,

23   the use of force was unreasonable in this case, the use of

24   deadly force, right?

25   A.  It's probably right.  If I remember it correctly, he says

KAPELSOHN - CROSS/QUINLAN

1    his hands were up, and then he got shot -- just was shot for no

2    reason.  But that's something that the videotape shows is not

3    true.  Because you see Dontrell Stephens backing up into the

4    view of the video camera before the shots are fired, and he

5    doesn't have his hands up in the air at all; they're down.  So

6    that's one thing that we can say didn't happen that way.

7    Q.  Well, we're not gonna bicker about that right now, because

8    the video has been viewed, and it is what it is.

9         PBSO use-of-force Rule 500.00, you've reviewed that,

10   correct, the Palm Beach County Sheriff's Office use-of-force

11   guideline?

12   A.  Yes.  I don't know that rule from memory to be a certain

13   number, but I've looked at their use-of-force guidelines.

14   Q.  And quoted it in your report, correct?

15   A.  I assume so.

16   Q.  And from your perspective, 500.00 adopts the objective

17   reasonableness standard of *Graham vs. Connor*?

18   A.  I'm sorry, but you're asking me to go from memory on what a

19   standard says in it, not *Graham vs. Connor*, which I know well,

20   but what the PBSO language is.  So I'd have to ask you to show

21   it to me before I could testify about it.  Sorry.

22   Q.  Just, again, reading from your report on page 7 and on to

23   page 8, you quote 500 there, talk about reasonable belief, and

24   then you talk about the factors that are listed in 500.

25   A.  Okay.  I see it now.  What was the question, sir?

KAPELSOHN - CROSS/QUINLAN

1   Q.   In your view, 500.00 is consistent with the standards of

2   *Graham vs. Connor*.

3   A.   That portion of it is, yes.

4   Q.   Do you agree with Mr. Tucker and, indeed, now Sergeant Lin

5   that officers are trained to focus on the hands in encounters

6   with citizenry?

7   A.   Yes.  In general, yes.

8   Q.   Are you familiar with the HGN test?

9   A.   I don't know what that is.

10  Q.   You never heard of horizontal gaze nystagmus test?

11  A.   Oh, yes.  I'm generally familiar with it.

12  Q.   Okay.  Officers are trained on that?

13  A.   Yes.

14  Q.   And it has to do with eye movements and the impact of

15  alcohol consumption on eye movements?

16  A.   Yes.

17  Q.   Do you know whether a PBSO officer who has effected a DUI

18  arrest and is testifying in a criminal case is allowed to

19  testify about HGN?

20  A.   I don't know whether he is or not.

21  Q.   Have you ever testified about saccadic eye movement in a

22  use-of-force case?

23  A.   I don't know whether or not I have used that term.  I have

24  certainly testified as to the principles of it that I've

25  included in my report and many other optical aspects -- tunnel

KAPELSOHN - CROSS/QUINLAN

1  vision, et cetera.  But saccadic eye movement and the fact that

2  the eye doesn't process something the same way a camera lens

3  does, yes, I have testified about that.

4  Q.  Okay.  The articles -- I barely had time to go through

5  them -- did you write any of these?

6  A.  No.

7  Q.  What is the record evidence that Sergeant Lin's eyes

8  shifted in the way that you've described to the Court?

9  A.  I don't know whether they did or not.

10  Q.  And if his eyes stayed focused on Dontrell Stephens and/or

11  Dontrell Stephens' hands during this encounter, then this

12  phenomenon of what happens when eyes shift between objects

13  wouldn't really be applicable to our case, right?

14  A.  Oh, it -- it -- let's see, if his eyes stayed focus on his

15  hands.  Well, first of all, he's got two, and they're not both

16  in the same place.  And the area where we focus our vision is

17  very narrow.  It's about five degrees, 5.2 degrees.  So you

18  can't focus exactly on both hands at the same time.  You can

19  kind of try to keep them in view.

20  Q.  Are you telling me I can't see both of your hands right

21  now?

22  A.  I did not say that.  I said we can keep them in view.  But

23  if you want to focus on one of them, you do lose your focus on

24  the other.  And the point here is the deputy is saying that

25  Dontrell Stephens put a hand behind his back.

KAPELSOHN - REDIRECT/GIUFFREDA

1  Q.  But the circumstance you described, for example, having one

2  person to your left and one person to your right and having to

3  keep an eye on both of them, that is not our case, right?

4  A.  That's not our case, that's correct.

5      **MR. QUINLAN:**  All right.  Nothing further.

6      Thank you, Mr. Kapelsohn.

7      **MR. GIUFFREDA:**  I just have a couple, your Honor.

8                      **REDIRECT EXAMINATION**

9  BY MR. GIUFFREDA:

10  Q.  Your expertise and testimony regarding how the eye focuses

11  and shifts from one point to another, does that have any

12  bearing on your opinions as they would relate to the analysis

13  of the video and how the deputy's driving his car up into the

14  yard, and watching someone riding a bicycle, and how he gets

15  off of the bicycle, and whether he has anything in his hands,

16  and when he moves after he gets off the bicycle, and then

17  getting out of the car, putting it in park, opening the door?

18  Does it have any bearing to any of those issues?

19  A.  It has to do with all of those things.  For instance, I

20  talk in my report about how when the deputy is following the

21  bike up onto the -- when it rides up onto the grass, onto the

22  lawn, he's very close behind it.  He's got to be watching it

23  closely to know when he's gonna have to put on his brakes and

24  stops, unless he wants to run right over Mr. Stephens.

25      I give the example of when the deputy is doing that,

1    he's not also simultaneously processing the number on the

2    mailbox, and the number of cars parked, the number of pine

3    trees in the yard, you know, across the street, and so forth.

4    You focus on one thing or another.  You may have a general

5    impression that you're here in a courtroom with people and

6    chairs and so forth around you, but if I want to see your

7    wristwatch, I'm looking at that, and I'm not seeing anything on

8    opposing counsel's table while I'm doing that.

9    Q.  All right.  So your opinions, in terms of that expert --

10   field of expertise that you've testified on, also relate to

11   this whole stop and the bicycle movement and getting off the

12   bike and all of that.

13   A.  All of those things, yes.

14   Q.  All right.

15       **MR. GIUFFREDA:**  I don't have any other questions, your

16   Honor.

17       **THE COURT:**  All right.  Any --

18       **MR. QUINLAN:**  No, Judge.

19       **THE COURT:**  Okay.  Thank you.

20       **THE WITNESS:**  Thank you, your Honor.

21       **MR. GIUFFREDA:**  May the witness be excused, your

22   Honor?

23       **THE COURT:**  Yes.

24       *(Witness excused)*

25       **THE COURT:**  Again, we go to a majority vote, I break

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

124

1  the tie, and -- you know, I'm able to keep going, but I don't

2  want to put anybody under any stress or duress here.  If you

3  want to break for lunch, we could break for lunch.  Actually,

4  my law clerk was kind enough to bring in snacks today, so we

5  could share those with you if you want to keep going.  What do

6  you all want to do?

7      **MR. GIUFFREDA:**  I'm hearing a short break maybe, just

8  grab a bite somewhere real quick and --

9      **THE COURT:**  All right.  Is that the consensus or --

10     **MR. SCAROLA:**  Our preference would be, since I don't

11 think there's gonna be a necessity for a great deal of

12 argument, to wrap up the *Daubert* portion of this and then come

13 back and move on to the next issue.

14     **THE COURT:**  I can't address the *Daubert* portion until

15 we know what claims are gonna be in the case.  That's why I

16 said at the beginning I want to do the *Monell* and then Count 5.

17     **MR. QUINLAN:**  So *Monell* is next in the batting order?

18     **THE COURT:**  Right, yeah, now that we got everybody's

19 testimony in the record.

20         I said, happy to share some cheese and crackers and

21 fruit.  But if you want to take a break for lunch or -- we

22 could do that.  Whatever you all want to do.

23     **MR. SCAROLA:**  How long is it gonna take us to get

24 lunch, your Honor?

25     **THE COURT:**  There's a couple of places within --

125

1    there's a place right behind our building here, a little

2    cafeteria in the office --

3            **LAW CLERK:**  I can show them where it is.

4            **THE COURT:**  Yeah, in the office building right behind

5    us.  My guess is you could probably do it in 45 minutes.

6    There's also across the street, there's like a pizza place, a

7    few other, you know, quick fast-food places.

8            It's 1:16 now.  Do you want to break until two?  Does

9    that give you enough time?

10           **MR. GIUFFREDA:**  That works.

11           **MR. SCAROLA:**  That's fine.

12           **THE COURT:**  Okay.

13           All right.  So when we come back, we'll take up the

14   *Monell* argument, then we'll go to the motions in limine, both

15   with regard to expert witnesses and topics.  And I think we may

16   be able to move more quickly through those than I think than

17   the *Monell* motion.  And then we'll try to talk about the trial

18   procedures a little.  All right?

19           **MR. GIUFFREDA:**  So hopefully we can be done

20   mid-afternoon, hopefully.  Well, it will be mid-afternoon when

21   we start.  Never mind.

22           **THE COURT:**  My guess it will be probably closer to

23   late afternoon.

24           **MR. GIUFFREDA:**  Late afternoon, okay.

25           **MR. SCAROLA:**  Yeah, that works.

126

```
 1          THE COURT:  All right.  Forty-five minutes?

 2          MR. SCAROLA:  Yeah.

 3          THE COURT:  All right.

 4          MR. QUINLAN:  Will the courtroom be open or is it

 5   gonna be locked up?

 6          THE COURT:  Aaron, could you look up -- you want it

 7   locked or you want it open?

 8          MR. QUINLAN:  I was gonna come back quickly and maybe

 9   just look at some of this stuff on the desk, if it's possible.

10          THE COURT:  We could leave it open.  I don't know if

11   you've got anything that's --

12          MR. QUINLAN:  That's what I mean.  No, I prefer it be

13   left open, if that's okay with everybody else.

14          THE COURT:  Okay.  Fine.  We'll leave it open.

15          MR. QUINLAN:  Thank you.

16          MR. GIUFFREDA:  Thank you, Judge.

17          ROOM CLERK:  Just don't leave you alone.

18          MR. GIUFFREDA:  Yeah, this is a federal courthouse.

19          THE COURT:  Shannon, I think, will show you where the

20   cafeteria is over there.  Unfortunately, a few years ago,

21   they -- oh, this is not on the record.

22          (Discussion had off the record between counsel)

23          (Luncheon recess taken at 1:18 p.m.)

24                        -  -  -  -  -

25
```

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1          **THURSDAY, JANUARY 7, 2016, 2:02 P.M.**

2          *(The Judge entered the courtroom)*

3          **THE COURT:**  Good afternoon.  Please be seated.

4          **MR. GIUFFREDA:**  Good afternoon.

5          **THE COURT:**  All right.  Hope you had a time to grab a

6    little bite to eat.

7          All right.  Recalling our case, Stephens vs. Bradshaw

8    and Lin.

9          I think we're gonna go over now to the *Monell* claim,

10   and then we'll come back and argue -- have argument on the

11   admissibility of the law enforcement -- the experts on use of

12   force.

13         All right.  I don't want to get all mixed up here with

14   my paperwork, so just bear with me for one second.  I had it so

15   neatly organized last night, but it's coming apart here.

16         Okay.

17         All right.  Docket Entry 192, the *Monell* claim.

18   Plaintiffs move for reconsideration.  Defendants oppose it.

19   Let me start and turn to plaintiffs for argument.

20         **MR. SCAROLA:**  Thank you very much, your Honor.

21         Your Honor, on December 31, 2014, your Honor entered

22   an order granting summary judgment with regard to the *Monell*

23   claim.

24         **THE COURT:**  Right.

25         **MR. SCAROLA:**  And it appears from our reading of your

1    Honor's order that the principal basis upon which your Honor

2    granted summary judgment was described in the following terms

3    by the Court.

4         **THE COURT:**  What page?

5         **MR. SCAROLA:**  What is required --

6         **THE COURT:**  What page are you on?  I have it here.

7         **MR. SCAROLA:**  Your Honor, quite frankly, I don't have

8    the page noted, because I'm just quoting from our memo.

9         **THE COURT:**  Oh, okay.  Fine.

10        **MR. SCAROLA:**  But I can find it if it's of any

11   assistance to your Honor.

12        **THE COURT:**  No.

13        There has to be sufficient evidence from which a

14   reasonable jury could find a constitutional violation?

15        **MR. SCAROLA:**  Your Honor has almost quoted it exactly

16   in the language that you originally expressed it.

17        **THE COURT:**  I read it again just the other night.

18        **MR. SCAROLA:**  Yes.  The exact language is:

19        "What is required of Stephens is some evidence

20     from which a reasonable jury may properly infer that

21     claims of excessive force were meritorious."

22        **THE COURT:**  Right.

23        **MR. SCAROLA:**  And the reference to claims of excessive

24   force was a reference to the necessity to show prior incidents

25   of excessive force --

129

```
 1          THE COURT:  Right.

 2          MR. SCAROLA:  -- were meritorious.

 3      We have now presented to the Court what we believe to

 4  be more than ample evidence that there were a significant

 5  number of prior claims of the use of excessive force, which, in

 6  fact, are meritorious claims.  Those claims have not yet been

 7  adjudicated.  There is no finding by a Court as yet that those

 8  claims constituted Monell violations.  And the position taken

 9  by the defense is that since they have not yet been adjudicated

10  as meritorious, they don't satisfy the standard imposed by the

11  Court.

12          Unfortunately, that position simply has no logic.  If,

13  indeed, no Monell claim can be brought until such time as a

14  prior Monell claim has been adjudicated as meritorious, then

15  there's a catch-22.  There can never be a meritorious Monell

16  claim, because each time the Monell claim is presented before

17  the Court, there is no prior Monell claim that has been

18  adjudicated as being meritorious.  That's --

19          THE COURT:  Well -- to -- I -- there could be a

20  finding of excessive force in 20 cases, and that would lay the

21  predicate for a Monell claim.  Now, I'm not saying you need to

22  have that.  I understand your argument.  But there doesn't have

23  to be a finding on a Monell claim to support another Monell

24  claim, just needs to be a finding of constitutional violations.

25          MR. SCAROLA:  I understand that, your Honor.  And I
```

1    understand that that's what the Court intended.

2         **THE COURT:**  Right.

3         **MR. SCAROLA:**  But that's not the way the defense has

4    characterized the requirement.

5         **THE COURT:**  Okay.

6         **MR. SCAROLA:**  I was describing what I understand --

7         **THE COURT:**  Right.

8         **MR. SCAROLA:**  -- the defense position to be.

9         **THE COURT:**  Oh, okay.

10        **MR. SCAROLA:**  And that is that there must have been an

11   adjudicated meritorious *Monell* claim before you can proceed

12   with a *Monell* claim.

13        **THE COURT:**  Right.

14        **MR. SCAROLA:**  What we have presented to your Honor is

15   what I believe clearly satisfies the Court's intent, and that

16   is, prior claims from which the available evidence would allow

17   a reasonable jury to conclude that there was an excessive use

18   of force.  We have presented the Court with details regarding

19   four prior claims.

20        On October 10, 2010, Jeremy Hutton, a 17-year-old boy

21   with Down syndrome, drove the family van away, and his mom

22   reported her son's having taken the family van by calling 911.

23   The deputy sheriff who responded and attempted to pull Jeremy

24   over said that he subsequently acted in self-defense in

25   shooting Jeremy as Jeremy tried to run him down in the van.

```
 1    Video evidence confirms that the shots were actually fired at
 2    the van after the van had passed the deputy sheriff.  If that
 3    evidence is to be believed and given credence by a reasonable
 4    jury, the reasonable jury could certainly conclude that this
 5    was an excessive use of force.
 6           On December 2, 2011, Angelo Kallas was stopped on the
 7    suspicion of DUI.  The dashcam video that records the
 8    circumstances of that stop show an unprovoked assault on
 9    Kallas, which continues while Kallas is handcuffed and under
10    control on the ground, at which point he is then tased seven
11    times and struck in the head with a flashlight.
12           The expert reports with respect to that matter
13    described those circumstances as, quote, "unconscionable
14    extrajudicial punishment and torture," unquote.  Clearly, those
15    circumstances would permit a reasonable jury to conclude that
16    there was an excessive use of force.
17           On May 16, 2012, 24-year-old Seth Adams drove his
18    truck home to Loxahatchee Groves, and he stopped to investigate
19    a man in a car parked in front of his family's business.
20    Although he was unarmed, he was shot, and he was killed by the
21    occupant of that car, who turned out to be a deputy sheriff.
22    The Palm Beach County Sheriff's Office accepted the deputy
23    sheriff's account of what went on.  He said that he acted in
24    self-defense when Adams appeared, after a physical
25    confrontation with the deputy sheriff, to be returning to his
```

1  truck to get a weapon.

2       The defense crime scene reconstruction demonstrates

3  that the deputy sheriff's account of having shot Adams while he

4  was reaching into his truck is false.

5       Obviously, there was no weapon.  He was unarmed.

6  There was no weapon in the truck.  And there is a pending

7  evidentiary hearing before Judge Hurley in which the sheriff's

8  office is being called upon to explain the spoliation of

9  substantial evidence suggesting that the deputy sheriff was, in

10  fact, involved in an illicit rendezvous with another deputy

11  sheriff and that this shooting was a cover-up of that improper

12  conduct.  Certainly sufficient evidence from which a jury could

13  conclude that there was an unconstitutional excessive use of

14  force.

15       On October 4, 2012, 18-year-old, 135-pound, unarmed

16  Michael Camberdella, dressed only in shorts, was shot 11 times

17  in his front yard and killed.  He was, quote, "armed," unquote,

18  with a rubber mallet and pruning shears, which eyewitness

19  testimony confirms he dropped when he was ordered to drop the

20  pruning shears and the rubber mallet.  He did, however,

21  according to witnesses, throw two small lava rocks at the

22  deputy.  And the response to having been assaulted with two

23  small lava rocks was having been shot and killed -- shot 11

24  times and killed.

25       Each of those four events precedes the September 13,

1    2013, Dontrell Stephens shooting.

2          All five cases demonstrate a common pattern.  The

3    deputies involved in each case claim to have acted in

4    justifiable self-defense in response to what they say was

5    perceived to be, but turned out to be a nonexistent threat of

6    great bodily harm.

7          The sheriff accepts the deputies' versions of events

8    in publicly defending their actions prior to the conduct of

9    even the semblance of a reasonable investigation.  Because

10   before the investigation has even begun, the sheriff is

11   defending the actions of each of the deputy sheriffs involved

12   in the circumstances that have been described.

13         What follows is then a grossly inadequate

14   investigation.  And that grossly inadequate investigation in

15   each circumstance ignores substantial available evidence that

16   conflicts with the deputies' accounts.  Those accounts are

17   accepted without any objective assessment of their credibility.

18   And the use of force is found to be justified, confirming the

19   sheriff's public pronouncements.

20         Even when conflicting evidence is presented to the

21   sheriff's office, after the sheriff's office has concluded its

22   investigation, or in some cases even during the sheriff's

23   office investigation, the sheriff's office declines to consider

24   it and persists in the ratification of what is then proven by

25   the conflicting evidence to be gross misconduct, substantially

1    excessive use of deadly force.

2           In the face of that conflicting evidence, there is no

3    reevaluation, there is no qualification of the prior statements

4    that have been publicly made accepting the unchallenged

5    accounts of the deputy sheriffs, and there is no retraction

6    that is ever made.  The sheriff's office persists in defending

7    conduct that clearly, on the basis of a reasonable

8    investigation, would support a conclusion of the use of

9    excessive force.

10          Now, the defendants' response to those circumstances

11   is, first of all, to concede that the events that I have

12   described, although they occurred prior to Dontrell Stephens'

13   shooting, those events all involve new evidence that has been

14   developed since the time of the Court's entry of summary

15   judgment.

16          At page 4 of the defendants' response to plaintiff's

17   amended motion for reconsideration regarding Count 2, *Monell*

18   liability, Docket Entry Number 192, the defendant states:

19          "Plaintiff now points to deposition testimony and

20       expert reports which have been presented in those

21       four lawsuits since the entry of the summary judgment

22       order in this case."

23          So the fact that this is newly developed evidence is

24   conceded by the defense in this case.

25          The defense also concedes -- and I don't know that

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    this could have been reasonably contested, but they concede

2    that it is within this Court's discretion to reconsider your

3    prior ruling.

4           They do, however, argue that the four matters on which

5    the plaintiff's motion focuses occurred before Stephens.  But,

6    of course, it is essential, pursuant to the analysis the Court

7    has applied, that we demonstrate events that occurred prior to

8    the Stephens' shooting as a predicate to establishing *Monell*

9    liability in our case.

10          They argue that -- or they acknowledge the fact that

11   these must be prior events, because any conduct subsequent to

12   the Stephens shooting could not have had a causal connection to

13   the Stephens shooting.  So we are obliged to look

14   retrospectively, and we now have evidence that demonstrates

15   that that retrospective view clearly would permit a jury to

16   arrive at the conclusion that there is a pattern and practice

17   not only of unconstitutional excessive use of force, but a

18   pattern and practice of condoning and ratifying

19   unconstitutional excessive force.

20          Evidence concerning the unconstitutional nature of the

21   prior cases has, in fact, been developed very recently, as the

22   defendant admits at page 4 in the quote that I previously read.

23   The defendant argues that there is no evidentiary finding of a

24   constitutional violation.

25          And that gets back to the point that I started with

1    earlier.  There is no case law that requires that there be a

2    judicial determination that there was, in fact, an excessive

3    use of force, but only, as your Honor has accurately described

4    it, that there is evidence from which a jury could conclude

5    that there was an excessive use of force.

6            The next argument that the defense makes is that there

7    is no evidence that the sheriff knew of prior constitutional

8    violations, that the sheriff had actual knowledge that the use

9    of force rose to unconstitutional levels.  Again, that position

10   is unsupported by the case law and makes no logical sense.

11           It doesn't make any sense at all that the sheriff can

12   insulate himself from liability by purposely choosing to ignore

13   the facts and circumstances that indicate that the excessive

14   use of force in various prior incidents rose to

15   unconstitutional levels.  He can't willfully disregard the

16   facts.  He can't choose not to conduct an investigation.  He

17   can't choose to ignore evidence that contradicts his

18   preconceived conclusion that this was a justified shooting, and

19   then defend subsequent cases by saying, I didn't know these

20   prior incidents involved an excessive use of force.  That

21   doesn't make any logical sense, it is not supported by any case

22   law citations, and would obviously result in a significant

23   injustice.  And, indeed, there is substantial case law that

24   indicates otherwise that I will talk about in just a moment.

25           There was established, based upon the evidence we have

1    presented to your Honor, a pattern of approving the use of

2    deadly force before any investigation is conducted, and that

3    pattern reflects a reckless disregard for constitutional

4    limitations on the use of deadly force.

5           There is a pattern of not only failing, but

6    steadfastly refusing to conduct even minimally competent

7    investigations into deputy sheriffs' use of deadly force.  That

8    further circumstantially establishes an existing policy of

9    indifference to the constitutional limitations on the use of

10   force.

11          There is indifference to constitutional limitations on

12   the part of the sheriff, which causes violation of those

13   limitations.  The message that is being communicated to deputy

14   sheriffs in Palm Beach County is, the facts don't matter, the

15   evidence that may contradict your assertions doesn't matter.

16   If you simply repeat the mantra that you reasonably perceived

17   that you were in danger, we will accept without examination

18   whatever force you choose to use under those circumstances.

19          If the limitations are ignored, it is obvious that

20   they are more likely to be exceeded.  If it is generally known

21   that the speed limit isn't enforced on I-95, people are going

22   to speed on I-95.  If it is generally known within the Palm

23   Beach County Sheriff's Office that the circumstances under

24   which deadly force is utilized really do not make a difference,

25   it is far more likely as a matter of logic, a matter of logic

```
 1   that has been supported by expert witness testimony, it is a
 2   matter of logic that the limitations will be ignored.
 3           The sheriff's office in this case approved Deputy
 4   Sheriff Lin's conduct with knowledge that it exceeded
 5   constitutional limitations and with knowledge that Lin's stated
 6   justification for his use of deadly force was demonstrably
 7   false.  They ratified known constitutional violations in this
 8   case.  And that, according to the case law that I'll reference
 9   in a moment, circumstantially proves a pre-existing policy to
10   condone such violations.
11           The failure to follow up on excessive use-of-force
12   complaints in Lin's own personnel file, tripping the Palm Beach
13   County Sheriff's Office's early intervention system, confirms
14   the PBSO's policy of indifference to limitations on the use of
15   force.
16           There are four cases that I think are most significant
17   with respect to this argument.  First is the Second Circuit's
18   opinion in 1986 in *Fiacco* -- F-I-A-C-C-O -- *vs. City of*
19   *Rensselear.*
20           **THE COURT:**  I think that was in your brief.
21           **MR. SCAROLA:**  It is, your Honor, yes.
22           And the specific language that I expressly call the
23   Court's attention to is:
24           "The fact that none of the claims had yet been
25       adjudicated in favor of the claimant was not
```

1        material.  If the City's efforts to evaluate the

2        claims were so superficial as to suggest that its

3        official attitude was one of indifference to the

4        truth of the claim, such an attitude would bespeak an

5        indifference to the rights asserted in those claims."

6            There's a further quote on page 7 of our memorandum

7    that expressly relates to the circumstances that we are dealing

8    with here.

9            The Second Circuit went on to write:

10           "Drawing all reasonable inferences in favor of

11       Fiacco, the jury could rationally have concluded that

12       during the two years prior to Fiacco's arrest" -- and

13       in this case, we have five -- a five-year long

14       pattern -- "the city defendants' response to

15       complaints of use of excessive force by city police

16       officers was uninterested and superficial.  It could

17       reasonably have inferred that a response to

18       complaints that generally consisted solely of the

19       chief's speaking to the accused officer" -- I'm

20       skipping a little bit -- "would have been viewed by

21       the officers, and should be viewed by an objective

22       observer, as reflecting an indifference by the city

23       to the use of excessive force.  The permissibility of

24       this inference is not diminished by the fact that

25       none of the claims introduced by Fiacco had yet been

1    adjudicated in favor of the claimants."

2        Again, skipping a little bit:

3        "The city and the chief simply did not care what

4    a thorough investigation would reveal.  They were,

5    indeed, indifferent to whether or not excessive force

6    were *(sic)* used.

7        "Accordingly, we conclude that the evidence was

8    sufficient as a matter of law to permit a rational

9    juror to find that the City had a policy of

10   nonsupervision of its police officers that amounted

11   to a deliberate difference to their use of excessive

12   force."

13       That language is an exact description of the

14   circumstances that are presented by the evidence before the

15   Court in this case.

16       The next case that is of significance is *Perez*.  And

17   that's a case that was cited to your Honor.  We've relied on

18   other authorities primarily, but *Perez* was cited to your Honor

19   in our initial motion.

20       And *Perez* stands for the proposition that an

21   established history of little or no discipline is by itself

22   circumstantial evidence of a flawed review system.  And the

23   evidence in that case basically amounted simply to the fact

24   that during a ten-year time frame, only 16 officers were

25   disciplined for use of excessive force.  The statistics

presented in our case are substantially more egregious than

those statistics.

The *Velazquez* case held that it was reversible error

to exclude evidence of multiple excessive force complaints for

which no discipline was imposed.  And that evidence in and of

itself was found to support a *Monell* claim.

Finally, *Salvato*, the most -- I think the most recent

Eleventh Circuit opinion that addresses excessive force issues.

It's a 2015 opinion.

And in that case, the Eleventh Circuit held that the

sheriff cannot be held liable under Section 1983 for a single

failure to investigate a constitutional violation.  That's the

basic holding in the case.

By implication, multiple failures to investigate a

constitutional violation -- and, again, I acknowledge it is by

implication only -- but multiple failures seem to be, in the

opinion of the Eleventh Circuit, a sufficient basis.

And we have a clear pattern of failure to investigate

alleged constitutional violations.  *Salvato* recognized that the

inferences to be made from past event facts may lend weight to

other proof of a policy or custom that led to a constitutional

violation.

So we can look at pre-event, that is, pre-Stephens

circumstances to meet the requirements that your Honor has

suggested must be met in the order in which you entered.  And

1   we have satisfied that.  But we can also look at post-Stephens

2   events to determine whether there is additional circumstantial

3   evidence that would indicate the existence of a policy,

4   practice, or procedure to condone the excessive use of force.

5        And that's where we get into the discussion in our

6   presentation to the Court of what has happened in the Stephens

7   case, of the fact that Deputy Sheriff Lin is deposed in the

8   criminal prosecution of Dontrell Stephens.  You may remember

9   that Dontrell Stephens is charged with the possession of

10  cocaine, and he is also charged with failure to obey lawful

11  orders.

12       When Deputy Sheriff Lin is asked, Did Dontrell

13  Stephens fail to obey any lawful order that you gave him, his

14  answer to that question was no.  The only orders he failed to

15  obey were orders that I gave him when he was on the ground shot

16  and paralyzed.  Up to that point in time, he obeyed all of my

17  lawful orders.  That's his testimony under oath.

18       The cocaine charges are nol-prossed when they cannot

19  connect cocaine found at the scene, after everyone has everyone

20  has left, to Dontrell Stephens in any way, despite

21  extraordinary efforts to attempt to connect the cocaine to

22  Dontrell Stephens.

23       Upon nol-prosing those charges, Dontrell Stephens is

24  charged for the first time, months later, with the possession

25  of marijuana that was alleged to have been found in his

1  underwear at the hospital.

2           However, a subsequent investigation proves --

3       **THE COURT:**  I think we're gonna be getting into these

4  on the motions in limine.  I just want to --

5       **MR. SCAROLA:**  I'm only referencing them here, your

6  Honor, to indicate the extraordinary efforts to which the

7  sheriff's office went in an effort to try to justify this

8  shooting and detract attention away from the excessive use of

9  force against Dontrell Stephens.

10      **THE COURT:**  Let me go ahead and interrupt you.  I'll

11 give you an opportunity to actually address this issue again in

12 response, but let me get defendants' statement.

13      **MS. BARRANCO:**  Thank you, your Honor.

14          First, I would want to point out to rebut what counsel

15 just said, the defendants were not conceding things in their

16 response.  The response was framed in regards to what the

17 plaintiff put forth in the amended motion for reconsideration.

18 So I first want to mention that.

19          Before we even get into the meat of it, your Honor, if

20 this was a golf game, we would consider this to be a mulligan

21 motion.

22      **THE COURT:**  I'm a miniature golfer, so you have to

23 tell me what that means.

24      **MS. BARRANCO:**  A mulligan, your Honor --

25      **THE COURT:**  In terms of windmills and castles, I

1    think....

2              MS. BARRANCO:  It's a do-over, your Honor.

3              THE COURT:  Oh, a do-over?

4              MS. BARRANCO:  It's a situation where you hit the

5    ball, you're not happy where it went, and you kind of look

6    around and go, Hey, I'm gonna take a mulligan, I'm gonna try it

7    again and see if I can hit it in the hole this time.

8              THE COURT:  All right.

9              MS. BARRANCO:  And that's essentially, your Honor, and

10   as was argued in our response, what this amended motion for

11   reconsideration is.

12             As we sit here before your Honor this afternoon, we

13   did this already, more than a year ago.  And the plaintiffs had

14   an opportunity, after many, many months of discovery, to put

15   forth to your Honor, over a year ago, in response to our motion

16   for summary judgment -- the defendants' motion for summary

17   judgment in regard to the *Monell* claim -- they were certainly

18   free to take any discovery and learn any of the stuff that

19   they're setting forth in regard to their amended motion now,

20   your Honor.  In fact, as plaintiff's counsel, as we're in the

21   state of Florida, a very liberal sunshine law is here, frankly,

22   before they even filed the lawsuit in regard to Mr. Stephens,

23   they could have requested and received all of the reports, all

24   of -- everything, about the Hutton case, about the Camberdella

25   case, about the Adams case.  And, in fact, they raised some of

```
 1   those cases in the complaint in this case.

 2             THE COURT:  I think one of them.

 3             MS. BARRANCO:  It was Adams and --

 4             THE COURT:  Is there another one?  I thought it was

 5   just --

 6             MS. BARRANCO:  -- Camberdella.

 7             THE COURT:  Oh, Camberdella.  Okay.

 8             MS. BARRANCO:  At least specifically by name.

 9        So there's certainly nothing that prevented them from

10   exploring those things.

11             THE COURT:  Mr. Scarola's argument is that the

12   particular evidence he is relying on is newly developed, as

13   opposed to the incident itself having occurred I think in -- I

14   think one was 2010, another 2011, then 2012.  I believe his

15   argument -- and if you can respond to this -- is that the

16   particular evidence which they have today, which primarily, I

17   guess, is expert reports, they did not have.

18             MS. BARRANCO:  Well, first, I would say, your Honor,

19   that the Court is not bound by expert reports.  It's not an

20   absolute thing that the judge has to follow --

21             THE COURT:  Right.

22             MS. BARRANCO:  -- that it would be considered in large

23   part hearsay.

24        And, additionally, there's nothing that could have

25   prevented the plaintiffs in this case from having their
```

1    experts, that your Honor had heard from earlier --

2          **THE COURT:**  Right.

3          **MS. BARRANCO:**  -- look into the facts of those other

4    cases and render their own opinions, and there are

5    reports *(sic)*, regarding what happened in the Camberdella case,

6    regarding what happened in the Hutton case, regarding what

7    happened in the Adams case.  There was absolutely nothing to

8    prevent them.

9          What, in actuality, has happened is, after plaintiff

10   lost the *Monell* claim in this case, they decided to start doing

11   some research about, well, what's been going on in these other

12   cases?  Let's see what these other lawyers in these other cases

13   have been doing, and what their experts have been opining

14   about.  And bootstrapping -- or attempting to bootstrap that

15   information into this case after they have already been given

16   the opportunity to do full and complete discovery, filing

17   responses to our motions for summary judgment that were filed,

18   you know, over a year ago, presenting it in due course to your

19   Honor.

20         And as was stated already, December 31st of 2014, your

21   Honor rendered an opinion that was very thorough and well

22   thought out in terms of the evidence that had been presented at

23   that time.  And that was their bite at the apple, your Honor.

24         At this point, we go forward a year, and maybe it's

25   sour grapes, but it's ultimately they're trying to get another

1    bite at the apple.  They're trying to say, Gee, you know, maybe

2    we didn't argue this before, and maybe we should argue this

3    now.  I mean, heck, if that was the way our judicial procedures

4    worked, we probably would never put any of these lawsuits to

5    bed, because typically there's always something new, another

6    angle you think about as a lawyer, you know, something you read

7    in the newspaper, or whatever.

8         So in terms of what's been presented to the Court

9    here, there isn't anything new.  It's essentially a do-over.

10        Now, there might be a new expert report, but that is

11   certainly nothing that couldn't have been explored and argued

12   to the Court a year and change ago.  There was nothing to

13   prevent them from doing that, other than perhaps they decided

14   to not go that route.  They focused on the ratification theory,

15   or whatever it was, and once they lost it, they're now going

16   back and trying to do it again.

17        You know, that's ultimately what the argument is here,

18   your Honor.  I know plaintiff's counsel really didn't talk

19   about that as much as, Hey, Judge, look at all these other

20   things that we found, and you should let us amend -- you should

21   reconsider -- excuse me -- you should reconsider it and, you

22   know, go down this road again.

23        And I certainly don't want to forget to point out to

24   your Honor that to the extent the Court were inclined to allow

25   a reconsideration of the *Monell* claims, the next step certainly

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

 1    would not be trial in two or three weeks.  It would be

 2    permitting the defense to, just as if another summary judgment

 3    motion opportunity had presented itself, give the defense an

 4    opportunity to raise a motion challenging the sufficiency of

 5    this alleged new evidence, if, in fact, that is what the Court

 6    believes it to be.  And I would, you know, oppose that,

 7    certainly.  And it wouldn't be, Oh, well, Judge, we now get to

 8    skip over that part of it, we get a second bite at the apple,

 9    and we go to a jury trial.  And, certainly, that would be

10    unfair.

11         **THE COURT:**  Right.  I guess implicit in their request

12    for reconsideration of that is the resetting of the trial date.

13    You know, I mean, obviously, you would have the right to follow

14    up on the summary judgment with the new evidence *(sic)*.  But --

15    assuming that that's their position.

16         Well, let me ask you this.  Let's just say for

17    argument's sake that the evidence of these other four or five

18    individuals had been part of the -- had been argued last year

19    on the merits.  Tell me why -- you allude to this in your

20    brief -- but tell me why you don't think it would be sufficient

21    to support a *Monell* claim -- putting the procedural aspect, the

22    tardiness aside, whether it was available or not.  Maybe if you

23    could then jump ahead and address the actual -- the merit of

24    it, and whether it is sufficient from -- evidence from which a

25    reasonable jury could conclude that there's a custom.

149

```
1        MS. BARRANCO:  Well, for instance, your Honor, counsel
2   a moment ago referred to Fiacco, a case that they cited to now
3   in their motion for reconsideration and in the quote that was
4   read, but skipped over parts.  Well, the parts that were
5   skipped over were the parts that clearly distinguished what
6   happened in the Stephens case and other cases, compared to what
7   happened in the Fiacco case.  And I'm specifically referring
8   to -- in the Fiacco case, apparently there was no formal
9   statement being taken from the complainant, no file being
10  created, no notation being made in the officer's file, and no
11  further investigation being made.
12       And the defense would submit to the Court that the
13  evidence in this case --
14       THE COURT:  Right.
15       MS. BARRANCO:  -- shows there was with an
16  investigation, not only of the Stephens case, but, frankly, of
17  all of these other cases as well.
18       THE COURT:  What about on the argument about that
19  there was a clear constitutional violation in these other four
20  cases?
21       MS. BARRANCO:  Well, there certainly is no evidence
22  that there's a clear constitutional violation.  The only
23  reason --
24       THE COURT:  Or sufficient evidence from which a jury
25  could find that there was a violation -- a constitutional
```

1  violation in these other four cases?

2      **MS. BARRANCO:**  Well, the one case of these four, is my

3  understanding, that's proceeded past the summary judgment

4  motion --

5      **THE COURT:**  Right, Judge Middlebrooks.

6      **MS. BARRANCO:**  -- I believe it was the Camberdella

7  case --

8      **THE COURT:**  Right.

9      **MS. BARRANCO:**  -- was certainly limited to the issues

10  in that case.

11      **THE COURT:**  Right.

12      **MS. BARRANCO:**  More importantly, my understanding,

13  that order was rendered before the Eleventh Circuit issued the

14  *Salvato* opinion.  And my understanding is, because there's an

15  interlocutory qualified immunity appeal going on in the

16  Camberdella case, once that's resolved, my understanding is

17  defense counsel in that case, which is not my firm, will be, in

18  fact, requesting the Court to revisit its ruling in regard to

19  the *Monell* claim in light of the *Salvato* opinion, Eleventh

20  Circuit.

21      **THE COURT:**  And why does *Salvato* put that in jeopardy,

22  that ruling?

23      **MS. BARRANCO:**  Well, *Salvato* makes it clear that

24  failing to properly investigate the -- in that case,

25  Camberdella case, is not sufficient to establish a *Monell*

1    violation.  And that, I think, was --

2           **MR. SCAROLA:**  Judge Middlebrooks.

3           **MS. BARRANCO:**  -- that was the basis of

4    Judge Middlebrooks' opinion in terms of permitting the *Monell*

5    claim to go forward past the summary judgment phase.

6           **MR. GIUFFREDA:**  If I may, your Honor?

7           **THE COURT:**  Just pull the mike over.

8           **MR. GIUFFREDA:**  I'm sorry.  Richard Giuffreda.

9           I'm personally defending the Hutton case.  I'm very

10   familiar with the evidence in that case.  It's in front of

11   Judge Dimitrouleas.  And, uhm, that case is far from a

12   clear-cut case of the excessive use of deadly force.

13          Deputy Franqui, first of all, had no idea that Jeremy

14   Hutton had Down syndrome.  Jeremy Hutton had been --

15          **THE COURT:**  Is that the car case, where he took --

16          **MR. GIUFFREDA:**  He took the family's van.  He ran over

17   stop signs, he ran over mailboxes.  Citizens were calling the

18   police because of their fear.  He was weaving back and forth

19   across the road.  Deputy Franqui and Deputy Stachelek followed

20   him for some distance, and he ignored all efforts to pull him

21   over.  He finally came to a stop in the crosswalk at -- on

22   Okeechobee Boulevard and Royal Palm.

23          Deputy Franqui, who did not know he had Down syndrome,

24   because the call originated in District 15, but the van ended

25   up in District 9, and back then it was two different dispatch

1    centers in two different locations.

2          And the video evidence shows that the van went

3    straight toward Deputy Franqui, who just stepped out of the way

4    as the van hit his Crown Victoria and bent the driver's door

5    back on its hinges all the way to the front fender.  And

6    Deputy Franqui, fearing for his own life and others in the

7    intersection, as the van raced through the intersection, fired

8    at the van.  The van was going away as he fired, but, of

9    course, there's lots of cases where courts have found qualified

10   immunity when firing at a motor vehicle that is going away.

11         The Brusseau *(phonetic)* case is a United States

12   Supreme Court opinion where an officer shot someone in the back

13   as they drove away from the officer, because vehicles are

14   considered deadly weapons.

15         The only point -- the only reason why I'm chiming

16   in --

17         **THE COURT:**  Right.

18         **MR. GIUFFREDA:**  -- is the Court should understand that

19   if the Court were to grant this motion, travelling on this

20   theory, involving these four cases -- and I also handled the

21   Kallas case, by the way, which I can tell you a little bit

22   about -- we would end up having minitrials regarding all of

23   these cases.

24         **THE COURT:**  Yeah.

25         **MR. GIUFFREDA:**  And just because the plaintiff's

1    experts think it was one thing, there's defense experts that

2    think it's another.  And it would literally, you know, devolve

3    into a minitrial for each one of these incidents.

4         **THE COURT:**  Well, I guess that would be an argument

5    for severance.

6         But let's get back into the issue here about in terms

7    of reconsideration.

8         Mr. Scarola, Ms. Barranco points out that given that

9    these cases go back some four years before we had our oral

10   argument, that it's really not new evidence in the sense that

11   it was not -- it could not have been developed by your team.

12   Perhaps the expert's opinion wasn't available, but that the

13   underlying reports from which those derived were available, and

14   for whatever reason, you chose not to rely on them at the time.

15        What about that?

16        **MR. SCAROLA:**  Your Honor, what Ms. Barranco suggests

17   is that we could have and should have requested the sheriff's

18   office reports with regard to all of these other use-of-force

19   claims.  And your Honor knows from references in the pleadings

20   that have been presented to your Honor about the number of

21   excessive use-of-force complaints that have occurred over an

22   extended period of time.

23        Our position is, it would have done us no good

24   whatsoever to ask for the sheriff's office reports with regard

25   to these matters, because the sheriff's office never conducted

1    a reasonable investigation with regard to these matters.  What

2    we would have learned was the sheriff's office preconceived

3    conclusion that there was no excessive use of force.  What gets

4    developed subsequent to December of 2014 is the evidence that

5    indicates that the sheriff's preconceived conclusion was just

6    that, a preconceived, unsupported conclusion.  And that the

7    facts subsequently developed indicate an excessive use of

8    force.

9           It would be extraordinary if we were obliged to

10   investigate independently and retain expert witness -- retain

11   expert witnesses to conduct an analysis of every excessive

12   use-of-force case that occurred within the Palm Beach County

13   Sheriff's Office over the course of the preceding five years,

14   ten years, whatever it may be.

15          This is evidence that did not exist, that was not

16   developed as of the time that we made this presentation to the

17   Court.  And I think it would be unreasonable to impose upon us

18   the kind of burden that is being suggested by the defense.

19          When the evidence became available, we've presented

20   that evidence to the Court.  It simply was not there until it

21   was independently developed.

22          **THE COURT:**  Response?

23          **MS. BARRANCO:**  Well, your Honor, counsel keeps

24   referring to this new evidence, this new evidence, and

25   ultimately, really what you have are opinions from plaintiffs'

1    experts in these other cases and argument of counsel in terms

2    of what allegedly is evidence.  And as Mr. Giuffreda just said

3    to you, in regard to -- it's one thing to allege in a complaint

4    or, you know, argue to the Court that there's evidence of

5    improper investigation.  It's another thing to be able to prove

6    it with evidence.  And ultimately, the case law does suggest

7    that it is a monumental task.  *Monell* is a very big barrier,

8    which is why a lot of lawyers don't go there.  And I think

9    that's why a lot of judges struggle with it as well.

10           **THE COURT:**  What was available?

11           **MR. GIUFFREDA:**  Well, I can speak to Hutton.

12           **THE COURT:**  Well -- all right.

13           **MR. GIUFFREDA:**  The offense report in the Hutton case

14    is 60 --

15           **THE COURT:**  Prior to November-December 2014.

16           **MR. GIUFFREDA:**  The Hutton incident occurred on

17    October 10, 2010 -- 10-10-10.

18           **THE COURT:**  All right.

19           **MR. GIUFFREDA:**  It was investigated by the violent

20    crimes division.  The state attorney's office was present at

21    the scene.  The offense report is 61 pages long.  There were

22    statements of the three deputies who were involved, one of whom

23    was an off-duty deputy by the name of Bender who responded.

24           There are numerous photographs of the scene.  The

25    dashcam video, which depicts the attempt to stop the van is in

156

1   evidence.  There's a traffic camera evidence that was gathered.

2   Statements were taken of several civilians who believed the

3   officer was about to be run over and killed.  The internal

4   affairs division reviewed the entire matter.  And there was, in

5   short, a fairly extensive investigation into that case.

6           **THE COURT:**  All this was publicly available?

7           **MR. GIUFFREDA:**  It was all publicly available, your

8   Honor.  And the state attorney's office, when Mr. McCullough

9   was the state attorney, reviewed the matter and cleared

10  Deputy Franqui.

11          Now, what's happened in that case is the plaintiff's

12  attorney has pointed out some questions that maybe could have

13  been asked or should have been asked, or some things that were

14  overlooked in an investigation.  But, of course, there is no

15  such thing as a perfect investigation.

16          The reality is, is the Hutton case and the Adams case,

17  the investigations into those shooting incidents are extremely

18  extensive.

19          The Kallas case, as I recall, Mr. Kallas made no

20  complaint of a use of excessive force.  He was extremely

21  impaired, and on dashcam video, smashes his car into another

22  car, and then takes out a traffic control box and runs his van

23  into the wall of a building, and then vomits all over himself.

24          And when the deputies get there, they're trying to

25  talk to him, and as they're talking to him, he reaches into his

1    pocket and takes out his pipe that he had been smoking

2    something in and throws it onto the roof of a building.  At

3    that point, they decide to arrest him, and they start to

4    handcuff him.  They go to the ground, they get him handcuffed,

5    and after he's off camera, there's a struggle, and he's tased.

6    And the tasing is not on camera.  And ultimately that case

7    ended up resolving itself.

8          The Camberdella, I'm not involved in that one.

9    Harriet Lewis is defending the sheriff's office in that case.

10         But all of these cases were investigated.  And,

11   ultimately, the plaintiff in this case could have requested

12   those reports, could have looked at the video evidence, and

13   could have attempted to make the same points that those lawyers

14   are making in that case, pointing to things that were allegedly

15   overlooked or better questions that could have been asked.

16         Just a quick example, during Deputy Franqui, in the

17   Hutton case, the shooting of the 17-year-old boy with Down

18   syndrome, at one point during his statement, he was asked if he

19   was injured.  He said his foot was burning, it hurt.  And the

20   detective didn't ask, Well, how did your foot get hurt?  That

21   was one of the criticisms in that case.  And, of course, the

22   deputy never claimed that the van ran over his foot, but that

23   was one of the criticisms, that that question perhaps could

24   have been asked.

25         But clearly our position is, this -- the evidence was

```
1    available all along.  And plaintiff's counsel and their experts
2    could, in essence, have done what the other attorneys have
3    done -- and I'm not conceding for a minute that there's any
4    merit to it -- but I think to Ms. Barranco's point, there
5    should be in our system some finality with cases or litigation.
6          And I don't know that the plaintiffs really meet a
7    standard that this Court should hold them to, because,
8    otherwise, as we litigate cases over the course of years, and
9    other cases are being litigated in other courtrooms, and other
10   depositions are being taken, I mean, it could be -- let's say
11   the Court granted this.  We go back to square one, we gather
12   all of this evidence, we do another motion for summary
13   judgment, the Court grants it, but in the meantime, there's
14   even more shootings and more cases and more depositions and
15   other evidence, then we could revisit it again.  And it could
16   go on in perpetuity.
17          THE COURT:  Well, these are competing values, the
18   finality and the quest for getting to the truth, that arise in
19   different contexts in a multitude of trials.  And in one sense
20   or another, they're coming to the fore here.
21          And I do sense, obviously, from Mr. Scarola and
22   Mr. Quinlan, a very genuinely held, passionate belief that the
23   sheriff's office is condoning unconstitutional conduct.  And I
24   do sense and appreciate that, and it's important.  Those are
25   important issues.
```

1      On the other hand, I do think in this case, we're
2  talking about four incidents that occurred in October 2012,
3  October 2010, May 2012, and December 2011.  So I don't think
4  that is persuasive -- that the argument that this is new
5  evidence is persuasive.  It may be that the expert opinions are
6  new, but the underlying facts were there and available.
7      I do understand and appreciate that it's a huge task.
8  And I think Mr. Giuffreda, you know, really put his finger on
9  that.  The barriers are high in a *Monell* claim, and whether
10  they should be or not, that's for other people to decide.  It
11  is very high.  And whether that's good policy or not, I don't
12  know.  That's, you know, for the appellate courts and perhaps
13  the legislature, Congress to decide.
14      But there are high standards.  And in this particular
15  case, a thorough opportunity to brief these issues were
16  provided to the parties.  We had argument.
17      When I read through my opinion the other night, I
18  brought back the plaintiffs did raise about 15 incidents of
19  police misconduct in their response to the sheriff's motion.
20  And at the end of the day, none of them really showed what they
21  purported to show.  And on page 23 and 24, I went through just
22  about all of them.  I mean in some of these situations, you
23  know, one involved a home invasion robbery, another, the
24  defendant had a gun and struggled and went for a gun.  They go
25  on and on and on.

160

```
1            So I do believe that the plaintiff did have a fair
2    opportunity to try to make its case and for whatever reason was
3    not able to do so.  The Court ruled, and I don't think it would
4    be appropriate at this time to reopen it based on cases that
5    occurred up to four years before we even had this argument.
6            So with that in mind -- and, again, I do sense and
7    appreciate the sincerity and the passion of the plaintiff's
8    arguments, because these are important issues.
9            MR. SCAROLA:  Your Honor --
10           THE COURT:  Yes.
11           MR. SCAROLA:  So as to avoid arguing after the Court
12   has ruled --
13           THE COURT:  Yes.
14           MR. SCAROLA:  -- but recognizing the fact that the
15   hammer is about to come down, your Honor said that I would have
16   an opportunity to make some brief rebuttal comments.
17           THE COURT:  Yes, yes.
18           MR. SCAROLA:  And I do want to make some very brief
19   rebuttal comments.
20           THE COURT:  Yes, I did say say that.  Go ahead.
21           MR. SCAROLA:  Thank you very much, your Honor.
22           THE COURT:  All right.
23           MR. SCAROLA:  Your Honor, even given the comments that
24   the Court has made and the position the defense has taken that
25   this is evidence that was available, because these events
```

1   predated the shooting of Dontrell Stephens --

2           **THE COURT:**  Right.

3           **MR. SCAROLA:**  -- what did not predate the shooting of

4   Dontrell Stephens, and what has come subsequent to your Honor's

5   order of December 31, 2014, is Judge Middlebrooks' order in

6   the --

7           **THE COURT:**  Camberdella case.

8           **MR. SCAROLA:**  -- the Camberdella case.

9           **THE COURT:**  Right.

10          **MR. SCAROLA:**  And that is a case that relied largely

11  upon the same evidence that we had presented before your Honor.

12  In fact, much of the work that we did was utilized by

13  plaintiff's counsel in that case and presented to

14  Judge Middlebrooks.

15          **THE COURT:**  Right.

16          **MR. SCAROLA:**  And Judge Middlebrooks made an express

17  finding that there were genuine issues of material fact as to

18  whether -- and I'm reading from the opinion now -- as to

19  whether PBSO has a policy, custom, practice, or procedure of

20  performing inadequate and/or improper investigations of officer

21  involved shootings, plural.

22          This was not a focus upon the events only relating to

23  that single case.  But, rather, an acknowledgment that there

24  was evidence of a pattern of the willful disregard of the

25  circumstances under which the prior shootings has occurred.

162

```
1              What also has developed subsequent to your Honor's
2     order is the *Salvato* decision.  And the *Salvato* decision,
3     again, I suggest, seems to indicates the Eleventh Circuit's
4     recognition of the fact that where there is a pattern of a
5     failure to conduct reasonable investigations of complaints,
6     that in and of itself can be sufficient.
7              So setting aside anything having to do with newly
8     developed evidence and its availability previously, what we now
9     have are two judicial determinations that are, quite frankly,
10    at odds with what I understand your Honor's rationale to have
11    been.  Because we presented that, quote/unquote, ratification
12    theory to your Honor.  And while your Honor did not expressly
13    address it, your Honor, at least by implication, clearly stated
14    that what we were required to prove was not simply that there
15    was a pattern of recklessly disregarding earlier complaints,
16    but that those earlier complaints, in fact, were justified,
17    that a jury may have found -- that there was a reasonable basis
18    from which a jury could find that there were constitutional
19    violations.
20             I suggest that the recent developments in the law
21    indicate that that is the wrong legal standard.  A willful
22    disregard of the merits of complaints is in and of itself
23    sufficient and can establish a causal connection between that
24    willful disregard and a constitutional violation.
25             That's what *Salvato* seems to say, that's what
```

1    Judge Middlebrooks has expressly held.  And I would ask the

2    Court to reconsider its position in that regard in light of the

3    guidance that we have subsequently gotten from both

4    Judge Middlebrooks and from the Court in *Salvato*.

5         **THE COURT:**  I think on the ratification, I'm looking

6    at my order, the issue with regard -- because there are several

7    theories I think that were raised.  And I tried to address each

8    of them.  There was policy, there was custom, deliberate

9    indifference, and ratification.

10        **MR. SCAROLA:**  I'm sort of combining the deliberate

11   indifference and ratification.

12        **THE COURT:**  Yeah, but I think there's -- it's a little

13   bit different.  With the ratification, what I had said was:

14           "Stephens had argued that Bradshaw's verbal

15        defense immediately following the shooting, coupled

16        with the inadequacy of the investigation, amounted to

17        a ratification of the deputy's actions *(sic)*."

18           And then I talk about certain cases that you rely on.

19           And then one of them, in turn, relies upon

20   *Thomas v. Roberts*.  And in that *Thomas* opinion, they talk about

21   the fact that students would have been subjected to a strip

22   search, and they wound up suing the district.  And the Court

23   said that the students' argument that the district should be

24   liable, because its investigation following the searches was

25   tantamount to ratification of the conduct, is without merit.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

1    It talks about the fact that they suggest the district's

2    inadequate investigation, which resulted in conclusion that the

3    personnel acted properly, was essentially a ratification.

4    However, the clear import of *Praprotnik*, which is the Supreme

5    Court decision, is that the local government may be held liable

6    for constitutional torts when policymakers have had an

7    opportunity to review the subordinates' decisions before they

8    became final.  And that's -- they say this is not the case at

9    bar.

10           And then I say here:

11           "Bradshaw's statement in defense of -- neither

12       Bradshaw's statement in defense of Lin nor subsequent

13       investigation of the shooting can support the

14       ratification theory, as neither occurred before the

15       shooting, and therefore neither could have been the

16       cause of the injury *(sic)*."

17           Then I cite to another judge from this court in

18    *Shehada vs. Tavss*, where he says:

19           "The failure to investigate or take disciplinary

20       action following the subject incident cannot support

21       a claim of municipal liability, because the

22       after-the-fact inadequate investigation or discipline

23       could not have been the legal cause of the

24       plaintiff's injury."

25           Then there are some citations.

1          "A different result would simply result in

2      respondeat superior liability."

3          And then even the Supreme Court said:

4          "The Supreme Court stressed that *Monell* liability

5      must be predicated on a showing of causation:  Where

6      a Court fails to adhere to rigorous requirements of

7      culpability and causation, municipal liability

8      collapses into respondeat superior liability."

9          So, in sum, what I stated then, I still believe to be

10  the case, that there's not been evidence presented, competent

11  evidence, that Bradshaw had ratified Lin's use of force, and

12  therefore granted the summary judgment.

13          Again, I -- sincerely, I do sense the passion and the

14  genuineness.  It's an important issue.  But I'm gonna go ahead,

15  and I believe it's the correct ruling, because these four

16  events occurred beforehand, and so, therefore, it is not newly

17  developed, that I'm not going to go ahead and revisit it now

18  after the summary judgment motions have been ruled on.

19          We'll see what happens, obviously, with

20  Judge Middlebrooks' case.  I'll be interested, just for

21  curiosity, to see how it turns out.

22          **MR. SCAROLA:**  As will we.

23          **THE COURT:**  Yeah.

24          But on the facts here, the procedural issue about

25  reconsideration, I'm going to go ahead, and counsel are keeping

```
 1    tab, and Docket Entry 192, I'm going to deny the motion for

 2    reconsideration.

 3          Now, that said, we now know what the claims are.  I

 4    believe there are two claims.  There's excessive force against

 5    Lin and battery against -- respondeat superior against

 6    Bradshaw.

 7          So let's talk first about the experts.

 8          Let me just put out there -- and maybe this might be a

 9    good way to do it -- when I read through the experts' reports,

10    both sides, there were a number of things that jumped out at

11    me.

12          One was their reference to the, you know -- their

13    statements, their legal conclusions, which I don't believe were

14    permissible.

15          But the other was that -- and probably even more

16    importantly, I asked myself, Is there anything that they are

17    saying that is actually helpful to a jury, in that an average

18    juror would not understand the evidence without the benefit of

19    this expertise?  Or is it, instead, really counsel's closing

20    argument, for both sides, cloaked as expert opinion?

21          As I see the case -- and this is why I want to put it

22    out there, and I want to invite discussion, and it's gonna

23    apply both ways -- as I see it, Mr. Stephens' testimony will be

24    he raised his hands, the officer just walked up to him and shot

25    him.  He was compliant, and the officer just shot him.  If the
```

1    jury accepts that testimony, I think the case is over.  It's

2    not gonna matter what the experts are going to say at that

3    point.

4         The experts' testimony at best comes into play if they

5    believe that the officer perceived the cell phone to be a gun,

6    and they have to decide the reasonableness of the officer's

7    perception.

8         I think -- and even I think Professor Alpert

9    acknowledged that if, in fact, the -- if the jury does believe

10   that the officer's perception was reasonable, then he could

11   have used the gun in defense.

12        So I think what it comes down to in determining

13   whether or not the shooting was objectively reasonable is

14   whether the officer's perceptions in this case were reasonable.

15   And I don't know whether there is anything that either side's

16   experts said that the jury could not figure out by itself,

17   cannot understand, or -- and/or the attorneys could not argue

18   in closing argument.

19        My concern is that this might devolve into a

20   credibility contest between the experts.  Plaintiff's expert --

21   let's put the professor aside -- plaintiff's expert, former

22   chief of police, the jurors are gonna say, He's a former police

23   chief, if he says it's bad, it's gotta be bad.  The other

24   side's expert, this guy went to Yale and Harvard.  If he says,

25   you know, it's good, it's gotta be good.  And they're both very

```
 1    articulate witnesses.  And they both, I'm sure, would testify

 2    powerfully.

 3         But would it then devolve, as I say, into a

 4    credibility contest between the experts rather than a

 5    credibility contest between the two witnesses with personal

 6    knowledge of what occurred?

 7         And is there anything that these expert witnesses will

 8    say that they could not figure out on their own?

 9         For instance -- and I must have read or looked at

10    virtually every published opinion, starting with the

11    Thanksgiving Day holiday, dealing with expert witness testimony

12    on use of force for every jurisdiction.  This is not a case,

13    for instance, where we're dealing with sophisticated weaponry,

14    where -- let's say a taser, where an expert might come in and

15    testify with respect to the properties of a taser, what it can

16    do, the danger, or some other type of sophisticated weapon.

17         There is not a situation where, you know, a suspect

18    raised a frying pan, let's say, as if to hit an officer, and

19    the officer used a taser rather than a baton or something --

20    this is -- on the facts of this case, this is a case where the

21    officer claims that he believed a gun was being pulled on him.

22    And if the jury feels that that was a reasonable perception, I

23    would think then they would say that it's objectively

24    reasonable for him to have drawn his weapon and fired.  If they

25    don't believe it was a reasonable perception, then they will
```

1   not.

2           All right.  That said, each side wants their expert

3   witness testimony to come in.  Putting aside all the testimony

4   on the adequacy of the investigation, which would be now not

5   relevant, why should I allow any expert testimony in this case?

6           Whoever wants to go first.

7           *(Laughter)*

8           **MR. QUINLAN:**  Well, actually, I'll take a crack at it

9   and get started.

10          **THE COURT:**  Okay.  Go ahead and pull the mike over.

11          **MR. QUINLAN:**  Yes.  Sorry.

12          But I'm gonna start by reading from a pleading.

13          "Initially, it should be noted that in dealing

14      with expert testimony, case law, which interprets

15      *Daubert*, demonstrates the rejection of expert

16      testimony is the exception rather than the rule.  As

17      stated by the United States Supreme Court in *Daubert*,

18      vigorous cross-examination," a preview of which I

19      submit we saw today, "presentation of contrary

20      evidence and careful instruction on the burden of

21      proof are the traditional and appropriate means of

22      attacking shaky but admissible evidence," cite to

23      *Daubert*.  "Generally, doubts about the usefulness of

24      proffered expert testimony should be resolved in

25      favor of admissibility and properly go to the weight

1       of the evidence rather than its admissibility."

2            I am quoting from the defendants' memorandum.

3            **THE COURT:**  Um-hum, right.

4            **MR. QUINLAN:**  The standard is reasonableness to be

5       "judged from the perspective of a reasonable officer on the

6       scene."

7            **THE COURT:**  Right.

8            **MR. QUINLAN:**  And I think the very nature of it being

9       a reasonable officer test would suggest that people with

10      expertise in the life of a law enforcement officer -- in the

11      job of law enforcement would be able to shed light -- I tried,

12      in the presentation of Mr. Tucker, particularly, to talk about

13      things like the three Cs, threat assessment.  I would submit

14      those are not things that the average juror would necessarily

15      know.

16           And I don't believe that offering Mr. Tucker's

17      explanation of what a reasonable threat assessment is, is my

18      closing argument --

19           **THE COURT:**  Why could you not --

20           **MR. QUINLAN:**  -- brought through --

21           **THE COURT:**  Let me ask this.  Tucker said, Well, you

22      gotta consider the fact that, you know, Stephens was on a

23      bicycle, it's not as if he had evidence that there was an armed

24      robbery beforehand, it was daylight, et cetera, et cetera,

25      therefore, he should not have jumped -- essentially jumped to

1   the conclusion that it was a gun.

2          Why is that not simply your closing argument?  Why do

3   we need an expert to say that?

4          **MR. QUINLAN:**  The cases -- and your Honor has just

5   said you read a number of the cases.  I assume among them are

6   some of the ones that we have cited.

7          **THE COURT:**  Yes.  I read all the ones that you cited,

8   and -- but, you know, of course, every case arises on different

9   facts.

10         **MR. QUINLAN:**  True.  But ultimately -- and I know some

11  of these cases get into, well, you can't say it's reasonable --

12         **THE COURT:**  You can't talk about -- even the Eleventh

13  Circuit, you know, you cited that one *Samples* case.

14         **MR. QUINLAN:**  Yes.

15         **THE COURT:**  They talked -- they gave a legal

16  conclusion, and the Eleventh Circuit said, Well, yeah, and

17  that's not good, you're not supposed to do that.

18         But if you look further, what they were really talking

19  about was whether he complied with law enforcement standards

20  and practices.

21         So let's just -- but that --

22         **MR. QUINLAN:**  But to me that suggests that somebody

23  has to tell the jury what the applicable law enforcement

24  standards are.  And I don't think my standing up in --

25         **THE COURT:**  But the law enforcement standards -- and

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

172

```
1    this is what I was getting at with -- for instance, Tucker
2    says, Well, an officer, when he gets out of his car, is
3    supposed to take cover and then communicate.  All right?  I
4    guess the rebuttal would be, So what?  He didn't do it for
5    whatever reason.  He's then faced in a situation where he
6    perceives Stephens to be pulling a gun, was it reasonable for
7    him to make that perception?  How does Tucker's testimony about
8    cover and communicate -- now, maybe if there was a negligence
9    claim, maybe, you know, if it were brought on that theory,
10   but -- how does the failure to take cover and communicate tell
11   us whether or not it was reasonable for Lin to believe that
12   Stephens was pointing a gun?
13           MR. SCAROLA:  Mr. Quinlan is inviting me to respond --
14           (Laughter)
15           THE COURT:  And, again, I'm thinking aloud as I'm
16   saying this.  I haven't reached any hard conclusions, but these
17   are things -- because I read twice -- I read all of the expert
18   reports twice.
19           Some of the stuff was, I think, the professor got into
20   credibility determinations, which I think is clearly out of
21   bounds.  He made some very inflammatory comments about police
22   being judge, jury, and executioner, and -- that, you know, I
23   would just never allow.
24           MR. QUINLAN:  If I can interrupt for one second.
25           THE COURT:  Yeah.
```

1        **MR. QUINLAN:**  Because you just reminded me of

2    something we referred to earlier.

3        **THE COURT:**  Yeah.

4        **MR. QUINLAN:**  And we had, I think -- we had said at

5    the beginning, there was one part that we were conceding.  We

6    would take it up later.  But there was one part --

7        **THE COURT:**  Okay.

8        **MR. QUINLAN:**  And your comment reminded me that in his

9    second bullet point, the video from the car makes these claims

10   unlikely to be truthful.

11       **THE COURT:**  Right.

12       **MR. QUINLAN:**  And that was what we were gonna concede.

13       **THE COURT:**  Right.

14       **MR. QUINLAN:**  Is really not something -- he should not

15   phrase it that way.

16       **THE COURT:**  Right.

17       **MR. QUINLAN:**  And if -- for the concerns that you just

18   raised.

19       **THE COURT:**  All right.  But let's just talk about

20   Tucker, because if I were to allow the experts, chances are,

21   just one on each side, because there's a lot of what Tucker and

22   Alpert say that are overlapped, duplicative.  And I'm assuming

23   that as between the two, you would prefer to have

24   Chief Tucker's testimony.  Is that correct?

25       **MR. SCAROLA:**  We would, your Honor --

```
 1              THE COURT:  Okay.

 2              MR. SCAROLA:  -- if we were compelled to make a

 3    choice, but --

 4              THE COURT:  Well, they're largely duplicative and --

 5    in some respects.  And as I said, there's a lot -- and I can go

 6    through each one of Alpert's opinions.  There's a lot in there

 7    that I would never permit -- the credibility assessments, some

 8    of the -- that inflammatory comment I thought was not a wise

 9    choice of words for an impartial expert.

10              All right.  So let's just talk -- if it were Tucker

11    and Kapelsohn.  And we're not going to allow them to speak to

12    the quality of the investigation, because that's not in the

13    case.  We're not going to allow them to testify to a legal

14    conclusion, whether it was objectively reasonable.

15              But would their testimony of the perception -- I guess

16    the term that Chief Tucker uses is "threat assessment," and I

17    think Mr. Kapelsohn -- he talks about that as well.  You know,

18    blading the body, jump a rolling stop off the bike, running

19    between the cars, all of that.

20              Is any of that information so difficult for an average

21    juror to digest that they need an expert to tell them about it?

22    Or is it -- and/or is it something that cannot simply be argued

23    by attorneys in closing?  That's the issue I'm wrestling with

24    and that I want to invite comment on.

25              MR. SCAROLA:  Your Honor, I don't think that the
```

1    question should be analyzed from --

2         **THE COURT:**  Maybe just pull the mike over.

3         **MR. SCAROLA:**  Yes.  I apologize.

4         I don't think that the issue should be analyzed from

5    the perspective of whether there are alternatives to the

6    presentation of expert testimony.

7         I think it needs to be analyzed the way the law

8    requires it to be analyzed, and that is, would the testimony of

9    expert witnesses aid the jury in making the determination that

10   they are called upon to make?

11        **THE COURT:**  Right.

12        **MR. SCAROLA:**  Could we argue these things?  There's a

13   lot that we can argue, but there is a significant substantive

14   difference between lawyer talk and expert opinion testimony.

15        If the standard is whether the determination, whether

16   the use of force was objectively reasonable, and the objective

17   reasonableness must be determined from the perspective of a

18   properly trained police officer, it would be extremely helpful

19   to a jury to know how a properly trained police officer should

20   be making the threat assessment to understand that he is

21   obliged to make a threat assessment.  And he is obliged to use

22   the least amount of force necessary, reasonably necessary under

23   the circumstances to meet his reasonable perception of the

24   threat.

25        Now, that means -- and the case law is clear -- you

1    look at the totality of the circumstances.  You look at

2    everything that went on from the perspective of a reasonably

3    trained police officer.

4         So we start with, would a reasonably trained police

5    officer have been able to avoid the use of deadly force by

6    conducting this entire contact with Dontrell Stephens in a

7    manner that would have avoided the ultimate necessity to

8    confront the split-second decision about whether when he is

9    reaching with his empty left hand behind his back, as he's

10   alleged to have been reaching, with a cell phone in his right

11   hand the entire time, and then coming forward with what must

12   have been an empty left hand, and not a hand with a cell phone

13   in it -- is that reasonable?  Was a reasonably trained police

14   officer required to focus on Dontrell Stephens' hands

15   throughout the course of this confrontation?  And how do you do

16   that?

17        **THE COURT:**  But tell me again -- and this is -- what

18   would Chief Tucker say -- because, again, my concern, both

19   sides, is it becomes a credibility determination between the

20   experts.

21        **MR. SCAROLA:**  It often is.

22        **THE COURT:**  But that's --

23        **MR. SCAROLA:**  And you say that as if there's something

24   wrong with that.

25        **THE COURT:**  But it should be the credibility of those

177

```
 1   with personal knowledge, and the witness helps to explain
 2   things that the jury might not understand.
 3        MR. SCAROLA:  Yes, sir.  And the credibility
 4   question --
 5        THE COURT:  So they --
 6        MR. SCAROLA:  I'm sorry to interrupt.
 7        THE COURT:  No, it's okay.
 8        It shouldn't be, Well, we like Kapelsohn more than
 9   Tucker, or we like Tucker more than Kapelsohn.  No.  It should
10   be who is more credible, Stephens or Lin.  And the experts
11   should help you understand their testimony.
12        It shouldn't be, Well, we like one expert witness over
13   another.  They are there to supplement and help the jurors
14   understand something they might not otherwise be able to
15   understand.
16        MR. SCAROLA:  Yes, sir.  And one of the things that
17   Chief Tucker would help the jury understand is, what
18   observations should a reasonably trained police officer have
19   made in advance that would have enabled him to have avoided the
20   use of deadly force?
21        Even if we assume, even if we assume the accuracy --
22        THE COURT:  You mean focusing on his hands before he
23   got off the bike --
24        MR. SCAROLA:  Yes.  You're gonna stop a suspect,
25   okay --
```

1     **THE COURT:**  All right.  But let's just say he didn't

2    do it.  He then -- we fast forward to the point at which they

3    step off the camera.  And at that point, Lin says Stephens

4    makes a move for his back pocket, blades his body, comes up

5    with a -- what appeared -- a black, flat, shiny object, which

6    he thought was a gun.  Irrespective of whether Lin should have

7    ten seconds earlier seen the cell phone, did Lin at that moment

8    reasonably believe that his life -- reasonably -- I think

9    that's the key -- believe that his life was in jeopardy and

10   that he had to draw his gun?

11    Whether or not he should have taken cover, should have

12   communicated, should have looked first at the suspect's hands

13   when he was on the bicycle, he didn't.  And we get to an issue

14   whether -- what Lin did at that moment, whether his perceptions

15   that his life was in danger was reasonable.

16    **MR. SCAROLA:**  Your Honor, I think that the Court has

17   improperly isolated the determination that the jury is obliged

18   to make.

19    In *Garczynski vs. Bradshaw* -- G-A-R-C-Z-Y-N-S-K-I --

20   *vs. Bradshaw* -- and it is cited in plaintiff's memorandum in

21   opposition to the defendants' renewed motion in limine to

22   exclude evidence.  That's an Eleventh Circuit opinion, 2009.

23   The Eleventh Circuit cites events occurring over the course of

24   several hours when analyzing whether a police officer's use of

25   deadly force was reasonable in light of the information they

```
1    possessed.

2           THE COURT:  Fair enough.  I understand your point.

3    That's fair enough, that, you know, had -- did he know whether

4    there had been an armed robbery?  Right.  Okay.

5           MR. SCAROLA:  Yes, sir.

6           THE COURT:  Okay.  All right.

7           MR. SCAROLA:  And, you know, is this a high-crime

8    area?  What time of day is it?  We heard a lot about, well, at

9    night, your perceptions are changed, and use of flashlights,

10   and things -- this is eight a.m. in the morning, broad

11   daylight, an individual riding a bicycle.

12          THE COURT:  I think --

13          MR. SCAROLA:  All of those things need to be taken

14   into consideration, and that's where the experts can assist a

15   jury.

16          THE COURT:  Fair point.

17          MR. SCAROLA:  Right there.

18          THE COURT:  Fair point.

19          Mr. Giuffreda, I don't know what your position or

20   Ms. Barranco --

21          MR. GIUFFREDA:  Well --

22          THE COURT:  -- do you believe that expert witness

23   testimony helps the jury in this case and how so?

24          MR. GIUFFREDA:  Okay.  Well, first of all, I

25   sympathize with the Court, because I actually have a lot of
```

1    these types of cases, and I struggle with that, because

2    ultimately, under Fourth Amendment, reasonableness is not some

3    hypertechnical, scientific standard.  It's a -- you don't --

4    it's a commonsense, everyday, ordinary life standard.  That's

5    the Fourth Amendment.

6          Of course, counsel's closing arguments are not

7    evidence.  But I would see the Court's point and, in essence,

8    agree with it, but I would like to say this.

9          You look at the totality of the circumstances, but the

10   totality of the circumstances --

11         **THE COURT:**  Can I just interrupt you?

12         Counsel's closing argument is inferences.  You can

13   argue inferences --

14         **MR. GIUFFREDA:**  From the evidence.

15         **THE COURT:**  -- from the evidence.

16         **MR. GIUFFREDA:**  Yes.

17         **THE COURT:**  Isn't that essentially what the expert

18   witnesses are doing --

19         **MR. GIUFFREDA:**  Yes, your Honor.

20         **THE COURT:**  -- when they render their opinions?

21         **MR. GIUFFREDA:**  Yes.

22         **THE COURT:**  They're giving their inferences based upon

23   their experience.

24         **MR. GIUFFREDA:**  Yes.  And ultimately, as a gatekeeper,

25   the issue for you, really, when you boil it down, is relevance

1   and will it assist the trier of fact?  You seem to be hung up

2   on, is this really going to assist the trier of fact?

3          **THE COURT:**  The relevance is easy --

4          **MR. GIUFFREDA:**  Yes.

5          **THE COURT:**  -- when we talk about the *Monell* claim.

6          **MR. GIUFFREDA:**  Yes.

7          **THE COURT:**  Because it's not in the case.  But -- and

8   it's easy to say -- there's a lot of case law -- you can't

9   testify to the legal conclusion.

10         **MR. GIUFFREDA:**  Right.

11         **THE COURT:**  Okay.  I think in this particular case,

12  though, the issue is the reasonableness of the officer's

13  perceptions.

14         **MR. GIUFFREDA:**  Correct.

15         **THE COURT:**  Right.

16         **MR. GIUFFREDA:**  And in terms of the totality of the

17  circumstances, the totality of the circumstances that you're

18  contemplating are the circumstances that lead to the particular

19  use of force.  It's not what time the officer got up that day,

20  what kind of car he drives, you know, what kind of uniform he

21  put on, what he had for breakfast.

22         And there is no illegal detention or false arrest

23  claim in this case.  So the fact that the deputy decided to

24  turn on his patrol lights, or -- and Dontrell Stephens admits

25  that he did communicate with him, that he told him to raise his

1    hands.  You know, it appears that some of these opinions are

2    more about criticizing the failures and some of the tactics

3    that Lin engaged in prior to the moment that the use of force

4    occurred.

5            And the reality is, even if Lin didn't follow accepted

6    police practices, no one would have the right to pull a gun on

7    him.  And had that phone turned out to be a gun, we wouldn't be

8    talking, because there would be no doubt that he would have the

9    right to defend himself, even if he was in the wrong uniform,

10   had too many bullets, was driving the wrong car, shouldn't have

11   turned on his lights, drove the wrong way down the street.

12   Those totality of the circumstances --

13           **THE COURT:**  All right.

14           **MR. GIUFFREDA:**  -- have nothing -- and you can go from

15   a moment of where there would be no use -- no reason to use

16   force at all, and in an instant go to a moment where there is a

17   reason to use force.

18           And so where the experts could help -- I think our

19   expert could help -- would be in things like eye movement, and

20   how officers with stress and tunnel vision, and their heart

21   rate goes up, and those types of things.

22           Now, are some of those things common sense?  I

23   suppose, if you've ever been in a scary situation.  I have.

24   You know, I did a ride-along one night, on a Friday night, on

25   Sistrunk, and I won't tell you all the details, but my heart

183

```
 1  rate went up when we pulled over a car.
 2          So, you know, the point is, is I think the experts
 3  could help the jury understand some of these things.  But maybe
 4  what I'm going to more is the other motions in limine, that if
 5  they are gonna help, it should be very narrow.  It should be a
 6  very narrow thing.
 7          THE COURT:  This is what I'll do.  I'll permit limited
 8  expert testimony from both -- I assume that you want to go with
 9  Tucker?
10          MR. SCAROLA:  (Nodding head affirmatively)
11          THE COURT:  -- Tucker and Kapelsohn as to the threat
12  assessment.
13          I think when you talk about the things that officers
14  are trained to look for, you know, facial -- tightening of
15  facial muscles, look to the hands, some of those things
16  probably are not within the common knowledge of the average
17  juror.  And that could assist the jurors in understanding
18  whether Deputy Lin's perceptions were reasonable.
19          I would agree with you whether or not Lin complied
20  with police protocol per se --
21          MR. SCAROLA:  Yeah.
22          THE COURT:  -- cover and duck or cover and
23  communicate, whatever it is, I don't think that's relevant.
24          MR. GIUFFREDA:  So the three C's are not relevant.
25          THE COURT:  Yeah.  I don't think... maybe, you know --
```

```
 1   like I say, that goes to what he could have done better, but it
 2   doesn't go to the reasonableness of his perception.  Maybe he
 3   should have covered and communicated, but he didn't.
 4        Anything about threat assessment that goes to the
 5   reasonableness of the deputy's perception, I'll permit.
 6        I'm going to exclude on relevance ground all the
 7   opinions dealing with the -- because the Monell claim is out --
 8   with the police subsequent investigation.  Exclude -- and
 9   please instruct the witnesses not to testify as to whether the
10   ultimate issue, legal issue, whether it was objectively
11   reasonable or not for the officer to have fired the weapon.
12        But I could see the case, I can see the argument --
13   and I think it's a close call -- I could see the argument where
14   the expert might assist the jury, which I think in this case is
15   really the issue, how reasonable was the deputy's perception?
16   Was he just, you know, jumping to the gun, because -- bad
17   phrase -- jumping --
18        MR. SCAROLA:  No, good phrase.
19        THE COURT:  -- jumping to a conclusion, you know,
20   without, you know, focusing on where he should have focused, or
21   maybe because of his military experience -- we'll get into
22   that.  So I'll permit limited expert testimony in that area.
23        I think both of the experts are eminently qualified.
24   I don't think that's an issue.
25        MR. GIUFFREDA:  May I --
```

185

```
 1          THE COURT:  With regard to the saccadic movement, I
 2   think even -- I'll permit that testimony.  I think even
 3   Chief Tucker acknowledged that.
 4          MR. GIUFFREDA:  May I make a suggestion, your Honor?
 5          THE COURT:  Yeah.
 6          MR. GIUFFREDA:  And it's just a suggestion.  But
 7   perhaps we should go back to our respective experts and tell
 8   them what your ruling is and have them modify their reports, so
 9   that we know what their opinions would be on those subjects,
10   just in case they go far afield, rather than wait until they're
11   on the stand.  It's just an idea.
12          THE COURT:  Or what you can do, if you want to just
13   submit a proffer of what their testimony is going to be.
14          MR. GIUFFREDA:  Okay.
15          THE COURT:  And exchange it with the other side, so if
16   there's any objection, and then just stick to your proffer.
17          MR. GIUFFREDA:  Okay.
18          THE COURT:  So that way there's no surprise at trial.
19          MR. GIUFFREDA:  And I suppose it would be limited to
20   those portions of their current reports that are contained to
21   those issues you're permitting.
22          THE COURT:  Right.
23          MR. GIUFFREDA:  So in that sense, we have the report.
24          THE COURT:  You know, one of the advantages of the
25   professor's report is that he enumerates exactly what his
```

1    opinions are.  Whereas the other two experts don't really

2    isolate and identify their specific opinions.

3           Let me, for the record -- because I know the Eleventh

4    Circuit in the Judge King case -- I don't know if that was

5    Cooke -- went through each one of the -- yeah -- went through

6    each one and -- let me ask you, before I go through each one of

7    Professor Alpert's opinions, are you still proffering him as an

8    expert or --

9           **MR. SCAROLA:**  We are still proffering him as an

10   expert, your Honor, yes.  And --

11          **THE COURT:**  All right.  Then -- I'm sorry.

12          **MR. SCAROLA:**  -- it would be our position that because

13   Dr. Alpert and Chief Tucker are coming at these issues from two

14   different perspectives, one an academic perspective and the

15   other a very practical perspective --

16          **THE COURT:**  Right.

17          **MR. SCAROLA:**  -- that they should both be permitted to

18   address these issues.  To the extent that your Honor is

19   permitting testimony, we think that it would be entirely

20   appropriate to have two experts address these issues from the

21   perspective of different expertise.

22          **THE COURT:**  I could appreciate why you would want to

23   have that.  I think they would -- it would be duplicative.

24          Let me go through, so we have a record, the problems I

25   had with the specific -- and I can't do it with the others,

1  because they didn't really enumerate in bullet points what they

2  would testify to.

3       All right.  Docket Entry 194-2, page 10, uhm, talks

4  about philosophy of community policing.  I don't think that's

5  relevant.

6       Number two is a -- he said -- talks about whether Lin

7  saw Stephens obstruct traffic.  First of all, I've already

8  ruled that the stop was legal, but Professor Alpert goes on to

9  say the video from his car makes these claims unlikely.  I

10  believe Mr. Quinlan referenced that.  That's not a proper area

11  of expert opinion.

12       Number three, "Mr. Stephens did not pose an imminent

13  threat to Deputy Lin.  When he was riding on his bicycle, he

14  was not a threat to anyone."  Uhm, I don't think there's --

15  that's even an issue.  I don't think anybody's arguing that he

16  was a threat when he was on his bicycle.  So I don't think

17  that's helpful to the jury.

18       "When he dismounted his bicycle, he had a cell phone

19  in the right hand and was not an imminent threat *(sic)*."

20  Again, I don't think that's being argued by anybody.  I don't

21  think that's particularly helpful that we need expert testimony

22  on that.

23       And I think that Chief Tucker can talk about the

24  totality of the threat assessment.  He could discuss that.  So

25  to that extent, it might be duplicative.

188

1          "Assuming that Lin observed Stephens' hand go behind

2     his back and felt threatened, he was required to use a

3     taser *(sic)*."  I think the professor backed off that.  I think

4     the professor said that if he reasonably believed that it was a

5     gun, that he was entitled to use a gun; he's not required to

6     use a taser.  That was the point that I followed up with him

7     on.

8          **MR. QUINLAN:**  I --

9          **THE COURT:**  Yeah.

10         **MR. QUINLAN:**  Well, that isn't how I understood his

11    testimony, but -- that was why I went back with the additional

12    question about the "at that point."  What he was saying was, at

13    the time that he's just starting to reach back, at that point,

14    he still had time to use the taser.

15         **THE COURT:**  Right.  The deputy first had his hand on

16    his taser.

17         **MR. QUINLAN:**  Right.  He was hovering the taser.

18         **THE COURT:**  And then when he thought that he was

19    coming up with a gun, then he -- that Stephens was coming up

20    with a gun, then he switched to the gun.

21         **MR. QUINLAN:**  Right.  But that's -- again, I don't

22    want to bicker too much with your Honor, but I think -- how I

23    interpreted point number five and the phrase "at that point"

24    was a slightly earlier point than "coming up."

25         **THE COURT:**  Oh.

FRANCINE C. SALOPEK, OFFICIAL COURT REPORTER
(954)769-5657

189

1          **MR. QUINLAN:**  And I thought that's what Dr. Alpert was

2     trying to say, is once he comes up with something, if it's

3     reasonably perceived to be a gun, that's a different ball

4     game --

5          **THE COURT:**  Right.

6          **MR. QUINLAN:**  -- than earlier, as he's reaching back,

7     when he still had time to tase and disarm the situation.

8          **THE COURT:**  But the facts changed, and the deputy

9     believed he was coming up with a gun, so....

10          **MR. QUINLAN:**  I'm just talking about the "at that

11     point."  I don't think he abandoned number five.

12          **THE COURT:**  All right.  Number six, "Deputy Lin

13     testified that if he had followed his training and seen the

14     cell phone, it would not have made a difference in his decision

15     to shoot Stephens.  This is disturbing"....  Again, I think

16     that's -- whether it's disturbing to, it's not relevant and

17     probably not a proper area of expert opinion.

18          "The shooting of Stephens by Lin was excessive,

19     unreasonable *(sic)*"....  Again, that's the ultimate legal

20     conclusion.

21          Number eight deals with the investigation, which is

22     not relevant.

23          Number nine deals with the investigation, which is not

24     relevant.

25          And when I say "not relevant," I don't mean to

1    disparage, because I think these are very important issues.  By

2    "not relevant," I want to be clear, within the context of the

3    remaining claims.

4          And number ten, the decision to ignore evidence that

5    indicates Lin's use of deadly force was unreasonable, and

6    unjustified, communicates to the other deputies that deadly

7    force would be permitted.  That, again, is not relevant.

8          Number 11, again, deals with the absence of

9    disciplinary action and remedial training.  Again, not

10   relevant.

11         All right.  Any objections to -- let me rephrase it.

12   Do any of the attorneys want to make argument for expert

13   testimony beyond that which I've allowed?  I'll let you make

14   your case for it.

15         **MR. SCAROLA:**  Your Honor, I do want to be sure that I

16   understand the parameters --

17         **THE COURT:**  So do I.

18         **MR. SCAROLA:**  -- the Court has established.

19         **THE COURT:**  Because I'm trying to see how -- think how

20   this is going to play out.  And that's why I think

21   Mr. Giuffreda's suggestion of a written proffer would be

22   helpful, because then we could have very specific statements,

23   but --

24         **MR. SCAROLA:**  Your Honor has repeatedly focused on the

25   point in time at which Deputy Sheriff Lin claims that Dontrell

191

```
1    Stephens bladed him, reached behind his back with his left hand
2    and appeared to come forward with what he thought was a gun.
3         THE COURT:  I think I know where you're going.  You're
4    going to say -- and I would agree with you -- that if the cell
5    phone was in plain sight, that it was unreasonable, therefore,
6    for the deputy to believe that was a gun.  And you want to have
7    your witness testify that they're trained to look in his hands,
8    it was in plain sight, it's on the video, he should be
9    permitted.  Yes, I would agree with that.
10        MR. SCAROLA:  Thank you.  Your Honor has -- you've
11   accurately anticipated --
12        THE COURT:  I would agree with that.
13        MR. GIUFFREDA:  That's part of the threat assessment.
14        THE COURT:  It's part of the threat assessment.
15   Right.
16        MR. SCAROLA:  And I just want to be sure --
17        THE COURT:  That goes to the reasonableness of his
18   interpreting the cell phone as a gun.  Let's say, you know, he
19   had a cell phone that was five feet tall, and it was in his
20   hands, and the officer said, "I didn't see it," you know, yes,
21   then that goes to the reasonableness of -- but not only his
22   credibility, but -- generally speaking, but the reasonableness
23   of his perception that it was a gun, when he had a five-foot
24   cell phone.  But, yes, I would agree with that.
25        MR. SCAROLA:  Okay.  I --
```

1    THE COURT:  And each side can argue it.  And it will

2    be permitted to put in their testimony that his eyes -- you

3    know, the saccadic movement, that just because it's in the

4    video doesn't mean that he saw it.

5         MR. SCAROLA:  I only want to be sure --

6         THE COURT:  Yeah, no --

7         MR. SCAROLA:  -- that when we're talking about the

8    totality of the circumstances --

9         THE COURT:  Yeah.

10        MR. SCAROLA:  -- we get to start with --

11        THE COURT:  The totality of the circumstances going to

12   the reasonableness of the perception.

13        MR. SCAROLA:  Yes, sir.  But --

14        THE COURT:  Yes, I would agree with that.

15        MR. SCAROLA:  But the totality of the circumstances

16   going to the reasonableness of the perception --

17        THE COURT:  Right.

18        MR. SCAROLA:  -- I would suggest --

19        THE COURT:  Right.

20        MR. SCAROLA:  -- include the fact that it's eight a.m.

21   in the morning --

22        THE COURT:  Right, yes.

23        MR. SCAROLA:  -- that Dontrell Stephens is leaving a

24   convenience store.

25        THE COURT:  Right.  That he's on a bicycle --

1        **MR. SCAROLA:**  That he is observed -- yes.

2        **THE COURT:**  Yes, I would agree with that.

3        **MR. SCAROLA:**  Okay.

4        **THE COURT:**  Yes, I would agree with that.

5        **MR. SCAROLA:**  Then I think that I understand --

6        **THE COURT:**  Okay.

7        **MR. SCAROLA:**  -- the scope of your Honor's ruling.

8        **THE COURT:**  Okay.

9        **MR. SCAROLA:**  And the only further clarification that

10   I think may be necessary from the perspective of the scope of

11   expert testimony is the extent to which Chief Tucker will be

12   permitted to talk about how a reasonably trained police officer

13   should be responding to these circumstances in ways that will

14   avoid getting to the point --

15        **THE COURT:**  See, that's where I would disagree.  That

16   might go to a negligence -- yeah, whether -- this goes to the

17   cover and communicate.  Maybe he should have.  But I don't know

18   how the failure to cover and communicate or wear a different

19   type of uniform affects the reasonableness of the deputy's

20   perception.

21        **MR. SCAROLA:**  And my response to that is, we are not

22   judging, ultimately, the reasonableness of the deputy's

23   perception.  We are ultimately judging the reasonableness of

24   his use of lethal force.  That's the issue.  The issue was, was

25   it reasonable for him to use deadly force?

1            One aspect of that is, were his perceptions of threat

2    reasonable?  But if he were able to avoid reaching the point

3    where he had to make the split-second decision that we're gonna

4    hear a whole lot about at trial -- the .26 seconds or whatever

5    the numbers are going to be -- if he could have avoided that,

6    then the use of deadly force is unreasonable.  If he could have

7    avoided it with a taser, it's unreasonable.  If he could have

8    avoided it with a collapsable nightstick, then the use of

9    deadly force is unreasonable.  Respectfully, if he could have

10   avoided it with concealment, cover, and communication, then the

11   use of deadly force is unreasonable.

12           And I think that the Court is much too narrowly

13   construing what the standard is if what your Honor is

14   suggesting is that the standard is simply and exclusively

15   whether the perception was reasonable at the moment he pulled

16   the trigger.  That's not the standard.  The standard is, was

17   the use of deadly force reasonable in the totality of these

18   circumstances?

19           **THE COURT:**  Response?

20           **MR. GIUFFREDA:**  Your Honor, I don't think it's an

21   accurate statement of the law at all, that if an officer can

22   avoid a situation that's otherwise a deadly force encounter,

23   that the use of deadly force somehow makes it unconstitutional.

24   Otherwise, police officers just -- if they just -- if you don't

25   respond to the call at all, nothing will ever happen, or just

195

```
1   leave, go home.
2            THE COURT:  Say that again.
3            MR. GIUFFREDA:  Well --
4            THE COURT:  Start that again.  I lost you somewhere.
5            MR. GIUFFREDA:  It is not the law that if you --
6   assuming you have a deadly force situation, someone pulls a gun
7   on you suddenly, it is not the law that if you could have
8   avoided that situation by not responding to the call at all, or
9   just turning left instead of right, or deciding not to enforce
10  the law that day -- that is not the law.
11           We have a situation where the law enforcement officer
12  lawfully stopped Mr. Dontrell Stephens.  There's no false
13  arrest or illegal detention claim.  And, therefore, he was
14  performing his duties at the time.  And so to say that he could
15  have avoided it by being nicer, wearing a different uniform,
16  having fewer magazines of ammunition, uttering different words,
17  completely misses the point.
18           And I don't know of any case law that would suggest
19  that the use of deadly force, where it was reasonable to
20  believe that your life was in imminent danger, would somehow be
21  unjustified just because you could have avoided the contact
22  with the person to begin with.  I just --
23           THE COURT:  I agree.  I agree.  And that might go more
24  towards a negligence type of theory.  Not that I see that as
25  negligent, but, you know, the omissions, in terms of what he
```

196

1    could have done to avoid it, you know, I think begs the

2    question -- ultimate question as to whether the actions that he

3    did take were objectively reasonable.

4              There's a little bit of a fine line there, also,

5    but --

6              MR. SCAROLA:  There is case law, your Honor, that the

7    aggressor, the aggressor cannot claim self-defense.  And this

8    is simply an extension of that general principle.  The

9    excessive force law is based upon basic principles of

10   self-defense.

11             I'm not suggesting that a police officer is obliged to

12   abandon the fulfillment of his responsibilities to avoid the

13   use of deadly force.  But I am saying that he must fulfill

14   those responsibilities in a reasonable manner that will not

15   cause the use of deadly force.

16             THE COURT:  I'll tell you what I'll do.  In fairness,

17   if you would like to submit something very brief -- today's

18   Thursday -- by Tuesday of next week, and I'll give the other

19   side till Thursday to respond, something just very, very brief,

20   with case law, in terms of the authority to support your

21   argument that the officer's omission or failure to take certain

22   actions beforehand is a -- is relevant to the objective

23   reasonableness of an affirmative use of deadly force after.

24             MR. SCAROLA:  Thank you for that opportunity, your

25   Honor.

197

```
1          THE COURT:  All right.  And then Thursday, if you can
2   get a response -- and if we need to have brief argument on it,
3   you know, at the first day of trial or something, we can do
4   that.  But my ruling at this point -- and I'll reconsider it,
5   you know, based upon what I see -- is that I don't think it
6   goes to objective reasonableness of the use of force to talk
7   about things he could have done that he did not do.
8          MR. GIUFFREDA:  So the plaintiff should couch it as a
9   motion to reconsider.
10         THE COURT:  To reconsider.
11         MR. GIUFFREDA:  And we will respond by the 14th.
12         THE COURT:  Right.
13         And if there's nothing there, if there is no
14  authority, then you don't have to submit anything.  You know, I
15  don't know that you'll find anything.  But, you know, take a
16  look.
17         All right.  Are we ready to move on to the motion
18  in limine with regard to the topics?
19         Anything else on the expert witnesses?
20         MR. GIUFFREDA:  I don't think so.
21         THE COURT:  No?
22         MS. BARRANCO:  I don't think so, your Honor.
23         THE COURT:  And, Mr. Scarola or Mr. Quinlan, anything
24  else on the expert witnesses before we get to the motion
25  in limine on the topics?
```

1         **MR. QUINLAN:**  Well, your Honor went through the points

2    for Dr. Alpert.  But with regard to -- I guess I'm having a

3    little difficulty translating your ruling to some of the

4    particular language in the other expert reports.

5         **THE COURT:**  Yeah, and that's why I think

6    Mr. Giuffreda's suggestion is a good one.  If we could get a

7    proffer very specifically what their opinions would be with

8    respect to the threat assessment, so we can have identified

9    arguments to address.  It's a little hard, because with Tucker

10   and Kapelsohn, they don't enumerate their opinions.

11        **MR. QUINLAN:**  Right.

12        **THE COURT:**  So it's -- but why don't you both submit a

13   proffer of what it would be, a succinct proffer, and that way

14   if there's any objection from the other side, then we can have

15   argument on it.

16        **MR. QUINLAN:**  Okay.

17        **THE COURT:**  All right?  Because in the abstract, it's

18   a little hard to know.  I mean they both alluded to what they

19   would be saying in their testimony today.

20        **MR. QUINLAN:**  Right.

21        **THE COURT:**  They made passing references to it,

22   but....

23        **MR. QUINLAN:**  I guess the particular question, because

24   it goes to both the reports, is, are they allowed to say it's a

25   greater level of force or not a greater level of force than

1  should have been used under the circumstances?  Or is that --

2       **THE COURT:**  That's really another way of couching a

3  legal conclusion.  That's another way of saying it was

4  objectively reasonable or not.

5       And there's a lot of case law that -- even the

6  Eleventh Circuit case, *Samples*, that you cited, that I think

7  impliedly acknowledges that expert testimony as to the ultimate

8  legal conclusion is not permissible.

9       Although in that case, they said, Well, he wasn't

10  really doing that, you know.

11       **MR. QUINLAN:**  Yeah.  I think one of the cases, maybe

12  it was *Samples*, where they said the question wasn't worded

13  well --

14       **THE COURT:**  Right.

15       **MR. QUINLAN:**  -- but he is made to speak in terms of

16  whether it was consistent with appropriate training.  And I

17  guess that's what I'm trying to get a better handle on.  Is it

18  just, this is what a threat assessment --

19       **THE COURT REPORTER:**  Excuse me, microphone.

20       **MR. QUINLAN:**  Did it again.  Apologize.

21       This is what a threat assessment is, and that's it, or

22  is it how the training in undertaking a threat assessment

23  applies to the circumstances that were encountered on that day?

24  I guess --

25       **THE COURT:**  Two different issues.  What are they

200

1   trained to look for?  And the other issue, from what I can

2   gather, is did Lin in this case adhere to his training?  Right?

3          **MR. QUINLAN:**  To the way in which an officer is

4   trained, yeah.

5          **THE COURT:**  All right.

6          **MR. SCAROLA:**  What would be an objectively --

7          **MR. QUINLAN:**  Yeah, an objectively --

8          **MR. SCAROLA:**  What would an objectively reasonable,

9   well-trained officer have observed?  That is relevant to his

10  threat assessment and how would he have processed that

11  information?

12         **MR. GIUFFREDA:**  No, I don't --

13         **THE COURT:**  This is so hard without having a specific

14  proffer.

15         **MR. GIUFFREDA:**  Yeah.

16         **THE COURT:**  Let's do this.  We'll make time, maybe

17  we'll plan to do it at the end of the day Monday.  Because I

18  take it we're not gonna be -- you're not gonna start your case

19  with your expert, are you, as your first witness?

20         **MR. SCAROLA:**  I'm sorry, but I can't answer that

21  question yet, your Honor.

22         **THE COURT:**  Because maybe what I'd like to do is

23  actually have before me the specific testimony from both sides.

24  So why don't we make time for some argument on that, if there's

25  any objection from the other side, on Monday.

1         **MR. GIUFFREDA:**  The day we start.

2         **THE COURT:**  The day we start.  Maybe we'll do it at

3    the end of the day after the jury -- or we'll do it over the

4    lunch hour.

5         **MR. GIUFFREDA:**  Or come in early, whatever.

6         **THE COURT:**  Yeah, I mean the first order of business

7    is gonna be the whole jury selection, but -- let's do this.  We

8    will make time to argue that once we have the specific opinions

9    that each side is proffering.

10        **MR. GIUFFREDA:**  Okay.

11        **THE COURT:**  It's a little hard to just do it in the

12   abstract, and I don't want to make an error in this or do

13   something that's gonna be unfair to either side.

14        So let's get the proffer, and then we'll set aside

15   time before the experts are called so we'll know exactly, you

16   know, what they'll be permitted to say.

17        **MR. GIUFFREDA:**  And I think, actually, the test is, is

18   what would the hypothetical objective, reasonable officer do,

19   knowing what Lin knew?

20        In other words, if the jury concludes that Lin never

21   saw the phone, then the question becomes, what would that

22   reasonable hypothetical officer do?  It's not, would a

23   reasonable hypothetical officer have seen the phone?

24        **THE COURT:**  Right.  But the plaintiff could put in

25   through their expert testimony, you know, concerning the

202

```
1   reasonableness of Lin's assessment --
2           MR. GIUFFREDA:  Sure.
3           THE COURT:  -- you know.  And he was trained to do X,
4   Y, and Z, and he didn't do it.
5           MR. GIUFFREDA:  Right.
6           THE COURT:  Uhm --
7           MR. GIUFFREDA:  Right.
8           THE COURT:  Or he did it.  Maybe he did it -- I don't
9   know.  Again, it's a little hard, because I don't know
10  exactly --
11          MR. GIUFFREDA:  What they're gonna say.
12          THE COURT:  -- what they're gonna say.
13          MR. GIUFFREDA:  All right.
14          THE COURT:  So we'll set it aside time, and we'll do
15  it sufficiently in advance of the experts, so that you can let
16  them know what the Court's ruling is.  So if you could
17  exchange, say by the middle of next week, a proffer.
18          MR. QUINLAN:  That's fine.
19          THE COURT:  All right.  We'll do that.
20          Let's go to the topics that the witnesses will be
21  permitted to testify to.
22          We have a defense motion in limine, 195, and a
23  plaintiff's motion in limine, 193.  Let's take 193 first -- it
24  comes first -- plaintiff's motion in limine, and there are
25  certain enumerated topics.  And let me kind of give you my
```

```
1    overview of this before we start.  It may give you an idea of
2    where I'm coming from.
3         I think this case is largely gonna be credibility --
4    turn on the credibility of the witnesses, the ones with
5    personal knowledge.  And in particular -- well, if they accept
6    the plaintiff's version, then I think the case is over, but if
7    they don't, or they have some questions about it, then they're
8    gonna be thinking about how credible -- how reasonable was
9    Deputy Lin's perception.
10        So I think anything that goes to the reasonableness of
11   his perception I think is fair game.  Because I think that's
12   really what this case is -- as I see it -- is about.  And that
13   includes not only things in Deputy Lin's background or
14   experience in life, but also the plaintiff's.
15        Now, with that in mind, and I want to permit vigorous
16   cross-examination on both sides, let's go to the plaintiff's
17   motion in limine.  The first issue is the smoking of marijuana
18   on the morning of the shooting.  Plaintiff argues that there's
19   no evidence he was impaired, only that he used.
20        There's case law, though -- and initially when I heard
21   that argument, I said, Yeah, that makes sense.  But then I read
22   somewhere, I think in the defendants' response, that he had
23   used the marijuana less than an hour before the shooting.
24             MR. GIUFFREDA:  According to his testimony.
25             THE COURT:  Yeah.  So that kind of made me reconsider
```

204

```
1    this, as whether inasmuch as credibility is key, obviously the
2    ability to perceive and recall to the extent it could have been
3    influenced by the drugs.  The -- is it the *Edwards* case, the
4    Florida Supreme Court decision, that talks about the
5    admissibility of, I guess, alcohol or use of drugs if it is at
6    or near the time --
7              MR. GIUFFREDA:  Yes.
8              THE COURT:  -- of the event?
9              MR. GIUFFREDA:  *Edwards v. State*.  It was three
10   scenarios at or near the time of the event --
11             THE COURT:  At or near the time --
12             MR. GIUFFREDA:  -- in the courtroom.
13             THE COURT:  Or at the trial, if they're smoking in the
14   courtroom.
15             MR. GIUFFREDA:  Or if you're such a chronic abuser or
16   you're --
17             THE COURT:  Right.  You're an addict.
18             Okay.  So here the issue is not addiction.  It's not,
19   hopefully, anybody being impaired while they're on the stand.
20   The issue is whether he used marijuana at or near the time of
21   the event.
22             If the testimony is that he used it within an hour,
23   Mr. Quinlan, Mr. Scarola, why shouldn't the jury be permitted
24   to hear that to determine the reasonableness of his perception?
25             Give you a different example.  You represent a
```

```
 1  plaintiff in an auto accident, and the defense calls a witness,

 2  non-party witness, who testified -- wants to testify for the

 3  defense, and you find out that the guy is smoking marijuana,

 4  you know, less than an hour before.  Is that fair game to ask

 5  him about it?

 6       MR. QUINLAN:  First of all, I would distinguish

 7  between "use" and "impairment."  That's obviously what we

 8  focused on in our submissions.

 9       I would also say --

10       THE COURT:  But is the proximity in time evidence of

11  impairment?

12       MR. QUINLAN:  According to who?  I mean what's the --

13  there is no expert that's been offered to talk about how time

14  affects --

15       THE COURT:  But you need that, or is that a matter for

16  the jury?  Does that go to the weight?  Because Edwards talks

17  about at or near the time.

18       MR. QUINLAN:  Edwards, a Florida state case from 1989,

19  Kelly, an Eleventh Circuit case from 1987, that said the

20  attorney's admission that he smoked marijuana during the trial

21  is irrelevant to ineffective assistance of counsel, because

22  there was no evidence that he was impaired.

23       THE COURT:  Evidence of impaired.  Right.  But there

24  were -- but that was not, at least from my review of the

25  case -- they didn't talk about him smoking it within an hour of
```

```
 1  going into court.  And they had actual evidence, they had the
 2  trial transcript -- the judge said he reviewed the transcript,
 3  and from the transcript, and from the quality of his motions
 4  and pleadings, there was no evidence of impairment.
 5          MR. QUINLAN:  Right.
 6          THE COURT:  Okay.
 7          MR. QUINLAN:  So there was no corroborative
 8  evidence --
 9          THE COURT:  To support an ineffective --
10          MR. QUINLAN:  -- such as -- sorry.
11          THE COURT:  -- to support an ineffective assistance
12  claim.
13          MR. QUINLAN:  Yes.  So there's no evidence in our case
14  that Dontrell Stephens acted in a way to indicate that he was
15  impaired.
16          THE COURT:  Why is that not for the jury to decide?
17  If somebody smokes -- the third-party witness being called by
18  the defendant in a case, you represent the plaintiff, says he
19  smoked marijuana within an hour of the accident, and you want
20  to challenge his ability to perceive or recollect what
21  occurred.  Why can't you ask that witness about the marijuana
22  smoking?  And then each side, then the other side can come up
23  and, you know, try to, you know, blunt the effect of it.
24          MR. QUINLAN:  I think, first of all, it needs to be
25  connected up in some fashion.  I, frankly, don't have any
```

207

1  personal experience in impairment with that substance, how --

2  when it passes.  I don't know if we're assuming all the jurors

3  have life experience they can draw upon.  You know, the

4  proposition hasn't passed yet in Florida.

5         I think there has to be some record evidence to show

6  that the substance had an effective impairment.  And there is

7  no suggestion by Deputy Lin that Dontrell appeared to be

8  impaired.  And, frankly -- I mean I understand that, in

9  general, credibility is always at issue when witnesses testify,

10  but there isn't any specific indication that Dontrell Stephens'

11  perception of reality was affected on the morning of

12  September 13th.

13         THE COURT:  Response?

14         MR. QUINLAN:  Again, I just think it turns on the

15  distinction between "usage" and "impairment."

16         MR. SCAROLA:  Your Honor, may --

17         THE COURT:  Yes.

18         MR. SCAROLA:  -- I add?

19         THE COURT:  Yes, yes.

20         MR. SCAROLA:  Thank you.

21         It really is an invitation to the jury to speculate

22  about what the effect of some unknown quantity of marijuana

23  could have been an hour after that unknown quantity of

24  marijuana was smoked.  There's no indication as to amount.  All

25  Dontrell says is --

1    **THE COURT:**  Didn't he say half a joint?

2    **MR. SCAROLA:**  Yeah, yeah, half a joint.

3    No indication that half a joint would impair anyone,

4  let alone that it impaired Dontrell.

5    Secondly, because we are dealing with issues of

6  admissibility, we must weigh prejudice against probative value.

7  And it's one thing to talk about the use of a legal substance,

8  such as alcohol, and quite another thing to talk about the use

9  of an illegal substance, such as marijuana.

10    **THE COURT:**  But for purposes of impeaching based on

11  impairment, or based on ability to perceive, it doesn't really

12  matter, does it, whether it's legal or illegal?  That's a 403

13  argument.

14    **MR. SCAROLA:**  That's the argument I'm making.

15    **THE COURT:**  But he admitted that he had marijuana on

16  him.

17    Let me go ahead and --

18    **MR. SCAROLA:**  May I make one other point?

19    **THE COURT:**  Yes.

20    **MR. SCAROLA:**  And that is that what is the perception

21  of Dontrell Stephens that is being challenged?

22    **THE COURT:**  Well, they have a completely different

23  account of what happened.  Stephens says he raised his hands,

24  he kept his hands up, he was fully compliant, and the deputy

25  shot him.  Lin says, no, he first raised them, then his hands

209

1    went down, he went to his back pocket, bladed, et cetera,

2    et cetera.  Stephens says that's not true.

3            So you have a conflict in the testimony, and --

4            **MR. SCAROLA:**  But aren't we talking about a

5    credibility issue as opposed to an ability to perceive issue?

6    We're not talking about --

7            **THE COURT:**  But in terms of determining somebody's

8    credibility, if they're impaired, they're gonna be less

9    credible.  Let's --

10           **MR. SCAROLA:**  No.  Then there needs to be evidence of

11   impairment, and impairment to the extent that it would preclude

12   an individual from knowing whether his hands were or were not

13   raised, from knowing whether he did or did not reach behind his

14   back.

15           And there's no evidence that would be presented in

16   this record that smoking half a joint of marijuana at any time

17   would preclude someone from being able to accurately perceive

18   whether their hands were or were not raised, or remember

19   whether their hands were or were not raised.

20           So it's strictly calling for speculation on the part

21   of the jury, and it is introducing highly prejudicial evidence

22   that has no probative value, because it isn't tied to the

23   ability to perceive.  That's where the 403 argument comes in.

24           **THE COURT:**  Okay.

25           **MR. SCAROLA:**  We are introducing highly prejudicial

```
 1   evidence with no probative value, because it isn't tied to

 2   perception.

 3         THE COURT:  I got to remember, I think I once made a

 4   403 argument to Judge Gonzalez, and he said, Of course it's

 5   prejudicial to your side, otherwise they wouldn't want to use

 6   it.  The question is whether it's unfairly prejudicial.

 7         MR. SCAROLA:  Yes, sir.

 8         MR. GIUFFREDA:  We did make that argument.

 9         THE COURT:  And, you know, I made the case, this is

10   prejudicial, prejudicial.  And he said, Of course, otherwise

11   they would be wanting to use it (sic).

12         I understand you point, though.

13         Let me get the -- does there need to be a predicate

14   showing of intoxication, separate and apart from the proximity

15   in time, of smoking a half a joint before a jury can consider

16   that?

17         MR. GIUFFREDA:  I don't know the law requires some

18   sort of scientific proof of impairment.  But there would have

19   to be evidence that a reasonable jury could conclude that

20   there's impairment, as I understand it.

21         And, frankly, one of the things with marijuana, there

22   is no .08 with marijuana.  There's no -- even if -- there's no

23   way to measure in blood or breath marijuana use.  So he smoked

24   marijuana within an hour, half a joint.  We don't know what

25   kind of marijuana, what the THC strength was.  But for us,
```

1    there's really two reasons this is relevant -- that issue and

2    impeachment issue.

3          And, also, it goes to his behavior.  I mean here --

4    he's a gentleman who has a conviction for drugs, he's got drugs

5    on his person.

6          **THE COURT:**  We'll get to those.

7          **MR. GIUFFREDA:**  But it all ties together, and that

8    eliminates some of the --

9          **THE COURT:**  Put aside the 609 conviction.

10         **MR. GIUFFREDA:**  Okay.  All right.

11         **THE COURT:**  Let's just talk about the issue of whether

12   it's admissible for impeachment.

13         Absent any information about the strength of the

14   marijuana, or the precise quantity, is it admissible, or does

15   there have to be some type of predicate showing of impairment

16   before it can be introduced to the jury?

17         **MR. GIUFFREDA:**  Your Honor, I don't know of anything

18   that requires that you have to have a blood alcohol result or

19   something like that.  I think it's a -- if there's a reasonable

20   basis to ask the question, and maybe we ask Dontrell Stephens,

21   Did you smoke a joint?  Were you impaired that morning?

22         No, I wasn't, you know, it was mild, it was -- I don't

23   know what his answers would be to that.  Because as I recall --

24   and I may be wrong -- but I think he might have been instructed

25   not to answer those questions because of the possession of

```
 1   marijuana charges pending.  But he had already admitted that he

 2   had the bag of marijuana in his -- on him.

 3         But I want to say when we -- when Ms. Barranco tried

 4   to ask more specific questions, he was instructed not to

 5   answer, I think.  I can't remember.  I can't remember, to be

 6   honest with you.

 7         But I would concede that Edwards vs. State -- I don't

 8   have it in front of me right now, but it does discuss

 9   impairment.  And Edwards actually was not an alcohol case, your

10   Honor, as I recall.  It's a drug case.  And I don't know that

11   there was any evidence in Edwards that proved the level of

12   impairment by the drugs, if my memory is accurate.

13         THE COURT:  All right.

14         I'm going to permit that.  Because, again, I think

15   this is really gonna be a credibility determination for the

16   jury, and I'm gonna give both sides wide latitude in

17   cross-examination.

18         And there are several cases.  Obviously, the Edwards

19   case, Edwards v. State, 548 So.2d 656, at 658, where it could

20   be shown that the witness had been using drugs at or about the

21   time of the incident, which is the subject of the witness's

22   testimony, that could be used for impeachment.

23         It's a number of federal cases, Roberts vs. Hollocher

24   out of the Eighth Circuit, 664 F.2d 200 at 203.

25   Cross-examination concerning Roberts' use of drugs was
```

213

1   permissible in light of his previous testimony.  The drugs were

2   relevant to his physical state at the time of the alleged

3   incidents and to his ability to accurately recall those

4   incidents.

5           There's *Brandon vs. Village of Maplewood* out of the

6   Northern District of Illinois, 179 F.Supp.2d 847, at 853.

7   Plaintiff objects to the admission of testimony that

8   Mr. Brandon had consumed any alcoholic beverages on the day, on

9   the day he was shot by the defendants.  However, consumption of

10  alcohol may be relevant to his memory and perception of events.

11  It was a police shooting case.

12          There are other Seventh Circuit -- *Cole vs. Bertsch*

13  *Vending Company*, 766 F.2d 327, at 334-335.  Evidence of alcohol

14  consumption prior to the accident was relevant to the witness's

15  recollection of events.

16          And there are others.

17          There's even in the Eleventh Circuit, *U.S. v. Clemons,*

18  32 F.3d 1504, at 1511, Eleventh Circuit, 1994.  Witness's use

19  of drugs may not be used to attack his general credibility, but

20  only his ability to perceive the underlying events and to

21  testify lucidly at trial.

22          So I will permit that inquiry into cross-examination

23  on that point.

24          The second is the vial of cocaine that was found under

25  the defendant's shorts.  The argument for excluding it is that

1  there was no DNA and fingerprints on the vial of cocaine.  The

2  state attorney in his memo cited that vial of cocaine as a

3  possible explanation of what Mr. Stephens might have been

4  reaching for, if, in fact, he was reaching for something, when

5  Deputy Lin said he reached toward his back pocket or rear

6  waistband.

7         You say no evidence of DNA and fingerprints, the other

8  side says but no evidence of anybody else's fingerprints or DNA

9  either.  So there's just an absence.

10        Is not the presence of that vial of crack cocaine

11 immediately, from what I understand -- and correct me if I'm

12 wrong -- immediately under the point at which -- the spot where

13 he fell, circumstantial evidence that he had carried that, and

14 would that not also possibly explain what he was reaching for?

15       **MR. QUINLAN:**  I -- first of all, I hadn't heard it

16 suggested by anybody that he pulled out something that appeared

17 to be cocaine.

18       **THE COURT:**  No, no, no, no, no.

19       **MR. QUINLAN:**  And it's no explanation for his conduct.

20 He pulled out what, at best, was a cell phone.

21       **THE COURT:**  No.  No, I was referring to the state

22 attorney's memo.  The state attorney said that there was a vial

23 of crack cocaine found under him at the scene.  And that could

24 explain what he was reaching for, I guess, perhaps to discard

25 the drugs, when the officer said he reached for -- into his

1    back pocket.

2            So my question to you is:  Is it relevant as a

3    possible explanation of what he might have been reaching for?

4            **MR. QUINLAN:**  No.  No.

5            **THE COURT:**  Okay.  Tell me why not.

6            **MR. QUINLAN:**  Because, again, I -- Deputy Lin's

7    testimony is he reached into his pocket and pulled out a cell

8    phone.  Deputy Lin -- you know, we've talked about the

9    credibility determination that has to be made, but it's never

10   been suggested that Deputy Lin thought he was reaching for

11   drugs, that he pulled out something that turned out to be

12   drugs, that he suspected that Dontrell had a crack cocaine vial

13   on him.  I didn't understand it when I read it in the state

14   attorney's letter, and I still don't understand how that's an

15   explanation for the testimony that he reached into his back

16   pocket and pulled out a cell phone.

17           **THE COURT:**  Response?

18           **MR. GIUFFREDA:**  Well, your Honor, I think it is a

19   question of circumstantial evidence that cocaine and the vial

20   was found directly underneath the clothing that was removed

21   from Mr. Stephens at the time.  And I think the logical

22   inference would be, if he already has a phone in his hand, and

23   he tries to reach back somehow to maybe ditch the marijuana or

24   ditch the cocaine, and then brings his hand back up, the

25   officer might have perceived the phone as a gun.  But those two

1  movements -- or the motion is not exclusive to the phone or the

2  drugs.  It's a potential explanation for the arm movement that

3  the deputy claims occurred at the time.

4         And it also could explain why he got out off the bike

5  the way he did, with the rolling dismount, and then went

6  between the two cars, rather than simply stopping on the side

7  of the road.  And it appeared to the officer that he was gonna

8  run, so....

9         **MR. QUINLAN:**  It's found in the area after he's gone,

10 after his clothes had been cut off.

11        **THE COURT:**  Was it found in the area, or was it found

12 directly underneath his clothing, I thought.  I mean I -- maybe

13 I'm wrong.  I understood that they found it right -- they cut

14 off his clothing, and when they picked up the clothing, it was

15 right there on the ground.

16        **MR. QUINLAN:**  Well, I believe it -- first of all, as a

17 matter of timing, it was long after he had been removed, after

18 the crime scene people had come and set up their stanches and

19 done their photographs, then it was found.  But, yes, it was

20 found underneath -- originally, I think one of the reports

21 claims inside of, and then they admitted that wasn't true --

22 underneath the shorts that were cut off of him.

23        There was no DNA.  The charge has been nol-prossed.

24        We are way into a 403 situation if we're gonna start

25 talking about vials of crack cocaine as a speculative

1    explanation for, again, Deputy Lin's clear testimony that he

2    reached in and pulled out a cell phone?  I -- I mean -- I think

3    we would all acknowledge that vials of crack cocaine --

4          **THE COURT:**  Well, we know that the cell phone was in

5    his hand before he reached back.  So the question is then

6    what -- if he did reach back, why would he have reached back?

7          **MR. QUINLAN:**  So this is if we reject Dontrell's

8    testimony, and we reject Deputy Lin's testimony, let's try to

9    find a third explanation.

10          **THE COURT:**  No.  We know from the video, there was a

11   cell phone in his hand.  The deputy -- Dontrell Stephens says

12   he didn't reach back for anything.  The deputy said that he

13   did.  Is the vial of crack cocaine found underneath his

14   clothing suggestive of the fact that he may have been reaching

15   for something?  And, also, would that explain perhaps the

16   reason why, according to Lin, it appeared as if he was going to

17   flee?

18          **MR. QUINLAN:**  I believe -- and Mr. Scarola is the one

19   who deposed Sergeant Lin, but I don't believe he -- and he's

20   now been deposed a third time, where he's talked about the fact

21   that I don't think he suspected at the time they encountered

22   each other that Dontrell was trying to flee.

23          Again, he didn't just testify that Dontrell reached

24   behind his back.  He said he reached behind his back and

25   produced something.  He came out with something.

1    **THE COURT:**  But we know -- he didn't see the phone,

2  but we know that he had a phone.  So then why would he -- is

3  that not an explanation why he might have, in fact, been

4  reaching behind his back?

5    **MR. SCAROLA:**  Your Honor, maybe it's an explanation,

6  but it's an explanation based upon shear speculation.  We have

7  two versions of the facts.  One version of the facts is, I

8  didn't reach behind my back at all.

9    The second version of the facts is, I reached

10 behind -- he reached behind his back with his left hand --

11 remember, the evidence is the phone is in the right hand the

12 entire time.

13   **THE COURT:**  Right.

14   **MR. SCAROLA:**  Okay?  He reached behind his back with

15 his left hand, and he came out with a dark object that turned

16 out to be his cell phone in his left hand.  What relevance that

17 outweighs the prejudice is there to talk about a vial of crack

18 cocaine that is not directly related to Dontrell Stephens?

19 They can't prove his possession of it.

20   **THE COURT:**  Well --

21   **MR. SCAROLA:**  There is no DNA.  There are no

22 fingerprints.  He is in an area which Deputy Lin describes is a

23 high-crime area.

24   **THE COURT:**  Wouldn't you have to believe it's a shear

25 coincidence that directly -- I mean nobody's DNA was on, and

1  obviously somebody had touched it.  So I don't think the

2  absence of DNA tells us much.  There wasn't anything on there.

3  And yet somebody had to have touched it.  Isn't it more than

4  just coincidence that there happened to be a vial of crack

5  cocaine on the precise spot on which he fell?

6          **MR. SCAROLA:**  Then why wasn't it still in his pocket?

7  Why was it under his clothes as opposed to in his --

8          **THE COURT:**  I don't know.  But what I'm putting out

9  there is, according to the state attorney's memo, that could

10  explain some of his -- according to what Lin testified, his

11  behavior was.

12          **MR. SCAROLA:**  And my response to that is, the state

13  attorney was speculating.  This has got to be based upon more

14  than mere speculation.  And all we would be doing would be

15  inviting speculation at the price of very serious undue

16  prejudice.

17          And when we balance those things, when we balance

18  speculation against the very clear prejudice of associating

19  Dontrell Stephens with crack cocaine, that's a balancing test

20  that I think very clearly comes out in favor of excluding that

21  evidence.

22          **THE COURT:**  Response?

23          **MR. GIUFFREDA:**  Honestly, Judge, as an officer of the

24  Court, I think it's a close call.  I think it's a close call.

25  I think that his admission he had marijuana in his pocket would

1    be a more proper admissible circumstantial fact.

2            **THE COURT:**  That was --

3            **MR. GIUFFREDA:**  That he might have reached -- he might

4    have been making some attempt, despite the fact that he also

5    had a phone in his hand, to get rid of the marijuana.

6            **THE COURT:**  Right.

7            **MR. GIUFFREDA:**  I don't want to invite error, but I

8    agree with the Court generally, but I think it's a very close

9    call.

10           **THE COURT:**  Fair enough.  I appreciate your candor on

11   that.

12           I had been leaning toward allowing it to come in with

13   a limiting instruction to the jury, but I appreciate your

14   concession on that.  And my sense, when I read the state

15   attorney's report, is, Eh, maybe that's why.  Because you

16   think, well, why would he have, you know, done -- why would he

17   have done anything to put his life in jeopardy?  He was only

18   being pulled over at that point for a bicycle violation.  I

19   read that, I said, Well, okay, that could explain why he went

20   back there.

21           But I'll go ahead, I'll exclude it, and we'll go then

22   to the next, which is the baggie of marijuana, which Stephens

23   acknowledged that he had.

24           **MR. QUINLAN:**  Well --

25           **THE COURT:**  Correct?

221

```
1            MR. QUINLAN:  He admitted that he was in possession of

2    marijuana on the morning of the 13th.  The baggie of marijuana

3    was found on the floor.

4            THE COURT:  The floor of the hospital room.

5            MR. QUINLAN:  Right.

6            THE COURT:  Presumably, most hospital operating rooms

7    don't have baggies of marijuana on the floor.

8            (Laughter)

9            MR. SCAROLA:  It was St. Mary's Hospital, your Honor.

10           THE COURT:  You know, I understand there was some

11   discrepancy as to whether it was in his underwear or just found

12   on the floor.  But if he conceded he was carrying marijuana on

13   him, was there any other marijuana found other than this

14   baggie?

15           MR. GIUFFREDA:  No, your Honor.

16           THE COURT:  All right.  So if he had marijuana, again,

17   might that explain his behavior?  Because, again, the argument

18   is -- I guess that I would make if I were sitting where you

19   are, is, well, why would he -- and I think you made this

20   argument -- why would he have done all these -- taken all these

21   actions that Lin said he took and put his life in danger?  Why

22   would he do that?  He was only being pulled over for a bicycle

23   violation.  But carrying narcotics could explain why, trying to

24   discard it or run.

25           MR. QUINLAN:  Well, I would --
```

222

1          **THE COURT:**  And I'm sensitive to you, because it's

2     now, in a few minutes, go over to the other side, when we get

3     to their motion.

4          **MR. QUINLAN:**  In terms of the baggie -- first --

5          **THE COURT:**  I don't want -- I understand the 403

6     argument on both sides.  I mean, you know, Dontrell Stephens is

7     not, you know, Tony Montana on a bicycle, and Deputy Lin is not

8     John Rambo with a badge.  And so, you know, we have to be very,

9     very careful of, you know, 403, the undue prejudice.

10         However, if it is a reasonable explanation for his

11    behavior, how could we keep it out?

12         **MR. QUINLAN:**  A couple things that come to mind.

13         First of all, I'll concede, since Mr. Giuffreda made a

14    concession, that from a 403 perspective, a baggie of marijuana

15    and a vial of crack cocaine are a little bit different.

16         **THE COURT:**  Right.

17         **MR. QUINLAN:**  Now, in terms of the specifics of how

18    this plays out, I think there's a difference between testimony

19    admitting that he was in possession of marijuana and actually

20    bringing in a baggie from Saint Mary's, putting it on the

21    table, and saying, This is his marijuana.  I think they're a

22    little bit different.

23         The only other point I think I would make that

24    wouldn't simply be repeating what has already been stated,

25    is -- calling your Honor's attention to the Jackson case, which

1    I know we already quoted --

2            **THE COURT:**  Right.

3        **MR. QUINLAN:**  -- in our submissions, but:

4        "Plaintiff persuasively argues that the evidence

5        of plaintiff's intent is not at issue.  Rather, the

6        question is whether from the perspective of a

7        reasonable officer in the defendant's position, the

8        plaintiff appeared to be fleeing or otherwise posing

9        a risk to her safety or the safety of others that

10       warranted her use of force."

11           **THE COURT:**  Right.

12       MR. QUINLAN:  "Allowing the seized items into

13       evidence would undermine the protections of the

14       Fourth Amendment by permitting the jury to infer that

15       the plaintiff's culpability or status as a presumed

16       drug dealer justified use of force."

17           **THE COURT:**  Right, right.

18       **MR. QUINLAN:**  This is a case where they actually found

19   the drugs in the car.

20       **THE COURT:**  I understand, and I think with regard to

21   your 609 argument, that we'll get to in a little bit, you know,

22   I think that maybe comes more into play.

23       You don't want the jury to say, Oh, he's a drug

24   dealer, he deserves what he got.  You don't want that to

25   happen.

```
 1              On the other hand, if it could very well explain his
 2     behavior on that day, and corroborate what is otherwise
 3     disputed testimony from the deputy, why -- you know, unless you
 4     want to just maybe -- maybe if there's -- we can just have --
 5     rather than -- you know, I don't think we need the baggie of
 6     marijuana, saying he was carrying a quantity of a small -- I
 7     don't know what the quantity was -- a small quantity of
 8     marijuana on him, you know, to try to mitigate the prejudicial
 9     effect of it.
10          MR. SCAROLA:  I would only point out that that does
11     not corroborate Deputy Sheriff Lin's account of what happened.
12     It contradicts Deputy Sheriff Lin's account of what happened.
13     Because Deputy Sheriff Lin's account of what happened is not
14     that he reached behind his back, and before he saw anything at
15     all, he shot him.  He reached behind his back, he pulled out a
16     dark black object that was not a small baggie of marijuana that
17     Deputy Sheriff Lin thought was a gun.  And that's the point at
18     which he shot.
19              So, if the contention is that what he was really doing
20     was reaching behind his back, so that confronting the police
21     officer, who is not telling him he's about to search him,
22     face-to-face with the police officer, he is going to reach
23     behind his back, pull out a baggie of marijuana, and drop it on
24     the ground?  Offer it to the police officer?  It just --
25          THE COURT:  What about the police officer's contention
```

1    it appeared that he was trying to run, the way he got off his

2    bike and went between the cars.

3         **MR. SCAROLA:**  Well, that's an assessment that the jury

4    will make, because they see exactly what his actions were on

5    the dashcam video.  That's a characterization that the jury

6    will be able to evaluate based upon what they themselves can

7    see.

8         **THE COURT:**  Response?

9         **MR. GIUFFREDA:**  I think ultimately, your Honor,

10   though, in any case, including this case, why people involved

11   did what they did, their motivations, those types of things are

12   always relevant and should be considered.

13        And so the fact that he had drugs on his person

14   explains a lot.  It explains why he pulled over the way he did.

15   He essentially rode his bike through someone's yard, up into

16   the front of their driveway, got off the bike in a rolling

17   dismount, went between the cars, and he may have, particularly

18   if the jury concludes that he was somehow under the influence

19   of marijuana, may not have been thinking straight, and reached

20   back thinking he could get rid of the marijuana with the same

21   hand that has the phone, and then comes forward with the phone,

22   and the officer thinks it's a gun.

23        **THE COURT:**  I do think it's relevant, and I don't

24   think the prejudicial effect outweighs its probative value.  I

25   don't know that we need to have the baggie of marijuana brought

```
 1    in to make the point that he had a quantity of narcotics on

 2    him.  Would it be less prejudicial to just say he had a small

 3    quantity of narcotics?

 4            MR. SCAROLA:  No, no, not narcotics, your Honor.

 5            THE COURT:  Okay.  A small quantity of marijuana?

 6            MR. SCAROLA:  In light of your Honor's ruling --

 7            THE COURT:  Yeah.

 8            MR. SCAROLA:  -- we would much rather have it referred

 9    to as "a small baggie of marijuana."

10            THE COURT:  Small quantity, baggie?

11            MR. SCAROLA:  Yes.

12            THE COURT:  All right.  Let's do that then.

13            And if you would like there to be a limiting

14    instruction as to how they're to consider that, not as evidence

15    of his character, but that might just draw more attention to it

16    than you want.  I don't know.  I'll leave that up to you.  But

17    if you want to propose a limiting instruction, you know, I

18    would entertain that.

19            MR. SCAROLA:  Thank you.  We'll give some thought to

20    that, your Honor.

21            THE COURT:  Okay.  All right.

22            I'll try to pick up the pace here.  I think we're at

23    4:30, and we still need to get to the other side.

24            The state attorney's decision not to prosecute.  I

25    don't think I need any argument on that.  I agree with the
```

1   plaintiff that that's not relevant.  They have different

2   standards.  And it's not -- it doesn't go to the objective --

3   you know, their assessment doesn't go to the objective

4   reasonableness in a civil case.  They're making a criminal

5   prosecutorial decision, different standards of proof, different

6   considerations.  So I will grant the plaintiff's motion as to

7   number four.

8        Photos from the social media.  I don't think I need

9   any argument on that.  I'm gonna grant that.  I think that

10  would be quite prejudicial, the money and the gun.  And it

11  would lend itself to some type of propensity on character --

12  he's a bad guy, he's a gangster, you know, that sort of thing.

13  We want to make sure we stay away from that.

14        Felony drug conviction.  Possession with intent to

15  sell cocaine.  609 says it's admissible.  And goes -- you know,

16  it's something the jury could consider with credibility.

17  Obviously, that's really what this case is all about.  But

18  Mr. Quinlan made the argument that if it's gonna come in, that

19  it should just be noted he has a felony conviction, without the

20  nature of the conviction, if it were to come in.

21        Mr. Giuffreda, what's your position on that?

22        **MR. GIUFFREDA:**  I think, generally, as I understand

23  it, when you impeach by prior felony conviction, the nature of

24  the crime doesn't come in unless there's some other relevant

25  reason for it to come in.  Sometimes it might be that the

1   witness doesn't remember what they were convicted for; they

2   don't remember how many convictions they have.  You introduce

3   certified copies of the convictions.

4          In this particular case, our position would be, is

5   that the nature of that felony conviction, coupled with the

6   fact that he had marijuana on his person and had used it that

7   day, and now he's being stopped by a police officer, all play

8   into why Dontrell responded to Lin the way he did.

9          **THE COURT:**  But that's not what 609 says the purpose

10  of the -- of admitting this testimony is.  It's only supposed

11  to be admitted to the extent it bears on his truthfulness.

12         **MR. GIUFFREDA:**  Truthfulness.  I understand.  I

13  understand.

14         **THE COURT:**  Right.  Not to explain his behavior.

15         **MR. GIUFFREDA:**  I understand.

16         **THE COURT:**  I'm inclined to deny in part and grant in

17  part the motion.  Deny it with regard to your request that

18  there be no mention of a felony conviction, but grant it to the

19  extent that other than the fact that a felony conviction, not

20  identify the nature of the conviction.

21         **MR. GIUFFREDA:**  And the exception --

22         **THE COURT:**  I think that serves the purpose of 609 and

23  yet 403 as well.

24         **MR. GIUFFREDA:**  And the exception would be if he

25  somehow denied being a convicted felon, then we could introduce

1   the certified copy of the conviction.

2          **THE COURT:**  Sure.  Yeah.

3          **MR. GIUFFREDA:**  Okay.

4          All right.  So we will limit it to, you're a convicted

5   felon.

6          **THE COURT:**  Right.

7          **MR. SCAROLA:**  Your Honor, my understanding of the

8   proper question -- and I must confess it's based primarily upon

9   state court experience -- the proper question is:  Have you

10  ever been convicted of a crime?  How many times?

11         **THE COURT:**  Of a felony offense, yeah.  Because he

12  can't ask about --

13         **MR. GIUFFREDA:**  It has to be a misdemeanor involving

14  dishonesty or false statement or a felony.

15         **THE COURT:**  Or a felony, right.  And this is would

16  not --

17         **MR. SCAROLA:**  That's the predicate for being able to

18  ask the question, but the question is not have you ever been

19  convicted of a felony, but have you ever been convicted of a

20  crime?

21         **THE COURT:**  No.  Because you can't ask about

22  misdemeanors.

23         **MR. SCAROLA:**  Yeah.

24         **THE COURT:**  So you have to be specific about -- I --

25  you know, my recollection from when I -- and this is really in

1   a criminal context -- you know, have you ever been convicted of

2   an offense punishable by imprisonment for a term exceeding one

3   year?  Yes.

4         And then you get into more discretionary, you know, as

5   to, you know, tell us what that was.  It was bank robbery,

6   whatever.

7         And then if they deny it, then you can, you know,

8   bring in the certified copies of the judgment and conviction to

9   prove it.

10        **MR. SCAROLA:**  Is your Honor suggesting they get to ask

11  what was the crime?

12        **THE COURT:**  You could --

13        **MR. SCAROLA:**  Yeah, I understand we have the right to

14  do that.

15        **THE COURT:**  No.  What I'm saying is, generally you

16  can, but on 403 grounds, I'm going to exclude the nature of the

17  crime in this case.  I'm gonna exclude it on 403 grounds, but

18  generally under 609, yes, you could ask:  What were you

19  convicted of?  Bank robbery.  Yes, you can ask that.

20        But, in this case, I'll exclude the nature of the

21  crime.  I think that would serve the dual purposes of 609 and

22  403.

23        And, generally, quite frankly, the proponent of the

24  witness puts that out there first.  So the other side actually

25  never even gets there.  But I'll leave that up to you.

231

1          MR. QUINLAN:  Yes, sir.

2          MR. GIUFFREDA:  But it will be that he's a convicted

3    felon.  That's the proper --

4          THE COURT:  Convicted of a felony punishable -- of a

5    crime punishable by -- yes.

6          MR. GIUFFREDA:  Yes.

7          THE COURT:  Imprisonment for more than one year, yeah.

8          MR. QUINLAN:  There is -- if I could, your Honor?

9          THE COURT:  Yeah.

10         MR. QUINLAN:  There is one point that may require

11   clarification based on how I read the response memorandum.  And

12   I addressed it in the reply.  There had seemed to be a

13   suggestion that maybe his full arrest history --

14         THE COURT:  Yeah, I'm not --

15         MR. QUINLAN:  -- is fair -- I just wanted to clarify

16   that.

17         THE COURT:  I think that's on the -- I think that's

18   part of their motion.

19         MR. QUINLAN:  No, I thought it was their response to

20   our motion, but in any event....

21         THE COURT:  Was it?  Okay.  I've got that down here,

22   yeah, about the withheld adjudication?  Yeah.

23         MR. QUINLAN:  Yeah.  Even arrests -- I think there

24   were arrests that did not result in conviction.

25         THE COURT:  Correct.

232

```
 1          MR. QUINLAN:  I just wanted to clarify that stuff is

 2   not coming in.

 3          THE COURT:  Right.  And they argued bias, right?

 4          MR. QUINLAN:  Right.  That's right.

 5          THE COURT:  Right.  Following words apply:  Witness's

 6   character for truthfulness for a crime that in the convicting

 7   jurisdiction is punishable by death -- by imprisonment for more

 8   than one year.

 9          Limiting it after ten years... must be admitted

10   subject to 403 in a civil case or in a criminal case in which

11   the witness is not a defendant.  So it's -- it specifically

12   says that the conviction comes in subject to 403, which would

13   be the --

14          MR. SCAROLA:  May I --

15          THE COURT:  Yes.

16          MR. SCAROLA:  -- may I anticipate an issue and try to

17   head that off?

18          THE COURT:  Sure.

19          MR. SCAROLA:  We would, in light of the Court's

20   ruling --

21          THE COURT:  Yeah.

22          MR. SCAROLA:  -- bring out in direct examination the

23   fact that Dontrell Stephens has been convicted of a crime

24   punishable --

25          THE COURT:  Right.
```

```
 1          MR. SCAROLA:  -- by a year or more --

 2          THE COURT:  Right.

 3          MR. SCAROLA:  -- in prison.  And I would want to ask

 4   him:  What, in fact, was the punishment that you received?  And

 5   I don't want, by virtue of doing that, to open the door to a

 6   discussion as to what the crime was.

 7          THE COURT:  What's the relevance of the punishment?

 8          MR. SCAROLA:  I don't --

 9          THE COURT:  Because 609, it only comes in -- the

10   conviction comes in for truthfulness.  What's the relevance of

11   the punishment?

12          MR. SCAROLA:  To mitigate the impression that this is

13   someone who spent a year in jail, or more.  I want to balance

14   the prejudice --

15          THE COURT:  But then we're going into the

16   underlying -- because that reflects the underlying seriousness.

17   The punishment is a reflection of the underlying seriousness of

18   the offense.

19          MR. SCAROLA:  Yes, sir.

20          THE COURT:  So if you're -- on that theory, then I

21   would think they'd be able to then say, Well, what was the

22   offense for which you were given probation?  I think --

23          MR. SCAROLA:  That's why --

24          THE COURT:  And I'm glad you're anticipating it --

25          MR. SCAROLA:  Yes, sir.  That's why I'm raising it.
```

234

```
 1        THE COURT:  -- because I think an argument could be
 2   made that that would be opening up the door.  So, yeah, maybe
 3   we should stay away from that.
 4        MR. SCAROLA:  Well, I may decide, in light of your
 5   Honor's ruling, to open that door.
 6        THE COURT:  Okay.  All right.
 7        MR. SCAROLA:  But I would suggest that it does not
 8   open the door.  If your Honor's ruling it does, then we'll need
 9   to make the tactical decision as to what we want to do with
10   that.
11        THE COURT:  Right.  Because once you're going to
12   elicit testimony that goes to the severity of the offense, you
13   know, he says, I got community service or whatever.  Okay, you
14   got community service.  We should be able to tell them what you
15   got community service for.  You know, possession of cocaine, or
16   whatever, with intent to distribute.
17        Yeah, you know, I question whether it is relevant, but
18   I think if it were, I think they would be permitted then to
19   explore that further.  Well, I'll leave that up to you.
20        MR. SCAROLA:  Thank you.
21        THE COURT:  Now, look, these are, you know, difficult
22   balancing, much of this, and we'll get to the defense motion in
23   a minute.  You know, you don't want there to be unfair
24   prejudice, but yet, you know, to what extent is it probative
25   and fair game.
```

```
 1              All right.  Let's go to the defense motion in limine.

 2              Number one, Docket Entry 195, the uniform.

 3              (Discussion had off the record between counsel)

 4         THE COURT:  Does anybody need a break?  Sometimes when

 5   I get going, I kind of forget.

 6         MR. QUINLAN:  I would take you up on one, if --

 7         THE COURT:  Okay.

 8         MR. GIUFFREDA:  Just a couple minutes.

 9         THE COURT:  Okay.  We just have this last motion left,

10   and then we'll talk about the trial procedures.

11         MR. SCAROLA:  Thank you, sir.

12         THE COURT:  Okay.  Thank you.

13              (Discussion had off the record between counsel)

14              (The Judge exited the courtroom)

15              (Recess taken at 4:45 p.m. until 4:57 p.m.)

16              (The judge entered the courtroom)

17         THE COURT:  All right.  Please be seated.

18         MR. QUINLAN:  Judge, I'm not trying to rush your

19   Honor, but I just put my last couple quarters in the meter.

20         THE COURT:  Okay.

21              All right.  We're in the ninth inning.  I'll try to

22   move it along.

23              Recalling Stephens vs. Bradshaw and Lin.

24              We'll move to then Docket Entry 195, which is defense

25   motion in limine.
```

236

```
1            Let me tell you where I'm coming from on this, because
2    it may help inform how you approach the argument.  When I
3    originally read and considered some of these things, I thought,
4    yeah, you know, it's really not relevant what he's wearing or
5    what his marital problem was, you know, but he was in the
6    military, and the rest.  And then started thinking about it
7    more.  Coming to a different -- so I'm telling you this so you
8    can maybe address it.
9            As I indicated earlier, I think this case really comes
10   down to perception and the reasonableness of the deputy's
11   perception.  You know, we all see things through the lens of
12   our life experiences.  To the extent that the deputy has life
13   experiences that could affect his perception, I think it's fair
14   game.  I think it could help the jurors decide whether or not
15   what he perceived or what he says he perceived was reasonable.
16   What was going on in his life at that time could have affected
17   his perception as well.
18           And as I said at the outset of these motions
19   in limine, I want to allow, you know, wide latitude in
20   cross-examination, vigorous cross-examination, and let the
21   jurors decide on credibility, once they've got the big picture
22   on both Mr. Stephens and Deputy Lin.
23           All right.  That said, with my view that a broad scope
24   should be permitted, the first issue is the uniform and the
25   ammunition.
```

1                I'm not sure whether it's Mr. Giuffreda or

2      Ms. Barranco --

3           **MR. GIUFFREDA:**  I'm passing the baton.

4           **THE COURT:**  Okay.  Pass the torch.

5           **MS. BARRANCO:**  Back again.

6           **THE COURT:**  That's another way of saying, I'm throwing

7      you under the bus.

8           *(Laughter)*

9           **THE COURT:**  You know -- okay, he's dressed, it's

10     county-issued uniform, he wasn't carrying anything he's not

11     permitted to carry, in terms of ammunition and equipment, but

12     is it not fair game for the jury to consider this to the extent

13     it might reflect on his perception and his fear, and let the

14     jury decide whether perhaps he has an unreasonable fear or not?

15               You know, if you take somebody who's a security guard

16     at a condo, and they come dressed like this, you're gonna go,

17     Whoa, I want a guy like this around, you know, he sees things

18     where nobody else sees them.

19               So tell me why it's not fair game, and why we should

20     not allow cross-examination with regard to the uniform and the

21     ammunition.

22          **MS. BARRANCO:**  Well, Judge, at this point, I know it's

23     been a long day, that we've had a lot of revelations in terms

24     of your Honor's rulings, and now that we know the *Monell* claim

25     is no longer viable, we know the negligence claim and related

```
1    negligent-type theories is no longer viable, it's hard for me
2    to say at this late hour with any real intellectual input in
3    terms of why I think it absolutely should not be relevant at
4    all.
5              THE COURT:  In fact, isn't it on the videotape?
6              MS. BARRANCO:  Well, I think it's one thing that it's
7    on the videotape in terms of what he's wearing, and he could be
8    questioned, you know, Is that your, you know, Class C uniform,
9    et cetera, et cetera, versus harping on the fact of, Well, how
10   many rounds of ammunition did you have, and why were you
11   wearing that, and making it a major player in the case, as
12   opposed to, you know, it's a passing reference, in terms of
13   what he was wearing, you know, what he was carrying on --
14             THE COURT:  I don't know enough about the nature of
15   his job responsibilities and the community in which he was
16   assigned to patrol to really know myself whether this was
17   reasonable or whether it may be in evidenced an unreasonable
18   fear (sic).  But isn't that fair game if the plaintiffs feel
19   that this is so out of line, it shows -- at least throws into
20   question his judgment and his perception, and then you're free
21   to come back, you know, on redirect that we maybe -- you know,
22   you were explaining the nature of the neighborhood, the nature
23   of his job, the danger, and the rest, and let the jury decide?
24   But to simply exclude it, isn't that perhaps an important piece
25   of the puzzle that they should be permitted to ask about?
```

1          **MS. BARRANCO:**  Well, this particular point in the

2    motion, your Honor, kind of covered a few things that we sort

3    of collectively put together in a topic.

4          **THE COURT:**  Right.

5          **MS. BARRANCO:**  And I know part of it was to prohibit

6    argument in regards to -- or the describing his manner of dress

7    as dressed for combat or dressed for war, because, frankly, I

8    don't think that is relevant.

9          **THE COURT:**  Yeah, there were some inflammatory --

10   somewhat inflammatory in terms of the dressed for war, which I

11   think a PBSO officer used that.  But in terms of just asking

12   what it was he had, you know, isn't it a fact that you had 76

13   rounds of ammunition, that you had five handcuffs, that you

14   had -- et cetera, et cetera, why is -- why would that not be --

15   without the inflammatory, you know, with the, you know, are you

16   John Rambo, and you're ready to -- that's what I want to stay

17   away from.  But in terms of evidencing his perception of the

18   danger that he faced --

19         **MS. BARRANCO:**  Well --

20         **THE COURT:**  -- why would that not be fair game?

21         **MS. BARRANCO:**  I first heard you ask about whether or

22   not they could ask the deputy about what he was wearing, and I

23   think that's certainly fair game in terms of describing what he

24   was wearing.

25         **THE COURT:**  Or what he was carrying --

1   **MS. BARRANCO:**  Right.  In terms of his ammunition,

2   that sort of thing.  Versus talking about -- either questioning

3   the witness or arguing to the jury, whether in opening or in

4   closing, about the Rambo persona, that, you know this deputy

5   used to be serving in the military, and now he basically just

6   continues that persona as a deputy sheriff, and trying to link

7   that to his decision to use deadly force.

8   **THE COURT:**  Well, I want to stay away from

9   inflammatory things that might touch on, you know, might

10  suggest John Rambo.

11  **MS. BARRANCO:**  Right.

12  **THE COURT:**  But I do think that the plaintiff should

13  be permitted to address this issue of the reasonableness of his

14  fear to the extent that his equipment and dress may have

15  reflected it.

16  Because, again, I think the heart of the issue, at

17  least as I see it, and maybe as it plays out in trial, it will

18  change, but I think the heart of it is the reasonableness of

19  his perceptions.  But I'm gonna go ahead, and I will deny the

20  motion in limine to exclude evidence regarding the uniform,

21  ammunition, and the equipment.

22  Second is the nature and philosophy of community

23  policing, including the suggestion that requires police

24  officers to dress in a particular fashion.

25  **MS. BARRANCO:**  Your Honor -- I'm sorry -- just skipped

1    over the body camera issue.

2              **THE COURT:**  Oh.

3              **MR. SCAROLA:**  Which is a non-issue.

4              **THE COURT:**  Okay.

5              **MR. SCAROLA:**  We have conceded in our response, your

6    Honor, that we --

7              **THE COURT:**  That's right, you did.

8              **MS. BARRANCO:**  They also mentioned that -- not to say

9    that they wouldn't mention that that was technology that was

10   available in September of 2013.  And I think that also is

11   something that should not be brought to the forefront.

12             **THE COURT:**  Right.

13             **MS. BARRANCO:**  Sure, it might have been, but the fact

14   of the matter is he didn't have one, and I don't think this

15   jury should judge him in terms --

16             **THE COURT:**  Let me just ask the plaintiffs.  You're

17   gonna stay away from the body camera?

18             **MR. SCAROLA:**  I don't have any reason to anticipate

19   any reference to body cameras.  There was a body microphone,

20   and we certainly will be talking about that.

21             **THE COURT:**  Right.

22             **MS. BARRANCO:**  That's different.

23             **THE COURT:**  Okay.

24             **MR. SCAROLA:**  But we won't be talking about body

25   cameras.

1          **THE COURT:**  Okay.

2          *(Discussion had off the record between the Court and*

3     *court reporter)*

4          **THE COURT:**  All right.  Second, evidence with

5     regarding the philosophy in community policing.  I'm not quite

6     sure how this would come in.  Maybe I should turn to the

7     plaintiffs.

8          Were you intending to -- I know that the professor was

9     talking about community policing, but were you intending to

10    raise any issue of community policing philosophies?

11         **MR. SCAROLA:**  Your Honor, we are, in the context of

12    the manner in which Deputy Sheriff Lin chose to address the

13    fulfillment of his community policing responsibilities.  The

14    testimony -- and this ties right in to the same considerations

15    that your Honor was discussing with regard to the manner in

16    which Deputy Sheriff Lin dressed.  Had Deputy Sheriff Lin been

17    dressed in the manner in which he was dressed as part of his

18    fulfillment of duties with the tactical unit of the Palm Beach

19    County Sheriff's Office --

20         **THE COURT:**  Right.  You would have said that's fine,

21    but this is community police.

22         **MR. SCAROLA:**  That's right.

23         **THE COURT:**  So you're saying it's evidence of the

24    unreasonable fear.

25         **MR. SCAROLA:**  Exactly.

1          **THE COURT:**  Okay.  Response?

2          **MR. SCAROLA:**  His job was to establish a rapport with

3    the local community --

4          **THE COURT:**  Right.

5          **MR. SCAROLA:**  -- and enlist them in the peacekeeping

6    effort.

7          **THE COURT:**  Right.  So it goes to the unreasonableness

8    of the fear.

9          Response?

10          **MR. SCAROLA:**  Correct.

11          **MS. BARRANCO:**  Well, your Honor, I think this is a way

12    that the plaintiffs will try to get into *(sic)* the back door

13    what the Court has already told them they couldn't get in

14    through the front door, in terms of -- you know, in terms of

15    what the philosophy of the sheriff's office is, and whether

16    that's being properly fulfilled regarding community policing,

17    and how that works.  It will be more about --

18          **THE COURT:**  Let's switch to this.  Because I don't

19    want to get off topic at the trial about too much, you know,

20    the philosophy, but I'll permit some inquiry into, you're a

21    community police officer, and the philosophy is to establish

22    rapport with the community, but you were dressed in whatever

23    you were dressed in.  And we'll leave it at that.

24          So, you know, I'll permit, but with limitations.  I

25    know that the professor was starting to go into a lot of detail

1   about it, and I don't want to get too offtrack.  So I'll permit

2   it to the extent it goes to the, you know, reasonableness of

3   his perception.

4        Three, the evidence that no Palm Beach deputy had been

5   killed in many years.  I guess that assumes that he knew -- and

6   I don't know whether Lin testified at his deposition whether he

7   knew the statistics.

8        **MR. SCAROLA:**  I believe he was questioned about that

9   during the course of his deposition, your Honor.  And

10  acknowledged the fact that he was unaware of any police officer

11  in the Palm Beach County Sheriff's Office having been killed in

12  the line of duty for a very extended period of time.

13       **THE COURT:**  Let me get a clarification.  Because I

14  don't know the answer.  Did he say that to his knowledge, no

15  deputy had been killed, or he just did not know if any deputy

16  had been killed?

17       **MR. SCAROLA:**  I'm sorry, I'm not sure that I

18  understand the distinction.

19       **THE COURT:**  Because --

20       **MR. SCAROLA:**  Did he know there was no deputy killed?

21  Or did he say --

22       **THE COURT:**  Did he know what the record was, or he

23  just didn't know what the record was?  Let's say, for argument

24  sake, no deputy had been killed in 30 years.  Did he know that,

25  or he just was not aware one way or the other?

1          **MR. SCAROLA:**  Your Honor, I don't feel comfortable

2     answering that question, because I really don't remember.

3          **THE COURT:**  Okay.  What I'll do is this.  If he was

4     aware that no deputy had been killed in 30 years, then I think

5     that -- then I think it would be fair to ask, because that

6     goes, then, to the reasonableness of his perception.  If he's

7     working in a jurisdiction in which no deputy had been killed in

8     30 years, if he was aware of that.  If he just didn't know,

9     then let's stay away from it.  So take a look and see how it

10    was phrased.

11         Uhm, evidence regarding his combat experience.

12    Ms. Barranco, you're a soldier, you come back from Afghanistan,

13    isn't that gonna affect, perhaps -- and I don't mean to in any

14    way disparage him, I mean it's a very -- you know, it's noble

15    that the deputy was in the Armed Forces and served in a -- you

16    know, in a combat zone.  But does that life experience color

17    the lens through which -- is it not fair to ask whether that

18    lifetime experience colors the lens through which he might have

19    viewed?

20         And I don't mean to suggest he was delusional or

21    anything like this, and he saw the Taliban, you know, on

22    Haverhill Road.  I'm not suggesting that.  But does that -- is

23    it at least fair game to ask about?

24         **MS. BARRANCO:**  Your Honor, I think it would depend on

25    how it was presented to the witness, whether it was -- and how

1  it was argued to the jury.  To the extent that the plaintiffs

2  try to deal with some sort of character assassination of

3  Deputy Lin, that's a Rambo type -- this kind of goes along with

4  what your Honor has already ruled on --

5          **THE COURT:**  Right.

6          **MS. BARRANCO:**  -- you know, that he was out there

7  fighting a war, and he comes home, and that's just the way he

8  does things, and, you know, he's just out there fighting a war,

9  he's dressed for combat, all of that, I don't think that's

10  proper.  I don't think that's relevant.  I think that's

11  inflammatory.

12          Additionally, to the extent that they go down that

13  road, I think the other side should be able to --

14          **THE COURT:**  Come back that he never shot anybody.

15          **MS. BARRANCO:**  Correct, that he never had to shoot

16  anybody.

17          **THE COURT:**  All right.  I think that's reasonable.

18  I'll permit you to inquire about it, you know, in a

19  noninflammatory -- I don't think you would do that anyway --

20  and I'll permit the other side then to, if -- to tie up any

21  loose ends in terms of what the extent of his combat role was

22  there.

23          But I do think it's fair that it was a life

24  experience, and it could color, as I say, the lens through

25  which he saw things, to at least raise it.

1      **MR. SCAROLA:**  Your Honor, just so that the Court is

2    aware of the context in which we would anticipate this coming

3    up.

4            **THE COURT:**  Okay.

5            **MR. SCAROLA:**  There is a specific reference in our

6    reply memorandum to the statement made by Deputy Sheriff --

7            **THE COURT:**  About the country being pretty if it

8    weren't for bombs killing people?

9            **MR. SCAROLA:**  Yes.  If it weren't for the mines and

10   the people trying to kill you, it's a damn nice country.

11           **THE COURT:**  It's a beautiful place.  Right.

12           And when I saw that, I said, Okay, obviously he's had

13   significant experience that could color the lens.

14           **MR. SCAROLA:**  Yes, sir.

15           **THE COURT:**  But I'm also -- I also agree with

16   Ms. Barranco that, you know, we don't want it to become an

17   inflammatory point that he's some out of control, you know,

18   guy -- well, you all saw the movie -- came back from combat

19   zone and shot up the police station, you know, so....

20           All right.  So, again, I will -- in terms of the

21   defense motion in limine, I will deny number four, but just

22   with the caveat that it be addressed in a noninflammatory

23   fashion, and that the other side then can tie up any loose ends

24   with regard to the extent of his combat.

25           Number five, evidence that the plaintiff was profiled

248

1  as a basis to detain him.  I've ruled that the stop was lawful.

2  I don't know whether there -- the plaintiffs were intending to

3  argue the legality of the stop, but I -- okay, no?  Okay.

4        **MR. SCAROLA:**  No, we're not intending to -- your Honor

5  has already ruled that the stop was legal.

6        **THE COURT:**  Okay.

7        All right.  So I will grant number five.  It's no

8  longer relevant in light of my rulings.

9        **MR. SCAROLA:**  Well -- I'm sorry.

10       **THE COURT:**  Yeah.

11       **MR. SCAROLA:**  What we would want to present are the

12  circumstances of the stop.

13       **THE COURT:**  Right.

14       **MR. SCAROLA:**  That's evident from the dashcam video.

15       **THE COURT:**  Correct.

16       **MR. SCAROLA:**  It's evident from the testimony that is

17  given by Deputy Sheriff Lin as to what his motivation was.  He

18  also claims that the reason why he stopped Dontrell Stephens

19  was because he didn't recognize him as belonging in the

20  neighborhood, when both the dashcam video and Deputy

21  Sheriff Lin's testimony indicates that he wasn't in a position

22  to be able to identify him, because all he saw was the back of

23  his head.  We would want to put that on.  The jury's gonna know

24  that this was a young black male in dreadlocks, who was not

25  dressed in his -- it -- in his polo shirt and plaid shorts.

1          We want to be able to get into those facts, and I

2    think they clearly played a role in Deputy Sheriff Lin's

3    perception of Dontrell Stephens.  It goes very much to the

4    example, that I thought was a very good one, given by

5    Chief Tucker, and that is, is there anyone who is going to

6    suggest that if this were a 65-year-old woman reaching into her

7    purse, that it would have been reasonable to conclude that she

8    was reaching into her purse to pull out a gun to assault the

9    deputy sheriff who was stopping her for a traffic infraction?

10         So I think that looking at the totality of the

11   circumstances, the jury needs to know those facts, and we need

12   to be able to argue the facts, that a significant factor that

13   played into Deputy Sheriff Lin's actions and reactions was the

14   fact that Dontrell Stephens was a young black male with

15   dreadlocks.

16         **THE COURT:**  The objection, as I understand it, is that

17   he was stopped.  The decision to pursue him was racially based.

18   Having already ruled -- the Court having ruled that the stop

19   was lawful, why would you -- or are you intending, maybe is the

20   question, to argue that he was stopped in pursuit in the first

21   instance because of his race?

22         **MR. SCAROLA:**  Yes, sir.  We would want to argue that

23   that was, in fact, the reason why he was stopped.  There was a

24   lawful basis for that stop.  But the police officer exercised

25   his discretion to make this stop and to make it in the manner

1   in which he made it, because this was a young black male with

2   dreadlocks.

3       **THE COURT:**  The question is then:  How does it affect

4   his perception of what occurred?

5       **MR. SCAROLA:**  Because it demonstrates a mind-set to

6   assume that this young black male with dreadlocks presented a

7   lethal threat to him.

8       **THE COURT:**  Response?

9       **MS. BARRANCO:**  Your Honor, uhm, at this point, what's

10  remaining in this case is the excessive force and battery

11  components.  And as your Honor has already ruled, the stop is

12  lawful.  I think to permit the plaintiff to get into these

13  other reasons for why he made the stop, notwithstanding that

14  the Court has ruled that the stop was lawful, number one, I

15  don't think it's relevant to any issue before this jury and

16  certainly is also inflammatory and will -- the plaintiff will

17  attempt to portray Deputy Lin as being some kind of a

18  racist-type deputy.

19       Additionally, it should be noted that Deputy Lin is of

20  Asian descent, he being a minority himself.

21       I don't see the connection here in terms of -- I

22  appreciate wanting to focus on things that might have played a

23  role in terms of his reasonable perception -- or the

24  reasonableness of his perception to actually use deadly force

25  on Mr. Stephens, but not emanating back to the point of, you

1    know, why he made the stop to begin with, particularly since

2    the Court has already found it was a lawful stop.  And I think

3    you get past -- in terms of the balancing test, I think it

4    becomes more prejudicial than probative at some point, and it

5    can basically poison the jury to, you know, portray this deputy

6    as being a bad deputy, a deputy that racially profiles people,

7    and that he otherwise really had no reason to do what he was

8    doing that day.

9          **THE COURT:**  Is there any evidence that Mr. Stephens'

10   race had anything to do with why he was stopped?

11          **MR. SCAROLA:**  Yes, sir.

12          **THE COURT:**  What is that evidence?

13          **MR. SCAROLA:**  That evidence is that the stated basis

14   for the stop was that Dontrell Stephens impeded the flow of

15   traffic on Haverhill Road, when, in fact, he never impeded the

16   flow of traffic on Haverhill Road, based upon his testimony and

17   the dashcam video.  So --

18          **THE COURT:**  Is that evidence that the stop was based

19   on race, or perhaps some other ulterior motive that he thought

20   Stephens might have been dealing drugs?

21          **MR. SCAROLA:**  Well, I would respond to that by saying

22   that Dontrell Stephens -- that the ultimate issue the jury is

23   going to need to decide is, was there objectively reasonable

24   evidence of a threat to Deputy Sheriff Lin?  And our response

25   to that is that Deputy Sheriff Lin's perceptions were not as a

1  result of objectively reasonable evidence; they were as a

2  result of stereotyping.

3      Here's this young black kid --

4    **THE COURT:**  But what evidence is there of that?

5    **MR. SCAROLA:**  Well, the fact that he is a young black

6  male with dreadlocks.

7    **THE COURT:**  But what evidence is there that Stephens'

8  race played a role in his decision to pursue him, as opposed to

9  perhaps the deputy, from his experience, his suspicion that he

10 might be dealing drugs?

11     I want to be very careful here.  We talked about 403

12 and getting into inflammatory areas, unless there is some

13 evidence to support that.

14   **MR. SCAROLA:**  The reasonable inferences, I would

15 argue, your Honor, are that there was no violation, as stated,

16 as the basis for stopping Dontrell Stephens.

17   **THE COURT:**  I understand that's your argument.  But

18 even accepting that as true, it is a leap of faith to then say,

19 Well, then the only reason -- then the reason he really stopped

20 him was because of race.  How do you make that jump?

21   **MR. SCAROLA:**  Well, how do you make the jump to the

22 reason he really stopped him was because he was suspected to be

23 a drug dealer riding a bicycle at eight o'clock in the morning?

24   **THE COURT:**  I mean I don't know.  All I'm saying is

25 that it's pure speculation.  We don't know.

253

1           And what I'm saying, in the absence of any evidence to

2     suggest that race was the real reason -- now, under *Whren*, that

3     doesn't go to the lawfulness of the stop, but... in the absence

4     of any evidence to suggest that race motivated this, as opposed

5     to other factors, I -- you know, I'm just -- you know, I just

6     don't know that it would be appropriate to argue that this was

7     a racially motivated -- that this incident was racially

8     motivated.  I think that's --

9           **MR. SCAROLA:**  Well, I wouldn't intend to present it

10    that way.

11          **THE COURT:**  Okay.

12          **MR. SCAROLA:**  I wouldn't intend to present it as being

13    a racially motivated stop.

14          What I would suggest is a reasonable inference from

15    the evidence is that Dontrell Stephens was not stopped because

16    he impeded the flow of traffic on Haverhill Road.  Dontrell

17    Stephens was stopped because he was a young black man with

18    dreadlocks.  That's the reason why he was stopped.

19          **THE COURT:**  But, again, other than the fact that

20    you're saying, you know, Lin fabricated the traffic impeding --

21    but how do you get from there to attributing it to race?  It

22    could be any one of a number of factors -- reasons why he got

23    stopped.

24          **MR. SCAROLA:**  Well, what are the other reasonable

25    alternatives?  Because he was a young black a man, he was

1    likely to be a drug dealer?

2         **THE COURT:**  He said he didn't recognize him as being

3    from the community?  Perhaps --

4         **MR. SCAROLA:**  Which also does not have credibility,

5    because he couldn't see him.

6         **THE COURT:**  Well, that will be for, you know --

7         **MR. SCAROLA:**  Right.

8         **THE COURT:**  -- I don't know exactly what he's gonna

9    say.

10        But I'm concerned about raising the issue of race as a

11   basis for what the Court has ruled is a lawful stop.  Now --

12        **MR. SCAROLA:**  I am -- I'm not arguing it to in any way

13   contest the lawfulness of the stop.

14        **THE COURT:**  Well, let me -- maybe the way to approach

15   it is -- maybe I need to know specifically how you would -- is

16   this something that you plan to argue in closing or question

17   the deputy about, maybe --

18        **MR. SCAROLA:**  Well, I would need to have a predicate

19   for question -- for arguing it.

20        **THE COURT:**  Right.

21        **MR. SCAROLA:**  So the only questions that I would

22   anticipate establishing through the evidence were:  That at the

23   time you made the decision to stop Dontrell Stephens, what you

24   did know was that he was a young black man with dreadlocks,

25   right?  And I probably wouldn't go beyond that.

255

1          In argument, I might suggest that the real reason why

2    Dontrell Stephens was targeted to be stopped and treated in the

3    way in which he was treated was because he was a young black

4    man with dreadlocks.

5          **THE COURT:**  Now, how does that go to the -- and you're

6    saying that affected the reasonableness of his perception at

7    the point that they're in the front yard.

8          **MR. SCAROLA:**  Yes, sir.  That he was stereotyped from

9    the outset, that Dontrell Stephens was stereotyped from the

10   outset.

11         **THE COURT:**  Response.

12         **MR. SCAROLA:**  Young black guys with dreadlocks are

13   more likely to be reaching for guns --

14         **THE COURT:**  Right.

15         **MR. SCAROLA:**  -- when they reach behind --

16         **THE COURT:**  I understand your argument.  You're saying

17   if he was in a polo shirt with a tennis racket, you're saying

18   they wouldn't have done that.

19         Let me -- I don't know whether you play tennis.  I

20   didn't mean to --

21         **MS. BARRANCO:**  That's okay.

22         I'm hearing words from counsel on the other side that

23   Deputy Lin -- arguing that Deputy Lin targeted Mr. Stephens or

24   how he was treated, et cetera, and trying to tie this in to the

25   behavior.  I would remind the Court that -- again, your Honor

1   has ruled on the lawfulness of the stop -- that the issue

2   before this jury is whether or not the force used -- the deadly

3   force that was used, whether it was reasonable or not.

4          **THE COURT:**  Well, whether his perception of the danger

5   he was in, his assessment was reasonable.

6          **MS. BARRANCO:**  Well, I think trying to portray

7   Deputy Lin and asking him about, Well, why did you stop this

8   guy, is because he's black and has dreadlocks, is highly

9   inflammatory.  There's no evidence in the record that

10  Deputy Lin has ever been accused of this kind of conduct

11  before.

12         **THE COURT:**  I guess I would be more comfortable with

13  it if the question were asked:  What did you know about

14  Stephens when you confronted him face-to-face at that house?

15  This is after the stop.  You knew he was a black male -- young

16  black male with dreadlocks.  That might go to the

17  reasonableness of his perception of danger.  Because I think

18  when we get into the stop, that the Court has already ruled is

19  lawful, I don't know that we need to revisit race at that

20  point.

21         I understand your argument.  Again, polo shirt, tennis

22  racket, you're saying the officer is not gonna be so quick to

23  pull a gun.

24         **MR. SCAROLA:**  He's not gonna pull him over at all.

25         **THE COURT:**  But the stop, though, is no longer an

1    issue.  And that's why I think that if that question is gonna

2    be asked, I think it needs to be asked at the point at which

3    he's already pulled over.

4            **MR. SCAROLA:**  Mr. Quinlan is chomping at the bit.

5            **MR. QUINLAN:**  Okay.  Well, I just wanted to point out

6    one thing.  And maybe my recollection is incorrect on this.  I

7    was trying to find the order while we've been having this

8    conversation.

9            **THE COURT:**  Right.

10           **MR. QUINLAN:**  My recollection is your Honor ruled that

11   the stop was legal, because once he decided to stop Dontrell

12   Stephens, drove down Haverhill, and made the left turn, then on

13   the video, you see a bicyclist going against traffic.

14           **THE COURT:**  Right.

15           **MR. QUINLAN:**  So 30 seconds after he actually made the

16   decision to stop --

17           **THE COURT:**  Right.

18           **MR. QUINLAN:**  -- there's evidence after -- I called it

19   after-acquired evidence.

20           **THE COURT:**  And *Whren* permits that.

21           **MR. QUINLAN:**  Right.  But I think part of what

22   Mr. Scarola is trying to get into is, the earlier decision to

23   make the stop, meaning, we should at least be able to establish

24   that -- Dontrell and Deputy Lin disagree about what happened on

25   Haverhill.  And as Mr. Scarola pointed out, in his deposition,

```
 1    he first says he can't -- his attention was drawn to

 2    Mr. Stephens because he didn't recognize him.  And then on

 3    examination, he was 50 feet away faced in the other direction.

 4    From our perspective is not being candid in his description of

 5    his first encounter with Dontrell, 60 seconds before he shot

 6    him.

 7              And, yeah, later on, normally -- and we're not trying

 8    to revisit your Honor's ruling about what's shown after he made

 9    the left turn, but I don't think that makes all of the

10    circumstances that predate the turn on to Norma Elaine

11    irrelevant.

12              THE COURT:  To the extent that race may factor into

13    the deputy's perception of danger, I would grant you that

14    that's -- that could be a legitimate area of inquiry.

15              My -- what I'm uncomfortable with is raising it with

16    regard to a stop that's lawful.

17              Why don't you go ahead and ask your question, but ask

18    it:  What did you know at that -- at the point at which you

19    came face-to-face him at that house?

20              MR. SCAROLA:  I understand the distinction, and I will

21    accept that limitation, your Honor.

22              THE COURT:  Okay.

23              All right.  So with regard to number 5 -- whose motion

24    is this?

25              MS. BARRANCO:  It's the defense motion, your Honor.
```

259

1      **THE COURT:**  Defense motion, okay.  Grant in part and

2    deny in part, and to limit the inquiry with regard to race to

3    the point at which he had dismounted -- you know, he was

4    actually pulled over.  All right?

5      **MS. BARRANCO:**  And, your Honor, if I could just add

6    something?

7      **THE COURT:**  So we don't revisit the legality --

8    anything about the legality of the stop.

9      **MS. BARRANCO:**  Additionally, there shouldn't be any

10   argument or comment talking about Deputy Lin targeting

11   Mr. Stephens, or that he's a racist, or those kinds of

12   inflammatory comments that may become part and parcel of what

13   plaintiffs attempt to do under the guise of it being related to

14   his decision to actually use deadly force on Mr. Stephens.

15     **MR. SCAROLA:**  I do not intend to argue that Deputy

16   Sheriff Lin is a racist.  I will argue that, with the Court's

17   permission -- and I think I've heard that I have that

18   permission --

19     **THE COURT:**  Right.

20     **MR. SCAROLA:**  -- I will argue that Dontrell Stephens'

21   race played a role in Deputy Sheriff Lin's perception --

22     **THE COURT:**  Perception of the danger.

23     **MR. SCAROLA:**  Yes, sir.

24     **THE COURT:**  All right.  Fair enough.

25     **MS. BARRANCO:**  In terms of his decision to use deadly

```
1    force.

2          THE COURT:  Right, right, right.  It's the argument

3    that if he had a tennis racket and a polo shirt, he wouldn't

4    have -- I guess the argument will be -- perceived that to be a

5    gun.

6          All right.

7          Number six, marital difficulties.  Ms. Barranco,

8    the -- I think your expert testified that stressors -- and I

9    think is the term that he used -- can affect perception and

10   recollection.  In light of that, why shouldn't the plaintiffs

11   be permitted to inquire about stress in Deputy Sheriff Lin's

12   life with regard to his marriage?  And I don't know what the

13   nature of it was, other than the fact that he told another

14   deputy not to call his wife, because they're not apparently on,

15   you know, speaking terms.

16         MR. SCAROLA:  "Me and her are fighting" is the exact

17   words.

18         THE COURT:  Yeah, yeah.  Why is that not fair game as

19   a stress?

20         MS. BARRANCO:  Well, your Honor, I don't recall what

21   the deputy was questioned about in regard to that during his

22   deposition.  I don't remember if they asked him details.  I

23   mean was it just a little spat that they kissed and made up

24   after the incident?

25         THE COURT:  I don't know.
```

1      **MS. BARRANCO:**  Or were they estranged and separated?

2  So I mean, to me, part of it is, uhm, just privacy issues in

3  terms of the deputy's marital status.  And I don't know off the

4  top of my head what the situation was and how much -- I don't

5  think the plaintiffs should make that a major issue in this

6  case either.

7      **THE COURT:**  The deputy might say -- I don't know what

8  he's gonna say -- he said, Yeah, I've not talked -- spoken to

9  her in ten years, we don't have anything to do with each other,

10  in which case, it's not.

11      You know, on the other hand, he might say, We had this

12  blowout argument this morning, and we're not talking to each

13  other, in which case, I guess, it permits then an argument that

14  he was undergoing stress at the time.

15      **MR. SCAROLA:**  Your Honor, if I may.

16      **THE COURT:**  Yeah.

17      **MR. SCAROLA:**  This arises because on the dashcam

18  video, the audio portion and video portion of which continue to

19  run, Deputy Sheriff Lin is asked on the video:  "You want me to

20  call anybody for you?  Are you married?"

21      **THE COURT:**  Right.

22      **MR. SCAROLA:**  His response is:  "Me and her are

23  fighting."

24      **THE COURT:**  Right.

25      **MR. SCAROLA:**  I don't anticipate going beyond that as

```
 1   far as the evidence is concerned.
 2            THE COURT:  Yeah.
 3            MR. SCAROLA:  It will be evidence that he was
 4   undergoing stress.
 5            THE COURT:  Stress.
 6            MR. SCAROLA:  And we would argue that.
 7            THE COURT:  All right.  I'll go ahead, and I'll permit
 8   that.
 9            So it would be -- again, this is the defense motion,
10   right?
11            MR. QUINLAN:  Yes.
12            MS. BARRANCO:  Yes.
13            THE COURT:  Gotta keep track, okay.
14            Defense motion, so I'll deny the motion.  I'll permit
15   the inquiry with regard to the fight with his wife.
16            Deputy Borut's statement that he would have Lin's
17   back.  I think that goes to the issue of the nature of the
18   investigations, whether there's a custom of, you know,
19   essentially whitewashing regarding these.  And I think that's
20   rendered irrelevant by virtue of the *Monell* claim not being in.
21            Evidence that -- so I will grant the motion as to
22   number seven.
23            Number eight, evidence that Lin obtained PBA counsel.
24   I think the plaintiffs have agreed that they're not going to
25   raise that.  So I'll go ahead then and grant that.
```

1      **MR. SCAROLA:**  Your Honor, that -- what we have said in

2  our response is --

3      **THE COURT:**  Pull the mike over, if you could.

4      **MR. SCAROLA:**  I'm sorry.

5      **THE COURT:**  That's okay.

6      **MR. SCAROLA:**  We don't intend to focus on the fact

7  that Deputy Sheriff Lin availed himself of the services of PBA

8  counsel.

9      However, we certainly do intend to focus considerable

10  attention on the post-shooting walk-through and the statements

11  that Deputy Sheriff Lin makes during the course of the

12  walk-through --

13      **THE COURT:**  Right.

14      **MR. SCAROLA:**  -- after he has been advised by PBSO

15  counsel and has the benefit of counsel in advance of those

16  statements.

17      We would want the jury to understand that these aren't

18  off-the-cuff remarks that he's making, that this is part of a

19  formal investigation, and these are the considered statements

20  made by him after he has had the benefit of talking to his

21  lawyer.

22      **THE COURT:**  Response?

23      **MR. SCAROLA:**  And I think it goes to the weight to be

24  placed upon statements that are, from our perspective, directly

25  contradicted by other evidence.

1          **THE COURT:**  Response?

2          **MS. BARRANCO:**  Your Honor, it was a union attorney

3    that was there, not -- I think counsel mentioned PBSO attorney.

4    It was a PBA attorney.

5          **THE COURT:**  PBA.  Got it.

6          **MR. SCAROLA:**  I thought I said PBA.

7          **MS. BARRANCO:**  I don't see what the relevance is, your

8    Honor.  I mean obviously --

9          **THE COURT:**  I guess the suggestion is that these --

10   that the comments he made were after -- were on advice of

11   counsel perhaps, that may have colored the way that he

12   described what happened, or these were not statements that

13   were, I guess the argument, that he might have made without the

14   benefit of counsel.  And the jury should just know that these

15   were counsel's statements.

16         **MR. GIUFFREDA:**  If I could just respond briefly, your

17   Honor?

18         **THE COURT:**  Yeah.

19         **MR. GIUFFREDA:**  Through the union contract, the PBA

20   lawyers respond to these scenes, and ultimately anything that

21   would suggest what conversations occurred between Deputy Lin

22   and his lawyer would be privileged.  And to in any way suggest

23   that he was coached or told what to say would be improper.  And

24   just -- so I can finish -- what we're really talking about is

25   the difference between him giving a voluntary statement that he

1    does not have to give, because of *Miranda*, versus a *Garrity*

2    statement.

3            Now, in a *Garrity* statement, which is an internal

4    affairs investigative statement, under *Garrity*, you cannot take

5    the statement until after the officer's had the opportunity to

6    review all of the evidence, including the dashcam video and

7    everything.

8            This statement was given without the benefit of

9    reviewing anything.  So, you know, if he was gonna doctor a

10   statement, it would be a *Garrity* statement, because he'd get to

11   see everything first.  This statement is literally off the

12   cuff, on the scene, from his memory, without the benefit of

13   reviewing anything.  And whatever conversations he had with

14   that attorney are privileged.  And it's certainly, in our view,

15   more prejudicial than probative that he decided to speak to an

16   attorney before giving a statement in a criminal investigation.

17           **MR. SCAROLA:**  Let me, again, explain the context in

18   which this arises, because maybe it avoids some of the concerns

19   that are being expressed.

20           **THE COURT:**  Okay.

21           **MR. SCAROLA:**  It's not our intent to try to invade any

22   attorney-client privileged communications.  But on the dashcam

23   video, the PBA counsel, my recollection is, is present, and

24   there are repeated references to his being there and to Deputy

25   Sheriff Lin having had an opportunity to talk to his lawyer.

```
 1              We don't want to have to go through and splice out all
 2     of those references.  They're part of the circumstances under
 3     which Deputy Sheriff Lin is making that walk-through statement.
 4     And I think the jury is entitled to know the circumstances
 5     under which he's making that statement, including the fact,
 6     he's had an opportunity to talk to his lawyer.  We don't know
 7     what those communications were.  I'm not going to suggest that
 8     his lawyer made this story up for him.  This is his account,
 9     after he's had an opportunity to have the advice of counsel,
10     and it's going through this walk-through with his lawyer
11     present.
12              THE COURT:  Response?
13              MR. GIUFFREDA:  Your Honor, it's true, during the
14     walk-throughs, there's a form that the VCD, violent crimes
15     division detective reads, and that's because the sheriff's
16     office is obligated to make sure that the deputy understands
17     that this is not a Garrity statement.  You can either
18     voluntarily give this statement as part of this criminal
19     investigation -- this is not an IA investigation -- or not.
20     It's up to you.
21              In the video -- that is very early on at the very
22     beginning of the video, and it could be edited without, you
23     know, impacting the substance of his statement.
24              THE COURT:  I'm gonna deny the -- now that I
25     understand how Mr. Scarola wants to use it, I don't think it's
```

1 unreasonable for the jury to know that -- the full context in

2 which the statements were made.  You could, of course, come

3 back on cross-examination and say:  Did you have an opportunity

4 to see the video?  Yeah.  Did you have an opportunity -- no.

5 You know, how close in time was, you know -- you know, you'll

6 be permitted to address that.

7          So I'll deny -- now that I understand what Mr. Scarola

8 intends to do, I'll deny number eight.

9          There was a motion -- what was the number of that

10 motion?  It's about to strike --

11          **LAW CLERK:**  It was Docket Entry 219.

12          **THE COURT:**  Yeah, it was to strike a submission with

13 regard to the *Monell* claim.

14          **LAW CLERK:**  The 217, notice.

15          **THE COURT:**  What is it?

16          **LAW CLERK:**  The notice is Docket Entry Number 217.

17          **THE COURT:**  Docket Entry 217.  I'll go ahead and deny

18 that as moot, since the *Monell* claim is not in.

19          I believe that covers all the motions.  In which case,

20 I'd like to address, without keeping you too much later, some

21 of the trial procedures.

22          Are there any motions that I've omitted?

23          **MR. QUINLAN:**  I hope not, sir.

24          *(Laughter)*

25          **MS. BARRANCO:**  I can't think of any, your Honor.

1          THE COURT:  Mr. Quinlan doesn't have a car anymore.

2          MR. GIUFFREDA:  I forgot, so I don't have a car

3    anymore.

4          MR. QUINLAN:  No, I don't think so.

5          But there's probably something we need to discuss --

6          THE COURT:  All right.

7          MR. QUINLAN:  -- that will fall between today and the

8    beginning of trial.

9          THE COURT:  All right.  Fair enough.

10         MR. QUINLAN:  Which is page and line designations on

11   depositions.

12         THE COURT:  All right.

13         MR. QUINLAN:  And we've conferred about this.

14         THE COURT:  All right.

15         MR. QUINLAN:  And a lot of it is gonna be impacted by,

16   and obviously will be minimized by the ruling today on *Monell*.

17         THE COURT:  Right.

18         MR. QUINLAN:  Some of the stuff was only relevant to

19   *Monell*.  So we're gonna have to go back --

20         THE COURT:  Right.

21         MR. QUINLAN:  -- and pare down.

22         THE COURT:  Right.

23         MR. QUINLAN:  But we need your guidance on how to deal

24   with the page and line designations -- when and how to deal

25   with them.

1          **THE COURT:**  What are the -- maybe if you could be more

2    specific.  There's deposition testimony that one side is gonna

3    seek to admit that the other side is -- wants to challenge?

4          **MR. QUINLAN:**  That's right.  I believe that we're the

5    only party that did page and line designations.

6          **MS. BARRANCO:**  I believe that's correct.

7          **MR. QUINLAN:**  And originally, it was from one, two --

8    probably seven or eight depositions.

9          **THE COURT:**  Okay.

10          **MR. QUINLAN:**  I think in -- I think exclusively

11   different people at PBSO --

12          **THE COURT:**  Right.

13          **MR. QUINLAN:**  -- that we were intending to use parts

14   of their deposition in our case in chief.

15          **THE COURT:**  All right.

16          **MR. QUINLAN:**  Defense did write out their

17   objections --

18          **THE COURT:**  Right.

19          **MR. QUINLAN:**  -- to the page and line designations.

20          **THE COURT:**  Right.

21          **MR. QUINLAN:**  And I've looked at them, and we agreed

22   that we are probably gonna need your Honor to --

23          **THE COURT:**  Okay.

24          **MR. QUINLAN:**  -- make some rulings on them.

25          **THE COURT:**  They're evidentiary objections that came

1    up during the deposition.

2            **MR. QUINLAN:**  No, that's actually one of our

3    arguments, is that --

4            **THE COURT:**  Or actually, you can't.

5            **MR. QUINLAN:**  -- some of these were waived by not

6    being brought up during the deposition, but they have been

7    brought up in the context of the page and line designations.

8            **THE COURT:**  All right.

9            **MR. QUINLAN:**  So, again, I -- from our perspective,

10   the first step is gonna have to be, I think, my going back, or

11   our going back, and looking at them and figuring our, well,

12   this was only relevant to the *Monell*, or the quality of the

13   investigation and paring them down.  But they're not gonna be

14   completely eliminated, because Deputy Lin's deposition is one

15   of the page and line designations --

16           **THE COURT:**  What type of volume are we talking about?

17           **MR. QUINLAN:**  I would say, at this point, if we played

18   everything that we designated, it's probably two hours?  Maybe?

19           **THE COURT:**  Oh, these were videotaped.  These were --

20           **MR. QUINLAN:**  These are -- yeah, they were videotaped

21   depositions, and we've identified by page and line, but we

22   ultimately would be cutting a video for playing.

23           **MR. SCAROLA:**  That's one of the practical concerns we

24   have, your Honor --

25           **THE COURT:**  Right.

```
 1              MR. SCAROLA:  Getting it done in advance to be able to
 2    do the editing.
 3              THE COURT:  All right.
 4              Okay.  Now, if you take out the Monell portions, then
 5    how much time are we talking about -- video time are we
 6    talking?
 7              MR. QUINLAN:  Well, I still think most of Lin is
 8    probably gonna stay, because that's really about the
 9    incident --
10              THE COURT:  Right.
11              MR. QUINLAN:  -- not about the Monell-related issues.
12    There may be some things about his -- there may be some things
13    that would come out.
14              THE COURT:  How do you propose we handle it?
15              MR. QUINLAN:  Uhm, is there a time next week to argue
16    these?
17              THE COURT:  I'll make time.  I'll make time.
18              MR. SCAROLA:  Your Honor, I would anticipate that most
19    of the rulings can probably be made without the necessity of
20    argument.
21              THE COURT:  Okay.
22              MR. SCAROLA:  And my suggestion is --
23              THE COURT:  Okay.
24              MR. SCAROLA:  -- that we submit the depositions to
25    your Honor, the written transcripts, along with indications as
```

1  to what the objections are, that your Honor indicate your

2  preliminary rulings, and if anyone has a particular problem

3  with the rulings that your Honor has made --

4          **THE COURT:**  Right.

5          **MR. SCAROLA:**  -- we can request an opportunity to

6  address those in oral argument.

7          **THE COURT:**  Just kind of give me sort of like a

8  preview of what are the nature of the objections?

9          **MS. BARRANCO:**  Relevance, uhm, cumulative, misstating

10  the evidence.  I mean they have both volumes of Deputy Lin's

11  first deposition and his criminal deposition.  I'm assuming

12  those three, they're still going to be attempting to use.

13          I would also argue, your Honor, at some point, if

14  Deputy Lin is gonna testify to this jury, and then to permit

15  hours more of his other testimony, at some point, it gets sort

16  of cumulative.  And I'm wondering if there's any way we can

17  pare it down.

18          **THE COURT:**  Is it gonna be used to impeach?

19          **MS. BARRANCO:**  I'm not really sure, your Honor.  I

20  mean, you know --

21          **THE COURT:**  Since Lin is gonna be testifying here,

22  what would be the purpose for which you're gonna use his

23  deposition?

24          **MR. SCAROLA:**  I like the way he testified during the

25  course of his deposition, your Honor.

1      **THE COURT:**  Right.

2      **MR. SCAROLA:**  I want to be able to present to the jury

3  the responses that he has already given under oath in front of

4  a video camera, many times with the video of the -- with a

5  dashcam video playing right in front of him and visible while

6  he is testifying.  That's part of our case in chief.

7      **THE COURT:**  Yeah, I understand, but if he's going to

8  be testifying live, and you're gonna ask him the same

9  question --

10      **MR. SCAROLA:**  No, no, I'm not planning on calling him

11  live.  The defense may choose to call him live, but I want to

12  use his video deposition.

13      **THE COURT:**  Is there anything that you cannot ask him

14  here that you asked -- is there gonna be a -- if he's going to

15  be available to testify live, and you can ask him the questions

16  here, it's not like he's an unavailable witness, and there's no

17  inconsistency between his testimony here live and what he said

18  in the deposition, what would the purpose be of introducing --

19      **MR. SCAROLA:**  I don't know whether there's going to be

20  any inconsistency or not.  But this is the sworn testimony of a

21  party.

22      **THE COURT:**  Right.

23      **MR. SCAROLA:**  The rules of evidence clearly permit us

24  to be able to use that testimony for substantive purposes.  And

25  I want to rely upon the right to be able to use his pretrial

1    sworn testimony as a tactical matter.

2            **THE COURT:**  But at some point, it becomes duplicative.

3    You know, where did you go to high school?

4            I went to Fort Lauderdale High School.

5            Deposition:  Where did you go to high school?

6            I went to Fort Lauderdale High School.

7            I'm trying to understand --

8            **MR. SCAROLA:**  The duplication does not arise in our

9    case.  The duplication arises if the defense decides to call

10   him and ask him the same questions that he's already answered.

11   I have the choice from a practical --

12           **THE COURT:**  So -- I understand.  So you're saying in

13   your case in chief, you want to use -- in lieu of calling him

14   live, you want to use his deposition testimony.

15           **MR. SCAROLA:**  I'm sorry I didn't say it that clearly.

16   Yes, sir.  That's exactly right.

17           **THE COURT:**  Okay.

18           **MR. SCAROLA:**  I don't choose to call him live.

19           **THE COURT:**  Right.

20           **MR. SCAROLA:**  I choose to present his testimony by way

21   of video deposition.

22           **THE COURT:**  Okay.

23           **MR. SCAROLA:**  I can't imagine getting better answers

24   from him than I've already gotten.

25           **THE COURT:**  Okay.  And then the nature of the

1  objections are to relevance, cumulative, is that the --

2         **MS. BARRANCO:**  Basically, your Honor -- I mean, of

3  course, when we were looking at it before the *Monell* claim was

4  still viable, or it was maybe viable again sort of a thing, so

5  we -- you know, there was a lot of issues floating out there

6  that we didn't really know, as well as the negligence claim.

7         **THE COURT:**  All right.

8         **MR. QUINLAN:**  If I could, Judge, there's another piece

9  of this, just -- I'm not trying to overly complicate it,

10  although maybe I am doing exactly that, but I think we all need

11  to go back and take a look at it.  Because, for example, if

12  they objected on relevance grounds --

13         **THE COURT:**  Right.

14         **MR. QUINLAN:**  -- to a question about how were you

15  dressed that day --

16         **THE COURT:**  Right.

17         **MR. QUINLAN:**  -- I think at this point, they wouldn't

18  be pressing that objection.

19         **THE COURT:**  Gotcha.  All right.

20         **MR. QUINLAN:**  So I think decisions made today are

21  gonna impact --

22         **THE COURT:**  Procedurally, how do you propose that we

23  go forward?

24         **MR. QUINLAN:**  Well, I -- with all due respect to the

25  gentleman to my right, my experience with page and line

```
 1   depositions has been that it's better to sit down with the

 2   judge, because sometimes a certain kind of objection recurs,

 3   you rule on it one time, two times, three times.

 4        THE COURT:  It moves the --

 5        MR. QUINLAN:  You don't have to rule on it 25 times.

 6   You don't have to look at it 25 times.

 7        THE COURT:  I'll make myself available next week, if

 8   you want to do it.

 9        Shannon, can you get my calendar?  Thanks.

10        MR. GIUFFREDA:  Your Honor, you said you're out of

11   town the week before the trial.

12        THE COURT:  Which would be the -- not next week, the

13   week after, the Martin Luther King weekend, I'm going to take

14   that.

15        MR. GIUFFREDA:  Because I know next week, for me, I'm

16   pretty much booked.  And we have this proffer we have to get to

17   you by Wednesday.  They have a motion to file Tuesday.  We have

18   to respond Thursday.

19        THE COURT:  Is Ms. Barranco available?

20        MS. BARRANCO:  Well, what I'm worrying about is

21   motions for summary judgment that are due in another shooting

22   case I have by next Friday.

23        THE COURT:  Yeah.  Well, I guess I've got to rule on

24   it.  If you've raised objections, I've got to rule on them.

25   If -- like I said, I'm willing to get my calendar to
```

1    accommodate you any time next week.

2            **MR. GIUFFREDA:**  I have --

3            **THE COURT:**  If we're dealing not with the audio -- not

4    with the videotape, but just with the written transcripts, and

5    you highlight in yellow or -- how long do you think we'll need

6    to get through everything?

7            **MR. QUINLAN:**  As I said, a lot of times, if -- the

8    ruling -- early rulings give us a blueprint.  You know, a lot

9    of times in my experience, the judge rules on the first page of

10   objections, and you get a sense of where it's going, and the

11   parties then work it out.  That's been my experience in the

12   past.

13           Now, we can do it in the way that Mr. Scarola is

14   suggesting --

15           **THE COURT:**  It's been a -- denied.

16           *(Laughter)*

17           **MR. GIUFFREDA:**  But I know Judge -- I don't know if

18   you Judge Paul Magnuson, but he comes down from Minnesota over

19   to the Fort Myers division, probably to get out of the winter

20   and try cases, and what he does is he has the parties submit

21   copies of the depositions to the Court using different colored,

22   you know, the --

23           **THE COURT:**  Color coding.

24           **MR. GIUFFREDA:**  -- color coding, and the Court reads

25   it, and --

278

```
 1          THE COURT:  I'll --
 2          MR. QUINLAN:  If it's your Honor's preference that we
 3   do it that way --
 4          THE COURT:  But then I don't have an opportunity to
 5   ask questions.
 6          MR. GIUFFREDA:  Right.
 7          THE COURT:  I'm available -- let me just tell you my
 8   schedule, and like I said, I will accommodate.
 9          I'm available all day Monday.  I'm available Tuesday
10   afternoon.  I'm available all day Wednesday, although we may
11   have to use a different courtroom.  Judge Valle is gonna be in
12   here at two.
13          LAW CLERK:  And I'm leaving at one.
14          THE COURT:  Okay.
15          I'm available all day Thursday.  Friday I have a
16   dental appointment from 12 to about one.  I could be available
17   the rest of the day.
18          Do you want to say Thursday?  Does that give you time
19   to get together and kind of brainstorm and see whether --
20          MR. QUINLAN:  It's up to you.
21          MR. SCAROLA:  Yeah, that should be fine.
22          MR. QUINLAN:  From our perspective, Thursday gives us
23   enough time.
24          THE COURT:  Thursday?
25          MS. BARRANCO:  I suppose it's hard to tell how long it
```

```
 1   will take, the hearing.
 2             THE COURT:  Well, you know, Mr. Quinlan actually, you
 3   know, put his finger on something.  You know, you may need to
 4   go back in light of some of the rulings we made on topics that
 5   we're going to exclude or not exclude.  That may pare down some
 6   of these -- reduce the number of objections.
 7             MS. BARRANCO:  Um-hum, yeah.
 8             THE COURT:  I'm available -- all right.  Do you want
 9   to do Thursday?  Tell me -- nine o'clock?  Or do you want to do
10   it in the afternoon?  Again, I'm not sure how long this will
11   take.  Do you think we could do it in an hour or two?  I just
12   don't have a sense for the volume that we're --
13             MR. QUINLAN:  Yeah.  I mean, I'm kind of just thinking
14   in my mind which ones are gonna drop by the wayside and what
15   rulings would affect what I remember to be objections.
16             THE COURT:  Yeah.
17             MR. QUINLAN:  I think two hours should, if not
18   complete it, put enough of a dent in it.
19             THE COURT:  What works better for you all?  Morning or
20   afternoon?
21             MR. SCAROLA:  I think I'm good either way.
22             MS. BARRANCO:  Probably morning, your Honor.
23             THE COURT:  All right.  Do you want to say nine a.m.
24   on Thursday?  And we'll do that.
25             MR. QUINLAN:  Yeah, ten might be better for us, just
```

1    because the drive --

2          **THE COURT:**  Traffic?

3          All right.  Ten a.m. Thursday.  All right.

4          Why don't we do this also.  And this maybe ties into

5    the next thing I was gonna address.  And maybe Thursday we

6    could follow up on this, also.  The issue of the juror

7    questionnaires.

8          Have you all had a chance to think about it, talk

9    about it?  I indicated I'd be amenable to the idea,

10   particularly if you can all agree on questions that should go

11   into the questionnaire.  I don't know.  Has there been

12   discussion?

13         **MR. SCAROLA:**  We have not discussed it, your Honor.

14         **THE COURT:**  Okay.

15         **MR. SCAROLA:**  But knowing that your Honor is amenable

16   to it --

17         **THE COURT:**  Yeah.

18         **MR. SCAROLA:**  -- I will put together a proposed

19   questionnaire.

20         **THE COURT:**  Okay.

21         **MR. SCAROLA:**  I'll get it to defense counsel within

22   the next couple of days.

23         **THE COURT:**  Okay.  Why don't we talk about that then

24   on Thursday, after we go through these depo's.

25         Anything else with regard to the trial procedure?

1        There is some discussion we had about giving the

2   jurors the instructions on the front end.

3        **MR. SCAROLA:**  Right.

4        **THE COURT:**  You know, my concern is, I think I

5   mentioned at the time, is the risk.  You know, when I was in

6   the county court, I used to do them on DUIs, give them the

7   instruction upfront.  It was never -- nothing ever changed on

8   those, and they're just boilerplate instructions.

9        But that's often not the, you know, the case -- the

10  situation in other cases.  What you think might be an

11  appropriate instruction on the front end may -- once the

12  evidence comes in, may not be on the tail end.  Of course, at

13  that point, it's the genie is out of the bottle.

14       You know, most cases are reversed on improper jury

15  instructions, so, you know, I want to be very careful about

16  that.

17       On the other hand, if you all agree on certain

18  instructions that are rock solid, that are not at all, you

19  know, gonna be subject to change, then, you know, I'll do it.

20  But, you know, that's my concern, that without knowing how this

21  is going to play out, giving it to them beforehand could lay

22  the seed for reversible error.

23       **MR. SCAROLA:**  The current standard state court

24  instructions anticipate that concern --

25       **THE COURT:**  Yeah.

1          **MR. SCAROLA:**  -- and inform the jury that these are

2    preliminary instructions only, and it is possible that, as a

3    consequence of developments during the course of the trial, the

4    instructions to be given to the jury at the conclusion of the

5    case may differ.

6          **THE COURT:**  Okay.

7          **MR. SCAROLA:**  But these are provided to you to give

8    you some general guidance as to what the legal structure, the

9    legal framework may be --

10         **THE COURT:**  Okay.

11         **MR. SCAROLA:**  -- for your deliberations.

12         **THE COURT:**  And what would you anticipate, that it

13   would just have the elements of a 1983 claim?

14         **MR. SCAROLA:**  I would anticipate that we would need to

15   have the elements of both the state --

16         **THE COURT:**  And the battery.

17         **MR. SCAROLA:**  -- battery claim and the 1983 claim.

18         **THE COURT:**  All right.

19         **MR. SCAROLA:**  That we would have general instructions

20   on believability of witnesses, burden of proof.

21         **THE COURT:**  Right.

22         **MR. SCAROLA:**  Those kinds of things --

23         **THE COURT:**  Okay.

24         **MR. SCAROLA:**  -- which we know aren't going to change.

25         **THE COURT:**  The standard instructions.

283

1          **MR. SCAROLA:**  Yes, the standards.

2          **MR. GIUFFREDA:**  We have all those, your Honor.

3          **THE COURT:**  Okay.

4          **MR. GIUFFREDA:**  I even have a state law -- there is no

5    pattern state law battery civil claim, and I have one I think

6    that Judge Hurley wrote that I use.

7          **THE COURT:**  All right.  If you want to come -- if you

8    can agree on instructions to give beforehand, I'll be happy to

9    do it.  If they're not, as I say, the sorts of instructions

10   that are going to be, you know, shown to be in error later on,

11   if it's just the basic elements of the offense, you know, that

12   should be okay.

13         **MR. SCAROLA:**  Well, I will take responsibility for you

14   in the first draft on the questionnaire.

15         **THE COURT:**  Okay.

16         **MR. GIUFFREDA:**  We'll do a draft of the jury

17   instructions?

18         **MR. SCAROLA:**  You can do the jury instruction draft.

19   That will be fine.

20         **THE COURT:**  All right.  We'll talk about that then on

21   Thursday, also.

22         I appreciate -- I'll ask you if you could submit your

23   proposed order on my rulings on the motions.  You don't have to

24   get into the substance.  You can just say, For the reasons on

25   the record.  But I think we tried to keep track of everything,

```
 1   but I want to make sure everybody's on the same page.

 2          Thank you for your efforts, not just your patience

 3   today, but these motions were very well briefed.  As I said, I

 4   reviewed them a few times and spent a lot of time on this,

 5   particularly the issue of expert testimony in the use-of-force

 6   cases.  I didn't go through the collection of cases I have, but

 7   there's a lot.  I read through it and really tried to think

 8   what would be fair, what would be appropriate, obviously what

 9   would be in conformity with the Federal Rules of Evidence.  And

10   I really appreciate your efforts on this.

11          MR. SCAROLA:  Your Honor, when we draft the order with

12   regard to the experts, in light of the Court's ruling --

13          THE COURT:  Yeah.

14          MR. SCAROLA:  -- what we would probably do, with your

15   permission, is just reflect that we have withdrawn

16   Dr. Alpert --

17          THE COURT:  Okay.

18          MR. SCAROLA:  -- having been given the choice as to

19   whether to use Dr. Alpert or Chief Tucker.

20          And the reason for that is that, obviously, there are

21   negative repercussions --

22          THE COURT:  Right.

23          MR. SCAROLA:  -- if there were to be an order entered

24   excluding his testimony, and I don't think that that was your

25   Honor's intent.
```

1          **THE COURT:**  All right.  Fair enough.

2          **MR. SCAROLA:**  Thank you, sir.

3          **THE COURT:**  That's a very thoughtful thing to do for

4    him.

5          **MR. GIUFFREDA:**  And if I may say, Judge, thank you for

6    your effort, and you're so very well prepared, and it makes our

7    lives a little easier too.

8          **MR. SCAROLA:**  It does, indeed.  Thank you.

9          **THE COURT:**  Well, my pleasure.

10         We will see you on Thursday.  You may want to bring

11   your proffers also, maybe on Thursday, of your expert witness

12   testimony so we can go through that and hopefully tie up any

13   loose ends.

14         And, again, thank you.

15         **MS. BARRANCO:**  Thank you, your Honor.

16         **ROOM CLERK:**  All rise.

17         *(Discussion had off the record)*

18         **THE COURT:**  Does either side -- generally, we use a

19   court reporter when we're taking testimony.  When we're not,

20   just oral argument, we use the audiotape.

21         It's either side -- if either side wishes for us to

22   have a court reporter, we'll order a court reporter.

23   Otherwise, we'll just use the audiotape.  Either side --

24         **MR. GIUFFREDA:**  For Thursday's hearing?

25         **THE COURT:**  For Thursday.

286

1          **MR. GIUFFREDA:**  It doesn't matter to me.

2          **MR. SCAROLA:**  I don't think it will be necessary.

3          **THE COURT:**  Okay.

4          All right.  Fran, you're off the hook.  We'll just go

5     with the audiotape.

6          **LAW CLERK:**  Judge, is there a date certain that you

7     want them to the submit the agreed order memorializing --

8          **THE COURT:**  Oh, if you could just do that in the next

9     couple of days, you know, memorializing my rulings.

10         **MR. QUINLAN:**  Today?

11         **THE COURT:**  Today's rulings.  Bring it Thursday, since

12    we're doing everything else Thursday.

13         **LAW CLERK:**  On Thursday.  Okay.

14         **MR. QUINLAN:**  The transcript.

15         **THE COURT:**  All right.  Thank you.

16         **LAW CLERK:**  Thank you, Judge.

17         *(The Judge exited the courtroom)*

18         *(Proceedings concluded at 6:05 p.m.)*

19                        -  -  -  -  -

20

21

22

23

24

25

```
 1                        INDEX OF WITNESSES

 2   PLAINTIFF'S WITNESS                     PAGE

 3   Geoffrey P. Alpert
     Direct by Mr. Quinlan                    31
 4   Cross by Ms. Barranco                    43
     Redirect by Mr. Quinlan                  47, 49
 5
     Melvin L. Tucker
 6   Direct by Mr. Quinlan                    53
     Cross by Mr. Giuffreda                   69
 7   Redirect by Mr. Quinlan                  88, 96

 8   DEFENDANTS' WITNESS                      PAGE

 9   Emanuel Kapelsohn
     Direct by Mr. Giuffreda                 100
10   Cross by Mr. Quinlan                    116
     Redirect by Mr. Giuffreda               122
11

12                    -   -   -   -   -

13

14

15

16

17

18

19              C E R T I F I C A T E

20    I certify that the foregoing is a correct transcript from

21    the record of proceedings in the above-entitled matter.

22

23
        /S/Francine C. Salopek              1-12-16
24    Francine C. Salopek, RMR-CRR        Date
      Official Court Reporter
25
```

**$**

**$13,800 [1]** 54/21
**$30 [1]** 61/9

**'**

**'05 [1]** 69/15
**'14 [1]** 27/2
**'66 [1]** 53/10
**'78 [1]** 100/16
**'80s [4]** 32/16 32/22 36/3 36/13
**'90s [2]** 36/3 36/13

**.**

**.08 [1]** 210/22
**.2 [1]** 69/24
**.2 seconds [1]** 69/24
**.26 [6]** 67/8 69/25 70/1 70/4 70/9 194/4
**.26 seconds [4]** 67/8 70/4 70/9 194/4
**.48 [1]** 70/11
**.48 seconds [1]** 70/11

**/**

**/S/Francine [1]** 287/23

**1**

**1,000-mile [2]** 68/15 68/16
**1-12-16 [1]** 287/23
**1.5 [1]** 67/5
**1.5 seconds [1]** 70/24
**1.7 seconds [2]** 67/5 70/24
**10 [4]** 130/20 155/17 155/17 187/3
**10-10-10 [1]** 155/17
**100 [1]** 287/9
**105 [2]** 12/18 19/10
**10:05 [1]** 1/7
**10:05 A.M [1]** 3/1
**11 [5]** 43/15 86/7 132/16 132/23 190/8
**11 o'clock [1]** 7/8
**110 years [1]** 66/8
**116 [1]** 287/10
**12 [3]** 96/9 97/5 278/16
**12 o'clock [1]** 7/7
**120 [1]** 101/18
**1216 [1]** 2/8
**122 [1]** 287/10
**12:18 [1]** 97/15
**12:19 p.m [1]** 97/24
**12:30 [1]** 97/15
**12:35 [3]** 97/16 97/17 97/22
**12:37 p.m [1]** 97/24
**13 [3]** 78/3 83/8 132/25
**130 [1]** 101/18
**135-pound [1]** 132/15
**13th [2]** 207/12 221/2
**14-80425-CIV-BSS [1]** 1/4
**14th [1]** 197/11
**15 [3]** 61/17 151/24 159/18
**15 years [1]** 56/24
**15,000 [2]** 37/17 101/8
**150 [1]** 38/13
**150 years [2]** 66/3 66/5
**1504 [1]** 213/18
**1511 [1]** 213/18
**16 [4]** 57/20 131/17 140/24 287/23
**16 hours [1]** 37/12
**16-hour [1]** 37/9
**162 [1]** 56/15
**17-year-old [2]** 130/20 157/17

**170-odd [1]** 33/8
**179 F.Supp.2d 847 [1]** 213/6
**17th [1]** 64/5
**18-year-old [1]** 132/15
**1844 [1]** 66/3
**186 [1]** 98/14
**186-2 [2]** 96/13 117/19
**188 [3]** 11/9 11/17 26/10
**19 years [2]** 102/10 102/19
**192 [4]** 26/24 127/17 134/18 166/1
**193 [2]** 202/23 202/23
**194 [5]** 27/23 27/23 28/9 77/11 77/17
**194-2 [3]** 29/10 30/12 31/20
**195 [3]** 202/22 235/2 235/24
**1965 [1]** 53/10
**1974 [1]** 55/19
**1977 [1]** 100/16
**1980 [3]** 32/3 34/16 34/23
**1981 [1]** 34/23
**1983 [3]** 141/11 282/13 282/17
**1985 [2]** 59/5 92/14
**1986 [1]** 138/18
**1987 [1]** 205/19
**1989 [2]** 59/5 205/18
**1990 [1]** 34/8
**1994 [2]** 57/2 213/18
**1:16 [1]** 125/8
**1:18 p.m [1]** 126/23
**1st [2]** 50/15 50/23

**2**

**20 [5]** 30/20 49/8 68/1 97/5 129/20
**20 years [1]** 102/3
**20-some [1]** 34/12
**20/20 [2]** 49/8 68/1
**200 [1]** 212/24
**2000s [2]** 35/16 36/14
**2001 [1]** 86/7
**2003 [1]** 25/22
**2008 [2]** 57/24 102/15
**2009 [1]** 178/22
**201-1 [1]** 52/15
**201-2 [1]** 30/20
**2010 [4]** 130/20 145/14 155/17 159/3
**2011 [4]** 83/18 131/6 145/14 159/3
**2012 [6]** 102/15 131/17 132/15 145/14 159/2 159/3
**2013 [7]** 78/3 78/8 80/23 82/25 83/8 133/1 241/10
**2014 [12]** 23/4 24/7 24/8 25/17 26/9 31/9 98/23 127/21 146/20 154/4 155/15 161/5
**2015 [3]** 24/13 27/2 141/9
**2016 [4]** 1/7 3/1 3/7 127/1
**203 [1]** 212/24
**205F [1]** 2/11
**21 [1]** 117/19
**211 [2]** 7/21 9/6
**2139 [1]** 2/4
**217 [3]** 267/14 267/16 267/17
**219 [1]** 267/11
**21st [1]** 36/8
**22 [1]** 129/15
**23 [1]** 159/21
**24 [1]** 159/21
**24 inches [1]** 109/8
**24-year-old [1]** 131/17
**2455 [1]** 2/7
**25 [4]** 98/22 98/23 276/5 276/6

**26 [1]** 58/11
**27 [2]** 55/12 58/11
**28 [1]** 52/20
**29 years [1]** 102/1
**299 [1]** 2/11
**2:02 [1]** 127/1

**3**

**30 [2]** 112/4 257/15
**30 days [1]** 55/10
**30 years [6]** 32/23 67/7 67/19 244/24 245/4 245/8
**300 [1]** 103/4
**31 [3]** 127/21 161/5 287/3
**31st [1]** 146/20
**32 F.3d 1504 [1]** 213/18
**32 years [1]** 102/23
**327 [1]** 213/13
**33301 [1]** 2/11
**33304 [1]** 2/8
**334-335 [1]** 213/13
**33477 [1]** 2/5
**335 [1]** 213/13
**35 years [1]** 105/19
**35-page [1]** 26/15
**350 [1]** 58/22
**350 pages [1]** 101/23
**36 [2]** 56/22 100/23
**36 years [2]** 34/19 42/25
**362 [1]** 56/23
**3626 [1]** 2/4
**398 [2]** 61/7 75/2
**3:30 [1]** 97/11

**4**

**40 years [3]** 62/12 80/25 84/17
**40-some [1]** 81/15
**403 [14]** 208/12 209/23 210/4 216/24 222/5 222/9 222/14 228/23 230/16 230/17 230/22 232/10 232/12 252/11
**43 [1]** 287/4
**45 [1]** 56/15
**45 minutes [1]** 125/5
**45-officer [1]** 55/8
**47 [1]** 287/4
**49 [1]** 287/4
**4:30 [1]** 226/23
**4:45 p.m [1]** 235/15
**4:57 p.m [1]** 235/15

**5**

**5.2 degrees [1]** 121/17
**50 feet [1]** 258/3
**50 years [1]** 65/10
**500 [2]** 119/23 119/24
**500.00 [5]** 96/8 96/19 119/9 119/16 120/1
**51 [1]** 96/7
**520 [1]** 91/22
**53 [1]** 287/6
**548 So.2d 656 [1]** 212/19
**55 [1]** 102/25
**58 years [1]** 100/22

**6**

**6-6-12 [1]** 96/9
**60 [1]** 155/14
**60 pages [1]** 101/21
**60 seconds [1]** 258/5

**6**

**60487 [1]** 26/15
**609 [8]** 211/9 223/21 227/15 228/9
 228/22 230/18 230/21 233/9
**61 pages [1]** 155/21
**64 years [1]** 100/21
**65-year-old [2]** 63/20 249/6
**656 [1]** 212/19
**658 [1]** 212/19
**664 F.2d 200 [1]** 212/24
**69 [1]** 287/6
**6:05 p.m [1]** 286/18

**7**

**702 [1]** 28/19
**76 [3]** 61/14 86/15 239/12
**76 rounds [4]** 89/14 89/16 89/20 89/21
**766 F.2d 327 [1]** 213/13
**769-5657/mjsfcs [1]** 2/12
**7th [2]** 8/18 8/20

**8**

**80 milliseconds [1]** 112/4
**800 [1]** 54/20
**847 [1]** 213/6
**853 [1]** 213/6
**87 [3]** 58/11 58/13 58/18
**88 [1]** 287/7

**9**

**911 [1]** 130/22
**92 [1]** 56/15
**95 [2]** 137/21 137/22
**954 [1]** 2/12
**96 [1]** 287/7

**A**

**A-L-P-E-R-T [1]** 31/5
**a.m [6]** 1/7 3/1 179/10 192/20 279/23
 280/3
**Aaron [3]** 7/21 9/9 126/6
**abandon [1]** 196/12
**abandoned [1]** 189/11
**abilities [2]** 106/20 107/21
**ability [13]** 69/4 75/9 92/23 92/24
 106/24 107/10 204/2 206/20 208/11
 209/5 209/23 213/3 213/20
**above [1]** 287/21
**above-entitled [1]** 287/21
**absence [5]** 190/8 214/9 219/2 253/1
 253/3
**Absent [1]** 211/13
**absolute [3]** 11/1 46/19 145/20
**absolutely [2]** 146/7 238/3
**abstract [2]** 198/17 201/12
**abuser [1]** 204/15
**academia [1]** 38/22
**academic [1]** 186/14
**academies [3]** 39/14 39/15 103/22
**academy [5]** 39/12 54/23 56/3 101/6
 101/14
**accept [2]** 137/17 203/5 258/21
**acceptable [1]** 117/14
**accepted [13]** 38/21 52/16 52/21 54/22
 60/13 65/12 103/18 104/12 108/21
 118/22 131/22 133/17 182/5
**accepting [2]** 134/4 252/18
**accepts [2]** 133/7 167/1

**accident [3]** 205/1 206/19 213/14
**accommodate [2]** 277/1 278/8
**accommodating [1]** 51/2
**accordance [1]** 29/15
**according [8]** 70/2 132/21 138/8
 203/24 205/12 217/16 219/9 219/10
**Accordingly [1]** 140/7
**account [7]** 131/23 132/3 208/23
 224/11 224/12 224/13 266/8
**accountability [3]** 82/25 84/6 88/10
**accounts [3]** 133/16 133/16 134/5
**accuracy [3]** 89/1 118/11 177/21
**accurate [5]** 18/11 67/10 118/22
 194/21 212/12
**accurately [5]** 118/17 136/3 191/11
 209/17 213/3
**accused [2]** 139/19 256/10
**acknowledge [4]** 16/17 135/10 141/15
 217/3
**acknowledged [6]** 89/9 115/1 167/9
 185/3 220/23 244/10
**acknowledges [1]** 199/7
**acknowledgment [1]** 161/23
**acquired [2]** 39/2 257/19
**acronym [2]** 60/14 60/15 67/1
**across [5]** 97/13 110/24 123/3 125/6
 151/19
**act [7]** 14/13 14/23 44/9 67/4 67/5
 70/23 70/23
**acted [8]** 12/20 61/23 76/5 130/24
 131/23 133/3 164/3 206/14
**action [22]** 32/5 42/4 42/7 42/7 48/9
 66/16 66/16 66/18 66/19 66/20 67/3
 67/15 71/2 71/4 75/15 79/13 79/14 90/6
 95/17 113/9 164/20 190/9
**actions [13]** 46/5 61/22 75/12 83/3 90/8
 133/8 133/11 163/17 196/2 196/22
 221/21 225/4 249/13
**activities [2]** 39/24 41/20
**actuality [1]** 146/9
**ad [1]** 16/12
**ad infinitum [1]** 16/12
**Adams [9]** 3/10 77/12 131/17 131/24
 132/3 144/25 145/3 146/7 156/16
**adapt [1]** 108/6
**adapts [1]** 107/24
**add [2]** 207/18 259/5
**addict [1]** 204/17
**addiction [1]** 204/18
**addition [3]** 25/1 52/8 80/21
**address [25]** 4/11 4/16 5/20 5/24 12/16
 18/8 22/23 29/23 30/8 104/22 124/14
 143/11 148/23 162/13 163/7 186/18
 186/20 198/9 236/8 240/13 242/12
 267/6 267/20 272/6 280/5
**addressed [5]** 39/3 50/15 109/1 231/12
 247/22
**addresses [1]** 141/8
**adequacy [1]** 169/4
**adhere [2]** 165/6 200/2
**adherence [2]** 40/14 93/8
**adjudicated [7]** 129/7 129/9 129/14
 129/18 130/11 138/25 140/1
**adjudication [1]** 231/22
**adjunct [1]** 57/5
**administration [2]** 56/1 57/6
**administrative [4]** 20/20 26/5 93/14
 102/25
**administratively [1]** 95/21

**admissibility [5]** 127/11 169/25 170/1
 204/5 208/6
**admissible [5]** 169/22 211/12 211/14
 220/1 227/15
**admission [3]** 205/20 213/7 219/25
**admit [2]** 29/15 269/3
**admits [2]** 135/22 181/24
**admitted [11]** 30/12 87/10 88/4 88/6
 100/17 208/15 212/1 216/21 221/1
 228/11 232/9
**admitting [2]** 222/19 228/10
**adopt [5]** 29/19 51/25 91/2 91/4 98/24
**adopted [5]** 40/14 51/16 89/4 91/12
 91/16
**adopting [1]** 31/9
**adopts [1]** 119/16
**advance [4]** 177/19 202/15 263/15
 271/1
**advancement [1]** 55/23
**advantage [1]** 109/13
**advantages [1]** 185/24
**advice [2]** 264/10 266/9
**advised [1]** 263/14
**advocating [1]** 50/17
**Aetna [1]** 26/15
**affairs [9]** 83/1 83/4 83/16 84/7 84/18
 95/9 95/10 156/4 265/4
**affect [7]** 30/24 108/1 236/13 245/13
 250/3 260/9 279/15
**affected [1]** 207/11 236/16 255/6
**affects [4]** 106/25 107/25 193/19
 205/14
**affidavit [7]** 29/19 30/15 30/17 30/18
 30/19 52/9 52/19
**affirmative [2]** 48/9 196/23
**affirmatively [1]** 183/10
**Afghanistan [1]** 245/12
**afield [1]** 185/10
**afraid [1]** 61/18
**after-acquired [1]** 257/19
**after-action [1]** 32/5
**after-the-fact [1]** 164/22
**afternoon [12]** 8/1 116/6 125/20 125/20
 125/23 125/24 127/3 127/4 144/12
 278/10 279/10 279/20
**afterwards [2]** 75/16 112/15
**age [3]** 55/12 56/22 92/13
**agencies [11]** 38/21 41/25 61/5 61/10
 85/20 91/22 101/2 101/3 102/4 103/1
 115/17
**agency [13]** 21/13 44/6 55/1 87/20
 93/13 93/14 93/19 93/20 93/24 94/7
 95/4 95/8 95/21
**agency's [1]** 92/5
**agent [6]** 29/19 54/11 54/16 54/19 55/1
 85/25
**agents [1]** 54/20
**aggravated [1]** 15/19
**aggressively [1]** 18/19
**aggressor [3]** 14/16 196/7 196/7
**agree [28]** 14/22 44/19 49/9 71/15
 73/13 74/24 76/12 80/4 92/6 117/2
 120/4 180/8 183/19 191/4 191/9 191/12
 191/24 192/14 193/2 193/4 195/23
 195/23 220/8 226/25 247/15 280/10
 281/17 283/8
**aid [1]** 175/9
**air [1]** 119/5
**AL [1]** 1/8

**A**

**alarm [2]** 106/17 114/3
**albeit [1]** 16/19
**Albuquerque [1]** 59/20
**alcohol [7]** 120/15 204/5 208/8 211/18 212/9 213/10 213/13
**alcoholic [1]** 213/8
**allegations [3]** 23/12 23/20 83/2
**allege [2]** 18/14 155/3
**alleged [5]** 141/19 142/25 148/5 176/10 213/2
**allegedly [3]** 18/20 155/2 157/14
**alleging [1]** 13/20
**allow [12]** 6/19 29/18 99/15 130/16 147/24 169/5 172/23 173/20 174/11 174/13 236/19 237/20
**allowed [4]** 117/13 120/18 190/13 198/24
**allowing [5]** 24/15 25/10 36/17 220/12 223/12
**allude [1]** 148/19
**alluded [1]** 198/18
**almost [6]** 33/19 56/23 58/16 65/10 90/11 128/15
**alone [3]** 104/14 126/17 208/4
**aloud [2]** 28/15 172/15
**Alpert [30]** 6/8 7/4 9/14 27/18 27/21 28/13 28/23 29/2 29/14 30/15 30/20 31/5 31/8 31/25 51/3 51/22 52/14 57/4 59/6 90/14 91/10 167/8 173/22 186/13 187/8 189/1 198/2 284/16 284/19 287/3
**Alpert's [5]** 27/8 27/9 92/12 174/6 186/7
**alternative [1]** 21/15
**alternatives [2]** 175/5 253/25
**although [6]** 23/2 131/20 134/12 199/9 275/10 278/10
**amenable [2]** 280/9 280/15
**amend [7]** 11/19 21/1 23/6 25/15 104/13 104/15 147/20
**amended [5]** 12/18 134/17 143/17 144/10 144/19
**amending [2]** 24/9 24/14
**amendment [11]** 11/21 12/4 21/16 23/17 24/19 25/4 94/23 103/9 180/2 180/5 223/14
**American [1]** 64/4
**ammunition [12]** 61/15 85/14 86/4 102/21 195/16 236/25 237/11 237/21 238/10 239/13 240/1 240/21
**amount [3]** 102/19 175/22 207/24
**amounted [3]** 140/10 140/23 163/16
**ample [1]** 129/4
**analysis [12]** 42/2 45/25 46/1 77/13 78/2 78/9 89/23 103/12 115/10 122/12 135/6 154/11
**analyze [2]** 48/1 48/4
**analyzed [4]** 175/1 175/4 175/7 175/8
**analyzing [4]** 69/2 111/24 115/13 178/24
**and/or [4]** 121/10 161/20 167/17 174/22
**Angeles [1]** 35/16
**Angelo [1]** 131/6
**angle [4]** 25/20 111/1 111/16 147/6
**answer [15]** 25/21 36/4 64/2 70/17 70/18 70/18 71/1 73/7 75/25 85/23 142/14 200/20 211/25 212/5 244/14

**answers [2]** 211/23 274/23
**Anthony [1]** 58/9
**anticipate [10]** 13/4 232/16 241/18 247/2 254/22 261/25 271/18 281/24 282/12 282/14
**anticipated [2]** 104/13 191/11
**anticipating [2]** 104/18 233/24
**anybody's [1]** 187/15
**anymore [2]** 268/1 268/3
**aol.com [1]** 2/12
**apologize [5]** 7/25 41/9 47/22 175/3 199/20
**apothecary [1]** 113/21
**Appalachian [1]** 55/25
**appeal [5]** 23/1 23/7 23/22 24/10 150/15
**Appeals [1]** 26/21
**appearances [2]** 2/1 3/14
**appellate [1]** 159/12
**apple [4]** 22/11 146/23 147/1 148/8
**applicable [2]** 121/13 171/23
**applicant [1]** 54/16
**application [1]** 42/24
**applied [10]** 10/13 40/19 40/20 40/20 41/23 54/22 55/23 56/21 56/21 135/7
**applies [3]** 103/8 106/13 199/23
**apply [8]** 39/4 42/16 64/12 69/1 89/3 103/11 166/23 232/5
**appointed [1]** 34/4
**appointment [1]** 278/16
**appreciate [12]** 97/2 104/25 105/2 158/24 159/7 160/7 186/22 220/10 220/13 250/22 283/22 284/10
**apprehend [1]** 92/19
**approach [9]** 4/8 5/8 7/18 10/20 44/15 59/14 117/25 236/2 254/14
**approached [1]** 13/11
**approved [1]** 138/3
**approving [2]** 8/15 137/1
**AR [1]** 61/17
**AR-15 [1]** 61/17
**area [15]** 30/7 39/24 41/8 41/17 112/19 121/16 179/8 184/22 187/10 189/17 216/9 216/11 218/22 218/23 258/14
**areas [2]** 41/20 252/12
**aren't [7]** 15/1 38/21 45/11 86/5 209/4 263/17 223/24
**argue [27]** 12/22 22/11 127/10 135/4 135/10 147/2 147/2 155/4 167/17 175/12 175/13 180/13 192/1 201/8 248/3 249/12 249/20 249/22 252/15 253/6 254/16 259/15 259/16 259/20 262/6 271/15 272/13
**argued [13]** 23/13 25/3 26/2 27/1 62/24 144/10 147/11 148/18 163/14 174/22 187/20 232/3 246/1
**argues [3]** 135/23 203/18 223/4
**arguing [9]** 20/9 50/18 104/11 160/11 187/15 240/3 254/12 254/19 255/23
**argument [74]**
**argument's [1]** 148/17
**arguments [10]** 18/2 19/9 20/19 22/14 22/25 26/8 160/8 180/6 198/9 270/3
**arise [2]** 158/18 274/8
**arises [4]** 171/8 261/17 265/18 274/9
**Arizona [1]** 102/7
**arm [1]** 216/2
**armed [11]** 19/19 20/1 71/18 79/8 82/2 102/11 112/13 132/17 170/23 179/4

245/15
**Army [2]** 53/7 53/8
**array [1]** 12/16
**arrest [9]** 61/14 64/20 64/23 120/18 139/12 157/3 181/22 195/13 231/13
**arrested [1]** 56/16
**arrests [2]** 231/23 231/24
**arrive [1]** 135/16
**articles [12]** 38/13 99/7 99/18 101/17 101/18 103/16 103/18 105/5 108/17 109/1 112/25 121/4
**articulate [2]** 67/22 168/1
**ash [1]** 56/19
**Ashville [3]** 56/5 56/7 56/15
**Asian [1]** 250/20
**asp [2]** 61/15 61/15
**aspect [2]** 148/21 194/1
**aspects [4]** 38/17 74/24 106/7 120/25
**assassination [1]** 246/2
**assault [4]** 71/25 72/3 131/8 249/8
**assaulted [1]** 132/22
**asserted [1]** 139/5
**assertions [1]** 137/15
**assess [1]** 68/23
**assessing [6]** 12/20 13/10 13/11 17/1 90/6 90/8
**assessment [40]** 19/18 19/25 38/18 47/23 48/1 48/2 50/3 61/24 61/25 63/8 65/6 65/8 65/13 65/25 79/13 80/24 88/24 89/19 89/23 116/10 133/17 170/13 170/17 174/16 175/20 175/21 183/12 184/4 187/24 191/13 191/14 198/8 199/18 199/21 199/22 200/10 202/1 225/3 227/3 256/5
**assessments [5]** 63/12 63/13 63/13 67/10 174/7
**assigned [5]** 8/16 53/11 53/19 102/16 238/16
**assigning [1]** 60/1
**assignment [1]** 88/1
**assist [10]** 60/4 61/4 77/6 111/23 115/12 179/14 181/1 181/2 183/17 184/14
**assistance [4]** 34/10 128/11 205/21 206/11
**assistant [1]** 3/16
**assisting [3]** 60/10 63/11 66/11
**associate [1]** 101/22
**associating [1]** 219/18
**Association [7]** 32/4 32/6 61/3 61/8 64/4 75/3 101/24
**assume [16]** 14/2 14/15 15/4 24/9 29/14 72/11 95/18 95/20 117/22 118/10 119/15 171/5 177/21 177/21 183/8 250/6
**assumed [8]** 89/4 116/10 116/11 116/17 116/19 116/23 117/1 118/9
**assumes [1]** 244/5
**assuming [26]** 13/20 14/5 14/7 14/9 18/4 24/1 43/21 43/22 44/13 45/11 48/12 48/14 49/23 49/25 77/12 77/21 77/25 85/25 89/1 93/1 148/15 173/22 188/1 195/6 207/2 272/11
**assure [1]** 33/10
**Atlantic [1]** 102/8
**attached [1]** 61/20
**attachment [1]** 30/17
**attack [5]** 37/9 68/19 70/19 71/2 213/19
**attacked [1]** 86/4

**A**

**attacking [1]** 169/22
**attacks [1]** 71/19
**attempt [9]** 21/1 22/8 22/10 117/3
 142/21 155/25 220/4 250/17 259/13
**attempted [2]** 130/23 157/13
**attempting [7]** 19/5 64/20 64/23 89/2
 118/18 146/14 272/12
**attend [2]** 105/22 105/23
**attended [1]** 111/22
**attitude [3]** 13/11 139/3 139/4
**attorney [14]** 32/13 84/25 103/8 156/9
 156/12 214/2 214/22 219/13 264/2
 264/3 264/4 265/14 265/16 265/22
**attorney's [8]** 155/20 156/8 205/20
 214/22 215/14 219/9 220/15 226/24
**attorney-client [1]** 265/22
**attorneys [6]** 9/2 49/17 158/2 167/17
 174/23 190/12
**attorneys' [1]** 8/17
**attributing [1]** 253/21
**audio [2]** 261/18 277/3
**audiotape [3]** 285/20 285/23 286/5
**auditory [5]** 74/25 105/10 106/21
 108/12 114/22
**August [3]** 31/8 98/22 98/23
**August 25 [2]** 98/22 98/23
**August 5 [1]** 31/8
**Augustine [1]** 101/13
**Australia [2]** 37/5 38/4
**author [1]** 101/19
**authorities [1]** 140/18
**authority [3]** 66/22 196/20 197/14
**authorized [4]** 21/12 45/23 49/4 96/14
**auto [1]** 205/1
**availability [1]** 162/8
**availed [1]** 263/7
**average [6]** 65/16 65/17 166/17 170/14
 174/20 183/16
**avoid [9]** 64/20 64/23 160/11 176/5
 193/14 194/2 194/22 196/1 196/12
**avoided [9]** 176/7 177/19 194/5 194/7
 194/8 194/10 195/8 195/15 195/21
**avoids [1]** 265/18
**aware [15]** 10/1 46/13 46/21 47/24 74/7
 84/24 85/1 86/1 86/5 86/7 89/8 244/25
 245/4 245/8 247/2
**awkward [1]** 35/21

**B**

**bachelor's [1]** 100/12
**background [7]** 31/18 32/1 33/4 53/3
 53/13 112/22 203/13
**backing [1]** 119/3
**badge [1]** 222/8
**bag [1]** 212/2
**baggie [12]** 220/22 221/2 221/14 222/4
 222/14 222/20 224/5 224/16 224/23
 225/25 226/9 226/10
**baggies [1]** 221/7
**balance [3]** 219/7 219/17 233/13
**balancing [3]** 219/19 234/22 251/3
**ball [2]** 144/5 189/3
**ballistics [3]** 106/9 116/22 116/22
**Baltimore [2]** 55/5 102/7
**bank [2]** 230/5 230/19
**bar [3]** 64/4 100/17 164/9
**barely [3]** 109/11 109/12 121/4

**Barnhart [1]** 2/3
**Barranco [18]** 2/6 2/7 3/22 20/17 28/12
 43/11 98/23 99/3 153/8 153/16 179/20
 212/3 237/2 245/12 247/16 260/7
 276/19 287/4
**Barranco's [3]** 47/18 49/1 158/4
**barrier [1]** 155/7
**barriers [1]** 159/9
**Barry [1]** 1/14
**basic [5]** 60/15 60/17 141/13 196/9
 283/11
**basis [15]** 11/21 84/20 87/9 104/19
 128/1 134/7 141/17 151/3 162/17
 211/20 248/1 249/24 251/13 252/16
 254/11
**basketball [1]** 59/17
**baton [4]** 61/15 61/16 168/19 237/3
**battery [5]** 166/5 250/10 282/16 282/17
 283/5
**batting [1]** 124/17
**Beach [22]** 2/4 2/5 3/9 19/16 89/15
 89/22 90/10 92/3 93/2 93/8 93/24 96/18
 101/14 119/10 131/22 137/14 137/23
 138/12 154/12 242/18 244/4 244/11
**bear [3]** 98/9 98/11 127/14
**bearing [2]** 122/12 122/18
**bears [1]** 228/11
**beats [1]** 71/2
**beautiful [1]** 247/11
**becomes [6]** 64/24 93/18 176/19
 201/21 251/4 274/2
**bed [1]** 147/5
**beer [1]** 87/17
**beforehand [5]** 165/16 170/24 196/22
 281/21 283/8
**begin [3]** 15/20 195/22 251/1
**beginning [1]** 124/16 173/5 266/22
 268/8
**begins [1]** 20/1
**begs [1]** 196/1
**begun [1]** 133/10
**behavior [7]** 211/3 219/11 221/17
 222/11 224/2 228/14 255/25
**behavioral [2]** 106/4 108/20
**behind [29]** 13/25 43/22 49/24 62/16
 82/9 109/5 113/2 113/5 114/1 121/25
 122/22 125/1 125/4 176/9 188/1 191/1
 209/13 217/24 217/24 218/4 218/8
 218/10 218/10 218/14 224/14 224/15
 224/20 224/23 255/15
**beings [1]** 75/21
**belabor [2]** 19/9 20/24
**belief [5]** 67/12 67/23 96/15 119/23
 158/22
**believability [1]** 282/20
**believe [54]** 6/24 15/9 16/2 16/6 16/23
 21/22 24/8 27/9 28/1 30/18 36/5 50/16
 50/18 60/14 67/12 78/21 79/6 80/5 80/5
 80/5 92/16 94/11 98/14 103/15 111/7
 115/15 129/3 130/15 145/14 150/6
 160/1 165/9 165/15 166/4 166/13 167/5
 167/9 168/25 170/16 172/11 178/8
 178/9 179/22 187/16 191/6 195/20
 216/16 217/18 217/19 218/24 244/8
 267/19 269/4 269/6
**believed [11]** 16/20 48/13 48/15 76/2
 76/21 78/14 131/3 156/2 168/21 188/4
 189/9
**believes [5]** 15/5 15/23 48/21 76/19

148/6
**belonging [1]** 248/19
**belt [1]** 22/16
**bench [2]** 113/18 114/7
**Bender [1]** 155/23
**benefit [6]** 166/18 263/15 263/20
 264/14 265/8 265/12
**bent [1]** 152/4
**Berks [1]** 102/11
**Bertsch [1]** 213/12
**besides [1]** 102/5
**bespeak [1]** 139/4
**betcha [1]** 55/10
**beverages [1]** 213/8
**beyond [5]** 12/12 14/20 190/13 254/25
 261/25
**bias [1]** 232/3
**bicker [2]** 119/7 188/22
**bicycle [22]** 20/2 20/4 74/2 74/4 74/12
 79/4 79/8 122/14 122/15 122/16 123/11
 170/23 178/13 179/11 187/13 187/16
 187/18 192/25 220/18 221/22 222/7
 252/23
**bicycle's [1]** 74/3
**bicyclist [3]** 18/18 257/13
**bifurcate [1]** 27/25
**bifurcating [1]** 10/18
**biggest [1]** 56/10
**bike [10]** 109/11 109/21 122/21 123/12
 174/18 177/23 216/4 225/2 225/15
 225/16
**Bill [4]** 70/6 70/7 74/24 106/2
**birth [1]** 16/12
**bite [6]** 22/11 124/8 127/6 146/23 147/1
 148/8
**black [23]** 13/25 15/14 20/2 20/4 65/4
 79/8 113/6 178/5 224/16 248/24 249/14
 250/1 250/6 252/3 252/5 253/17 253/25
 254/24 255/3 255/12 256/8 256/15
 256/16
**bladed [3]** 15/12 191/1 209/1
**blades [1]** 178/4
**blading [1]** 174/18
**bled [1]** 72/23
**bleeding [1]** 107/12
**BLET [8]** 60/14 60/15 60/16 60/16
 60/18 60/23 60/24 65/12
**blood [2]** 210/23 211/18
**blowout [1]** 261/12
**blue [2]** 18/19 75/17
**blueprint [1]** 277/8
**blunt [1]** 206/23
**Blvd [1]** 2/11
**board [2]** 54/9 102/1
**bodily [2]** 96/16 133/6
**body [11]** 15/13 106/16 106/17 110/9
 174/18 178/4 241/1 241/17 241/19
 241/19 241/24
**boil [2]** 22/6 180/25
**boilerplate [1]** 281/8
**bolt [1]** 109/22
**bombs [1]** 247/6
**book [2]** 83/17 101/19
**booked [1]** 276/16
**bootleg [1]** 70/11
**bootstrap [1]** 146/14
**bootstrapping [1]** 146/14
**Borut's [2]** 83/25 262/16
**bosses [1]** 67/22

**B**

**bottle** [1] 281/13
**bottom** [2] 84/20 93/23
**bottom-line** [1] 93/23
**Boulevard** [3] 2/4 2/7 151/22
**bound** [1] 145/19
**bounds** [1] 172/21
**box** [2] 114/4 156/22
**boy** [2] 130/20 157/17
**BRADSHAW** [9] 1/8 89/9 98/3 127/7 165/11 166/6 178/19 178/20 235/23
**Bradshaw's** [3] 163/14 164/11 164/12
**brainstorm** [1] 278/19
**brakes** [1] 122/23
**Brandon** [2] 213/5 213/8
**Brandon vs. Village** [1] 213/5
**breach** [5] 14/5 14/6 18/4 19/17 21/13
**breached** [3] 13/20 18/12 26/18
**breaches** [1] 19/11
**break** [17] 14/4 15/11 15/15 16/3 69/9 97/7 97/8 97/12 97/20 97/22 123/25 124/3 124/3 124/7 124/21 125/8 235/4
**breakfast** [1] 181/21
**breaks** [1] 17/14
**breath** [1] 210/23
**brief** [11] 25/19 41/7 52/23 138/20 148/20 159/15 160/16 160/18 196/17 196/19 197/2
**briefed** [1] 26/2 284/3
**bright** [2] 63/17 108/2
**broad** [3] 39/20 179/10 236/23
**broadens** [1] 12/10
**broke** [2] 22/4 22/4
**broken** [1] 14/13
**brother** [3] 54/16 54/18 56/18
**Broward** [2] 2/11 39/11
**Brusseau** [1] 152/11
**BSS** [1] 1/4
**building** [5] 108/3 125/1 125/4 156/23 157/2
**buildings** [1] 110/11
**bullet** [3] 30/4 173/9 187/1
**bullet-pointed** [1] 30/4
**bulletin** [2] 38/19 108/19
**bullets** [2] 22/15 182/10
**burden** [3] 154/18 169/20 282/20
**bureau** [1] 33/14 34/10 54/20
**burning** [1] 157/19
**bus** [1] 237/7
**business** [2] 131/19 201/6
**but-for** [1] 16/9

**C**

**C's** [1] 183/24
**cafe** [3] 37/9 37/11 37/14
**cafeteria** [2] 125/2 126/20
**calculate** [1] 116/24
**calendar** [2] 276/9 276/25
**call** [25] 3/8 51/7 57/25 62/7 62/13 62/14 67/11 67/16 79/5 87/25 111/5 117/1 138/22 151/24 184/13 194/25 195/8 219/24 219/24 220/9 260/14 261/20 273/11 274/9 274/18
**called** [18] 36/20 36/22 61/1 66/15 66/18 67/1 70/11 83/18 101/19 102/10 105/25 106/17 106/18 132/8 175/10 201/15 206/17 257/18
**calling** [7] 36/15 130/22 151/17 209/20

222/25 273/10 274/13
**calls** [1] 205/1
**Camberdella** [11] 132/16 144/24 145/6 145/7 146/5 150/6 150/16 150/25 157/8 161/7 161/8
**camera** [25] 75/23 79/22 79/25 80/6 80/7 108/23 109/6 109/10 109/25 109/25 110/1 110/2 110/4 110/7 110/18 111/16 121/2 156/1 157/5 157/6 178/3 241/1 241/17 273/4
**cameras** [6] 110/9 110/10 110/11 110/11 241/19 241/25
**camouflage** [1] 14/5
**candid** [1] 258/4
**candidate** [1] 53/10
**candor** [1] 220/10
**capacity** [1] 56/4
**capsicum** [1] 61/16
**car** [34] 14/9 62/16 62/17 62/25 62/25 63/17 63/19 63/20 63/20 63/22 63/22 63/22 78/25 80/9 108/1 109/23 111/1 116/25 122/13 122/17 131/19 131/21 151/15 156/21 156/22 172/2 173/9 181/20 182/10 183/1 187/9 223/19 268/1 268/2
**Caravella** [1] 58/9
**careful** [4] 169/20 222/9 252/11 281/15
**Carolina** [4] 55/20 56/3 56/5 57/24
**carried** [1] 214/13
**carry** [6] 13/18 61/19 71/25 72/5 86/24 237/11
**carrying** [8] 71/24 89/20 221/12 221/23 224/6 237/10 238/13 239/25
**carryover** [1] 92/25
**cars** [6] 94/12 123/2 174/19 216/6 225/2 225/17
**castles** [1] 143/25
**catastrophe** [1] 37/18
**catch** [3] 6/16 6/21 129/15
**catch-22** [1] 129/15
**causal** [2] 135/12 162/23
**causation** [14] 14/4 14/13 15/12 15/15 16/3 16/8 16/16 17/14 22/5 25/19 25/22 26/18 165/5 165/7
**cause** [16] 14/4 14/12 14/24 16/16 16/21 16/25 17/21 18/6 18/6 24/15 25/25 26/18 92/16 164/16 164/23 196/15
**caused** [3] 14/20 19/3 83/7
**causes** [1] 137/12
**caveat** [1] 247/22
**caveats** [1] 31/11
**CDC** [1] 34/11
**cell** [26] 22/3 45/18 45/19 45/22 67/13 79/2 111/3 111/3 113/9 167/5 176/10 176/12 178/7 187/18 189/14 191/4 191/18 191/19 191/24 214/20 215/7 215/16 217/2 217/4 217/11 218/16
**center** [2] 70/2 80/8
**centers** [1] 152/1
**century** [1] 36/9
**certainty** [1] 60/4
**certification** [3] 57/13 105/25 114/20
**certifications** [3] 100/9 105/8 105/20
**certified** [11] 57/22 100/25 105/13 105/14 105/16 106/2 106/6 114/19 228/3 229/1 230/8
**certify** [1] 287/20
**cetera** [13] 60/1 79/15 79/15 121/1

170/24 170/24 209/1 209/2 238/9 238/9 239/14 239/14 255/24
**chain** [11] 14/4 14/13 15/11 15/15 16/3 17/5 17/6 17/9 17/14 22/5 26/18
**chairman** [4] 56/3 56/24 56/25 60/22
**chairs** [1] 123/6
**challenge** [3] 72/23 206/20 269/3
**challenged** [1] 208/21
**challenging** [1] 148/4
**chance** [3] 45/8 45/15 280/8
**chances** [1] 173/20
**character** [4] 226/15 227/11 232/6 246/2
**characterization** [1] 225/5
**characterized** [1] 130/4
**charge** [3] 220/10 61/9 216/23
**charged** [3] 142/9 142/10 142/24
**charges** [3] 142/18 142/23 212/1
**checklist** [1] 82/15
**cheese** [1] 124/20
**Chicago** [5] 65/21 66/1 66/5 90/23 110/13
**chief** [28] 8/21 8/24 33/14 38/19 55/8 55/12 56/7 56/22 57/17 88/17 90/5 109/17 140/3 167/22 167/23 173/24 174/16 176/18 177/17 185/3 186/13 187/23 191/11 249/5 269/14 273/6 274/13 284/19
**Chief Tucker** [9] 174/16 176/18 177/17 185/3 186/13 187/23 193/11 249/5 284/19
**Chief Tucker's** [1] 173/24
**chief's** [1] 139/19
**chiefs** [6] 32/4 32/6 61/4 61/8 75/3 87/23
**chiming** [1] 152/15
**Chipotle** [1] 71/24
**chocolate** [1] 37/9
**choice** [6] 13/5 19/6 174/3 174/9 274/11 284/18
**chomping** [1] 257/4
**choose** [6] 136/16 136/17 137/18 273/11 274/18 274/20
**choosing** [1] 136/12
**chose** [4] 19/11 72/24 153/14 242/12
**chronic** [1] 204/15
**Circuit** [17] 139/9 141/8 141/10 141/17 150/13 150/20 171/13 171/16 178/22 178/23 186/4 199/6 205/19 212/24 213/12 213/17 213/18
**Circuit's** [3] 11/2 138/17 162/3
**circumstance** [5] 13/12 19/1 94/15 122/1 133/15
**circumstances** [52] 12/19 13/2 13/10 14/21 15/19 16/5 16/25 18/17 18/21 19/2 24/25 64/11 64/15 68/4 68/8 68/10 69/2 78/8 81/6 81/16 131/8 131/13 131/15 133/12 134/10 136/13 137/18 137/23 139/7 140/14 141/24 161/25 175/23 176/1 180/9 180/10 181/17 181/17 181/18 182/12 192/8 192/11 192/15 193/13 194/18 199/1 199/23 248/12 249/11 258/10 266/2 266/4
**circumstantial** [5] 140/22 142/2 214/13 215/19 220/1
**circumstantial** [2] 137/8 138/9
**citations** [2] 136/22 164/25
**cite** [2] 164/17 169/22
**cited** [11] 75/5 80/20 140/17 140/18

# C

**cited...** [7] 149/2 171/6 171/7 171/13 178/20 199/6 214/2
**cites** [1] 178/23
**citizen** [1] 36/24
**citizenry** [2] 88/19 120/6
**city** [19] 32/8 32/20 33/7 33/11 33/15 33/19 57/15 100/16 101/1 101/11 102/8 102/8 110/12 138/18 139/14 139/15 139/22 140/3 140/9
**City's** [1] 139/1
**CIV** [1] 1/4
**civil** [7] 32/17 58/16 87/22 93/15 227/4 232/10 283/5
**civilian** [1] 112/17
**civilians** [1] 156/2
**claim** [54] 10/12 11/7 11/8 11/9 12/15 15/7 20/11 20/20 21/1 26/23 27/4 27/16 82/22 127/9 127/17 127/23 129/13 129/14 129/16 129/16 129/17 129/21 129/23 129/24 130/11 130/12 133/3 139/4 141/6 144/17 146/10 148/21 150/19 151/5 159/9 164/21 172/9 181/5 181/23 184/7 195/13 196/7 206/12 237/24 237/25 262/20 267/13 267/18 275/3 275/6 282/13 282/17 282/17 283/5
**claimant** [1] 138/25
**claimants** [1] 140/1
**claimed** [1] 157/22
**claims** [30] 4/15 5/6 7/2 21/7 74/11 124/15 128/21 128/23 129/5 129/6 129/6 129/8 130/16 130/19 138/24 139/2 139/5 139/25 147/25 153/19 166/3 166/4 168/21 173/9 187/9 190/3 190/25 216/3 216/21 248/18
**clarification** [6] 7/22 9/7 96/7 193/9 231/11 244/13
**clarify** [5] 47/20 49/19 81/5 231/15 232/1
**class** [5] 19/16 110/20 110/21 110/21 238/8
**Class C** [2] 19/16 238/8
**classroom** [4] 75/10 75/13 75/14 75/15
**clear** [14] 23/19 31/22 58/25 111/7 141/18 149/19 149/22 150/23 151/12 164/4 175/25 190/2 217/1 219/18
**clear-cut** [1] 151/12
**cleared** [1] 156/9
**Clemons** [1] 213/17
**clerk** [1] 124/4
**client** [1] 265/22
**clips** [1] 113/20
**cloaked** [1] 166/20
**clock** [1] 27/8
**close** [15] 7/7 9/18 92/13 98/18 100/21 107/4 107/6 107/7 107/8 122/22 184/13 219/24 219/24 220/8 267/5
**closely** [1] 122/23
**closer** [1] 125/22
**closing** [9] 166/19 167/18 170/18 171/2 174/23 180/6 180/12 240/4 254/16
**clothes** [2] 216/10 219/7
**clothing** [5] 215/20 216/12 216/14 216/14 217/14
**coached** [1] 264/23

**cocaine** [22] 142/10 142/18 142/19 142/21 213/24 214/1 214/2 214/10 214/17 214/23 215/12 215/19 215/24 216/25 217/3 217/13 218/18 219/5 219/19 222/15 227/15 234/15
**coding** [2] 277/23 277/24
**Cohn** [1] 58/8
**coincidence** [2] 218/25 219/4
**coined** [1] 106/10
**cold** [1] 107/11
**Cole** [1] 213/12
**Cole vs. Bertsch** [1] 213/12
**collaboratively** [1] 5/13
**collapsable** [1] 194/8
**collapses** [1] 165/8
**collection** [1] 284/6
**collectively** [1] 239/3
**college** [4] 38/9 39/9 39/10 53/4
**color** [5] 245/16 246/24 247/13 277/23 277/24
**colored** [3] 111/3 264/11 277/21
**colors** [1] 245/18
**combat** [7] 239/7 245/11 245/16 246/9 246/21 247/18 247/24
**combined** [1] 18/23
**combining** [1] 163/10
**comfortable** [5] 5/11 51/11 98/18 245/1 256/12
**commands** [1] 18/20
**comment** [6] 83/25 104/12 173/8 174/8 174/24 259/10
**comments** [6] 160/16 160/19 160/23 172/21 259/12 264/10
**commission** [6] 56/2 57/1 60/20 101/4 105/15 105/18
**commissioned** [1] 53/11
**committed** [1] 13/19
**common** [9] 66/13 86/10 86/12 86/13 86/15 86/24 133/2 182/22 183/16
**commonsense** [1] 180/4
**Commonwealth** [1] 101/3
**communicate** [13] 62/2 62/18 62/23 65/15 81/3 82/10 172/3 172/8 172/10 181/25 183/23 193/17 193/18
**communicated** [4] 81/22 137/13 178/12 184/3
**communicates** [1] 190/6
**communication** [1] 194/10
**communications** [2] 265/22 266/7
**community** [26] 36/5 36/7 36/15 36/21 36/22 38/15 39/9 39/9 57/3 90/21 187/4 234/13 234/14 234/15 238/15 240/22 242/5 242/9 242/10 242/13 242/21 243/3 243/16 243/21 243/22 254/3
**Company** [1] 213/13
**compared** [2] 90/23 149/6
**compelled** [1] 174/2
**competent** [2] 137/6 165/10
**competing** [1] 158/17
**complainant** [1] 149/9
**complaining** [1] 55/8
**complaint** [6] 23/14 24/9 24/14 145/1 155/3 156/20
**complaints** [9] 138/12 139/15 139/18 141/4 153/21 162/5 162/15 162/16 162/22
**complete** [3] 104/6 146/16 279/18
**completing** [1] 30/21
**compliance** [1] 33/14

**compliant** [2] 166/25 208/24
**complicate** [1] 275/9
**complied** [2] 171/19 183/19
**components** [1] 250/11
**comport** [1] 96/20
**comported** [1] 116/12
**comports** [3] 90/11 117/9 117/10
**comprehensive** [2] 32/11 35/7
**computer** [1] 1/25
**con** [1] 91/23
**conceal** [3] 62/3 65/15 82/4
**concealed** [1] 70/14
**concealment** [5] 62/16 62/22 81/2 82/9 194/10
**concede** [6] 30/6 134/11 135/1 173/12 212/7 222/13
**conceded** [3] 134/24 221/12 241/5
**concedes** [1] 134/25
**conceding** [3] 143/15 158/3 173/5
**concept** [7] 65/13 67/1 71/13 73/8 73/11 82/17 115/3
**concepts** [4] 74/25 75/8 75/10 115/2
**concern** [9] 10/10 18/7 21/20 72/25 167/19 176/18 281/4 281/20 281/24
**concerned** [3] 22/23 254/10 262/1
**concerning** [3] 135/20 201/25 212/25
**concerns** [3] 173/17 265/18 270/23
**concession** [2] 220/14 222/14
**conclude** [10] 83/6 130/17 131/4 131/15 132/13 136/4 140/7 148/25 210/19 249/7
**concluded** [4] 78/14 133/21 139/11 286/18
**concludes** [2] 201/20 225/18
**concluding** [1] 42/6
**conclusion** [23] 59/22 76/22 77/2 78/20 84/8 84/10 118/2 134/8 135/16 136/18 154/3 154/5 154/6 164/2 171/1 171/16 174/14 181/9 184/19 189/20 199/3 199/8 282/4
**conclusions** [5] 5/14 60/6 76/25 166/13 172/16
**conditions** [1] 107/23
**condo** [1] 237/16
**condone** [2] 138/10 142/4
**condoning** [2] 135/18 158/23
**conduct** [26] 12/5 21/24 22/2 34/6 39/4 40/8 60/13 65/12 116/12 116/18 117/4 117/7 117/9 132/12 133/8 134/7 135/11 136/16 137/6 138/4 154/11 158/23 162/5 163/25 214/19 256/10
**conducted** [5] 41/25 83/16 95/9 137/2 153/25
**conducting** [1] 176/6
**conference** [1] 10/5
**conferences** [2] 101/13 105/23
**conferred** [1] 268/13
**confess** [1] 229/8
**confirm** [1] 30/18
**confirming** [1] 133/18
**confirms** [3] 131/1 132/19 138/13
**conflagration** [1] 12/2
**conflict** [1] 209/3
**conflicting** [3] 133/20 133/25 134/2
**conflicts** [1] 133/16
**conformity** [1] 284/9
**confront** [1] 176/8
**confrontation** [3] 12/1 131/25 176/15
**confronted** [2] 18/19 256/14

**C**

**confronting [3]** 18/17 81/6 224/20
**confusing [1]** 22/18
**confusion [1]** 95/4
**Congress [2]** 103/2 159/13
**connect [2]** 142/19 142/21
**connected [1]** 206/25
**Connecticut [1]** 64/6
**connection [5]** 42/13 52/10 135/12
162/23 250/21
**Connor [16]** 49/6 59/2 64/12 64/13
67/20 67/25 72/12 76/3 76/14 91/25
92/1 96/21 116/12 119/17 119/19 120/2
**conscious [1]** 27/8
**consensus [1]** 124/9
**consent [6]** 26/14 33/1 33/6 33/16
33/17 35/16
**consequence [2]** 25/3 282/3
**consequences [1]** 67/18
**considerable [1]** 263/9
**consideration [3]** 68/2 89/21 179/14
**considerations [2]** 227/6 242/14
**consisted [1]** 139/18
**consistent [8]** 29/24 42/18 50/21 60/8
90/14 91/23 120/1 199/16
**consistently [1]** 70/8
**constantly [1]** 105/22
**constituted [1]** 129/8
**constitutes [1]** 25/25
**Constitution [5]** 50/22 66/22 90/22
91/3 92/8
**constitutional [35]** 33/16 40/13 40/15
40/24 42/20 46/13 66/21 66/21 91/13
93/3 93/9 94/1 94/18 94/21 95/2 95/25
128/14 129/24 135/24 136/7 137/3
137/9 137/11 138/5 138/7 141/12
141/15 141/19 141/21 149/19 149/22
149/25 162/18 162/24 164/6
**constraint [1]** 28/1
**construing [1]** 194/13
**consultant [1]** 103/4
**consulting [3]** 59/16 102/12 102/20
**consumed [1]** 213/8
**consumption [3]** 120/15 213/9 213/14
**contact [2]** 176/6 195/21
**contacted [5]** 55/11 55/20 56/5 56/18
57/18
**contained [2]** 83/9 185/20
**contemplating [1]** 181/19
**contend [1]** 11/22
**content [1]** 98/24
**contention [2]** 224/19 224/25
**contest [4]** 167/20 168/4 168/5 254/13
**contested [1]** 135/1
**context [14]** 25/23 26/4 64/16 72/4
78/25 79/5 104/10 190/2 230/1 242/11
247/2 265/17 267/1 270/7
**contexts [1]** 158/19
**continued [3]** 30/23 49/21 96/5
**continuously [1]** 56/18
**continuum [1]** 44/5
**contract [2]** 101/2 264/19
**contradict [1]** 137/15
**contradicted [1]** 263/25
**contradicts [2]** 136/17 224/12
**contrary [3]** 85/7 109/3 169/19
**contributed [1]** 80/23
**control [3]** 131/10 156/22 247/17

**convenience [2]** 110/25 192/24
**conversation [5]** 11/23 15/21 18/22
62/4 257/8
**conversational [1]** 5/12
**conversations [2]** 264/21 265/13
**convicted [11]** 228/1 228/25 229/4
229/10 229/19 229/19 230/1 230/19
231/2 231/4 232/23
**convicting [1]** 232/6
**conviction [15]** 211/4 211/9 227/14
227/19 227/20 227/23 228/5 228/18
228/19 228/20 229/1 230/8 231/24
232/12 233/10
**convictions [2]** 228/2 228/3
**convinced [1]** 87/7
**convincing [1]** 111/13
**Cooke [1]** 186/5
**coordinated [1]** 107/9
**coordination [1]** 106/24
**copies [4]** 60/24 228/3 230/8 277/21
**COPS [2]** 57/3 57/6
**copy [7]** 7/18 7/20 8/11 96/12 99/13
117/21 229/1
**coroner [2]** 38/3 38/4
**coronial [1]** 38/3
**corresponding [1]** 51/21
**corroborate [2]** 224/2 224/11
**corroborative [1]** 206/7
**corruption [1]** 56/8
**couch [1]** 197/8
**couching [1]** 199/2
**council [2]** 57/16 57/16
**counsel [37]** 3/13 5/17 8/11 11/11
22/24 31/16 43/5 66/21 85/10 96/23
99/13 113/16 126/22 143/14 144/20
147/18 149/1 150/17 154/23 155/1
158/1 161/13 165/25 205/21 235/3
235/13 255/22 262/23 263/8 263/15
263/15 264/3 264/11 264/14 265/23
266/9 280/21
**counsel's [6]** 112/3 123/8 166/19 180/6
180/12 264/15
**count [15]** 4/12 4/13 4/13 8/19 11/7
11/9 11/17 12/18 14/14 23/19 24/15
25/15 104/13 124/16 134/17
**Count 2 [1]** 134/17
**Count 4 [1]** 8/19
**Count 5 [8]** 4/13 11/7 11/9 11/17 12/18
25/15 104/13 124/16
**countries [1]** 39/16
**country [9]** 35/23 39/15 58/12 85/21
102/24 106/7 117/13 247/7 247/10
**county [18]** 3/9 35/8 69/15 89/15 89/22
90/10 96/18 102/11 119/10 131/22
137/14 137/23 138/13 154/12 237/10
242/19 244/11 281/6
**county-issued [1]** 237/10
**court [96]**
**Court's [9]** 130/15 134/14 135/2 138/23
180/7 202/16 232/19 259/16 284/12
**courthouse [3]** 3/7 58/4 126/18
**courtroom [15]** 3/2 9/15 58/10 97/23
97/25 112/9 123/5 126/4 127/2 142/12
204/14 235/14 235/16 278/11 286/17
**courtrooms [1]** 158/9
**courts [4]** 102/23 117/5 152/9 159/12
**cover [20]** 3/25 7/1 62/2 62/17 62/23
65/15 81/2 82/5 82/9 82/12 132/11
172/3 172/8 172/10 178/11 183/22

183/22 193/17 193/18 194/10
**cover-up [1]** 132/11
**coverage [1]** 38/20
**covered [2]** 184/3 239/2
**covers [1]** 267/19
**crack [11]** 169/8 214/10 214/23 215/12
216/25 217/3 217/13 218/17 219/4
219/19 222/15
**crackers [1]** 124/20
**create [1]** 95/4
**created [7]** 16/5 16/24 19/2 21/20
36/10 108/15 149/10
**credence [1]** 131/3
**credentials [1]** 54/11
**credibility [26]** 13/11 60/1 73/16
109/17 133/17 167/20 168/4 168/5
172/20 174/7 176/19 176/25 177/3
191/22 203/3 203/4 204/1 207/9 209/5
209/8 212/15 213/19 215/9 227/16
236/21 254/4
**credible [3]** 177/10 203/8 209/9
**crime [16]** 64/18 64/22 132/2 179/7
216/18 218/23 227/24 229/10 229/20
230/11 230/17 230/21 231/5 232/6
232/23 233/6
**crimes [2]** 155/20 266/14
**criminal [17]** 14/13 14/23 29/18 56/3
56/25 84/25 93/14 106/4 110/21 120/18
142/8 227/4 230/1 232/10 265/16
266/18 272/11
**criteria [1]** 40/5
**critical [1]** 85/13
**criticisms [2]** 157/21 157/23
**criticizing [1]** 182/2
**cross [22]** 27/12 27/13 31/15 43/8
43/10 69/8 69/11 99/4 116/2 116/4
169/18 203/16 212/17 212/25 213/22
236/20 236/20 237/20 267/3 287/4
287/6 287/10
**cross-examination [17]** 27/13 43/8
43/10 69/8 69/11 99/4 116/2 116/4
169/18 203/16 212/17 212/25 213/22
236/20 236/20 237/20 267/3
**crossed [1]** 5/4
**crosswalk [1]** 151/21
**crowds [1]** 35/24
**Crown [1]** 152/4
**CRR [2]** 2/9 287/24
**Cs [2]** 62/14 65/14 81/3 170/13
**cuff [2]** 263/18 265/12
**culpability [5]** 93/14 93/14 93/15 165/7
223/15
**culpable [1]** 93/18
**culture [1]** 37/20
**cumulative [3]** 272/9 272/16 275/1
**cups [1]** 113/19
**curiosity [1]** 165/21
**curious [1]** 17/24
**currency [1]** 38/10
**curriculum [1]** 101/4
**custom [5]** 141/21 148/25 161/19
163/8 262/18
**customs [1]** 32/21
**cut [5]** 11/13 151/12 216/10 216/13
216/22
**cutting [1]** 270/22

**D**

**D.C [4]** 94/17 94/17 94/21 102/6

О

**D**

**difference [8]** 65/3 68/16 137/24 140/11 175/14 189/14 222/18 264/25
**differences [1]** 108/23
**difficult [2]** 174/20 234/21
**difficulties [1]** 260/7
**difficulty [1]** 198/3
**digest [1]** 174/21
**dignity [1]** 36/17
**dilemma [3]** 71/21 72/2 72/7
**diminished [1]** 139/24
**Dimitrouleas [1]** 151/11
**direct [16]** 29/19 31/10 31/14 31/17 31/23 51/17 52/1 52/24 53/1 98/25 99/4 100/6 232/22 287/3 287/6 287/9
**direction [2]** 33/10 258/3
**directly [6]** 85/7 215/20 216/12 218/18 218/25 263/24
**director [2]** 32/14 55/17
**directors [1]** 102/1
**disagree [3]** 19/22 193/15 257/24
**disarm [1]** 189/7
**discard [2]** 214/24 221/24
**disciplinary [5]** 40/21 164/19 190/9
**discipline [3]** 140/21 141/5 164/22
**disciplined [2]** 93/21 140/25
**discovered [1]** 24/25
**discovery [4]** 72/24 144/14 144/18 146/16
**discrepancy [1]** 221/11
**discretion [4]** 25/4 25/9 135/2 249/25
**discretionary [1]** 230/4
**discuss [4]** 4/19 187/24 212/8 268/5
**discussed [2]** 118/21 280/13
**discussing [1]** 242/15
**discussion [17]** 29/25 31/16 36/10 43/5 46/1 85/10 96/23 126/22 142/5 166/22 233/6 235/3 235/13 242/2 280/12 281/1 285/17
**dishonesty [1]** 229/14
**dismount [4]** 73/25 109/21 216/5 225/17
**dismounted [2]** 187/18 259/3
**dismounts [1]** 20/4
**disparage [2]** 190/1 245/14
**dispatch [1]** 151/25
**dispute [1]** 48/14
**disputed [1]** 224/3
**disregard [5]** 136/15 137/3 161/24 162/22 162/24
**disregarding [1]** 162/15
**distance [3]** 109/4 109/8 151/20
**distinct [3]** 12/23 13/14 19/20
**distinction [6]** 13/5 13/7 94/17 207/15 244/18 258/20
**distinguish [1]** 205/6
**distinguished [1]** 149/5
**distracts [1]** 22/18
**distribute [1]** 234/16
**district [9]** 1/1 1/2 2/10 112/2 151/24 151/25 163/22 163/23 213/6
**District 15 [1]** 151/24
**District 9 [1]** 151/25
**district's [1]** 164/1
**disturbing [2]** 189/15 189/16
**ditch [2]** 215/23 215/24
**division [5]** 1/3 155/20 156/4 266/15 277/19

**DNA [7]** 214/1 214/7 214/8 216/23 218/21 218/25 219/2
**do-over [3]** 144/2 144/3 147/9
**docket [25]** 7/21 9/6 11/8 11/9 11/16 26/10 26/24 27/22 27/23 27/23 31/9 51/25 52/11 52/20 98/14 98/23 127/17 134/18 166/1 187/3 235/2 235/24 267/11 267/16 267/17
**doctor [8]** 33/3 44/19 45/21 46/13 47/12 57/10 103/21 265/9
**documents [1]** 104/4
**DONTRELL [75]**
**Dontrell's [2]** 118/21 217/7
**door [9]** 62/16 122/17 152/4 233/5 234/2 234/5 234/8 243/12 243/14
**dotted [1]** 5/4
**doubling [1]** 56/14
**doubt [1]** 182/8
**doubts [1]** 169/23
**Dr. [23]** 6/8 7/4 9/14 27/21 28/13 28/23 29/14 30/15 30/20 31/8 31/25 51/3 51/22 52/14 57/4 59/6 90/14 91/10 186/13 189/1 198/2 284/16 284/19
**Dr. Alpert [23]** 6/8 7/4 9/14 27/21 28/13 28/23 29/14 30/15 30/20 31/8 31/25 51/3 51/22 52/14 57/4 59/6 90/14 91/10 186/13 189/1 198/2 284/16 284/19
**draft [4]** 283/14 283/16 283/18 284/11
**drafted [1]** 53/7
**draw [6]** 63/25 70/13 70/15 178/10 207/3 226/15
**Drawer [1]** 2/4
**drawing [2]** 70/10 139/10
**drawn [2]** 168/24 258/1
**dreadlocks [11]** 248/24 249/15 250/2 250/6 252/6 253/18 254/24 255/4 255/12 256/8 256/16
**dress [8]** 18/5 19/13 21/11 86/13 86/15 239/6 240/14 240/24
**dressed [22]** 18/13 18/18 18/21/12 22/15 85/13 86/9 86/10 132/16 237/9 237/16 239/7 239/7 239/10 242/16 242/17 242/17 243/22 243/23 246/9 248/25 275/15
**dressing [1]** 18/13
**drive [1]** 280/1
**driven [1]** 63/20
**driver's [1]** 152/4
**drives [1]** 181/20
**driveway [2]** 73/23 225/16
**driving [4]** 63/20 78/25 122/13 182/10
**drop [5]** 63/25 63/25 132/19 224/23 279/14
**dropped [2]** 68/17 132/19
**drove [5]** 130/21 131/17 152/13 182/11 257/12
**drug [6]** 212/10 223/16 223/23 227/14 252/23 254/1
**drugs [17]** 204/3 204/5 211/4 211/4 212/12 212/20 212/25 213/1 213/19 214/25 215/11 215/12 216/2 223/19 225/13 251/20 252/10
**dual [1]** 230/21
**Duarate [1]** 26/15
**Duarate vs. Aetna [1]** 26/15
**duck [1]** 183/22
**ducks [1]** 111/9
**DUI [2]** 120/17 131/7
**DUIs [1]** 281/6

**Duke [1]** 64/7
**duplication [2]** 274/8 274/9
**duplicative [5]** 173/22 174/4 186/23 187/25 274/2
**duress [1]** 124/2
**duties [3]** 13/20 195/14 242/18
**duty [12]** 13/17 14/6 18/4 18/12 19/11 19/17 21/10 21/14 66/9 102/16 155/23 244/12

**E**

**ear [3]** 20/3 109/9 109/12
**earliest [1]** 25/24
**early [10]** 26/20 32/16 32/22 35/16 36/13 36/21 138/13 201/5 266/21 277/8
**easier [1]** 285/7
**east [1]** 57/21
**easy [2]** 181/3 181/8
**eat [1]** 127/6
**ed [2]** 50/14 50/23
**Edgar [1]** 54/19
**edification [1]** 26/3
**edited [1]** 266/22
**editing [1]** 271/2
**editor [1]** 101/22
**education [2]** 100/8 105/17
**Edwards [9]** 204/3 204/9 205/16 205/18 212/7 212/9 212/11 212/18 212/19
**Edwards v. State [2]** 204/9 212/19
**Edwards vs. State [1]** 212/7
**effect [4]** 206/23 207/22 224/9 225/24
**effective [2]** 96/9 207/6
**efficient [2]** 14/12 29/17
**effort [3]** 143/7 243/6 285/6
**efforts [7]** 38/15 139/1 142/21 143/6 151/20 284/2 284/10
**egregious [1]** 141/1
**Eh [1]** 220/15
**eight [7]** 179/10 189/21 192/20 252/23 262/23 267/8 269/8
**eight a.m [2]** 179/10 192/20
**eight o'clock [1]** 252/23
**Eighth [1]** 212/24
**Elaine [1]** 258/10
**elected [1]** 57/15
**electronic [1]** 114/4
**elements [3]** 282/13 282/15 283/11
**eleventh [17]** 11/2 21/1 141/8 141/10 141/17 150/13 150/19 162/3 171/12 171/16 178/22 178/23 186/3 199/6 205/19 213/17 213/18
**eleventh-hour [1]** 21/1
**elicit [1]** 234/12
**eliminated [1]** 270/14
**eliminates [1]** 211/8
**else's [1]** 214/8
**emanating [1]** 250/25
**EMANUEL [3]** 98/16 98/20 287/9
**embodied [1]** 88/25
**emergency [1]** 94/15
**eminently [1]** 184/23
**emphasized [1]** 94/20
**emphasizing [1]** 38/7
**employee [1]** 96/17
**Employees [1]** 96/14
**empty [4]** 43/22 49/24 176/9 176/12
**enabled [1]** 177/19
**encounter [5]** 88/19 89/2 121/11

**E**

encounter... [2] 194/22 258/5
encountered [2] 199/23 217/21
encountering [1] 82/16
encounters [2] 105/12 120/5
enforce [1] 195/9
enforced [1] 137/21
enforcement [62]
engage [1] 91/8
engaged [1] 182/3
engaging [2] 81/1 81/1
enjoying [1] 28/7
enlist [1] 243/5
entertain [2] 4/23 226/18
entirely [1] 186/19
entitled [4] 13/9 188/5 266/4 287/21
entry [27] 7/21 9/6 11/8 11/9 11/17
26/10 26/24 27/22 27/23 27/23 31/9
52/1 52/11 52/20 98/14 98/23 127/17
134/14 134/18 134/21 166/1 187/3
235/2 235/24 267/11 267/16 267/17
Entry 111-28 [1] 52/20
Entry 186 [1] 98/14
Entry 186-2 [1] 98/23
Entry 188 [3] 11/9 11/17 26/10
Entry 192 [3] 26/24 127/17 166/1
Entry 194 [2] 27/23 27/23
Entry 194-1 [1] 52/1
Entry 194-2 [1] 31/9 187/3
Entry 195 [2] 235/2 235/24
Entry 201-1 [1] 52/11
Entry 211 [2] 7/21 9/6
Entry 219 [1] 267/11
enumerate [2] 187/1 198/10
enumerated [1] 202/25
enumerates [1] 19/10 185/25
equipment [4] 13/18 237/11 240/14
240/21
error [5] 141/3 201/12 220/7 281/22
283/10
errors [1] 52/3
escalate [2] 12/2 14/21
escalating [1] 13/12
escape [1] 92/17
Esq [4] 2/2 2/2 2/6 2/6
essence [4] 12/16 64/16 158/2 180/7
essential [1] 135/6
essentially [16] 4/14 5/3 7/2 12/24
13/23 23/9 23/17 60/16 61/20 144/9
147/9 164/3 170/25 180/17 225/15
262/19
establish [5] 150/25 162/23 243/2
243/21 257/23
established [9] 24/20 60/21 78/4 80/22
81/7 96/21 136/25 140/21 190/18
establishes [1] 137/8
establishing [2] 135/8 254/22
establishment [1] 82/11
estimate [3] 10/14 10/21 101/6
estranged [1] 261/1
et [14] 1/8 60/1 79/15 79/15 121/1
170/24 170/24 209/1 209/2 238/9 238/9
239/14 239/14 255/24
et cetera [13] 60/1 79/15 79/15 121/1
170/24 170/24 209/1 209/2 238/9 238/9
239/14 239/14 255/24
ethics [1] 57/8
evaluate [9] 32/4 32/8 37/8 37/15 37/19

67/4 70/23 139/1 225/6
evaluating [3] 37/19 38/2 40/6
evaluation [1] 67/2
evaluations [1] 36/3
eve [1] 24/16
event [16] 16/18 17/11 17/14 22/4
26/18 37/25 38/1 38/1 87/17 110/14
141/20 141/23 204/8 204/10 204/21
231/20
events [21] 17/5 17/6 17/9 46/8 86/11
107/17 118/22 132/25 133/7 134/11
134/13 135/7 135/11 142/2 160/25
161/22 165/16 178/23 213/10 213/15
213/20
everybody [5] 5/15 5/18 57/15 98/4
126/13
everybody's [2] 124/18 284/1
everyday [2] 72/7 180/4
everyone [3] 37/24 142/19 142/19
Evett [1] 3/11
evidence [152]
evidenced [2] 83/21 238/17
evidencing [1] 239/17
evident [2] 248/14 248/16
evidentiary [5] 1/13 4/9 132/7 135/23
269/25
evolving [1] 68/4
examination [35] 27/13 29/20 31/10
31/23 43/8 43/10 47/1 49/21 51/17 52/1
52/24 53/1 69/8 69/11 88/15 96/5 98/25
99/4 99/4 100/6 116/2 116/4 122/8
137/17 169/18 203/16 212/17 212/25
213/22 232/22 236/20 236/20 237/20
258/3 267/3
examples [3] 12/17 104/1 110/16
exceeded [2] 137/20 138/4
exceeding [1] 230/2
exception [4] 6/19 169/16 228/21
228/24
excess [1] 101/8
excessive [50] 12/4 12/5 13/3 13/13
15/7 20/11 22/8 23/21 83/2 83/5 84/4
87/8 87/11 128/21 128/23 128/25 129/5
129/20 130/17 131/5 131/16 132/13
134/1 134/9 135/17 135/19 136/2 136/5
136/13 136/20 138/11 139/15 139/23
140/5 140/11 140/25 141/4 141/8 142/4
143/8 151/12 153/21 154/3 154/7
154/11 156/20 166/4 189/18 196/9
250/10
exchange [3] 30/11 185/15 202/17
exclude [12] 141/4 178/22 184/6 184/8
220/21 230/16 230/17 230/20 238/24
240/20 279/5 279/5
excluded [1] 28/13
excluding [4] 4/10 213/25 219/20
284/24
exclusion [3] 106/21 108/12 114/23
exclusive [1] 216/1
exclusively [2] 194/14 269/10
excuse [5] 48/18 81/6 109/4 147/21
199/19
excused [4] 51/1 97/4 123/21 123/24
executioner [1] 172/22
exercise [1] 25/9
exercised [1] 249/24
Exhibit [3] 29/8 30/20 52/13
Exhibit 2 [1] 52/13
Exhibit 4 [1] 30/20

Exhibit B [1] 29/8
exist [1] 154/15
existed [1] 15/20
existence [1] 142/3
existing [4] 4/15 80/23 137/8 138/9
exists [2] 13/17 48/10
exited [3] 97/23 235/14 286/17
expandable [1] 61/16
expanding [1] 54/20
expected [1] 89/9
expedite [1] 33/4
expediting [2] 29/11 30/13
experience [37] 32/20 39/21 39/21
40/1 40/4 43/17 60/1 65/11 65/16 65/18
66/12 83/15 84/17 87/6 87/13 88/8
91/20 91/21 100/9 105/7 105/11 111/20
180/23 184/21 203/14 207/1 207/3
229/9 245/11 245/16 245/18 246/24
247/13 252/9 275/25 277/9 277/11
experiences [2] 236/12 236/13
expert [72]
expert's [1] 153/12
expertise [8] 41/17 58/21 115/12
122/10 123/10 166/19 170/10 186/21
experts [29] 4/17 27/25 60/8 67/11
127/11 146/1 146/13 153/1 153/1 155/1
158/1 166/7 167/2 167/16 167/20 168/4
173/20 176/20 177/10 179/14 182/18
183/2 184/23 185/7 186/1 186/20
201/15 202/15 284/12
experts' [2] 166/9 167/4
explain [16] 35/24 47/17 111/20 132/8
177/1 214/14 214/24 216/4 217/15
219/10 220/19 221/17 221/23 224/1
228/14 265/17
explained [1] 9/15
explaining [3] 41/5 50/2 238/22
explains [2] 225/14 225/14
explanation [12] 170/17 214/3 214/19
215/3 215/15 216/2 217/1 217/9 218/3
218/5 218/6 222/10
explore [2] 73/3 234/19
explored [1] 147/11
exploring [1] 145/10
express [1] 161/16
expressed [3] 117/14 128/16 265/19
expressly [4] 138/22 139/7 162/12
163/1
extended [2] 153/22 244/12
extension [1] 196/8
extensive [2] 156/5 156/18
extent [21] 21/2 118/13 118/13 147/24
186/18 187/25 193/11 204/2 209/11
228/11 228/19 234/24 236/12 237/12
240/14 244/2 246/1 246/12 246/21
247/24 258/12
extra [1] 61/15
extrajudicial [1] 131/14
extraordinary [5] 25/7 94/15 142/21
143/6 154/9
extremely [7] 63/8 63/8 63/8 67/10
156/17 156/20 175/18
eye [16] 99/8 103/17 105/9 107/24
111/22 112/24 114/14 115/3 120/14
120/15 120/21 121/1 121/2 122/3
122/10 182/19
eyes [18] 80/5 80/6 108/6 109/5 110/3
112/1 112/3 112/7 112/12 112/18 114/9
115/6 115/7 121/7 121/10 121/12

**E**

**eyes... [2]** 121/14 192/2
**eyes' [1]** 112/1
**eyewitness [1]** 132/18

**F**

**F-I-A-C-C-O [1]** 138/18
**F.2d [2]** 212/24 213/13
**F.3d [1]** 213/18
**F.Supp.2d [1]** 213/6
**fables [1]** 108/15
**fabricated [1]** 253/20
**face [7]** 134/2 224/22 224/22 256/14 256/14 258/19 258/19
**face-to-face [2]** 224/22 256/14 258/19
**faced [3]** 172/5 239/18 258/3
**facial [2]** 183/14 183/15
**fact [84]**
**factor [2]** 249/12 258/12
**factors [4]** 75/19 119/24 253/5 253/22
**facts [36]** 13/2 15/1 23/24 24/24 26/16 43/1 45/11 69/2 72/10 73/15 77/12 77/25 89/4 116/11 116/11 116/17 116/19 118/9 118/10 136/13 136/16 137/14 141/20 146/3 154/7 159/6 165/24 168/20 171/9 189/8 218/7 218/7 218/9 249/1 249/11 249/12
**factual [1]** 17/22
**factually [1]** 79/20
**faculty [1]** 57/5
**fail [2]** 107/10 142/13
**failed [1]** 142/14
**failing [2]** 137/5 150/24
**fails [1]** 165/6
**failure [12]** 80/21 82/24 83/6 138/11 141/12 141/18 142/10 162/5 164/19 172/10 193/18 196/21
**failures [3]** 141/14 141/16 182/2
**fairness [1]** 196/16
**faith [3]** 10/14 10/21 252/18
**fall [2]** 17/10 268/7
**false [5]** 132/4 138/7 181/22 195/12 229/14
**familiarity [4]** 40/22 41/1 42/25 69/2
**family [3]** 102/15 130/21 130/22
**family's [2]** 131/19 151/16
**fascinating [1]** 25/19
**fashion [6]** 19/12 51/21 52/18 206/25 240/24 247/23
**fast [4]** 70/12 112/8 125/7 178/2
**fast-food [1]** 125/7
**faster [1]** 70/15
**fatal [1]** 37/16
**father [1]** 100/20
**fault [2]** 87/21 87/24
**favor [5]** 138/25 139/10 140/1 169/25 219/20
**FBI [9]** 38/19 54/11 54/16 54/23 55/6 85/25 86/1 105/14 108/18
**fear [10]** 61/23 68/8 105/11 151/18 237/13 237/14 238/18 240/14 242/24 243/8
**fearing [2]** 109/21 152/6
**federal [16]** 32/24 33/6 34/2 34/5 34/13 37/1 37/1 58/13 58/13 58/17 101/2 102/23 103/1 126/18 212/23 284/9
**federally [1]** 34/13
**feds [1]** 35/3

**fee [1]** 28/5
**feed [1]** 97/13
**feeding [1]** 68/11
**feeled [1]** 88/5
**fell [3]** 74/5 214/13 219/5
**felon [3]** 228/25 229/5 231/3
**felony [11]** 227/14 227/19 227/23 228/5 228/18 228/19 229/11 229/14 229/15 229/19 231/4
**female [1]** 65/5
**fender [1]** 152/5
**fewer [1]** 195/16
**Fiacco [6]** 138/18 139/11 139/25 149/2 149/7 149/8
**Fiacco's [1]** 139/12
**field [10]** 35/22 63/16 79/19 103/19 105/25 106/10 108/25 109/1 111/12 123/10
**fight [3]** 106/17 114/23 262/15
**fight-or-flight [1]** 106/17
**fighting [4]** 246/7 246/8 260/16 261/23
**figure [2]** 167/16 168/8
**figuring [1]** 270/11
**file [6]** 23/4 104/4 138/12 149/9 149/10 276/17
**filed [9]** 8/2 23/15 23/16 30/16 52/10 99/10 104/12 144/22 146/17
**filing [3]** 11/13 52/13 146/16
**final [2]** 8/1 164/8
**finality [2]** 158/5 158/18
**finally [3]** 56/21 141/7 151/21
**fine [12]** 5/11 36/1 80/4 106/24 125/11 126/14 128/9 196/4 202/18 242/20 278/21 283/19
**finely [1]** 107/9
**finger [3]** 107/3 159/8 279/3
**fingerprints [4]** 214/1 214/7 214/8 218/22
**finish [1]** 264/24
**fire [5]** 13/6 55/17 70/15 70/15 113/4
**firearm [13]** 13/6 13/15 22/1 44/1 44/7 45/18 47/14 48/6 48/17 48/22 72/6 76/21 79/6
**firearms [16]** 100/19 100/22 100/24 101/5 101/9 101/9 101/23 101/25 102/4 103/1 105/8 105/13 105/16 106/25 107/18 111/21
**fired [11]** 45/14 86/20 86/22 93/21 113/5 119/4 131/1 152/7 152/8 168/24 184/11
**firing [1]** 152/10
**firm [1]** 150/17
**Fitch [1]** 69/15
**five-foot [1]** 191/23
**five-year [1]** 139/13
**fixation [1]** 112/1
**fixed [1]** 112/14
**flag [1]** 37/13
**flash [2]** 46/15 47/25
**flashed [1]** 54/11
**flashing [1]** 107/25
**flashlight [1]** 131/11
**flashlight's [1]** 107/24
**flashlights [1]** 179/9
**flat [2]** 15/14 178/5
**flawed [1]** 21/2 140/22
**flee [2]** 217/17 217/22
**fleeing [2]** 92/15 223/8
**flesh [1]** 31/20

**flight [11]** 6/15 6/21 6/23 6/24 9/18 64/20 64/23 97/11 106/17 114/23 114/24
**floating [1]** 275/5
**floor [4]** 221/3 221/4 221/7 221/12
**FLORIDA [29]** 1/2 1/6 2/5 2/8 2/11 25/24 26/21 32/18 39/8 53/20 54/18 56/20 56/25 58/11 60/16 60/21 63/17 64/5 68/19 80/24 101/9 101/15 101/16 102/5 108/3 144/21 204/4 205/18 207/4
**flow [3]** 251/14 251/16 253/16
**focus [19]** 12/4 20/7 88/18 112/1 115/6 115/6 115/7 120/5 121/14 121/16 121/18 121/23 121/23 123/4 161/22 176/14 250/22 263/6 263/9
**focused [5]** 121/10 147/14 184/20 190/24 205/8
**focuses [2]** 122/10 135/5
**focusing [3]** 37/25 177/22 184/20
**folks [1]** 66/12
**follow-up [3]** 49/17 50/11 96/3
**food [1]** 125/7
**foot [7]** 46/6 80/7 80/7 157/19 157/22 191/23
**force [198]**
**Forces [1]** 245/15
**fore [1]** 158/20
**forefront [1]** 241/11
**foregoing [1]** 287/20
**foreseeable [2]** 15/18 17/19
**forget [3]** 4/25 147/23 235/5
**forgot [1]** 268/2
**form [4]** 36/15 94/6 98/22 266/14
**formal [2]** 149/8 263/19
**format [1]** 5/12
**former [3]** 85/25 167/21 167/22
**formerly [1]** 57/17
**formulate [2]** 32/10 32/15
**formulating [1]** 30/25
**formulation [1]** 94/14
**FORT [7]** 1/3 1/6 2/8 2/11 274/4 274/6 277/19
**Fort Lauderdale [1]** 274/4
**Fort Myers [1]** 277/19
**fortunate [1]** 39/16
**Fortunately [1]** 38/11
**fortune [3]** 37/4 39/25 40/1
**Forty [1]** 126/1
**Forty-five [1]** 126/1
**foul [1]** 59/18
**Fourth [5]** 94/23 103/9 180/2 180/5 223/14
**frame [1]** 140/24
**framed [1]** 143/16
**framework [1]** 282/9
**Fran [1]** 286/4
**Francine [4]** 2/9 3/4 287/23 287/24
**Frank [1]** 8/23
**frankly [14]** 62/6 70/7 82/21 93/19 95/16 128/7 144/21 149/16 162/9 206/25 207/8 210/21 230/23 239/7
**Franqui [7]** 151/13 151/19 151/23 152/3 152/6 156/10 157/16
**free [5]** 61/9 91/2 91/13 144/18 238/20
**Friday [4]** 87/16 182/24 276/22 278/15
**front [16]** 62/25 62/25 96/12 117/21 131/19 132/17 151/10 152/5 212/8 225/16 243/14 255/7 273/3 273/5 281/2 281/11

**F**

**fruit [1]** 124/21
**frying [1]** 168/18
**fulfill [1]** 196/13
**fulfilled [1]** 243/16
**fulfillment [3]** 196/12 242/13 242/18
**full-time [1]** 102/18
**fullest [1]** 25/10
**funded [2]** 34/13 35/8
**futile [2]** 21/9 21/16

**G**

**G-A-R-C-Z-Y-N-S-K-I [1]** 178/19
**gain [1]** 39/6
**gained [1]** 42/25
**game [13]** 143/20 189/4 203/11 205/4
  234/25 236/14 237/12 237/19 238/18
  239/20 239/23 245/23 260/18
**gangster [2]** 56/10 227/12
**Garczynski [1]** 178/19
**Garczynski vs. Bradshaw [1]** 178/19
**Garner [3]** 59/3 92/14 92/21
**Garrity [5]** 265/1 265/3 265/4 265/10
  266/17
**gatekeeper [1]** 180/24
**gather [2]** 158/11 200/2
**gathered [1]** 156/1
**gaze [1]** 120/10
**gears [1]** 27/22
**general [14]** 19/5 72/14 72/18 82/16
  96/8 96/19 112/19 120/7 123/4 196/8
  207/9 213/19 282/8 282/19
**generalized [1]** 73/1
**generated [1]** 30/23
**genie [1]** 281/13
**gentleman [3]** 44/24 211/4 275/25
**genuine [1]** 161/17
**genuinely [2]** 15/23 158/22
**genuineness [1]** 165/14
**GEOFFREY [4]** 29/2 31/5 92/12 287/3
**get-go [1]** 21/2
**gets [10]** 17/20 22/18 93/23 122/14
  122/16 135/25 154/3 172/2 230/25
  272/15
**girl's [1]** 74/4
**Giuffreda [26]** 2/6 2/7 3/22 20/17 69/8
  69/12 73/14 76/17 77/24 82/23 85/11
  99/3 100/7 103/6 105/4 122/9 151/8
  155/2 159/8 179/19 222/13 227/21
  237/1 287/6 287/9 287/10
**Giuffreda's [2]** 190/21 198/6
**gives [1]** 278/22
**glad [1]** 233/24
**glasses [1]** 113/22
**glint [1]** 66/24
**gloves [1]** 107/11
**golf [1]** 143/20
**golfer [1]** 143/22
**gonna [97]**
**Gonzalez [1]** 210/4
**good-faith [2]** 10/14 10/21
**goodness [1]** 110/23
**gosh [2]** 33/8 35/6
**Gotcha [1]** 275/19
**gotta [4]** 167/23 167/25 170/22 262/13
**gotten [2]** 163/3 274/24
**governing [2]** 91/2 94/11
**government [1]** 164/5

**governor's [1]** 56/2
**governs [1]** 95/2
**grab [3]** 107/8 124/8 127/5
**graduation [1]** 53/4
**Graham [16]** 49/6 59/2 64/12 64/13
  67/20 67/25 72/12 76/3 76/14 91/25
  92/1 96/21 116/12 119/17 119/19 120/2
**Graham v [1]** 76/14
**Graham v. Connor [8]** 64/12 64/13
  67/20 67/25 72/12 76/3 91/25 92/1
**Graham vs. Connor [7]** 49/6 59/2
  96/21 116/12 119/17 119/19 120/2
**grand [2]** 32/13 32/15
**grant [11]** 34/11 152/19 227/6 227/9
  228/12 228/18 248/7 258/13 259/1
  262/21 262/25
**granted [3]** 128/2 158/11 165/12
**granting [2]** 26/19 127/22
**grants [4]** 34/6 34/9 34/13 158/13
**grapes [1]** 146/25
**grass [2]** 74/4 122/21
**great [4]** 9/4 54/22 124/11 133/6
**greater [3]** 78/5 198/25 198/25
**greatly [1]** 12/10
**green [1]** 11/2
**grew [1]** 53/14
**grip [1]** 111/4
**gross [2]** 107/13 133/25
**grossly [2]** 133/13 133/14
**ground [6]** 131/10 142/15 157/4 184/6
  216/15 224/24
**grounds [5]** 26/5 68/12 230/16 230/17
  275/12
**Groves [1]** 131/18
**growing [1]** 108/25
**growth [1]** 36/23
**guard [1]** 237/15
**guidance [4]** 94/7 163/3 268/23 282/8
**guide [1]** 101/22
**guideline [1]** 119/11
**guidelines [1]** 119/13
**gun [70]**
**gunfight [1]** 48/7
**guns [4]** 37/21 72/1 102/21 255/13
**gunshots [1]** 108/14

**H**

**hair [1]** 75/18
**half [12]** 35/6 55/15 55/19 60/22 66/8
  80/7 208/1 208/2 208/3 209/16 210/15
  210/24
**hallway [1]** 7/5
**hamburgers [1]** 87/17
**hammer [1]** 160/15
**hand [47]** 7/18 7/20 15/14 20/3 20/5
  21/20 21/23 21/25 29/1 43/22 46/6
  49/24 50/1 51/8 63/23 63/24 79/3 79/4
  79/22 98/15 107/8 111/4 112/13 113/2
  121/25 159/1 176/9 176/11 176/12
  176/12 187/19 188/1 188/15 191/1
  215/22 215/24 217/5 217/11 218/10
  218/11 218/15 218/16 220/5 224/1
  225/21 261/11 281/17
**handcuff [1]** 157/4
**handcuffed [2]** 131/9 157/4
**handcuffs [3]** 61/14 86/14 239/13
**handgun [6]** 86/20 87/4 107/4 107/5
  107/5 112/13
**handguns [1]** 86/24

**handle [2]** 199/17 271/14
**handled [1]** 152/20
**handling [1]** 18/21
**hands [37]** 13/23 13/24 20/7 22/3
  62/20 74/8 74/11 74/16 80/18 88/19
  88/22 88/22 107/11 113/2 113/11 119/1
  119/5 120/5 121/11 121/15 121/18
  121/20 122/15 166/24 176/14 177/22
  178/12 182/1 183/15 191/7 191/20
  208/23 208/24 208/25 209/12 209/19
  209/19
**Hanlon [1]** 86/1
**happy [6]** 53/22 55/6 117/23 124/20
  144/5 283/8
**hardball [1]** 104/16
**harm [5]** 61/18 92/23 92/23 96/17
  133/6
**harping [1]** 238/9
**Harriet [1]** 157/9
**Harvard [2]** 100/13 167/24
**hate [1]** 32/22
**Haven [1]** 64/6
**Haverhill [6]** 245/22 251/15 251/16
  253/16 257/12 257/25
**he'd [1]** 265/10
**head [7]** 112/6 112/7 131/11 183/10
  232/17 248/23 261/4
**heading [1]** 73/1
**headphone [1]** 113/22
**hear [8]** 27/3 67/22 83/25 108/13
  112/11 112/12 194/4 204/24
**heard [14]** 5/16 20/21 57/4 59/6 63/14
  66/20 74/8 120/10 146/1 179/8 203/20
  214/15 239/21 259/17
**hearing [11]** 1/13 4/19 23/5 23/18
  30/13 52/21 124/7 132/7 255/22 279/1
  285/24
**hearings [3]** 29/18 38/4 102/25
**hearsay [1]** 145/23
**heart [4]** 182/20 182/25 240/16 240/18
**heck [2]** 23/15 147/3
**help [12]** 32/9 62/4 66/19 177/11
  177/13 177/17 182/18 182/19 183/3
  183/5 236/2 236/14
**helpful [6]** 28/19 166/17 175/18 187/17
  187/21 190/22
**helping [1]** 101/4
**helps [2]** 177/1 179/23
**Henry [1]** 64/5
**here's [3]** 63/15 93/10 252/3
**Hey [2]** 144/6 147/19
**HGN [2]** 120/8 120/19
**Hickory [3]** 55/20 56/14 56/15
**high [14]** 39/24 41/20 57/8 92/3 108/12
  159/9 159/11 159/14 179/7 218/23
  274/3 274/4 274/5 274/6
**high-crime [2]** 179/7 218/23
**high-risk [3]** 39/24 41/20 57/8
**higher [4]** 44/7 91/2 92/8 93/5
**highlight [1]** 277/5
**highly [3]** 209/21 209/25 256/8
**hindsight [4]** 45/17 45/20 49/8 68/1
**hinges [1]** 152/5
**hire [1]** 56/7
**hired [5]** 33/9 55/12 55/23 56/13 56/16
**hiring [1]** 88/1
**history [4]** 89/15 89/22 140/21 231/13
**hit [4]** 144/4 144/7 152/4 168/18
**hold [5]** 26/4 55/14 111/4 114/6 158/7

**H**

**holding [4]** 20/4 37/11 72/1 141/13
**hole [1]** 144/7
**holiday [1]** 168/11
**Hollocher [1]** 212/23
**holster [1]** 70/20
**holsters [1]** 102/21
**home [6]** 53/23 56/21 131/18 159/23 195/1 246/7
**Homeland [1]** 57/19
**honest [1]** 212/6
**honestly [4]** 10/1 10/12 99/21 219/23
**Honor [193]**
**Honor's [14]** 113/18 128/1 161/4 162/1 162/10 193/7 222/25 226/6 234/5 234/8 237/24 258/8 278/2 284/25
**Honorable [1]** 1/14
**honors [1]** 100/12
**hook [1]** 286/4
**Hoover [1]** 54/20
**hope [3]** 25/9 127/5 267/23
**hopefully [4]** 125/19 125/20 204/19 285/12
**horizontal [1]** 120/10
**hospital [5]** 84/25 143/1 221/4 221/6 221/9
**hostage [2]** 37/11 37/13
**hour [14]** 21/1 28/4 37/9 97/14 201/4 203/23 204/22 205/4 205/25 206/19 207/23 210/24 238/2 279/11
**hourly [1]** 28/5
**hours [6]** 37/12 105/22 178/24 270/18 272/15 279/17
**house [3]** 87/16 256/14 258/19
**housekeeping [1]** 9/11
**houses [1]** 103/2
**hovering [3]** 21/23 45/1 188/17
**Hudspeth [2]** 110/17 111/2
**huge [1]** 159/7
**hum [3]** 99/9 170/3 279/7
**human [3]** 75/21 106/15 114/14
**hundreds [1]** 105/21
**hung [1]** 181/1
**Hurley [2]** 132/7 283/6
**hurt [2]** 157/19 157/20
**Hutton [11]** 130/20 144/24 146/6 151/9 151/14 151/14 155/11 155/13 155/16 156/16 157/17
**hypertechnical [1]** 180/3
**hypothetical [6]** 15/2 71/1 116/20 201/18 201/22 201/23

**I**

**I'd [12]** 4/3 4/18 4/24 5/3 5/12 94/4 99/15 117/23 119/20 200/22 267/20 280/9
**I'll [70]**
**I'm [169]**
**I's [1]** 5/4
**I've [67]**
**I-95 [2]** 137/21 137/22
**I.E.1 [1]** 96/18
**IA [1]** 266/19
**ID [1]** 79/10
**idea [4]** 151/13 185/11 203/1 280/9
**identified [3]** 12/18 198/8 270/21
**identify [4]** 108/5 186/2 228/20 248/22
**ignore [3]** 136/12 136/17 190/4

**ignored [3]** 137/19 138/2 151/20
**ignores [1]** 133/15
**ill [1]** 33/24
**illegal [4]** 181/22 195/13 208/9 208/12
**illicit [1]** 132/10
**Illinois [1]** 213/6
**imagine [1]** 107/3 274/23
**immediate [4]** 21/20 64/19 65/2 67/24
**immediately [4]** 74/12 163/15 214/11 214/12
**imminent [6]** 21/21 92/17 96/16 187/12 187/19 195/20
**immunity [3]** 23/7 150/15 152/10
**impact [3]** 75/1 120/14 275/21
**impacted [1]** 268/15
**impair [1]** 208/3
**impaired [10]** 156/21 203/19 204/19 205/22 205/23 206/15 207/8 208/4 209/8 211/21
**impairment [14]** 205/7 205/11 206/4 207/1 207/6 207/15 208/11 209/11 209/11 210/18 210/20 211/15 212/9 212/12
**impartial [1]** 174/9
**impeach [2]** 227/23 272/18
**impeaching [1]** 208/10
**impeachment [3]** 211/2 211/12 212/22
**impeded [3]** 251/14 251/15 253/16
**impeding [1]** 253/20
**implication [3]** 141/14 141/16 162/13
**implicit [1]** 148/11
**implied [1]** 44/5
**impliedly [1]** 199/7
**import [1]** 164/4
**impose [1]** 154/17
**imposed [2]** 129/10 141/5
**impression [3]** 112/20 123/5 233/12
**imprisonment [3]** 230/2 231/7 232/7
**improper [5]** 132/11 155/5 161/20 264/23 281/14
**improperly [1]** 178/17
**improved [1]** 35/6
**in limine [16]** 27/24 125/14 143/4 178/21 183/4 197/18 197/25 202/22 202/23 202/24 203/17 235/1 235/25 236/19 240/20 247/21
**inadequacy [1]** 163/16
**inadequate [5]** 133/13 133/14 161/20 164/2 164/22
**inappropriate [2]** 42/23 46/12
**incapac [1]** 45/3
**incapacitated [1]** 45/5
**incentive [1]** 57/23
**inches [2]** 80/8 109/8
**incident [12]** 42/4 82/1 86/1 86/5 117/16 145/13 155/16 164/20 212/21 253/7 260/24 271/9
**incidents [9]** 128/24 136/14 136/20 153/3 156/17 159/2 159/18 213/3 213/4
**inclined [2]** 147/24 228/16
**include [3]** 74/25 102/4 192/20
**included [1]** 120/25
**includes [2]** 75/7 203/13
**including [10]** 18/17 87/22 101/1 102/25 106/15 108/13 225/10 240/23 265/6 266/5
**inconsistency [2]** 273/17 273/20
**incorporated [1]** 35/11
**incorrect [3]** 49/9 49/13 257/6

**increase [1]** 48/5
**increases [1]** 48/5
**incredible [1]** 38/20
**incredibly [1]** 37/23
**indeed [6]** 13/1 120/4 129/13 136/23 140/5 285/8
**indemnify [1]** 84/15
**independent [2]** 14/12 16/18
**independently [2]** 154/10 154/21
**INDEX [1]** 287/1
**Indiana [1]** 102/14
**indicate [7]** 136/13 142/3 143/6 154/7 162/21 206/14 272/1
**indicated [3]** 44/18 236/9 280/9
**indicates [5]** 136/24 154/5 162/3 190/5 248/21
**indicating [2]** 72/4 118/5
**indication [6]** 44/16 68/18 77/10 207/10 207/24 208/3
**indications [2]** 83/24 271/25
**indicator [1]** 68/21
**indicators [3]** 67/16 68/14 68/22
**indicted [1]** 65/21
**indifference [8]** 137/9 137/11 138/14 139/3 139/5 139/22 163/9 163/11
**indifferent [1]** 140/5
**individual [10]** 62/18 62/23 63/19 64/20 82/10 82/19 96/17 115/18 179/11 209/12
**individuals [1]** 148/18
**ineffective [3]** 205/21 206/9 206/11
**inequitable [1]** 23/8
**infer [2]** 128/20 223/14
**inference [3]** 139/24 215/22 253/14
**inferences [6]** 139/10 141/20 180/12 180/13 180/22 252/14
**inferred [1]** 139/17
**infinitum [1]** 16/12
**inflammatory [12]** 172/21 174/8 239/9 239/10 239/15 240/9 246/11 247/17 250/16 252/12 256/9 259/12
**influence [1]** 225/18
**influenced [1]** 204/3
**inform [3]** 9/14 236/2 282/1
**informal [1]** 5/9
**information [7]** 36/18 37/24 146/15 174/20 178/25 200/11 211/13
**infraction [4]** 11/25 18/22 82/1 249/9
**infringe [1]** 30/7
**initial [4]** 23/14 41/6 51/14 140/19
**initially [3]** 23/14 169/13 203/20
**initiated [1]** 11/23
**injured [1]** 157/19
**injury [3]** 18/6 164/16 164/24
**injustice [1]** 136/23
**inning [2]** 59/19 235/21
**innocent [1]** 37/11
**input [1]** 238/2
**inquire [2]** 246/18 260/11
**inquiry [7]** 49/18 96/3 213/22 243/20 258/14 259/2 262/15
**insert [1]** 8/17
**instance [9]** 91/10 107/3 107/22 122/19 149/1 168/9 168/13 172/1 249/21
**instances [2]** 116/19 116/20
**instant [1]** 182/16
**instead [4]** 47/5 47/6 95/19 115/5 166/19 195/9
**institute [5]** 34/10 57/3 64/5 106/1

**I**

**institute... [1]** 106/2
**instruct [1]** 184/9
**instructed [2]** 211/24 212/4
**instruction [8]** 75/14 169/20 220/13
226/14 226/17 281/7 281/11 283/18
**instructions [12]** 281/2 281/8 281/15
281/18 281/24 282/2 282/4 282/19
282/25 283/8 283/9 283/17
**instructor [10]** 57/22 100/24 101/6
101/9 101/12 103/22 105/9 105/13
105/16 111/21
**instructors [8]** 63/14 100/25 101/23
101/25 102/4 106/25 107/20 111/5
**insulate [1]** 136/12
**intellectual [1]** 238/2
**intend [5]** 253/9 253/12 259/15 263/6
263/9
**intended [1]** 130/1
**intending [6]** 242/8 242/9 248/2 248/4
249/19 269/13
**intends [1]** 267/8
**intense [1]** 68/10
**intent [6]** 130/15 223/5 227/14 234/16
265/21 284/25
**intention [1]** 73/5
**intentional [4]** 12/23 13/3 13/13 14/12
82/18
**interact [1]** 82/18
**interactions [3]** 35/18 36/1 36/24
**interest [1]** 25/10
**interested [3]** 54/17 55/22 165/20
**interests [1]** 25/13
**interfered [1]** 56/19
**interlocutory [3]** 23/1 24/10 150/15
**internal [9]** 83/1 83/4 83/16 84/7 84/18
95/9 95/10 156/3 265/3
**international [6]** 37/3 61/3 61/8 75/3
101/12 101/24
**interpreting [1]** 191/18
**interprets [1]** 169/14
**interrupt [6]** 33/3 72/22 143/10 172/24
177/6 180/11
**intersection [2]** 152/7 152/7
**intersections [1]** 110/10
**intervening [7]** 14/3 14/11 14/23 14/24
17/11 17/14 25/25
**intervention [1]** 138/13
**interviewed [1]** 95/14
**intoxication [1]** 210/14
**introduce [2]** 228/2 228/25
**introduced [2]** 139/25 211/16
**introducing [3]** 209/21 209/25 273/18
**invade [1]** 265/21
**invasion [1]** 159/23
**investigate [8]** 87/18 131/18 141/12
141/14 141/18 150/24 154/10 164/19
**investigated [3]** 87/14 155/19 157/10
**investigation [38]** 83/19 84/7 95/7 95/9
95/10 133/9 133/19 133/14 133/14
133/22 133/23 134/8 136/16 137/2
140/4 143/2 149/11 149/16 154/1 155/5
156/5 156/14 155/16 163/16 163/24
164/2 164/13 164/22 169/4 174/12
184/8 189/21 189/23 263/19 265/16
266/19 266/19 270/13
**investigations [9]** 33/21 37/22 83/16
84/18 137/7 156/17 161/20 162/5
262/18

**investigative [1]** 265/4
**investigators [2]** 83/1 83/4
**invitation [2]** 103/2 207/21
**invite [3]** 166/22 174/24 220/7
**inviting [2]** 172/13 219/15
**invocation [1]** 95/3
**invoked [1]** 84/25
**invoking [1]** 95/3
**involvement [1]** 36/6
**irrelevant [3]** 205/21 258/11 262/20
**irrespective [1]** 178/6
**ISIS [1]** 37/13
**Island [2]** 53/11 69/21
**isolate [1]** 186/2
**isolated [1]** 178/17
**issue [62]**
**issued [3]** 19/16 150/13 237/10
**issues [5]** 6/2 8/6 22/11 34/11 35/9
36/9 36/11 37/7 40/21 73/3 102/13
114/22 122/18 141/8 150/9 158/25
159/15 160/8 161/17 185/21 186/13
186/18 186/20 190/1 199/25 208/5
261/2 271/11 275/5
**item [2]** 96/7 114/7
**item 51 [1]** 96/7
**items [1]** 223/12

**J**

**J. [1]** 54/19
**J. Edgar [1]** 54/19
**Jack [1]** 3/16
**jackets [1]** 5/10
**Jackson [1]** 222/25
**Jacksonville [1]** 101/11
**jail [1]** 233/13
**jammed [1]** 47/7
**Janet [1]** 32/12
**January [8]** 1/7 3/1 3/7 24/13 24/13
50/15 50/23 127/1
**January 1st [2]** 50/15 50/23
**January 2015 [1]** 24/13
**JANUARY 7 [2]** 3/1 3/7
**jar [1]** 113/21
**jeans [1]** 75/17
**jeopardy [6]** 36/10 63/4 63/5 150/21
178/9 220/17
**Jeremy [6]** 130/20 130/23 130/25
130/25 151/13 151/14
**Jersey [2]** 105/14 105/15
**job [8]** 55/9 55/14 57/24 81/18 170/11
238/15 238/23 243/2
**John [5]** 2/2 86/1 222/8 239/16 240/10
**joined [1]** 53/8
**joint [7]** 208/1 208/2 208/3 209/16
210/15 210/24 211/21
**Jolly [1]** 2/7
**Jordan [1]** 59/18
**judge [58]**
**Judge Cohn [1]** 58/8
**Judge Dimitrouleas [1]** 151/11
**Judge Gonzalez [1]** 210/4
**Judge Hurley [2]** 132/7 283/6
**Judge King [1]** 186/4
**Judge Lynch [1]** 8/24
**Judge Middlebrooks [6]** 150/5 151/2
161/14 161/16 163/1 163/4
**Judge Middlebrooks' [3]** 151/4 161/5
165/20
**Judge Morgan [1]** 33/10

**Judge Paul [1]** 277/18
**Judge Valle [1]** 278/11
**judged [1]** 170/5
**judges [1]** 155/9
**judging [2]** 193/22 193/23
**judgment [23]** 23/15 23/16 23/18 26/20
26/25 65/6 127/22 128/2 134/15 134/21
144/16 144/17 146/17 148/2 148/14
150/3 151/5 158/13 165/12 165/18
230/8 238/20 276/21
**judicial [3]** 136/2 147/3 162/9
**jump [5]** 5/17 148/23 174/18 252/20
252/21
**jumped [7]** 18/1 18/3 26/1 50/20
166/10 170/25 170/25
**jumping [3]** 184/16 184/17 184/19
**jumps [1]** 109/22
**June [4]** 24/7 24/8 25/17 26/9
**June 2014 [4]** 24/7 24/8 25/17 26/9
**juries [5]** 66/6 68/22 109/17 111/13
114/5
**jurisdiction [9]** 90/17 90/18 91/16
91/19 91/19 94/23 168/12 232/7 245/7
**jurisdictions [2]** 34/1 35/14
**juror [6]** 140/9 166/18 170/14 174/21
183/17 280/6
**jurors [10]** 4/22 66/16 114/12 167/22
177/13 183/17 207/2 236/14 236/21
281/2
**jury [107]**
**jury's [1]** 248/23
**justice [15]** 25/10 25/13 33/6 33/7 34/6
34/9 34/10 34/10 36/11 36/15 36/20
56/3 56/25 106/4 110/21
**justifiable [1]** 133/4
**justification [3]** 68/12 110/19 138/6
**justified [7]** 79/14 84/9 84/13 133/18
136/18 162/16 223/16
**justify [2]** 67/15 143/7
**justifying [2]** 63/4 75/12

**K**

**K-A-P-E-L-S-O-H-N [1]** 98/20
**Kallas [6]** 131/6 131/9 131/9 152/21
156/19 156/19
**Kansas [1]** 90/21
**Kapelsohn [20]** 97/12 97/19 98/7 98/16
98/20 98/21 99/7 103/7 105/5 113/17
113/25 116/6 122/6 174/11 174/17
177/8 177/9 183/11 198/10 287/3
**Kapelsohn's [4]** 28/18 97/7 97/9 98/6
**keep [11]** 9/2 41/6 41/16 121/19 121/22
122/3 124/1 124/5 222/11 262/13
283/25
**keeping [3]** 34/5 165/25 267/20
**keeps [1]** 154/23
**Kelly [1]** 205/19
**key [8]** 53/20 61/1 61/3 61/5 61/7 75/2
178/9 204/1
**key 398 [1]** 75/2
**Key West [1]** 53/20
**keys [2]** 61/6 65/13
**kicked [1]** 17/6
**kid [1]** 252/3
**kill [2]** 72/3 247/10
**killed [17]** 66/9 66/9 71/16 86/2 131/20
132/17 132/23 132/24 156/3 244/5
244/11 244/15 244/16 244/20 244/24
245/4 245/7

**K**

**killing [1]** 247/8
**kinds [3]** 104/16 259/11 282/22
**King [2]** 186/4 276/13
**kissed [1]** 260/23
**knife [7]** 48/6 61/16 65/22 65/23 66/9 67/13 116/24
**knowing [7]** 46/19 60/4 201/19 209/12 209/13 280/15 281/20
**knowledge [16]** 42/16 59/25 66/13 79/7 83/14 83/15 89/14 107/16 136/8 138/4 138/5 168/6 177/1 183/16 203/5 244/14
**knows [3]** 65/16 72/2 153/19
**Knoxville [3]** 54/24 54/25 57/12
**Kuhmo [2]** 59/11 59/23

**L**

**lab [1]** 116/22
**laboratories [1]** 108/17
**lack [1]** 88/10
**laid [4]** 11/21 31/1 53/3 74/4
**Lake [1]** 102/8
**Lakes [1]** 2/4
**language [8]** 45/1 76/11 119/20 128/16 128/18 138/22 140/13 198/4
**large [3]** 34/20 115/22 145/22
**largely [3]** 161/10 174/4 203/3
**late [5]** 8/1 24/13 125/23 125/24 238/2
**latitude [3]** 73/12 212/16 236/19
**LAUDERDALE [6]** 1/3 1/6 2/8 2/11 274/4 274/6
**Laughter [10]** 28/6 53/16 62/10 100/15 169/7 172/14 221/8 237/8 267/24 277/16
**lava [2]** 132/21 132/23
**law [113]**
**lawful [12]** 142/10 142/13 142/17 248/1 249/19 249/24 250/12 250/14 251/2 254/11 256/19 258/16
**lawfully [2]** 19/16 195/12
**lawfulness [1]** 253/3 254/13 256/1
**lawn [1]** 122/22
**laws [1]** 33/18
**lawsuit [2]** 87/25 144/22
**lawsuits [2]** 134/21 147/4
**lawyer [9]** 40/16 147/6 175/14 263/21 264/22 265/25 266/6 266/8 266/10
**lawyers [5]** 64/8 146/12 155/8 157/13 264/20
**lay [2]** 129/20 281/21
**layperson [2]** 65/16 65/17
**lead [1]** 181/18
**leading [3]** 12/5 13/2 13/14
**leads [1]** 20/13
**leaning [1]** 220/12
**leap [1]** 252/18
**learn [2]** 107/20 144/18
**learned [3]** 59/20 59/23 154/2
**leave [14]** 4/24 6/20 11/19 55/9 85/9 104/15 126/10 126/14 126/17 195/1 226/16 230/25 234/19 243/23
**leaving [2]** 192/23 278/13
**lectern [1]** 5/8
**led [2]** 32/5 141/21
**Lee [2]** 64/5 69/15
**legal [35]** 13/17 14/6 16/16 17/21 17/22 19/17 21/14 22/12 24/2 25/1 25/1 40/17 49/3 49/10 49/13 60/6 96/21 103/8

162/21 164/23 166/13 171/15 174/13 181/9 184/10 187/8 189/19 199/3 199/8 208/7 208/12 248/5 257/11 282/8 282/9
**legality [4]** 21/10 248/3 259/7 259/8
**legally [1]** 72/5
**legislature [1]** 159/13
**legitimate [1]** 258/14
**lend [2]** 141/20 227/11
**lens [10]** 109/6 109/25 109/25 110/4 121/2 236/11 245/17 245/18 246/24 247/13
**lethal [9]** 43/24 44/8 44/11 44/15 44/16 44/18 50/6 193/24 250/7
**letter [2]** 98/23 215/14
**levels [2]** 136/9 136/15
**lever [1]** 107/6
**Lewinski [4]** 70/6 70/7 74/24 106/3
**Lewis [1]** 157/9
**liability [12]** 7/22 10/18 10/19 87/22 134/18 135/9 136/12 164/21 165/2 165/4 165/7 165/8
**liable [3]** 141/11 163/24 164/5
**liberal [1]** 144/21
**lieu [1]** 274/13
**lieutenant [1]** 54/9
**life [24]** 21/22 26/16 44/9 46/10 49/5 56/19 68/9 152/6 170/10 178/8 178/9 178/15 180/4 195/20 203/14 207/3 220/17 221/21 236/12 236/12 236/16 245/16 246/23 260/12
**lifetime [1]** 245/18
**light [19]** 9/7 11/3 11/3 90/6 107/21 107/24 108/1 150/19 163/2 170/11 178/25 213/1 226/6 232/19 234/4 248/8 260/10 279/4 284/12
**lighting [2]** 107/23 108/6
**lights [4]** 18/19 107/25 181/24 182/11
**limine [16]** 27/24 125/14 143/4 178/21 183/4 197/18 197/25 202/22 202/23 202/24 203/17 235/1 235/25 236/19 240/20 247/21
**limit [4]** 97/14 137/21 229/4 259/2
**limitation [1]** 258/21
**limitations [13]** 40/13 40/24 41/3 42/20 137/4 137/9 137/11 137/13 137/19 138/2 138/5 138/14 243/24
**limited [6]** 9/25 33/23 150/9 183/7 184/22 185/19
**limiting [4]** 220/13 226/13 226/17 232/9
**lin [113]**
**Lin's [38]** 13/10 20/6 79/21 80/1 80/21 87/6 88/4 89/1 90/6 93/7 109/5 111/24 118/11 121/7 138/4 138/5 138/12 165/11 183/18 190/5 202/1 203/9 203/13 215/6 217/1 217/8 224/11 224/12 224/13 248/21 249/2 249/13 251/25 259/21 260/11 262/16 270/14 272/10
**link [2]** 104/5 240/6
**liquor [2]** 56/9 56/9
**list [2]** 83/13 96/8
**literally [2]** 153/2 265/11
**litigate [1]** 158/8
**litigated [1]** 59/16
**litigation [2]** 59/16 158/5
**Lively [1]** 111/15
**local [3]** 90/7 164/5 243/3
**locally [1]** 89/4

**locations [1]** 152/1
**locked [2]** 126/5 126/7
**locks [1]** 107/5
**logic [4]** 129/12 137/25 137/25 138/2
**logical [5]** 4/7 6/2 136/10 136/21 215/21
**Los [1]** 35/16
**Los Angeles [1]** 35/16
**lose [2]** 106/23 121/23
**loss [1]** 112/22
**lost [3]** 146/10 147/15 195/4
**loud [1]** 108/13
**love [1]** 55/10
**loved [1]** 26/2
**lower [1]** 91/5
**Loxahatchee [1]** 131/18
**lucidly [1]** 213/21
**luck [1]** 50/24
**luckily [1]** 111/1
**lunch [6]** 97/20 124/3 124/3 124/21 124/24 201/4
**Luncheon [1]** 126/23
**Luther [2]** 276/13
**lying [3]** 80/5 80/15 80/16
**Lynch [2]** 8/23 8/24

**M**

**M-E-L-V-I-N [1]** 51/13
**magazines [2]** 38/20 195/16
**magistrate [3]** 1/15 8/23 58/7
**Magnuson [2]** 277/18
**mailbox [1]** 123/2
**mailboxes [1]** 151/17
**Maine [4]** 57/2 57/3 57/5 57/11
**major [4]** 101/1 101/1 238/11 261/5
**majority [2]** 97/6 123/25
**male [8]** 79/8 248/24 249/14 250/1 250/6 252/6 256/15 256/16
**mallet [2]** 132/18 132/20
**man [11]** 11/24 55/1 65/4 110/19 110/24 112/10 131/19 253/17 253/25 254/24 255/4
**managed [1]** 83/15
**management [1]** 38/17
**manager [2]** 37/14 56/6
**manifestation [1]** 84/5
**Mankato [1]** 106/4
**manner [10]** 11/20 11/22 18/18 176/7 196/14 239/6 242/12 242/15 242/17 249/25
**mantra [1]** 137/16
**manuals [2]** 60/23 60/24
**manufacturer [1]** 115/22
**manufacturers [2]** 102/20 115/20
**manuscripts [1]** 38/13
**Maplewood [1]** 213/5
**marijuana [44]** 142/25 203/17 203/23 204/20 205/3 205/20 206/19 206/21 207/22 207/24 208/9 208/15 209/16 210/21 210/22 210/23 210/24 210/25 211/14 212/1 212/2 215/23 219/25 220/5 220/22 221/2 221/2 221/7 221/12 221/13 221/16 222/14 222/19 222/21 224/6 224/8 224/16 224/23 225/19 225/20 225/25 226/5 226/9 228/6
**marital [3]** 236/5 260/7 261/3
**Marquise [1]** 110/16
**marriage [1]** 260/12
**married [1]** 261/20

**M**

**Martin [1]** 276/13
**Mary's [2]** 221/9 222/20
**Maryland [1]** 55/5
**master's [1]** 55/25
**material [7]** 29/21 30/3 30/24 52/3 84/21 139/1 161/17
**materials [12]** 30/22 30/23 41/14 43/1 43/2 52/15 60/2 83/10 83/12 83/13 103/14 104/9
**matter [22]** 7/10 15/8 25/4 66/13 114/11 131/12 137/14 137/15 137/25 137/25 138/2 140/8 156/4 156/9 167/2 205/15 208/12 216/17 241/14 274/1 286/1 287/21
**matters [6]** 5/23 9/11 25/8 135/4 153/25 154/1
**May 16 [1]** 131/17
**May 2012 [1]** 159/3
**mayor [3]** 55/10 55/11 55/11
**McCullough [1]** 156/8
**McDuffie [2]** 32/5 34/15
**mean [45]** 22/22 33/5 42/21 45/3 63/7 68/20 71/7 73/8 73/13 90/23 90/24 91/7 94/23 95/24 106/11 113/13 126/12 147/3 148/13 158/10 159/22 177/22 189/25 192/4 198/18 201/6 205/12 207/8 211/3 216/12 217/2 218/25 222/6 245/13 245/14 245/20 252/24 255/20 260/23 261/2 264/8 272/10 272/20 275/2 279/13
**meaning [2]** 76/20 257/23
**means [4]** 93/21 143/23 169/21 175/25
**meantime [1]** 158/13
**measure [4]** 109/3 109/4 116/23 210/23
**measurements [1]** 118/15
**meat [1]** 143/19
**mechanical [1]** 1/24
**media [1]** 227/8
**medical [1]** 103/21
**meet [5]** 59/25 91/24 141/24 158/6 175/23
**Mel [2]** 9/14 52/9
**MELVIN [3]** 51/9 51/13 287/5
**member [1]** 57/16
**membership [1]** 61/10
**memo [4]** 128/8 214/2 214/22 219/9
**memorandum [6]** 26/19 139/6 170/2 178/20 231/11 247/6
**memorializing [1]** 286/7 286/9
**memory [7]** 46/8 46/8 119/12 119/18 212/12 213/10 265/12
**men [1]** 71/24
**mentally [1]** 33/24
**mere [1]** 219/14
**merit [3]** 148/23 158/4 163/25
**meritorious [8]** 128/21 129/2 129/6 129/10 129/14 129/15 129/18 130/11
**merits [2]** 148/19 162/22
**mess [1]** 98/10
**message [2]** 83/3 137/13
**metallic [1]** 111/3
**meter [3]** 51/5 97/13 235/19
**methodology [3]** 31/18 59/13 60/7
**methods [1]** 42/5
**Metro [2]** 32/7 35/21
**Metro-Dade [2]** 32/7 35/21

**Metropolitan [1]** 102/6
**Mexico [1]** 59/21
**Miami [10]** 32/3 32/7 32/8 34/15 35/14 35/19 35/22 39/9 42/3 101/11
**Miami-Dade [4]** 32/7 34/15 35/22 39/9
**Michael [2]** 59/18 132/16
**microphone [4]** 98/18 113/20 199/19 241/19
**mid [2]** 125/20 125/20
**mid-afternoon [2]** 125/20 125/20
**middle [4]** 37/19 38/2 51/14 202/17
**Middlebrooks [6]** 150/5 151/2 161/14 161/16 163/1 163/4
**Middlebrooks' [3]** 151/4 161/5 165/20
**mike [7]** 31/6 31/6 51/11 151/7 169/10 175/2 263/3
**mild [1]** 211/22
**mile [2]** 68/15 68/16
**military [4]** 16/10 184/21 236/6 240/5
**milliseconds [1]** 112/4
**mind-set [1]** 250/5
**mines [1]** 247/9
**miniature [2]** 113/21 143/22
**minimally [1]** 137/6
**minimized [1]** 268/16
**minimum [1]** 64/17
**minitrial [1]** 153/3
**minitrials [1]** 152/22
**Minnesota [2]** 106/3 277/18
**minor [1]** 81/25
**minority [1]** 250/20
**minute [3]** 62/21 158/3 234/23
**minutes [7]** 27/9 27/14 104/11 125/5 126/1 222/2 235/8
**Miranda [1]** 265/1
**misconduct [2]** 133/25 159/19
**misdemeanor [1]** 229/13
**misdemeanors [1]** 229/22
**misleading [1]** 93/7
**misses [1]** 195/17
**misstate [1]** 48/12
**misstated [1]** 3/10
**misstating [1]** 272/9
**mistaken [4]** 15/10 16/19 67/12 113/8
**mistakenly [1]** 16/6
**mistakes [1]** 88/10
**misunderstood [1]** 48/25
**mitigate [2]** 224/8 233/12
**mixed [1]** 127/13
**mjsfcs [1]** 2/12
**modify [1]** 185/8
**mom [1]** 130/21
**moment [18]** 18/3 20/1 21/17 22/24 43/4 98/9 98/11 109/20 112/1 136/24 138/9 149/2 178/7 178/14 182/3 182/15 182/16 194/15
**Monday [4]** 87/18 200/17 200/25 278/9
**Monell [51]** 4/12 10/11 11/8 24/5 26/23 27/4 27/16 82/22 124/16 124/17 125/14 125/17 127/9 127/17 127/22 129/8 129/13 129/14 129/15 129/16 129/17 129/21 129/23 129/23 130/11 130/12 134/17 135/8 141/6 144/17 146/10 147/25 148/21 150/19 150/25 151/4 155/7 159/9 165/4 181/5 184/7 237/24 262/20 267/13 267/18 268/16 268/19 270/12 271/4 271/11 275/3
**Monell-related [1]** 271/11
**money [1]** 227/10

**monitor [4]** 33/5 33/12 33/22 34/3
**monitoring [1]** 33/9
**monitors [1]** 32/25
**Montana [1]** 222/7
**month [1]** 4/6
**months [8]** 24/7 24/14 24/17 54/8 64/6 70/8 142/24 144/14
**monumental [1]** 155/7
**moot [2]** 9/7 267/18
**Morales [1]** 66/23
**Morgan [1]** 33/10
**morning [28]** 3/3 3/4 3/5 3/15 3/21 12/12 43/12 43/13 43/18 62/5 62/24 63/16 69/13 87/18 99/8 99/11 105/6 112/9 179/10 192/21 203/18 207/11 211/21 221/2 252/23 261/12 279/19 279/22
**Morristown [6]** 54/25 55/7 55/13 55/22 56/15 57/14
**mostly [1]** 34/9
**motion [68]**
**motions [21]** 4/4 4/7 4/9 4/12 5/7 9/4 20/23 22/13 23/18 125/14 143/4 146/17 165/18 183/4 206/3 236/18 267/19 267/22 276/21 283/23 284/3
**motivated [4]** 253/4 253/7 253/8 253/13
**motivation [1]** 248/17
**motivations [1]** 225/11
**motive [1]** 251/19
**motor [2]** 106/24 152/10
**mounted [1]** 80/8
**movant [1]** 28/10
**move [14]** 21/19 55/9 57/14 82/12 85/6 112/6 112/6 124/13 125/16 127/18 178/4 197/17 235/22 235/24
**moved [2]** 57/2 57/11
**movement [20]** 99/8 99/9 105/9 107/9 107/13 111/22 111/25 111/25 112/11 113/4 113/12 115/5 115/6 120/21 121/1 123/11 182/19 185/1 192/3 216/2
**movements [6]** 103/17 103/17 104/20 120/14 120/15 216/1
**moves [5]** 55/5 55/6 109/23 122/16 276/4
**movie [1]** 247/18
**moving [2]** 32/20 46/6 46/6 74/18 109/21 112/7
**MR [28]** 31/24 47/2 49/22 53/2 54/1 65/9 69/12 73/14 76/17 77/24 82/23 85/11 88/16 96/6 100/7 103/6 105/4 116/5 118/4 122/9 287/3 287/4 287/6 287/6 287/7 287/9 287/10 287/10
**Mr. [115]**
**Mr. Alpert [1]** 27/18
**Mr. Alpert's [2]** 27/8 27/9
**Mr. Brandon [1]** 213/8
**Mr. Dontrell [1]** 195/12
**Mr. Giuffreda [9]** 20/17 69/8 99/3 155/2 159/8 179/19 222/13 227/21 237/1
**Mr. Giuffreda's [2]** 190/21 198/6
**Mr. Kallas [1]** 156/19
**Mr. Kapelsohn [12]** 97/12 97/19 98/7 98/21 99/7 103/7 105/5 113/17 113/25 116/6 122/6 174/17
**Mr. Kapelsohn's [4]** 28/18 97/7 97/9 98/6
**Mr. McCullough [1]** 156/8
**Mr. Quinlan [13]** 31/11 51/15 52/7

## M

**Mr. Quinlan... [10]** 116/2 158/22 172/13 187/10 197/23 204/23 227/18 257/4 268/1 279/2
**Mr. Scarola [15]** 24/3 29/21 30/11 51/15 62/11 153/8 158/21 197/23 204/23 217/18 257/22 257/25 266/25 267/7 277/13
**Mr. Scarola's [1]** 145/11
**Mr. Stephens [30]** 21/19 21/25 43/24 44/16 44/20 45/5 45/8 45/12 45/14 45/22 46/2 47/3 47/14 48/6 48/15 50/1 109/9 109/20 113/5 122/24 144/22 187/12 214/3 215/21 236/22 250/25 255/23 258/2 259/11 259/14
**Mr. Stephens' [6]** 22/2 43/21 49/24 113/11 166/23 251/9
**Mr. Tucker [14]** 28/17 51/7 51/24 52/19 53/3 62/8 69/13 72/24 96/7 104/20 106/1 115/1 120/4 170/12
**Mr. Tucker's [2]** 29/5 170/16
**MS [2]** 43/11 287/4
**Ms. [16]** 20/17 28/12 47/18 49/1 98/23 99/3 153/8 153/16 158/4 179/20 212/3 237/2 245/12 247/16 260/7 276/19
**Ms. Barranco [13]** 20/17 28/12 98/23 99/3 153/8 153/16 179/20 212/3 237/2 245/12 247/16 260/7 276/19
**Ms. Barranco's [3]** 47/18 49/1 158/4
**mulligan [3]** 143/20 143/24 144/6
**multiple [3]** 141/4 141/14 141/16
**multitude [1]** 158/19
**municipal [3]** 105/17 164/21 165/7
**muscles [1]** 183/15
**muscular [1]** 107/9
**muzzle [2]** 46/15 47/25
**Myers [1]** 277/19

## N

**name [14]** 31/3 31/4 51/12 51/12 51/13 51/14 54/19 57/9 58/8 62/18 98/18 98/19 145/8 155/23
**named [1]** 87/24
**names [1]** 36/20
**narcotics [4]** 221/23 226/1 226/3 226/4
**narrow [3]** 121/17 183/5 183/6
**narrowly [1]** 194/12
**nation [2]** 86/13 86/16
**national [10]** 34/9 42/12 42/16 42/19 59/7 90/9 90/11 91/9 93/17 117/10
**nationally [1]** 89/3
**nature [19]** 38/8 81/18 105/7 135/20 170/8 227/20 227/23 228/5 228/20 230/16 230/20 238/14 238/22 238/22 240/22 260/13 262/17 272/8 274/25
**Navy [3]** 53/8 54/8 55/5
**near [5]** 204/6 204/10 204/11 204/20 205/17
**neatly [1]** 127/15
**necessary [14]** 40/23 41/2 49/5 89/22 91/11 92/5 92/20 93/3 95/22 96/16 175/22 175/22 193/10 286/2
**necessity [11]** 49/8 49/14 50/19 81/21 81/22 92/22 92/24 124/11 128/24 176/7 271/19
**negative [1]** 284/21
**negligence [22]** 4/13 11/10 12/3 12/17 12/23 13/5 13/7 13/14 14/8 14/14 15/7

17/4 19/5 20/10 22/9 23/20 62/5 172/8 193/16 195/24 237/25 275/6
**negligent [8]** 4/13 12/5 14/9 16/15 18/21 87/25 195/25 238/1
**negligent-type [1]** 238/1
**negligently [4]** 12/1 12/1 14/20 19/11
**negotiating [1]** 194/8
**neighborhood [2]** 238/22 248/20
**neither [3]** 164/11 164/14 164/15
**New Haven [1]** 64/6
**New Jersey [2]** 105/14 105/15
**New Mexico [1]** 59/21
**New Orleans [6]** 32/25 33/1 33/5 33/7 33/8 33/20
**New York [3]** 50/15 100/16 102/5
**newly [6]** 106/10 106/11 134/23 145/12 162/7 165/16
**Newport [1]** 53/10
**news [1]** 7/13
**newspaper [2]** 56/8 147/7
**nice [2]** 3/18 247/10
**nicer [1]** 195/15
**nightstick [1]** 194/8
**nine [5]** 63/16 80/7 189/23 279/9 279/23
**nine a.m [1]** 279/23
**nine o'clock [2]** 63/16 279/9
**ninth [1]** 235/21
**noble [1]** 245/14
**nobody [3]** 64/9 65/2 237/18
**nobody's [1]** 218/25
**Nodding [1]** 183/10
**noises [1]** 108/14
**nol [3]** 142/18 142/23 216/23
**nol-prosing [1]** 142/23
**nol-prossed [2]** 142/18 216/23
**non [2]** 205/2 241/3
**non-issue [1]** 241/3
**non-party [1]** 205/2
**noncriminal [2]** 11/25 18/22
**none [3]** 138/24 139/25 159/20
**nonexistent [1]** 133/5
**noninflammatory [2]** 246/19 247/22
**nonsupervision [1]** 140/10
**noon [1]** 6/25
**Norfolk [1]** 54/10
**Norma [1]** 258/10
**normal [1]** 45/5
**normally [2]** 104/15 258/7
**North [4]** 55/20 56/3 56/5 57/24
**North Carolina [4]** 55/20 56/3 56/5 57/24
**Northern [1]** 213/6
**notation [1]** 149/10
**note [3]** 29/22 30/21 104/8
**noted [5]** 52/15 128/8 169/13 227/19 250/19
**notice [5]** 75/17 75/18 75/18 267/14 267/16
**notwithstanding [2]** 78/17 250/13
**November [3]** 23/4 27/2 155/15
**November 2014 [1]** 23/4
**November 2015 [1]** 27/2
**November-December 2014 [1]** 155/15
**NRA [1]** 105/14
**number [43]** 4/6 22/2 26/15 26/20 43/20 44/12 49/23 61/7 101/12 119/13 123/1 123/2 123/2 129/5 134/18 153/20 166/10 171/5 187/6 187/12 188/23

189/11 189/12 189/21 189/23 190/4 190/8 212/23 227/7 235/2 247/21 247/25 248/7 250/14 253/22 258/23 260/7 262/22 262/23 267/8 267/9 267/16 279/6
**Number 03-60487 [1]** 26/15
**Number 11 [1]** 190/8
**Number 192 [1]** 134/18
**Number 217 [1]** 267/16
**number 398 [1]** 61/7
**number 5 [4]** 43/20 44/12 49/23 258/23
**number eight [3]** 189/21 262/23 267/8
**number five [4]** 188/23 189/11 247/25 248/7
**number four [2]** 227/7 247/21
**Number nine [1]** 189/23
**number one [2]** 22/2 250/14
**number seven [1]** 262/22
**Number six [2]** 189/12 260/7
**number ten [1]** 190/4
**Number three [1]** 187/12
**Number two [1]** 187/6
**numbers [2]** 51/21 194/5
**numerous [3]** 84/18 108/17 155/24
**nystagmus [1]** 120/10

## O

**o'clock [6]** 6/25 7/7 7/8 63/16 252/23 279/9
**oath [2]** 142/17 273/3
**obey [3]** 142/10 142/13 142/15
**obeyed [1]** 142/16
**object [14]** 14/1 15/14 20/3 20/4 21/19 22/3 76/20 113/3 113/6 113/6 113/8 178/5 218/15 224/16
**objected [1]** 275/12
**objection [9]** 104/8 104/19 105/2 185/16 198/14 200/25 249/16 275/18 276/2
**objections [11]** 12/9 190/11 269/17 269/25 272/1 272/8 275/1 276/24 277/10 279/6 279/15
**objective [23]** 40/5 48/2 49/7 72/14 72/16 72/19 73/9 75/25 76/4 78/20 79/16 82/25 89/6 91/17 119/16 133/17 139/21 175/16 196/22 197/6 201/18 227/2 227/3
**objectively [24]** 48/21 49/5 49/7 59/21 72/9 76/21 78/14 91/11 116/18 117/4 117/8 117/12 167/13 168/23 174/14 175/16 184/10 196/3 199/4 200/6 200/7 200/8 251/23 252/1
**objects [2]** 121/12 213/7
**obligated [1]** 266/16
**obliged [6]** 135/13 154/9 175/21 175/21 178/17 196/11
**observations [1]** 177/18
**observe [1]** 73/21
**observed [6]** 43/21 49/24 75/16 188/1 193/1 200/9
**observer [2]** 39/14 139/22
**obstruct [1]** 187/7
**obtained [1]** 262/23
**obvious [1]** 137/19
**OC [1]** 86/14
**occasions [1]** 81/20
**occupant [1]** 131/21
**October [5]** 130/20 132/15 155/17 159/2 159/3

# O

**October 10 [2]** 130/20 155/17
**October 2010 [1]** 159/3
**October 2012 [1]** 159/2
**October 4 [1]** 132/15
**odd [1]** 33/8
**odds [1]** 162/10
**off-duty [1]** 155/23
**off-the-cuff [1]** 263/18
**offense [8]** 155/13 155/21 229/11 230/2 233/18 233/22 234/12 283/11
**offer [2]** 12/19 224/24
**offering [1]** 170/16
**office [36]** 5/2 19/17 56/6 57/7 90/11 92/3 93/2 93/8 93/25 96/18 119/10 125/2 125/4 131/22 132/8 133/21 133/21 133/23 133/23 134/6 137/23 138/3 143/7 153/18 153/24 153/25 154/2 154/13 155/20 156/8 157/9 158/23 242/19 243/15 244/11 266/16
**Office's [1]** 138/13
**officer [120]**
**Officer Borut's [1]** 83/25
**Officer Lin's [1]** 93/7
**officer's [22]** 15/22 17/4 20/12 84/12 94/6 107/10 107/25 108/23 114/9 116/12 116/18 117/7 117/9 149/10 167/6 167/10 167/14 178/24 181/12 196/21 224/25 265/5
**officer-created [1]** 36/10
**Officer-Involved [1]** 83/18
**officers [85]**
**Officers' [1]** 105/17
**offtrack [1]** 244/1
**oh [32]** 5/22 6/10 7/6 8/16 34/3 34/3 41/12 42/1 47/16 47/19 48/18 53/21 96/11 101/17 102/24 103/4 110/23 113/25 113/25 120/11 121/14 126/21 128/9 130/9 144/3 145/7 148/7 188/25 223/23 241/2 270/19 286/8
**Okeechobee [1]** 151/22
**older [3]** 65/4 92/12 92/20
**oleoresin [1]** 61/16
**omission [1]** 196/21
**omissions [2]** 52/4 195/25
**omitted [1]** 267/22
**one percent [1]** 66/8
**ongoing [1]** 34/18
**op [2]** 50/14 50/23
**op-ed [2]** 50/14 50/23
**open [13]** 55/21 56/20 71/25 72/5 107/5 126/4 126/7 126/10 126/13 126/14 233/5 234/5 234/8
**opening [3]** 122/17 234/2 240/3
**operate [1]** 46/11
**operating [1]** 221/6
**operations [1]** 57/8
**ophthalmologist [1]** 103/21
**opine [1]** 117/15
**opining [1]** 146/13
**opinion [52]** 25/21 26/14 26/19 43/20 44/4 45/21 49/23 59/20 60/3 77/11 78/9 78/13 78/16 78/17 78/18 78/19 80/14 80/19 82/21 82/24 83/7 83/9 84/21 85/12 86/17 86/18 86/19 87/9 88/3 88/7 94/4 98/22 118/11 138/18 141/8 141/9 141/17 146/21 150/14 150/19 151/4

152/12 153/12 159/17 161/18 163/20 166/20 168/10 175/14 178/22 187/11 189/17
**opinions [31]** 29/16 30/3 30/5 30/24 30/25 43/15 49/12 60/11 61/7 73/3 77/9 87/5 88/25 111/23 117/4 122/12 123/9 146/4 154/25 159/5 174/6 180/20 182/1 184/7 185/9 186/1 186/2 186/7 198/7 198/10 201/8
**opportunity [24]** 5/16 5/18 20/18 20/21 92/23 92/24 143/11 144/14 146/16 148/3 148/4 159/15 160/2 160/16 164/7 196/24 265/5 265/25 266/4 266/9 267/3 267/4 272/5 278/4
**oppose [2]** 127/18 148/6
**opposed [12]** 16/21 36/19 38/4 62/24 65/4 75/13 145/13 209/5 219/7 238/12 252/8 253/4
**opposing [2]** 5/17 123/8
**opposition [1]** 178/21
**optical [1]** 120/25
**option [1]** 44/11
**oral [3]** 153/9 272/6 285/20
**orally [1]** 9/5
**order [31]** 6/1 6/19 8/14 9/3 10/2 10/8 10/13 26/19 26/24 56/2 96/8 96/19 107/17 124/17 127/22 128/1 134/22 141/25 142/13 150/13 161/5 161/5 162/2 163/6 201/6 257/7 283/23 284/11 284/23 285/22 286/7
**Order 500.00 [2]** 96/8 96/19
**ordered [1]** 132/19
**orders [4]** 142/11 142/14 142/15 142/17
**ordinary [1]** 180/4
**Oregon [2]** 33/2 33/23
**organization's [1]** 102/1
**organize [1]** 98/9
**organized [1]** 127/15
**original [1]** 30/21
**originally [6]** 21/2 21/23 128/16 216/20 236/3 269/7
**originated [1]** 151/24
**Orlando [1]** 101/13
**Orleans [6]** 32/25 33/1 33/5 33/7 33/8 33/20
**outcomes [1]** 35/19
**outgunned [2]** 86/3 89/12
**outset [5]** 10/4 11/25 236/18 255/9 255/10
**outweighs [2]** 218/17 225/24
**overlapped [1]** 173/22
**overlooked [1]** 156/14 157/15
**overly [1]** 275/9
**overmilitarized [1]** 19/12
**overreacted [1]** 87/8
**oversaw [1]** 60/20
**oversight [1]** 57/16
**oversimplification [1]** 18/14
**overview [2]** 4/3 203/1

# P

**P.A [2]** 2/3 2/7
**p.m [7]** 97/24 97/24 126/23 127/1 235/15 235/15 286/18
**P.O [1]** 2/4
**pace [1]** 226/22
**page [34]** 12/14 26/15 49/3 77/11 77/14 77/15 77/16 77/20 77/23 85/12 117/18

117/19 119/22 119/23 128/4 128/6 128/8 134/16 135/22 139/6 159/21 187/3 268/10 268/24 269/5 269/19 270/7 270/15 270/21 275/25 277/9 284/1 287/2 287/8
**page 10 [1]** 187/3
**page 2 [1]** 12/14
**page 21 [1]** 117/19
**page 23 [1]** 159/21
**page 4 [4]** 77/20 77/23 134/16 135/22
**page 5 [3]** 77/11 77/15 77/16
**page 6 [1]** 85/12
**page 7 [2]** 119/22 139/6
**page 8 [2]** 49/3 119/23
**paged [1]** 54/10
**pages [3]** 101/21 101/23 155/21
**Palm [23]** 2/4 2/5 3/9 19/16 89/15 89/22 90/10 92/2 93/2 93/8 93/24 96/18 101/14 119/10 131/22 137/14 137/22 138/12 151/22 154/12 242/18 244/4 244/11
**pan [1]** 168/18
**papers [2]** 53/4 109/4
**paperwork [1]** 127/14
**paragraph [4]** 12/18 19/10 49/20 118/2
**paragraph 105 [2]** 12/18 19/10
**paragraph 5 [1]** 49/20
**paragraphs [1]** 33/9
**paralyzed [1]** 142/16
**parameters [1]** 190/16
**parcel [2]** 21/3 259/12
**pare [3]** 268/21 272/17 279/5
**parents [1]** 16/12
**paring [1]** 270/13
**park [1]** 122/17
**parked [4]** 97/13 111/1 123/2 131/19
**parking [1]** 110/25
**part [52]** 13/3 14/23 15/19 19/14 20/10 21/3 21/10 21/21 23/3 28/14 30/6 30/13 30/25 35/15 39/25 40/17 52/21 63/6 63/7 72/16 76/1 79/7 89/18 89/23 92/17 95/8 99/16 112/25 114/19 137/12 145/23 148/8 148/18 173/5 173/6 191/13 191/14 209/20 228/16 228/17 231/18 239/5 242/17 257/21 259/1 259/2 259/12 261/2 263/18 266/2 266/18 273/6
**parties [6]** 5/15 18/25 26/12 159/16 277/11 277/20
**parts [6]** 108/7 108/8 149/4 149/4 149/5 269/13
**party [4]** 205/2 206/17 269/5 273/21
**Pass [1]** 237/4
**passed [3]** 8/22 131/2 207/4
**passes [1]** 207/2
**passing [3]** 198/21 237/3 238/12
**passion [2]** 160/7 165/13
**passionate [1]** 158/22
**patent [1]** 10/16
**path [1]** 73/1
**pathology [1]** 57/11 57/13
**patience [1]** 284/2
**Patrick [2]** 2/2 3/15
**patrol [2]** 181/24 238/16
**pattern [12]** 132/2 135/16 135/18 137/1 137/3 137/5 139/14 141/18 161/24 162/4 162/15 283/5
**Paul [1]** 277/18
**pay [3]** 56/10 56/12 57/23

# P

**PBA [7]** 262/23 263/7 264/4 264/5 264/6 264/19 265/23
**PBCSO [1]** 96/8
**PBSO [12]** 42/14 42/18 87/6 96/10 119/9 119/20 120/17 161/19 239/11 263/14 264/3 269/11
**PBSO's [1]** 138/14
**peaceful [1]** 18/22
**peacekeeping [1]** 243/5
**PEDA [3]** 67/1 67/3 71/13
**peer [6]** 38/9 38/13 41/13 41/14 41/16 43/17
**peer-review [1]** 38/9
**peer-reviewed [2]** 38/13 43/17
**pending [2]** 132/6 212/1
**Pennsylvania [2]** 102/10 105/17
**Pennsylvania's [1]** 101/3
**people [25]** 32/17 36/16 36/17 36/17 37/11 59/15 61/14 65/1 65/22 82/16 85/16 86/4 88/7 101/8 102/18 123/15 137/21 159/10 170/9 216/18 225/10 247/8 247/10 251/6 269/11
**Peoples [1]** 66/23
**Peoples vs. Morales [1]** 66/23
**pepper [1]** 87/2
**per se [1]** 183/20
**perceive [12]** 67/3 70/23 71/10 75/9 75/22 204/2 206/20 208/11 209/5 209/17 209/23 213/20
**perceived [12]** 17/3 64/25 76/5 118/17 133/5 137/16 167/5 189/3 215/25 236/15 236/15 260/4
**perceives [1]** 172/6
**percent [1]** 66/8
**perception [55]** 15/10 15/22 16/19 19/2 19/3 46/3 46/9 46/10 67/2 105/10 106/16 106/20 167/7 167/10 168/22 168/25 172/7 174/15 175/23 184/2 184/5 184/15 191/23 192/12 192/16 193/20 193/23 194/15 203/9 203/11 204/24 207/11 208/20 210/2 213/10 236/10 236/11 236/13 236/17 237/13 238/20 239/17 244/3 245/6 249/3 250/4 250/23 250/24 255/6 256/4 256/17 258/13 259/21 259/22 260/9
**perceptions [10]** 20/12 118/11 167/14 178/14 179/9 181/13 183/18 194/1 240/19 251/25
**perceptual [1]** 106/20
**Perez [3]** 140/16 140/18 140/20
**perfect [2]** 65/19 156/15
**perfectly [1]** 47/24
**performing [2]** 161/20 195/14
**perhaps [16]** 91/3 109/22 147/13 153/12 157/23 159/12 185/7 214/24 217/15 237/14 238/24 245/13 251/19 252/9 254/3 264/11
**period [5]** 55/15 60/19 108/4 153/22 244/12
**permissibility [1]** 139/23
**permissible [4]** 117/6 166/14 199/8 213/1
**permission [4]** 51/22 259/17 259/18 284/15
**permit [23]** 4/22 91/9 131/15 135/15 140/8 174/7 183/7 184/5 184/22 185/2 203/15 212/14 213/22 243/20 243/24

244/1 246/18 246/20 250/12 262/7 262/14 272/14 273/23
**permits [2]** 257/20 261/13
**permitted [18]** 4/17 12/2 22/16 186/17 190/7 191/9 192/2 193/12 201/16 202/21 204/23 234/18 236/24 237/11 238/25 240/13 260/11 267/6
**permitting [6]** 25/3 148/2 151/4 185/21 186/19 223/14
**perpetuity [1]** 158/16
**persists [2]** 133/24 134/6
**person [15]** 37/10 64/19 67/7 69/23 70/10 70/12 71/18 90/20 112/16 122/2 122/2 195/22 211/5 225/13 228/6
**person's [2]** 67/12 68/18
**persona [2]** 240/4 240/6
**personal [4]** 168/5 177/1 203/5 207/1
**personally [1]** 151/9
**personnel [3]** 101/20 138/12 164/3
**perspective [17]** 80/1 96/20 119/16 170/5 175/5 175/17 176/2 186/14 186/15 186/21 193/10 222/14 223/6 258/4 263/24 270/9 278/22
**perspectives [1]** 186/14
**perspiration [1]** 68/20
**persuasive [2]** 159/4 159/5
**persuasively [1]** 223/4
**pertains [1]** 11/13
**Petersburg [1]** 101/11
**Ph.D [2]** 38/25 40/17
**phase [1]** 151/5
**phenomenon [1]** 121/12
**Philadelphia [1]** 102/7
**philosophies [1]** 242/10
**philosophy [6]** 187/4 240/22 242/5 243/15 243/20 243/21
**Phoenix [1]** 102/7
**phone [47]** 6/11 22/3 45/18 45/19 45/22 67/13 76/22 78/15 78/21 79/2 79/22 80/14 80/15 109/9 111/3 111/3 113/9 113/11 167/5 176/10 176/12 178/7 182/7 187/18 189/14 191/5 191/18 191/19 191/24 201/21 201/23 214/20 215/8 215/16 215/22 215/25 216/1 217/2 217/4 217/11 218/1 218/2 218/11 218/16 220/5 225/21 225/21
**phonetic [2]** 86/1 152/11
**photograph [2]** 113/24 114/6
**photographs [3]** 56/8 155/24 216/19
**Photos [1]** 227/8
**phrase [4]** 173/15 184/17 184/18 188/23
**phrased [1]** 245/10
**physical [4]** 61/18 64/19 131/24 213/2
**physiological [1]** 106/21
**physiology [2]** 107/17 108/20
**pick [2]** 72/3 226/22
**picked [2]** 21/8 216/14
**picture [3]** 113/14 113/17 236/21
**pictures [1]** 71/23
**piece [3]** 50/14 238/24 275/8
**pine [2]** 69/21 123/2
**pipe [1]** 157/1
**pistol [1]** 107/7
**pizza [1]** 125/6
**place [9]** 5/5 63/6 81/20 81/22 82/25 121/16 125/1 125/6 247/11
**plaid [1]** 248/25
**plain [2]** 191/5 191/8

**plaintiff [28]** 1/6 2/2 12/19 13/22 14/8 14/10 15/5 15/24 23/7 80/1 134/19 143/17 146/9 157/11 160/1 197/8 201/24 203/18 205/1 206/18 213/7 223/4 223/8 227/1 240/12 247/25 250/12 250/16
**plaintiff's [33]** 4/12 5/6 9/6 11/11 22/24 22/25 27/24 29/2 51/9 98/13 99/13 134/16 135/5 144/20 147/18 152/25 156/11 158/1 160/7 161/13 164/24 167/20 167/21 178/20 202/24 203/6 203/14 203/16 223/5 223/15 227/6 287/2
**plaintiffs [18]** 3/17 23/19 127/18 127/19 144/13 145/25 158/6 159/18 238/18 241/16 242/7 243/12 246/1 248/2 259/13 260/10 261/5 262/24
**plaintiffs' [2]** 10/19 154/25
**plan [2]** 200/17 254/16
**planned [1]** 12/13
**planning [1]** 273/10
**play [7]** 104/15 167/4 190/20 223/22 228/7 255/19 281/21
**played [7]** 25/20 249/2 249/13 250/22 252/8 259/21 270/17
**player [2]** 59/17 238/11
**playing [2]** 270/22 273/5
**plays [2]** 222/18 240/17
**pleading [1]** 169/12
**pleadings [3]** 96/13 153/19 206/4
**pleasure [1]** 285/9
**pled [1]** 25/16
**plural [1]** 161/21
**pocket [11]** 15/12 67/7 157/1 178/4 209/1 214/5 215/1 215/7 215/16 219/6 219/25
**point [98]**
**pointed [7]** 30/4 73/2 108/11 109/18 111/9 156/12 257/25
**pointing [4]** 111/6 112/10 157/14 172/12
**points [7]** 110/15 111/8 134/19 153/8 157/13 187/1 198/1
**poison [1]** 251/5
**Pole [3]** 53/12 53/24 54/5
**police [130]**
**policies [7]** 32/10 33/18 35/11 40/19 41/11 91/22 94/10
**policing [19]** 33/17 36/6 36/7 36/9 36/16 36/21 38/18 39/21 39/23 41/19 57/3 65/17 187/4 240/23 242/5 242/9 242/10 242/13 243/16
**policy [24]** 33/19 42/21 42/23 90/10 93/20 93/24 93/25 94/8 94/18 95/8 95/11 95/17 95/21 96/10 102/13 137/8 138/9 138/14 140/9 141/21 142/3 159/11 161/19 163/8
**policymakers [1]** 164/6
**polo [4]** 248/25 255/17 256/21 260/3
**poor [6]** 80/23 107/21 107/23 107/24 108/1 108/6
**portion [6]** 30/4 120/3 124/12 124/14 261/18 261/18
**portions [2]** 185/20 271/4
**Portland [3]** 33/2 33/23 33/25
**portray [3]** 250/17 251/5 256/6
**pose [1]** 187/12
**posing [2]** 64/19 223/8
**position [29]** 20/25 21/9 21/18 22/1

**P**

**position... [25]** 24/11 62/15 62/22 63/3 67/21 70/11 79/21 81/2 81/17 102/12 129/8 129/12 130/8 136/9 148/15 153/23 157/25 160/24 163/2 179/19 186/12 223/7 227/21 228/4 248/21
**positive [1]** 107/15
**possessed [1]** 179/1
**possessing [1]** 72/5
**possession [8]** 142/9 142/24 211/25 218/19 221/1 222/19 227/14 234/15
**possibility [2]** 45/4 76/9
**post [2]** 142/1 263/10
**post-shooting [1]** 263/10
**post-Stephens [1]** 142/1
**potential [3]** 20/8 21/4 216/2
**pound [1]** 132/15
**powerful [1]** 111/13
**powerfully [1]** 168/2
**practical [4]** 6/5 186/15 270/23 274/11
**practice [6]** 35/25 52/11 135/16 135/18 142/4 161/19
**practices [11]** 32/2 32/10 32/21 35/12 40/14 40/22 41/1 90/7 101/22 171/20 182/6
**practicing [1]** 100/16
**Praprotnik [1]** 164/4
**pre [3]** 138/9 141/23 141/23
**pre-event [1]** 141/23
**pre-existing [1]** 138/9
**pre-Stephens [1]** 141/23
**preattack [4]** 67/16 68/14 68/21 68/22
**preceded [1]** 12/3
**precedes [3]** 13/5 13/8 132/25
**preceding [5]** 154/13
**precise [2]** 211/14 219/5
**preclude [2]** 209/11 209/17
**preconceived [4]** 136/18 154/2 154/5 154/6
**predate [2]** 161/3 258/10
**predated [1]** 161/1
**predicate [6]** 129/21 135/8 210/13 211/15 229/17 254/18
**predicated [2]** 49/12 165/5
**predict [1]** 4/1
**preempting [1]** 117/6
**preemptive [10]** 66/15 66/16 66/18 66/19 66/20 67/15 79/14 113/4 113/7 113/9
**prefer [2]** 126/12 173/23
**preference [2]** 124/10 278/2
**prejudice [10]** 12/15 24/23 25/2 208/6 218/17 219/16 219/18 222/9 233/14 234/24
**prejudicial [13]** 21/6 209/21 209/25 210/5 210/6 210/10 210/10 224/8 225/24 226/2 227/10 251/4 265/15
**preliminary [2]** 272/2 282/2
**premise [1]** 72/19
**prepared [1]** 285/6
**preparing [1]** 4/5
**presence [1]** 214/10
**present [12]** 19/5 19/12 64/7 98/4 155/20 248/11 253/9 253/12 265/23 266/11 273/2 274/20
**presentation [11]** 7/9 25/11 27/9 41/7 64/4 64/8 142/6 154/16 169/19 170/12 175/6

**presented [21]** 129/3 129/16 130/14 130/18 133/20 134/20 137/1 140/14 141/1 146/22 147/8 148/3 153/20 154/19 161/1 161/13 162/11 165/10 209/15 245/25 250/6
**presenting [1]** 146/18
**president's [1]** 36/8
**presidents [1]** 102/2
**pressing [1]** 275/18
**pressure [2]** 87/23 88/2
**presumed [1]** 223/15
**pretrial [1]** 273/25
**prevent [3]** 96/16 146/8 147/13
**prevented [1]** 145/9 145/25
**Prevention [1]** 83/19
**preview [2]** 169/18 272/8
**price [1]** 219/15
**pride [1]** 55/2
**primarily [3]** 140/18 145/16 229/8
**principal [2]** 101/19 128/1
**principle [1]** 196/8
**principles [2]** 120/24 196/9
**printed [1]** 99/11
**prison [1]** 233/3
**privacy [1]** 261/2
**privilege [1]** 8/22
**privileged [3]** 264/22 265/14 265/22
**proactively [1]** 35/4
**probable [1]** 92/16
**probation [1]** 233/22
**probative [7]** 208/6 209/22 210/1 225/24 234/24 251/4 265/15
**problem [6]** 6/6 36/21 56/8 84/16 236/5 272/2
**problems [1]** 186/24
**procedural [5]** 36/11 36/15 36/20 148/21 165/24
**Procedurally [1]** 275/22
**procedure [9]** 4/21 6/15 9/17 82/7 82/9 82/18 142/4 161/19 280/25
**procedures [8]** 40/14 40/22 41/2 41/11 125/18 147/3 235/10 267/21
**proceed [4]** 26/23 63/17 98/5 130/11
**proceeded [1]** 150/3
**proceeding [1]** 29/12
**proceedings [4]** 1/24 34/2 286/18 287/21
**process [3]** 35/25 61/25 121/2
**processed [1]** 200/10
**processes [1]** 34/14
**processing [1]** 123/1
**produced [3]** 1/25 41/23 217/25
**products [1]** 102/21
**profess [1]** 40/17
**profession [2]** 38/12 108/16
**professional [4]** 55/22 56/19 60/3 100/23
**professionally [1]** 117/7
**professor [12]** 38/9 50/17 106/3 167/8 167/21 172/19 186/7 187/8 188/3 188/4 242/8 243/25
**Professor Alpert [2]** 167/8 187/8
**Professor Alpert's [1]** 186/7
**professor's [1]** 185/25
**proffer [10]** 185/13 185/16 190/21 198/7 198/13 198/13 200/14 201/14 202/17 276/16
**proffered [1]** 169/24
**proffering [3]** 186/7 186/9 201/9

**proffers [1]** 285/11
**profiled [1]** 247/25
**profiles [1]** 251/6
**profiling [6]** 34/20 34/25 35/2 35/8 35/13 42/3
**program [4]** 36/2 57/4 60/17 61/5
**programs [12]** 61/4 101/2 101/3 101/10 101/15 103/23 103/23 103/24 105/23 107/1 107/18 108/9
**progresses [1]** 50/3
**prohibit [1]** 239/5
**project [3]** 35/17 36/4 42/2
**promote [1]** 40/14
**promoted [2]** 55/17 95/19
**promotion [1]** 3/18
**pronouncements [1]** 133/19
**proof [5]** 141/21 169/21 210/18 227/5 282/20
**propensity [1]** 227/11
**proper [8]** 79/13 187/10 189/17 220/1 229/8 229/9 231/3 246/10
**properly [8]** 83/1 128/20 150/24 164/3 169/25 175/18 175/19 243/16
**properties [1]** 168/15
**proponent [1]** 230/23
**proposals [1]** 34/14
**propose [3]** 226/17 271/14 275/22
**proposed [4]** 19/10 21/15 280/18 283/23
**proposition [2]** 140/20 207/4
**prosecute [1]** 226/24
**prosecution [1]** 142/8
**prosecutorial [1]** 227/5
**prosing [1]** 142/23
**prossed [2]** 142/18 216/23
**protect [3]** 48/7 63/2 88/2
**protected [1]** 87/19
**protection [2]** 62/17 90/22
**protections [1]** 223/13
**protocol [1]** 183/20
**proud [1]** 53/22
**prove [4]** 155/5 162/14 218/19 230/9
**proved [1]** 212/11
**proven [2]** 89/22 133/24
**proves [2]** 138/9 143/2
**provide [1]** 36/18
**provided [7]** 56/9 61/6 61/8 99/7 105/6 159/16 282/7
**province [1]** 117/6
**proving [1]** 13/4
**proximate [4]** 16/16 16/21 17/21 18/6
**proximity [2]** 205/10 210/14
**pruning [2]** 132/18 132/20
**psychological [4]** 75/1 75/5 75/8 105/10
**psychologist [1]** 106/5
**psychology [1]** 108/20
**public [3]** 55/17 56/1 133/19
**publication [1]** 42/10
**publications [4]** 38/6 38/9 38/16 41/16
**publicity [1]** 87/22
**publicly [4]** 133/5 134/4 156/6 156/7
**published [9]** 32/16 38/18 41/14 83/18 101/18 101/24 108/18 108/19 168/10
**pull [21]** 13/15 29/4 51/11 70/4 70/9 70/12 77/19 94/12 98/18 111/3 130/23 151/7 151/20 169/10 175/2 182/6 224/23 249/8 256/23 256/24 263/3
**pulled [21]** 14/16 25/21 45/2 47/4 47/5

**P**

pulled... [16]  47/6 168/21 183/1 194/15 214/16 214/20 215/7 215/11 215/16 217/2 220/18 221/22 224/15 225/14 257/3 259/4
pulling [3]  45/12 48/15 172/6
pulls [4]  16/18 63/21 71/5 195/6
punishable [5]  230/2 231/4 231/5 232/7 232/24
punishment [5]  131/14 233/4 233/7 233/11 233/17
pupils [1]  108/4
Purdy [1]  2/7
pure [1]  252/25
purported [1]  159/21
purposely [1]  136/12
purposes [9]  3/11 29/9 29/11 30/13 87/22 118/10 208/10 230/21 273/24
purse [4]  63/23 79/1 249/7 249/8
pursuant [1]  135/6
pursue [3]  13/18 249/17 252/8
pursuing [1]  14/8
pursuit [2]  91/8 249/20
pursuits [1]  91/8
push [2]  35/1 107/6
puts [1]  230/24
puzzle [1]  238/25

**Q**

qualification [1]  134/3
qualifications [3]  28/20 31/22 70/16
qualified [6]  23/7 58/10 58/10 150/15 152/9 184/23
quality [3]  174/12 206/3 270/12
quantity [11]  85/13 207/22 207/23 211/14 224/6 224/7 224/7 226/1 226/3 226/5 226/10
quarterdeck [1]  54/10
quarters [2]  107/22 235/19
Queens [1]  38/3
Queensland [2]  37/6 37/16
quest [1]  158/18
question [54]  12/7 13/16 17/19 49/1 49/2 64/24 70/17 70/18 70/19 71/1 71/22 73/4 75/19 76/3 77/6 84/22 86/12 93/24 95/1 115/16 119/25 142/14 157/23 175/1 177/4 188/12 196/2 196/2 198/23 199/12 200/21 201/21 210/6 211/20 215/2 215/19 217/5 223/6 229/8 229/9 229/18 234/17 238/20 245/2 249/20 250/3 254/16 254/19 256/13 257/1 258/17 273/9 275/14
questioned [3]  238/8 244/8 260/21
questioning [1]  240/2
questionnaire [3]  280/11 280/19 283/14
questionnaires [4]  4/21 280/7
questions [26]  4/23 5/1 43/6 46/22 47/9 52/7 59/24 60/5 69/6 69/22 73/7 88/12 96/3 99/3 115/24 123/15 156/12 157/15 203/7 211/25 212/4 254/21 273/15 274/2 278/5 280/10
quick [8]  73/6 111/25 112/3 112/12 124/8 125/7 157/16 256/22
quickly [3]  88/17 125/16 126/8
Quinlan [29]  2/2 3/16 31/11 31/24 49/22 51/15 52/7 53/2 54/1 65/9 88/16 96/6 116/2 116/5 118/4 158/22 172/13

**R**

187/10 197/23 204/23 227/18 257/4 268/1 279/2 287/3 287/4 287/6 287/7 287/10
quote [10]  77/18 89/1 96/13 119/23 131/13 132/17 135/22 139/6 149/3 162/11
quote/unquote [1]  162/11
quoted [3]  119/14 128/15 223/1
quoting [2]  128/8 170/2

**R**

race [13]  249/21 251/10 251/19 252/8 252/20 253/2 253/4 253/21 254/10 256/19 258/12 259/2 259/21
raced [1]  152/7
racial [6]  34/20 34/24 35/2 35/7 35/13 42/3
racially [5]  249/17 251/6 253/7 253/7 253/13
racist [3]  250/18 259/11 259/16
racist-type [1]  250/18
racket [1]  255/17 256/22 260/3
raise [12]  12/10 29/1 51/8 72/25 74/8 98/15 148/4 159/18 181/25 242/10 246/25 262/25
raised [17]  23/12 23/14 23/25 26/8 73/4 74/11 144/25 163/7 166/24 168/18 173/18 208/23 208/25 209/13 209/18 209/19 276/24
raising [4]  10/24 233/25 254/10 258/15
Raleigh [2]  57/24 58/1
Rambo [5]  222/8 239/16 240/4 240/10 246/3
ran [3]  151/16 151/17 157/22
rank [2]  38/11 54/9
ranking [1]  92/4
rapidly [2]  68/4 68/10
rapport [2]  243/2 243/22
rate [2]  182/21 183/1
ratification [12]  83/3 133/24 147/14 162/11 163/5 163/9 163/11 163/13 163/17 163/25 164/3 164/14
ratified [2]  138/7 165/11
ratifying [1]  135/18
rational [1]  140/8
rationale [1]  162/10
rationally [1]  139/11
rattle [1]  63/7
reach [14]  13/6 60/3 76/24 76/25 77/2 79/10 188/13 209/13 215/23 217/6 217/12 218/8 224/22 255/15
reached [27]  7/17 13/25 15/12 17/3 19/4 76/19 84/8 84/10 113/5 172/16 191/1 214/5 214/25 215/7 215/15 217/2 217/5 217/6 217/23 217/24 218/9 218/10 218/14 220/3 224/14 224/15 225/19
reaches [1]  156/25
reaching [19]  79/1 79/9 132/4 176/9 176/10 189/6 194/2 214/4 214/4 214/14 214/24 215/3 215/10 217/14 218/4 224/20 249/6 249/8 255/13
react [3]  71/4 71/10 71/10
reacting [1]  71/7
reaction [4]  71/2 75/8 106/15 106/17
reactions [1]  249/13
reacts [1]  106/16
read [26]  11/12 20/23 28/25 40/18 44/12 51/20 99/21 116/21 128/17

135/22 147/6 149/4 159/17 166/9 168/9 171/5 171/7 172/17 172/17 203/21 215/13 220/14 220/19 231/11 236/3 284/7
reading [9]  46/7 49/6 77/10 117/22 118/5 119/22 127/25 161/18 169/12
reads [3]  49/23 266/15 277/24
ready [6]  5/3 53/7 55/4 70/14 197/17 239/16
reality [3]  156/16 182/5 207/11
rear [1]  214/5
reasonableness [40]  20/11 50/18 72/15 72/16 73/9 75/25 76/4 79/17 90/6 91/17 119/17 167/6 170/4 175/17 180/2 181/12 184/2 184/5 191/17 191/21 191/22 192/12 192/16 193/19 193/22 193/23 196/23 197/6 202/1 203/10 204/24 227/4 236/10 240/13 240/18 244/2 245/6 250/24 255/6 256/17
reasoned [1]  5/14
reasons [6]  26/11 95/10 211/1 250/13 253/22 283/24
rebut [1]  143/14
rebuttal [3]  160/16 160/19 172/4
recall [9]  45/2 89/11 89/13 156/19 204/2 211/23 212/10 213/3 260/20
Recalling [5]  98/3 127/7 235/23
received [4]  18/1 34/6 144/23 233/4
recent [3]  26/21 141/7 162/20
recess [3]  97/24 126/23 235/15
recite [1]  72/13
reckless [1]  137/3
recklessly [1]  162/15
recognition [1]  162/4
recognize [5]  77/2 86/9 248/19 254/2 258/2
recognized [1]  141/19
recognizing [2]  84/1 160/14
recollect [1]  206/20
recollection [6]  213/15 229/25 257/6 257/10 260/10 265/23
recommendations [1]  35/11
reconsider [8]  135/2 147/21 147/21 163/2 197/4 197/9 197/10 203/25
reconsideration [11]  27/4 127/18 134/17 143/17 144/11 147/25 148/12 149/3 153/7 165/25 166/2
reconstruction [4]  106/6 106/9 116/21 132/2
record [34]  8/21 9/1 9/5 11/12 26/11 28/16 28/21 28/25 31/1 31/3 31/16 43/5 45/12 83/10 85/10 96/23 99/16 104/3 104/6 108/24 121/7 124/19 126/21 126/22 186/3 186/24 207/5 209/16 235/3 235/13 242/2 244/22 244/23 256/9 283/25 285/17 287/21
recorded [1]  1/24
records [1]  131/7
recounting [1]  118/17
recross [2]  47/10 90/3
recruits [1]  110/21
recurs [1]  276/2
red [1]  11/3
redirect [11]  46/24 47/1 49/21 88/14 88/15 96/5 122/8 238/21 287/4 287/7 287/10
reduce [1]  279/6
reevaluation [1]  134/3

# R

**refer [2]** 3/12 85/16
**reference [7]** 128/23 128/24 138/8
 166/12 238/12 241/19 247/5
**referenced [1]** 187/10
**references [5]** 59/10 153/19 198/21
 265/24 266/2
**referencing [1]** 143/5
**referred [4]** 61/1 149/2 173/2 226/8
**referring [4]** 23/11 149/7 154/24
 214/21
**refiled [1]** 52/10
**refined [1]** 36/23
**reflect [4]** 42/24 62/4 237/13 284/15
**reflected [4]** 30/3 43/1 89/3 240/15
**reflecting [1]** 139/22
**reflection [1]** 233/17
**reflects [3]** 91/25 137/3 233/16
**reform [2]** 33/9 56/7
**refusing [1]** 137/6
**regular [1]** 102/16
**regularly [2]** 106/7 114/16
**regulations [1]** 33/18
**reject [2]** 217/7 217/8
**rejection [1]** 169/15
**relationship [1]** 34/18
**relatively [1]** 15/6
**relatives [1]** 37/25
**relevance [10]** 180/25 181/3 184/6
 218/16 233/7 233/10 264/7 272/9 275/1
 275/12
**relevant [37]** 93/25 93/25 94/2 94/5
 95/5 95/6 169/5 183/23 183/24 187/5
 189/16 189/22 189/24 189/25 190/2
 190/7 190/10 196/22 200/9 211/1 213/2
 213/10 213/14 215/2 225/12 225/23
 227/1 227/24 234/17 236/4 238/3 239/8
 246/10 248/8 250/15 268/18 270/12
**reliability [1]** 67/6
**reliance [4]** 43/1 43/2 52/15 96/8
**relied [2]** 140/17 161/10
**relies [1]** 163/19
**reload [1]** 107/5
**rely [5]** 43/16 100/1 153/14 163/18
 273/25
**relying [1]** 145/12
**remain [2]** 29/25 85/1
**remaining [2]** 190/3 250/10
**remarks [1]** 263/18
**remedial [1]** 190/9
**remember [18]** 69/14 69/16 69/20
 89/17 112/14 115/9 118/25 142/8
 209/18 210/3 212/5 212/5 218/11 228/1
 228/2 245/2 260/22 279/15
**remind [3]** 4/18 4/25 255/25
**reminded [2]** 173/1 173/8
**remnants [1]** 36/2
**removed [2]** 215/20 216/17
**render [3]** 117/3 146/4 180/20
**rendered [4]** 59/20 146/21 150/13
 262/20
**rendezvous [1]** 132/10
**renew [1]** 82/22
**renewed [2]** 52/10 178/21
**Reno [1]** 32/12
**Rensselear [1]** 138/19
**reopen [1]** 160/4
**repeated [1]** 265/24

**repercussions [1]** 284/21
**rephrase [1]** 190/11
**replead [1]** 24/15
**replicated [1]** 90/9
**reply [3]** 12/14 231/12 247/6
**report [68]**
**reporter [7]** 2/9 2/10 242/3 285/19
 285/22 285/22 287/24
**reporter's [1]** 114/8
**reports [20]** 29/1 32/5 59/24 131/12
 134/20 144/23 145/17 145/19 145/6
 153/13 153/18 153/24 157/12 166/9
 172/18 185/8 185/20 198/4 198/24
 216/20
**represent [2]** 204/25 206/18
**request [3]** 148/11 228/17 272/5
**requested [3]** 144/23 153/17 157/11
**requesting [1]** 150/18
**requests [1]** 34/14
**required [12]** 43/25 46/14 47/14 48/16
 48/19 82/15 128/5 128/19 162/14
 176/14 188/2 188/5
**requirement [1]** 130/4
**requirements [4]** 59/25 91/24 141/24
 165/6
**reread [3]** 26/24 59/23 59/23
**rereads [1]** 49/15
**research [5]** 32/14 34/7 35/25 43/17
 146/11
**reserve [3]** 50/20 102/9 102/15
**resetting [1]** 148/12
**residency [1]** 57/11
**resident [1]** 55/1
**resolve [1]** 35/9
**resolved [3]** 35/10 150/16 169/24
**resolving [1]** 157/7
**respectfully [1]** 16/23 19/22 194/9
**respective [1]** 185/7
**respond [13]** 20/18 44/14 47/25 63/24
 145/15 172/13 194/25 196/19 197/11
 251/21 264/16 264/20 276/18
**respondeat [2]** 165/2 165/8 166/5
**responded [3]** 130/23 155/23 228/8
**responding [2]** 193/13 195/8
**responds [1]** 62/6
**response [54]** 12/15 15/18 17/16 18/1
 23/9 24/3 37/12 44/1 47/14 47/18 48/5
 49/1 61/21 71/6 74/15 80/3 85/2 113/7
 116/13 132/22 133/4 134/10 134/16
 139/14 139/17 143/12 143/16 143/16
 144/10 144/15 154/22 159/19 193/21
 194/19 197/2 203/22 207/13 215/17
 219/12 219/22 225/8 231/11 231/19
 241/5 243/1 243/9 250/8 251/24 255/11
 261/22 263/2 263/22 264/1 266/12
**responses [3]** 20/24 146/17 273/3
**responsibilities [4]** 196/12 196/14
 238/15 242/13
**responsibility [1]** 283/13
**rest [4]** 68/13 236/6 238/23 278/17
**restatement [2]** 25/24 26/22
**restaurant [1]** 71/24
**restrictive [1]** 94/17
**rests [1]** 25/4
**result [9]** 6/11 76/23 136/22 165/1
 165/1 211/18 231/24 252/1 252/2
**resulted [2]** 23/2 164/2
**retain [2]** 154/10 154/10
**retained [1]** 41/25 57/20 58/20

**retention [1]** 88/1
**rethink [1]** 61/17
**retired [2]** 57/2 57/25
**retiring [1]** 55/10
**retraction [1]** 134/5
**retrospective [1]** 135/15
**retrospectively [1]** 135/14
**return [1]** 56/21
**returning [1]** 131/25
**reveal [1]** 140/4
**revelations [1]** 237/23
**reversed [1]** 281/14
**reversible [2]** 141/3 281/22
**review [14]** 32/21 34/14 38/9 41/13
 41/14 41/16 42/13 83/2 83/10 83/12
 140/22 164/7 205/24 265/6
**reviewed [13]** 30/22 38/13 43/1 43/17
 83/14 84/21 91/22 103/15 119/9 156/4
 156/9 206/2 284/4
**reviewing [3]** 60/2 265/9 265/13
**revision [1]** 19/10
**revisit [6]** 150/18 158/15 165/17 256/19
 258/8 259/7
**rewrite [1]** 101/4
**rewritten [1]** 33/19
**Rhode [1]** 53/11
**Rhode Island [1]** 53/11
**RIC [1]** 1/8
**Richard [3]** 2/6 3/22 151/8
**rid [2]** 220/5 225/20
**ride [1]** 182/24
**ride-along [1]** 182/24
**rides [1]** 122/21
**riding [7]** 20/2 79/8 109/11 122/14
 179/11 187/13 252/23
**rifle [1]** 72/3
**rifles [1]** 71/25
**rights [2]** 58/16 139/5
**rigorous [1]** 165/6
**riot [1]** 32/5
**riots [3]** 34/15 35/20 35/24
**rise [1]** 285/16
**risk [8]** 19/18 38/17 39/24 41/20 57/8
 63/12 223/9 281/5
**RMR [2]** 2/9 287/24
**RMR-CRR [1]** 287/24
**road [10]** 69/21 73/22 147/22 151/19
 216/7 245/22 246/13 251/15 251/16
 253/16
**robber [1]** 112/13
**robbery [6]** 79/8 159/23 170/24 179/4
 230/5 230/19
**Roberts [2]** 163/20 212/23
**Roberts vs. Hollocher [1]** 212/23
**Roberts' [1]** 212/25
**rock [1]** 281/18
**rocks [2]** 132/21 132/23
**rode [2]** 73/22 225/15
**role [6]** 33/5 246/21 249/2 250/23
 252/8 259/21
**roles [1]** 33/13
**rolling [6]** 63/18 64/22 73/25 174/18
 216/5 225/16
**roof [1]** 157/2
**room [2]** 2/11 221/4
**rooms [1]** 221/6
**rose [3]** 54/9 136/9 136/14
**rotations [1]** 8/24
**rounds [8]** 61/15 86/15 89/14 89/16

**R**

**rounds... [4]** 89/20 89/21 238/10 239/13
**route [1]** 147/14
**routine [1]** 83/2
**Royal [1]** 151/22
**rubber [2]** 132/18 132/20
**rude [1]** 11/14
**rule [8]** 25/12 119/9 119/12 169/16 276/3 276/5 276/23 276/24
**Rule 500.00 [1]** 119/9
**ruled [16]** 4/14 160/3 160/12 165/18 187/8 246/4 248/1 248/5 249/18 249/18 250/11 250/14 254/11 256/1 256/18 257/10
**rules [5]** 59/17 59/19 273/23 277/9 284/9
**ruling [18]** 9/5 135/3 150/18 150/22 165/15 185/8 193/7 197/4 198/3 202/16 226/6 232/20 234/5 234/8 258/8 268/16 277/8 284/12
**rulings [15]** 9/3 10/22 26/12 237/24 248/8 269/24 271/19 272/2 272/3 277/8 279/4 279/15 283/23 286/9 286/11
**runs [1]** 156/22
**rush [1]** 235/18

**S**

**saccade [2]** 114/9 115/5
**saccadic [13]** 99/9 103/16 104/20 111/22 111/25 111/25 115/3 115/5 115/5 120/21 121/1 185/1 192/3
**safe [1]** 82/8
**safety [10]** 21/22 34/11 55/17 64/19 80/22 81/8 82/7 82/16 223/9 223/9
**Saint [1]** 222/20
**Saint Mary's [1]** 222/20
**sake [5]** 14/2 14/7 48/12 148/17 244/24
**salary [3]** 54/21 56/10 56/11
**Salopek [3]** 2/9 287/23 287/24
**Salt [1]** 102/8
**Salvato [10]** 141/7 141/19 150/14 150/19 150/21 150/23 162/2 162/2 162/25 163/4
**Samples [3]** 171/13 199/6 199/12
**sanction [1]** 41/2
**sat [4]** 39/12 39/13 39/14 109/5
**satisfied [1]** 142/1
**satisfies [1]** 130/15
**satisfy [1]** 129/10
**Saturday [1]** 63/16
**save [2]** 28/16 30/5
**saw [23]** 21/24 50/20 79/21 80/12 80/14 80/17 92/2 109/16 110/2 110/3 111/15 113/13 114/11 169/19 187/7 192/4 201/21 224/14 245/21 246/25 247/12 247/18 248/22
**sawed [1]** 112/11
**sawed-off [1]** 112/11
**scared [1]** 54/12
**Scarola [19]** 2/2 2/3 3/16 24/3 29/21 30/11 47/2 51/15 62/11 153/8 158/21 197/23 204/23 217/18 257/22 257/25 266/25 267/7 277/13
**Scarola's [1]** 145/11
**scary [1]** 182/23
**scenario [3]** 64/2 65/1 65/3
**scenarios [1]** 204/10

**scene [17]** 74/18 89/10 106/6 106/9 112/10 113/10 116/21 118/12 118/14 132/2 142/19 155/21 155/24 170/6 214/23 216/18 265/12
**scenes [1]** 264/20
**schedule [1]** 278/8
**scheduled [1]** 6/15
**scheduling [1]** 10/5
**scholarly [1]** 108/17
**school [9]** 40/16 53/10 55/24 64/7 100/13 274/3 274/4 274/5 274/6
**science [6]** 70/2 74/23 106/1 106/1 106/10 114/20
**sciences [1]** 38/14
**scientific [2]** 180/3 210/18
**scientifically [1]** 67/6
**scientist [1]** 39/20
**scientists [1]** 40/2
**scope [7]** 4/14 5/6 7/2 12/10 193/7 193/10 236/23
**screamed [1]** 36/19
**screen [1]** 74/17
**se [1]** 183/20
**seal [2]** 112/2 113/16
**search [2]** 163/22 224/21
**searches [1]** 163/24
**Searcy [1]** 2/3
**Seattle [1]** 102/8
**second [20]** 17/1 56/11 63/7 68/3 68/9 107/14 107/14 112/5 127/14 138/17 139/9 148/8 172/24 173/9 176/8 194/3 213/24 218/9 240/22 242/4
**seconds [13]** 67/5 67/8 69/24 70/1 70/4 70/9 70/11 70/24 70/24 178/7 194/4 257/15 258/5
**Section [2]** 96/18 141/11
**Section 1983 [1]** 141/11
**Section I.E.1 [1]** 96/18
**security [7]** 21/22 57/19 82/11 97/17 110/7 110/11 237/15
**seed [1]** 281/22
**seek [2]** 81/2 269/3
**seeking [3]** 11/19 11/21 18/14
**sees [6]** 63/17 76/3 110/1 115/4 237/17 237/18
**seized [1]** 223/12
**selected [2]** 55/16 56/2
**selection [1]** 201/7
**self [6]** 117/17 130/24 131/24 133/4 196/7 196/10
**self-defense [6]** 117/17 130/24 131/24 133/4 196/7 196/10
**Seltzer [1]** 1/14
**semblance [1]** 133/9
**send [1]** 55/4
**sense [19]** 4/11 6/3 77/5 94/5 136/10 136/11 136/21 153/10 158/19 158/21 158/24 160/6 165/13 182/22 185/23 203/21 220/14 277/10 279/12
**sensitive [1]** 222/1
**separated [1]** 261/1
**September [7]** 69/15 78/3 83/8 86/7 132/25 207/12 241/10
**September 11 [1]** 86/7
**September 13 [3]** 78/3 83/8 132/25
**September 13th [1]** 207/12
**sequence [1]** 4/7
**Sergeant [8]** 21/21 47/6 89/8 89/13 118/11 120/4 121/7 217/19

**Sergeant Lin [6]** 21/21 47/6 89/8 89/13 120/4 217/19
**Sergeant Lin's [2]** 118/11 121/7
**series [1]** 32/6
**serious [3]** 44/9 96/16 219/15
**seriousness [3]** 25/8 233/16 233/17
**serve [1]** 230/21
**served [7]** 54/8 55/24 56/4 56/16 56/23 60/20 245/15
**serves [1]** 228/22
**service [3]** 234/13 234/14 234/15
**services [1]** 263/7
**serving [1]** 240/5
**Seth [1]** 131/17
**setting [3]** 75/10 144/19 162/7
**settled [1]** 10/19
**seven [6]** 24/14 24/17 33/13 131/10 262/22 269/8
**Seventeen [1]** 24/7
**Seventh [1]** 213/12
**severance [1]** 153/5
**severity [3]** 64/18 64/22 234/12
**shaky [1]** 169/22
**Shannon [2]** 126/19 276/9
**share [2]** 124/5 124/20
**sharing [1]** 87/17
**shear [2]** 218/6 218/24
**shears [2]** 132/18 132/20
**shed [1]** 170/11
**Shehada [1]** 164/18
**Shehada vs. Tavss [1]** 164/18
**shells [1]** 86/15
**sheriff [51]** 3/9 11/24 13/10 20/2 20/6 84/3 88/5 89/9 102/10 102/15 130/23 131/2 131/21 131/25 132/9 132/11 133/7 133/10 136/7 136/8 136/11 137/12 138/4 141/11 142/7 142/12 190/25 224/11 224/12 224/13 224/17 240/6 242/12 242/16 242/16 247/6 248/17 248/21 249/2 249/9 249/13 251/24 251/25 259/16 259/21 260/11 261/19 263/7 263/11 265/25 266/3
**Sheriff Bradshaw [1]** 89/9
**Sheriff Lin [17]** 11/24 20/2 142/7 142/12 190/25 224/17 242/12 242/16 242/16 248/17 251/24 259/16 261/19 263/7 263/11 265/25 266/3
**Sheriff Lin's [12]** 13/10 20/6 138/4 224/11 224/12 224/13 248/21 249/2 249/13 251/25 259/21 260/11
**sheriff's [38]** 19/17 62/19 82/24 90/11 92/3 93/2 93/8 93/24 96/18 102/11 119/10 131/22 131/23 132/3 132/7 133/19 133/21 133/21 133/22 133/23 134/6 137/23 138/3 138/13 143/7 153/17 153/24 153/25 154/2 154/5 154/13 157/9 158/23 159/19 242/19 243/15 244/11 266/15
**sheriffs [3]** 133/11 134/5 137/14
**sheriffs' [3]** 57/20 102/13 137/7
**shift [6]** 111/25 112/4 112/8 112/12 112/24 121/12
**shifted [2]** 21/25 121/8
**shifts [2]** 102/16 122/11
**shiny [2]** 15/14 178/5
**ship [3]** 53/11 53/19 54/9
**Shipley [1]** 2/3
**shirt [4]** 248/25 255/17 256/21 260/3
**shock [1]** 54/4

**S**

**shoot [15]** 12/21 13/15 63/25 64/10 67/8 69/23 70/4 70/24 72/3 79/2 100/20 110/24 111/10 189/15 246/15
**shooter [1]** 100/19
**shooting [41]** 16/22 19/20 19/21 37/15 65/20 67/11 68/6 69/15 83/17 83/23 84/8 84/13 99/19 106/6 106/9 110/17 110/19 116/21 130/25 132/11 133/1 134/13 135/8 135/12 135/13 136/18 143/8 156/17 157/17 161/1 161/3 163/15 164/13 164/15 167/13 189/18 203/18 203/23 213/11 263/10 276/21
**shootings [7]** 37/17 37/19 83/18 107/23 158/14 161/21 161/25
**short [6]** 97/8 97/12 97/19 101/21 124/7 156/5
**shorts [4]** 132/16 213/25 216/22 248/25
**shot [30]** 13/22 13/24 37/14 44/23 45/2 45/7 45/10 47/5 65/24 74/12 74/18 86/2 119/1 119/1 131/20 132/3 132/16 132/23 132/23 142/15 152/12 166/24 166/25 208/25 213/9 224/15 224/18 246/14 247/19 258/5
**shotgun [5]** 61/16 86/14 86/15 87/2 112/11
**shots [2]** 119/4 131/1
**shoulder [1]** 68/17
**shouting [1]** 18/20
**shown [4]** 111/17 212/20 258/8 283/10
**Shreveport [1]** 110/17
**shut [1]** 108/4
**sic [14]** 24/13 78/7 78/8 140/6 146/5 148/14 163/17 164/16 187/19 188/3 189/19 210/11 238/18 243/12
**side [34]** 20/20 25/2 39/18 39/19 53/15 73/22 107/7 169/2 173/21 185/15 192/1 196/19 198/14 200/25 201/9 201/13 206/22 206/22 210/5 214/8 216/6 222/2 226/23 230/24 246/13 246/20 247/23 255/22 269/2 269/3 285/18 285/21 285/21 285/23
**side's [2]** 167/15 167/24
**sides [7]** 166/10 166/20 176/19 200/23 203/16 212/16 222/6
**siege [1]** 37/9
**sight [2]** 191/5 191/8
**sign [2]** 63/18 64/22
**signed [2]** 9/8 30/15
**significance [2]** 22/12 140/16
**signs [1]** 151/17
**silent [1]** 85/1
**Simmons [1]** 3/11
**simple [6]** 15/6 66/25 73/7 73/8 73/11 82/8
**simplicity [1]** 3/11
**simultaneously [1]** 123/1
**sincerely [1]** 165/13
**sincerity [1]** 160/7
**single [2]** 141/11 161/23
**siren [1]** 16/10
**sirens [1]** 18/19
**Sistrunk [1]** 182/25
**situation [24]** 16/25 27/8 44/12 46/19 62/6 67/24 78/24 79/2 87/14 112/18 113/1 113/15 144/4 168/17 172/5 182/23 189/7 194/22 195/6 195/8

195/11 216/24 261/4 281/10
**situations [7]** 71/4 71/17 75/2 83/17 88/9 107/2 159/22
**size [2]** 55/22 56/14
**skip [2]** 7/9 148/8
**skipped [3]** 149/4 149/5 240/25
**skipping [2]** 139/20 140/2
**slide [4]** 107/4 107/6 107/7 107/13
**slightly [1]** 188/24
**slipped [1]** 92/13
**slowly [1]** 63/18
**small [11]** 90/20 107/16 132/21 132/23 224/6 224/7 224/16 226/2 226/5 226/9 226/10
**smashes [1]** 156/21
**smoke [1]** 211/21
**smoked [4]** 205/20 206/19 207/24 210/23
**smokes [1]** 206/17
**smoking [8]** 157/1 203/17 204/13 205/3 205/25 206/22 209/16 210/15
**snacks [1]** 124/4
**so-called [2]** 66/18 106/17
**So.2d [1]** 212/19
**social [5]** 38/14 39/20 40/2 87/17 227/8
**Sociology [1]** 39/1
**soldier [1]** 245/12
**solely [2]** 94/21 139/18
**solid [1]** 281/18
**solving [1]** 36/21
**somebody's [2]** 53/15 209/7
**someone's [3]** 73/22 114/5 225/15
**son's [1]** 130/22
**sophisticated [2]** 168/13 168/16
**sorts [1]** 283/9
**sought [1]** 85/9
**sound [1]** 25/4
**sour [1]** 146/25
**source [2]** 20/8 30/24
**south [6]** 37/6 37/10 39/8 53/12 53/24 54/5
**SOUTHERN [1]** 1/2
**spat [1]** 260/23
**specialist [1]** 102/9
**specific [16]** 12/17 40/10 44/6 96/10 138/22 186/2 186/25 190/22 200/13 200/23 201/8 207/10 212/4 229/24 247/5 269/2
**specifics [1]** 222/17
**speculate [1]** 207/21
**speculating [1]** 219/13
**speculation [6]** 209/20 218/6 219/14 219/15 219/18 252/25
**speculative [1]** 216/25
**sped [1]** 16/11
**speed [3]** 27/1 137/21 137/22
**spell [3]** 31/4 51/12 98/19
**spend [1]** 104/24
**spent [2]** 233/13 284/4
**splice [1]** 266/1
**split [5]** 17/1 68/3 68/9 176/8 194/3
**split-second [5]** 17/1 68/3 68/9 176/8 194/3
**Spokane [1]** 102/8
**spoke [2]** 84/9 94/16
**spoken [2]** 36/25 261/8
**spoliation [1]** 132/8
**spontaneous [3]** 70/19 71/2 71/19
**spot [2]** 214/12 219/5

**spouse [1]** 58/1
**spray [1]** 87/2
**spread [1]** 38/14
**square [1]** 158/11
**St. [3]** 101/11 101/13 221/9
**St. Augustine [1]** 101/13
**St. Mary's [1]** 221/9
**St. Petersburg [1]** 101/11
**stabbed [2]** 66/2 66/5
**Stachelek [1]** 151/19
**staffed [1]** 83/1
**stance [1]** 111/5
**stanches [1]** 216/18
**stand [4]** 62/25 82/9 185/11 204/19
**standard [52]** 46/14 49/3 49/7 49/10 49/13 50/18 50/19 72/9 72/14 72/16 72/17 81/8 90/9 90/24 91/4 91/5 91/11 91/12 91/14 91/17 92/5 92/8 93/2 93/4 93/5 93/13 93/18 94/1 94/18 94/21 94/22 95/2 95/3 96/21 103/8 103/11 118/8 119/17 119/19 129/10 158/7 162/21 170/4 175/15 180/3 180/4 194/13 194/14 194/16 194/16 281/23 282/25
**standards [45]** 39/4 40/15 41/23 42/1 42/6 42/12 42/14 42/16 42/18 42/19 42/24 56/25 59/7 59/8 60/13 65/12 69/1 78/5 79/12 80/23 89/3 89/6 90/7 90/12 90/17 91/2 91/2 91/9 91/18 93/8 93/9 95/4 95/25 101/20 101/21 101/22 117/10 120/1 159/14 171/19 171/24 171/25 227/2 227/5 283/1
**standing [1]** 171/24
**stands [5]** 67/1 67/2 67/2 67/3 140/20
**stare [2]** 68/15 68/16
**starting [7]** 21/5 54/21 110/9 110/10 168/10 188/13 243/25
**starts [4]** 19/11 46/9 63/23 106/22
**state [43]** 3/13 31/3 32/12 37/1 43/16 51/12 53/23 56/1 56/21 57/22 60/16 71/25 72/5 91/25 98/18 101/14 101/16 102/5 102/14 102/23 116/22 144/21 155/20 156/8 156/9 204/9 205/18 212/7 212/19 213/2 214/2 214/17 214/22 215/13 219/9 219/12 220/14 226/24 229/9 281/23 282/15 283/4 283/5
**stated [8]** 138/5 146/20 162/13 165/9 169/17 222/24 251/13 252/15
**statement [30]** 49/10 72/14 85/5 85/6 89/10 117/11 143/12 149/9 157/18 164/11 164/12 194/22 229/14 247/6 262/16 264/25 265/2 265/3 265/4 265/5 265/8 265/10 265/10 265/11 265/16 266/3 266/5 266/17 266/18 266/23
**statements [13]** 85/8 134/3 155/22 156/2 166/13 190/22 263/10 263/16 263/19 263/24 264/12 264/15 267/2
**states [13]** 1/1 1/15 2/10 43/14 43/20 46/14 60/25 94/9 101/1 101/2 134/18 152/11 169/17
**station [1]** 247/19
**statistics [3]** 140/25 141/2 244/7
**status [3]** 38/11 223/15 261/3
**stay [10]** 10/25 23/3 62/16 227/13 234/3 239/16 240/8 241/17 245/9 271/8
**stayed [2]** 121/10 121/14
**steadfastly [1]** 137/6
**steel [1]** 66/24
**steering [1]** 109/5

**S**

**stenography [1]** 1/24
**step [10]** 15/2 42/17 62/25 82/15 82/15 82/18 82/18 147/25 178/3 270/10
**step-by-step [2]** 82/15 82/18
**STEPHENS [122]**
**Stephens vs. Bradshaw [3]** 98/3 127/7 235/23
**Stephens vs. Sheriff [1]** 3/9
**Stephens' [15]** 15/19 22/2 43/21 49/24 113/11 121/11 134/12 135/8 166/23 176/14 188/1 207/10 251/9 252/7 259/20
**stepped [3]** 74/3 74/3 152/3
**steps [1]** 65/14
**stereotyped [2]** 255/8 255/9
**stereotyping [1]** 252/2
**stick [1]** 185/16
**stipulation [6]** 7/15 7/16 7/17 8/18 9/8 9/9
**stop [45]** 63/18 63/18 63/19 64/22 73/21 103/5 111/18 123/11 131/8 151/17 151/21 155/25 174/18 177/24 187/8 248/1 248/3 248/5 248/12 249/18 249/24 249/25 250/11 250/13 250/14 251/1 251/2 251/14 251/18 253/3 253/13 254/11 254/13 254/23 256/1 256/7 256/15 256/18 256/25 257/11 257/11 257/16 257/23 258/16 259/8
**stopped [17]** 36/18 131/6 131/18 195/12 228/7 248/18 249/17 249/20 249/23 251/10 252/19 252/22 253/15 253/17 253/18 253/23 255/2
**stopping [3]** 216/6 249/9 252/16
**stops [3]** 35/3 35/8 122/24
**store [2]** 110/25 192/24
**story [2]** 111/14 266/8
**straight [3]** 10/2 152/3 225/19
**Straight-up [1]** 10/2
**street [6]** 65/22 79/9 97/14 123/3 125/6 182/11
**strength [2]** 210/25 211/13
**stress [16]** 75/5 75/8 75/9 105/11 106/16 107/10 107/15 108/13 114/23 124/2 182/20 260/11 260/19 261/14 262/4 262/5
**stressed [1]** 165/4
**stressful [1]** 75/2
**stressors [1]** 260/8
**stretch [1]** 40/18
**stretching [1]** 37/23
**stricter [2]** 91/2 91/4
**strictly [1]** 209/20
**strip [1]** 163/21
**strong [1]** 67/25
**struck [1]** 131/11
**structure [1]** 282/8
**struggle [3]** 155/9 157/5 180/1
**struggled [1]** 159/24
**student [1]** 75/16
**students [2]** 50/16 163/21
**students' [1]** 163/23
**studies [2]** 35/13 35/20
**study [7]** 34/20 34/22 34/25 35/4 35/7 35/15 42/3
**stuff [7]** 84/17 113/23 126/9 144/18 172/19 232/1 268/18
**styrofoam [1]** 113/19

**subject [12]** 81/1 81/1 81/5 109/2 110/6 114/16 114/19 164/20 212/21 232/10 232/12 281/19
**subjected [2]** 93/13 163/21
**subjective [2]** 48/2 72/19
**subjectively [1]** 76/2
**subjects [2]** 103/1 185/9
**submission [2]** 104/9 267/12
**submissions [2]** 205/8 223/3
**submit [14]** 9/3 23/23 26/12 149/12 169/19 170/13 185/13 196/17 197/14 198/12 271/24 277/20 283/22 286/7
**subordinates' [1]** 164/7
**subsequent [8]** 135/11 136/19 143/2 154/4 161/4 162/1 164/12 184/8
**substance [6]** 207/1 207/6 208/7 208/9 266/23 283/24
**substantial [4]** 12/3 132/9 133/15 136/23
**substantially [2]** 133/25 141/1
**substantive [2]** 175/13 273/24
**successful [1]** 36/4
**succinct [2]** 11/22 198/13
**suddenly [2]** 108/3 195/7
**sufficiency [1]** 148/4
**sufficient [12]** 7/2 60/2 128/13 132/12 140/8 141/17 148/20 148/24 149/24 150/25 162/6 162/23
**sufficiently [1]** 202/15
**suggest [22]** 13/14 19/15 92/11 139/2 155/6 162/3 162/20 164/1 170/9 192/18 195/18 234/7 240/10 245/20 249/6 253/2 253/4 253/14 255/1 264/21 264/22 266/7
**suggested [4]** 141/25 154/18 214/16 215/10
**suggesting [7]** 81/10 132/9 194/14 196/11 230/10 245/22 277/14
**suggestion [9]** 185/4 185/6 190/21 198/6 207/7 231/13 240/23 264/9 271/22
**suggestive [1]** 217/14
**suggests [2]** 153/16 171/22
**suing [1]** 163/22
**Suite [1]** 2/8
**sum [1]** 165/9
**summarize [2]** 11/22 38/6
**summarizing [1]** 9/3
**summary [21]** 23/15 23/16 23/18 26/12 26/19 26/25 127/22 128/2 134/14 134/21 144/16 144/16 146/17 148/2 148/14 150/3 151/5 158/12 165/12 165/18 276/21
**Summer [2]** 2/6 3/21
**summertime [1]** 68/19
**sunlight [1]** 108/2
**sunny [1]** 63/17
**Sunrise [1]** 2/7
**sunshine [1]** 144/21
**super [1]** 14/23
**superficial [2]** 139/2 139/16
**superior [3]** 165/2 165/8 166/5
**superseding [9]** 14/3 14/11 14/24 17/10 17/13 17/13 22/4 25/25 26/17
**supervision [2]** 55/3 88/1
**supervisory [1]** 95/12
**supplement [1]** 177/13
**supplemental [2]** 43/2 52/19
**support [11]** 61/6 129/23 134/8 141/6

148/21 164/13 164/20 196/20 206/9 206/11 252/13
**supported [2]** 136/21 138/1
**suppression [2]** 75/1 105/10
**Supreme [9]** 25/24 26/21 90/24 152/12 164/4 165/3 165/4 169/17 204/4
**surgery [1]** 50/24
**surgical [1]** 6/15
**surprise [1]** 185/18
**surrounding [1]** 13/2
**survive [1]** 23/20
**suspect [3]** 20/7 168/17 177/24
**suspect's [1]** 178/12
**suspected [3]** 215/12 217/21 252/22
**suspicion [2]** 131/7 252/9
**sweating [1]** 68/18
**swinging [1]** 111/6
**switch [1]** 243/18
**switched [1]** 188/20
**sworn [8]** 29/2 38/23 39/6 51/9 98/16 102/11 273/20 274/1
**sympathize [1]** 179/25
**syndrome [5]** 106/17 130/21 151/14 151/23 157/18
**system [5]** 54/4 82/25 138/13 140/22 158/5

**T**

**T's [1]** 5/4
**T-U-C-K-E-R [1]** 51/14
**tab [1]** 166/1
**table [6]** 112/3 113/16 114/1 114/8 123/8 222/21
**tactical [9]** 61/14 85/16 85/19 85/21 85/21 86/14 234/9 242/18 274/1
**tactics [3]** 38/8 39/18 182/2
**tail [1]** 281/12
**take [58]**
**taken [17]** 23/22 24/10 95/17 97/24 105/19 110/15 126/23 129/8 130/22 149/9 156/2 158/10 160/24 178/11 179/13 221/20 235/15
**takes [1]** 67/5 70/24 71/10 100/17 156/22 157/1
**Taliban [1]** 245/21
**talk [46]** 19/18 54/12 54/14 54/15 59/6 60/12 61/24 62/2 62/20 65/19 67/19 69/23 70/16 75/5 119/23 119/24 122/20 125/17 136/24 147/18 156/25 163/18 163/20 166/7 170/12 171/12 173/19 174/10 175/14 181/5 183/13 187/23 193/12 197/6 205/13 205/25 208/7 208/8 211/11 218/17 235/10 265/25 266/6 280/8 280/23 283/20
**talked [12]** 4/19 4/22 42/12 58/24 77/1 82/5 118/9 171/15 215/8 217/20 252/11 261/8
**talking [34]** 15/18 24/24 24/24 57/4 63/3 70/6 72/12 73/9 79/3 83/19 87/13 88/8 90/19 113/15 156/25 159/2 171/18 182/8 189/10 192/7 209/4 209/6 216/25 240/2 241/20 241/24 242/9 259/10 261/12 263/20 264/24 270/16 271/5 271/6
**talks [7]** 46/5 164/1 174/17 187/3 187/6 204/4 205/16
**tall [1]** 191/19
**Tallahassee [3]** 56/20 56/22 68/5
**Tampa [1]** 54/2

**T**

**tantamount** [1] 163/25
**Tap** [1] 31/6
**tape** [1] 83/24
**tardiness** [1] 148/22
**targeted** [2] 255/2 255/23
**targeting** [1] 259/10
**tase** [1] 189/7
**tased** [2] 131/10 157/5
**taser** [31] 21/24 43/25 44/8 44/21
44/24 44/25 45/2 45/3 45/8 45/13 45/15
45/23 47/3 47/4 47/5 47/6 47/15 48/16
48/19 50/5 61/15 87/2 168/14 168/15
168/19 188/3 188/6 188/14 188/16
188/17 194/7
**tasers** [1] 86/14
**tasing** [1] 157/6
**task** [3] 36/9 155/7 159/7
**tat** [1] 104/17
**taught** [30] 39/14 57/6 62/13 63/12
65/8 66/17 67/9 68/24 75/13 80/25
81/14 82/18 92/15 92/18 92/24 100/20
101/14 101/15 102/4 103/20 103/22
103/22 103/23 103/23 106/14 108/7
109/2 112/25 115/2 115/4
**Tavss** [1] 164/18
**teach** [4] 39/17 75/10 92/21 107/19
**teaching** [2] 110/5 110/21
**team** [3] 33/9 35/15 153/11
**technically** [1] 3/10
**techniques** [3] 107/1 107/3 108/9
**technology** [1] 241/9
**telephone** [1] 97/8
**tell** [33] 24/22 34/24 59/15 64/14 67/20
68/16 76/23 76/25 77/1 82/10 86/13
91/18 100/8 113/18 143/23 148/19
148/20 152/21 171/23 172/10 174/21
176/17 182/25 185/7 196/16 215/5
230/5 234/14 236/1 237/19 278/7
278/25 279/9
**telling** [8] 55/21 80/6 84/14 118/19
118/19 121/20 224/21 236/7
**tells** [1] 219/2
**tempted** [1] 5/17
**Ten a.m** [1] 280/3
**ten-year** [1] 140/24
**Tennessee** [11] 54/24 54/25 55/1 55/7
55/13 57/11 57/12 57/21 59/3 92/14
92/21
**Tennessee v. Garner** [2] 92/14 92/21
**Tennessee vs. Garner** [1] 59/3
**Tennessee's** [1] 55/16
**tennis** [4] 255/17 255/19 256/21 260/3
**tenth** [2] 107/14 112/5
**tenths** [1] 107/14
**term** [6] 36/5 106/11 120/23 174/16
230/2 260/9
**termed** [1] 106/11
**terminated** [1] 26/17
**terms** [61]
**terrain** [1] 3/25
**terrified** [1] 106/23
**terrorist** [2] 37/9 37/14
**test** [10] 64/13 76/1 76/4 79/17 120/8
120/10 170/9 201/17 219/19 251/3
**tested** [1] 67/6
**testified** [30] 36/8 58/4 58/9 58/10
58/11 58/21 70/22 74/8 74/20 78/23

81/23 81/25 90/15 102/24 102/25 103/1
103/2 115/16 115/20 116/7 120/21
120/24 121/3 123/10 189/13 205/2
219/10 244/6 260/8 272/24
**testifies** [1] 28/17
**testify** [22] 6/9 29/15 91/20 109/15
114/12 118/7 119/21 120/19 168/1
168/15 174/13 181/9 184/9 187/2 191/7
202/21 205/2 207/9 213/21 217/23
272/14 273/15
**testifying** [5] 117/9 120/18 272/21
273/6 273/8
**testimonial** [1] 115/11
**testimony** [102]
**testing** [1] 70/8
**Texas** [1] 102/7
**textbooks** [1] 108/19
**thank** [40] 10/24 11/18 20/22 27/5
27/19 29/6 30/2 43/7 43/9 47/9 50/10
50/24 50/25 51/2 90/2 97/2 97/3 122/6
123/19 123/20 126/15 126/16 127/20
143/13 160/21 191/10 196/24 207/20
226/19 234/20 235/11 235/12 284/2
285/2 285/5 285/8 285/14 285/15
286/15 286/16
**Thanks** [2] 69/5 276/9
**Thanksgiving** [1] 168/11
**THC** [1] 210/25
**theirs** [1] 33/23
**theories** [10] 12/17 21/4 21/9 21/15
22/9 23/13 24/1 24/17 163/7 238/1
**theory** [11] 19/5 24/6 25/1 25/1 147/14
152/20 162/12 164/14 172/9 195/24
233/20
**thermostat** [1] 114/2
**they'd** [2] 92/16 233/21
**think** [280]
**thinking** [10] 24/12 28/15 59/15 113/8
172/15 203/8 225/19 225/20 236/6
279/13
**thinks** [1] 225/22
**third-party** [1] 206/17
**thirds** [1] 107/22
**Thomas** [2] 163/20 163/20
**Thomas v. Roberts** [1] 163/20
**thorough** [3] 140/4 146/21 159/15
**thought** [24] 6/10 13/25 14/1 15/24
15/24 47/18 47/21 87/24 145/4 146/22
174/8 178/6 188/18 189/1 191/2 215/10
216/12 224/17 226/19 231/19 236/3
249/4 251/19 264/6
**thoughtful** [1] 285/3
**thousands** [1] 105/22
**threat** [70]
**threatened** [5] 43/23 44/14 49/25 50/5
188/2
**three-and-a-half** [4] 35/6 55/15 55/19
60/22
**three-hour** [1] 97/14
**three-quarters** [1] 107/22
**three-year** [1] 8/23
**threw** [1] 74/2
**throughs** [1] 266/14
**throw** [1] 132/21
**throwing** [1] 237/6
**throws** [2] 157/2 238/19
**THURSDAY** [22] 3/1 127/1 196/18
196/19 197/1 276/18 278/15 278/18
278/22 278/24 279/9 279/24 280/3

280/5 280/24 283/21 285/10 285/11
285/25 286/11 286/12 286/13
**Thursday's** [1] 285/24
**thus** [1] 118/18
**ticket** [2] 63/19 82/13
**tie** [6] 97/7 124/1 246/20 247/23 255/24
285/12
**tied** [2] 209/22 210/1
**ties** [4] 111/22 211/7 242/14 280/4
**tightening** [1] 183/14
**till** [1] 196/19
**time** [99]
**times** [24] 4/5 50/15 50/23 58/11 58/11
58/22 75/8 86/22 102/25 103/3 115/18
116/9 131/11 132/16 132/24 229/10
273/4 276/3 276/3 276/5 276/6 277/7
277/9 284/4
**timing** [2] 85/8 216/17
**tinker** [1] 42/22
**Tire** [1] 59/11
**tit** [1] 104/17
**titled** [2] 96/8 99/18
**today's** [4] 8/20 37/22 196/17 286/11
**tolerated** [1] 83/5
**tolerates** [1] 84/4
**Tony** [1] 222/7
**top** [2] 107/25 261/4
**topic** [2] 239/3 243/19
**topics** [9] 4/10 4/16 5/19 125/15
197/18 197/25 202/20 202/25 279/4
**torch** [2] 82/22 237/4
**tort** [2] 12/23 14/12
**torts** [1] 164/6
**torture** [1] 131/14
**totality** [19] 12/19 13/3 13/9 18/16 38/1
41/19 64/15 176/1 180/9 180/10 181/16
181/17 182/12 187/24 192/8 192/11
192/15 194/17 249/10
**touch** [3] 59/1 82/22 240/9
**touched** [2] 219/1 219/3
**toward** [3] 152/3 214/5 220/12
**towards** [1] 195/24
**town** [3] 6/21 56/10 276/11
**track** [3] 9/2 262/13 283/25
**traditional** [1] 169/21
**traffic** [16] 11/25 13/19 18/22 35/3 35/8
82/1 156/1 156/22 187/7 249/9 251/15
251/16 253/16 253/20 257/13 280/2
**trailing** [1] 58/1
**train** [2] 88/21 114/16
**trained** [30] 20/6 57/7 57/20 63/9 65/14
67/14 68/5 74/21 79/15 80/17 83/1
88/18 100/24 101/8 101/11 120/5
120/12 175/18 175/19 176/3 176/4
176/13 177/18 183/14 191/7 193/12
200/1 200/4 200/9 202/3
**trainer** [2] 74/20 75/21
**training** [59]
**trajectory** [1] 116/25
**transcript** [7] 1/13 1/24 206/2 206/2
206/3 286/14 287/20
**transcripts** [2] 271/25 277/4
**transition** [1] 45/15
**transitioning** [1] 115/7
**translate** [1] 38/15
**translating** [1] 198/3
**TRASH** [1] 87/25
**travelling** [1] 152/19
**traversed** [1] 112/18

**T**

**treated [4]** 36/16 255/2 255/3 255/24
**treating [2]** 36/16 36/17
**trees [1]** 123/3
**tremble [1]** 106/22
**trembling [1]** 107/11
**trend [1]** 36/23
**trial [35]** 4/15 4/21 5/3 5/3 9/25 12/11 12/13 21/5 24/12 24/16 25/20 58/18 58/19 58/21 58/23 58/23 125/17 148/1 148/9 148/12 185/18 194/4 197/3 204/13 205/20 206/2 213/21 235/10 240/17 243/19 267/21 268/8 276/11 280/25 282/3
**trials [1]** 158/19
**trier [5]** 60/4 60/10 66/11 181/1 181/2
**tries [2]** 63/1 215/23
**trigger [5]** 70/3 70/4 70/9 70/12 194/16
**tripping [1]** 138/12
**truck [4]** 131/18 132/1 132/4 132/6
**trucks [1]** 56/8
**true [18]** 16/11 68/13 71/21 75/11 75/23 75/24 77/12 78/1 85/15 85/16 85/20 87/11 119/3 171/10 209/2 216/21 252/18 266/13
**truth [5]** 71/3 118/19 118/19 139/4 158/18
**truthful [1]** 173/10
**truthfulness [4]** 228/11 228/12 232/6 233/10
**Tucker [40]** 9/14 28/17 51/7 51/9 51/14 51/24 52/9 52/19 53/3 62/8 69/13 72/24 88/17 90/5 96/7 104/20 106/1 115/1 120/4 170/12 170/21 172/1 173/20 173/21 174/10 174/16 176/18 177/9 177/9 177/17 183/9 183/11 185/3 186/13 187/23 193/11 198/9 249/5 284/19 287/5
**Tucker's [4]** 29/5 170/16 172/7 173/24
**Tuesday [3]** 196/18 276/17 278/9
**tunnel [8]** 75/1 75/8 105/10 106/20 108/10 114/23 120/25 182/20
**tunnels [1]** 108/11
**turning [1]** 195/9
**TV [2]** 65/18 71/19
**Twenty [1]** 27/11
**twice [6]** 11/13 29/1 55/21 70/12 172/17 172/18
**two o'clock [1]** 6/25
**two-hand [1]** 111/4
**two-man [1]** 55/1
**two-part [2]** 72/16 76/1
**two-tenths [1]** 107/14
**Two-thirds [1]** 107/22
**typically [5]** 71/3 105/20 106/23 112/4 147/5

**U**

**U.S. [3]** 90/24 112/2 213/17
**U.S. District [1]** 112/2
**U.S. Supreme [1]** 90/24
**U.S. v. Clemons [1]** 213/17
**uhm [15]** 22/20 39/20 58/3 77/10 89/8 99/9 151/11 187/13 187/14 202/6 245/11 250/9 261/2 271/15 272/9
**uhm-hum [1]** 90/9
**ulterior [1]** 251/19
**ultimate [8]** 9/5 20/14 176/7 184/10

189/19 196/2 199/7 251/22
**ultimately [22]** 10/21 72/8 73/15 82/8 82/14 88/3 99/25 109/15 146/25 147/17 154/25 155/6 157/6 157/11 171/10 180/2 180/24 193/22 193/23 225/9 264/20 270/22
**Um [2]** 170/3 279/7
**Um-hum [2]** 170/3 279/7
**un [1]** 46/3
**unappropriate [1]** 42/8
**unarmed [3]** 131/20 132/5 132/15
**unavailable [1]** 273/16
**unaware [1]** 244/10
**unchallenged [1]** 134/4
**uncomfortable [1]** 258/15
**unconscionable [1]** 131/13
**unconstitutional [8]** 132/13 135/17 135/19 135/20 136/9 136/15 158/23 194/23
**undergoing [2]** 261/14 262/4
**underlying [6]** 153/13 159/6 213/20 233/16 233/16 233/17
**undermine [1]** 223/13
**underneath [5]** 215/20 216/12 216/20 216/22 217/13
**understand [63]**
**understanding [14]** 39/2 39/4 39/6 49/3 60/5 63/1 78/10 115/13 150/3 150/12 150/14 150/16 183/17 229/7
**understands [1]** 266/16
**understood [4]** 47/13 47/21 188/10 216/13
**undertaking [1]** 199/22
**underwear [2]** 143/1 221/11
**undue [2]** 219/15 222/9
**unduly [1]** 21/6
**unfair [4]** 26/7 148/10 201/13 234/23
**unfairly [1]** 210/6
**unforeseeable [5]** 14/12 16/18 17/10 17/13 71/19
**unfortunately [5]** 67/17 85/23 85/24 126/20 129/12
**uniform [20]** 12/11 14/6 16/10 16/22 19/16 19/16 21/12 85/16 85/19 94/11 181/20 182/9 193/19 195/15 235/2 236/24 237/10 237/20 238/8 240/20
**uniforms [2]** 13/18 85/21
**unintentional [1]** 67/18
**uninterested [1]** 139/16
**union [2]** 264/2 264/19
**unit [1]** 242/18
**UNITED [7]** 1/1 1/15 2/10 94/9 101/1 152/11 169/17
**University [6]** 32/3 56/1 57/5 57/12 100/13 106/3
**unjustified [1]** 83/7 190/6 195/21
**unknown [2]** 207/22 207/23
**unless [4]** 122/24 224/3 227/24 252/12
**unlike [1]** 24/4
**unlikely [1]** 173/10 187/9
**unorthodox [1]** 4/20
**unprovoked [1]** 131/8
**unquote [3]** 131/14 132/17 162/11
**unreasonable [16]** 46/4 46/12 59/21 118/23 154/17 189/19 190/5 191/5 194/6 194/7 194/9 194/11 237/14 238/17 242/24 267/1
**unreasonableness [1]** 243/7
**unreasonably [1]** 61/23

**unsupported [2]** 136/10 154/6
**updated [1]** 83/13
**upfront [1]** 281/7
**us [28]** 5/5 5/13 6/19 32/1 33/12 33/13 37/17 43/18 90/25 91/18 100/8 104/4 105/7 113/18 124/23 125/5 147/20 153/23 154/17 172/11 210/25 219/2 230/5 273/23 277/8 278/22 279/25 285/21
**usage [1]** 207/15
**use-of-deadly-force [3]** 32/21 34/22 42/4
**use-of-force [25]** 33/21 33/21 37/7 39/13 39/24 44/5 57/22 58/3 58/15 68/7 78/4 90/10 101/10 111/21 116/8 117/3 119/9 119/10 119/13 120/22 138/11 153/18 153/21 154/12 284/5
**usefulness [1]** 169/23
**user [1]** 100/19
**utilized [2]** 137/24 161/12
**uttering [1]** 195/16

**V**

**v. [14]** 64/12 64/13 67/20 67/25 72/12 76/3 91/25 92/1 92/14 92/21 163/20 204/9 212/19 213/17
**vague [1]** 112/23
**validity [1]** 67/6
**Valle [1]** 278/11
**value [4]** 208/6 209/22 210/1 225/24
**values [1]** 158/17
**van [17]** 69/18 69/19 130/21 130/22 130/25 131/2 131/2 151/16 151/24 152/2 152/4 152/7 152/8 152/8 155/25 156/22 157/22
**vantage [2]** 109/23 110/15
**variations [1]** 4/20
**variety [1]** 32/17
**vary [2]** 90/17 91/18
**VCD [1]** 266/14
**vehicle [1]** 152/10
**vehicles [1]** 152/13
**vein [1]** 34/5
**Velazquez [1]** 141/3
**Vending [1]** 213/13
**venire [1]** 4/21
**verbal [1]** 163/14
**verdict [1]** 10/19
**version [7]** 77/12 77/25 84/12 90/21 203/6 218/7 218/9
**versions [3]** 15/5 133/7 218/7
**versus [4]** 118/9 238/9 240/2 265/1
**vest [2]** 61/14 85/19
**vests [2]** 85/22 86/14
**viable [4]** 237/25 238/1 275/4 275/4
**vial [11]** 213/24 214/1 214/2 214/10 214/22 215/12 215/19 217/13 218/17 219/4 222/15
**vials [2]** 216/25 217/3
**vicarious [1]** 7/22
**vice [3]** 56/24 60/21 102/2
**Victoria [1]** 152/4
**video [48]** 23/24 73/18 74/14 74/16 80/13 83/25 109/10 111/2 111/12 111/24 115/4 115/10 115/13 118/14 119/4 119/8 122/13 131/1 131/7 152/2 155/25 156/21 157/12 173/9 187/9 191/8 192/4 217/10 225/5 248/14 248/20 251/17 257/13 261/18 261/18

# V

**video... [13]** 261/19 265/6 265/23 266/21 266/22 267/4 270/22 271/5 273/4 273/4 273/5 273/12 274/21
**videos [3]** 110/7 110/7 110/8
**videotape [5]** 83/22 119/2 238/5 238/7 277/4
**videotaped [2]** 270/19 270/20
**videotapes [1]** 110/13
**view [11]** 13/9 20/2 32/11 79/18 119/4 120/1 121/19 121/22 135/15 236/23 265/14
**viewed [4]** 119/8 139/20 139/21 245/19
**viewing [1]** 118/14
**vigorous [3]** 169/18 203/15 236/20
**Village [1]** 213/5
**violated [3]** 78/3 95/21 95/25
**violates [2]** 93/12 93/17
**violation [20]** 13/19 79/12 93/19 95/11 95/16 128/14 135/24 137/12 141/12 141/15 141/22 149/19 149/22 149/25 150/1 151/1 162/24 220/18 221/23 252/15
**violations [9]** 40/23 41/2 129/8 129/24 136/8 138/7 138/10 141/19 162/19
**violence [2]** 19/2 19/4
**violent [2]** 155/19 266/14
**Virginia [1]** 54/10
**virtually [3]** 57/7 58/15 168/10
**virtue [3]** 23/6 233/5 262/20
**visible [1]** 273/5
**vision [16]** 75/1 75/9 99/19 105/10 106/16 106/20 107/19 107/20 107/25 108/1 108/11 114/5 114/23 121/1 121/16 182/20
**visual [2]** 107/21 109/23
**visually [1]** 112/14
**voice [1]** 36/18
**volume [2]** 270/16 279/12
**volumes [1]** 272/10
**voluntarily [1]** 266/18
**voluntary [1]** 264/25
**vomits [1]** 156/23
**vote [2]** 97/6 123/25
**vs. [23]** 3/9 26/15 49/6 59/2 59/3 66/23 94/9 96/21 98/3 116/12 119/17 119/19 120/2 127/7 138/18 164/18 178/19 178/20 212/7 212/23 213/5 213/12 235/23
**vs. Bradshaw [1]** 178/20
**vs. City [1]** 138/18

# W

**waistband [1]** 214/6
**wait [5]** 35/3 46/14 47/24 66/24 185/10
**waited [1]** 23/17
**waived [1]** 270/5
**Wales [2]** 37/6 37/10
**walk [3]** 263/10 263/12 266/3 266/10 266/14
**walk-through [4]** 263/10 263/12 266/3 266/10
**walk-throughs [1]** 266/14
**walked [4]** 13/22 56/6 71/24 166/24
**walking [2]** 65/22 110/24
**wall [3]** 113/25 114/4 156/23
**wallet [2]** 64/25 79/10
**war [4]** 239/7 239/10 246/7 246/8

**warning [1]** 63/19
**warranted [1]** 223/10
**Washington, [2]** 94/17 102/6
**Washington, D.C [2]** 94/17 102/6
**watched [2]** 73/18 78/19
**watching [2]** 122/14 122/22
**water [1]** 26/4
**watered [1]** 90/21
**watered-down [1]** 90/21
**wayside [1]** 279/14
**weapon [11]** 43/25 44/8 45/12 63/25 108/11 132/1 132/5 132/6 168/16 168/24 184/11
**weaponry [1]** 168/13
**weapons [3]** 85/14 86/3 152/14
**wear [2]** 13/17 85/21 193/18
**wearing [10]** 61/13 75/17 85/15 195/15 236/4 238/7 238/11 238/13 239/22 239/24
**Weaver [1]** 111/5
**weaving [1]** 151/18
**Wednesday [2]** 276/17 278/10
**week [12]** 5/2 5/4 105/21 196/18 202/17 271/15 276/7 276/11 276/12 276/13 276/15 277/1
**week-long [1]** 105/21
**weekend [1]** 21/5
**weeks [3]** 21/5 104/12 148/1
**weigh [1]** 208/6
**weight [5]** 24/2 141/20 169/25 205/16 263/23
**welcome [2]** 3/6 98/2
**well-established [3]** 78/4 80/22 81/7
**well-trained [1]** 200/9
**West [3]** 2/5 53/20 101/14
**wet [1]** 107/2
**whatsoever [3]** 25/2 110/20 153/24
**wheel [1]** 109/6
**Whereas [2]** 107/12 186/1
**white [3]** 63/21 65/4 78/25
**whitewashing [1]** 262/19
**who's [4]** 102/18 106/3 112/10 237/15
**Whoa [1]** 237/17
**Whren [4]** 94/9 94/16 253/2 257/20
**Whren vs. the [1]** 94/9
**wide [2]** 212/16 236/19
**widely [1]** 109/1
**wife [4]** 57/10 57/24 260/14 262/15
**willful [3]** 161/24 162/21 162/24
**willfully [1]** 136/15
**willing [1]** 276/25
**wind [1]** 10/21
**windmills [1]** 143/25
**winds [1]** 116/25
**winter [1]** 277/19
**wise [1]** 174/8
**wish [5]** 25/18 29/22 51/16 73/6 111/19
**wishes [1]** 285/21
**Withdraw [1]** 8/10
**withdrawn [1]** 284/15
**withheld [1]** 231/22
**witness [36]** 4/10 29/2 51/1 51/9 59/16 73/7 84/1 97/4 98/16 102/22 117/25 123/21 123/24 138/1 154/10 168/11 169/3 177/1 177/12 179/22 191/7 200/19 205/1 205/2 206/17 206/21 212/20 228/1 230/24 232/11 240/3 245/25 273/16 285/11 287/2 287/8
**witness's [5]** 51/16 212/21 213/14

213/18 232/5
**witnesses [19]** 60/2 92/3 109/17 125/15 132/21 154/11 168/1 168/5 168/7 175/9 180/18 184/9 197/19 197/24 202/20 203/4 207/9 282/20 287/1
**witnessing [1]** 102/22
**woman [8]** 26/17 63/21 64/1 64/21 78/25 112/21 113/22 249/6
**wondering [1]** 272/16
**word [1]** 115/2
**worded [2]** 30/7 199/12
**wording [2]** 8/1 30/6
**words [7]** 112/5 174/9 195/16 201/20 232/5 255/22 260/17
**work [34]** 32/6 32/11 32/15 33/14 35/17 36/6 36/25 37/1 37/2 37/4 37/6 41/22 41/24 41/24 42/13 42/21 44/6 45/4 45/6 45/13 45/16 47/4 57/3 59/16 83/17 101/7 101/17 102/13 102/17 102/20 102/23 110/8 161/12 277/11
**workable [1]** 50/21
**worked [10]** 7/25 32/12 34/12 41/8 45/3 45/5 103/3 105/15 114/8 147/4
**working [6]** 5/13 34/11 34/22 65/11 110/12 245/7
**works [7]** 101/19 114/5 114/15 125/10 125/25 243/17 279/19
**world [4]** 35/23 37/22 39/21 59/17
**worry [1]** 11/6
**worrying [1]** 276/20
**worth [1]** 99/22
**wound [2]** 10/18 163/22
**wrap [1]** 124/12
**wrestling [1]** 174/23
**wristwatch [1]** 123/7
**write [4]** 38/12 121/5 139/9 269/16
**writing [1]** 101/17
**written [11]** 31/19 33/19 38/13 41/11 50/16 60/12 103/19 108/18 190/21 271/25 277/4
**wrong [9]** 35/5 162/21 176/24 182/9 182/10 182/11 211/24 214/12 216/13
**wrote [6]** 32/17 50/19 83/17 91/10 96/11 283/6

# Y

**Yale [4]** 50/16 50/16 100/12 167/24
**yank [1]** 107/8
**yanking [1]** 107/12
**yard [6]** 73/22 122/14 123/3 132/17 225/15 255/7
**yelled [2]** 36/19 108/14
**yellow [1]** 277/5
**York [3]** 50/15 100/16 102/5
**you'd [4]** 41/4 54/16 61/12 111/4
**young [15]** 11/24 18/17 65/4 248/24 249/14 250/1 250/6 252/3 252/5 253/17 253/25 254/24 255/3 255/12 256/15

# Z

**zero [1]** 46/1
**zone [2]** 245/16 247/19